| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | WESTERN DISTRICT OF WASHINGTON AT SEATTLE |
| 3 | |

```
UNITED STATES OF AMERICA,        ) MJ20-390
                                 )
                Plaintiff,       ) SEATTLE, WASHINGTON
                                 )
      v.                         ) July 24, 2020 -
                                 ) 2:00 P.M.
KENNETH JOHN RHULE,              )
                                 )
                Defendant.       ) WEBEX INITIAL
                                 ) APPEARANCE HEARING
                                 )
```

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE BRIAN A. TSUCHIDA
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:      Marie M. Dalton
                        U.S. Attorney's Office
                        700 Stewart Street
                        Suite 5220
                        Seattle, WA  98101


For the Defendant:      Peter Offenbecher
                        Skellenger Bender
                        1301 5th Avenue
                        Suite 3401
                        Seattle, WA  98101

Proceedings stenographically reported and transcript produced with computer-aided technology

Nickoline Drury, RMR, CRR - Federal Court Reporter - (206)370-8508 - 700 Stewart Street, Suite 17205, Seattle, WA  98101

1          THE CLERK:  The United States District Court for the

2   Western District of Washington is in session.  The Honorable

3   Brian A. Tsuchida presiding.

4       The matter before the Court is an initial appearance in Cause

5   No. MJ20-390, United States of America v. Kenneth John Rhule.

6       We will take appearances, starting with the government,

7   followed by defense counsel, and then pretrial services.

8          MS. DALTON:  Good afternoon, Your Honor.  Marie Dalton

9   for the United States.

10         THE COURT:  Ms. Dalton, good afternoon.

11         MR. OFFENBECHER:  Peter Offenbecher appearing for

12  Kenneth Rhule.  Good afternoon, Your Honor.

13         THE COURT:  Mr. Offenbecher, good afternoon.

14         MS. BOLLE:  Good afternoon, Your Honor.  Lorraine Bolle

15  for pretrial services.

16         THE COURT:  And, Ms. Bolle, good afternoon.

17      Mr. Rhule, good afternoon.  Can you hear and see everything

18  so far?

19         THE DEFENDANT:  Yes, sir.

20         THE COURT:  If at any time you can't hear or something

21  happens in the video, please let us know so we can make

22  adjustments or go over things, okay?

23         THE DEFENDANT:  Okay, Your Honor.

24         THE COURT:  We are conducting this hearing by

25  audio-visual technology due to the COVID health crisis.  We

1    normally have these hearings in person, where everybody is in the

2    same courtroom.  Because this is sort of a deviation from the

3    normal rule, I just wanted to check with you and your lawyer

4    whether you have any objection going forward this way, if you

5    would approve going this way.

6        So, Mr. Offenbecher, any objection going forward by

7    audio-visual?

8             MR. OFFENBECHER:  No.  Under the circumstances, we have

9    no objection, Your Honor.

10            THE COURT:  Okay.

11       And, Mr. Rhule, are you okay with this?

12            THE DEFENDANT:  Yes, Your Honor.

13            THE COURT:  All right.  Also, you know, because this is

14   a public hearing, a criminal case, and normally if we had it in

15   the courthouse, people could wander into the courthouse and

16   wander into the courtroom and listen.  So we do try to make

17   available to the public the ability to call in so they can listen

18   to the hearing if they want to, and they're invited to do that.

19       Of course, the same rules apply, that these hearings cannot

20   be recorded, they cannot be rebroadcast.  And so if anyone else

21   is calling in and listening, you are welcome, but please do not

22   record, please do not rebroadcast.

23       So, Mr. Rhule, this is a criminal case that you're here on.

24   And I know you just came from Hawaii and you appeared there in

25   fact.  I understand Mr. Offenbecher is your retained counsel.

1        Mr. Offenbecher, is that correct?

2            MR. OFFENBECHER:  That's correct, Your Honor.

3            THE COURT:  All right.  So he's representing you here in

4    this federal district.

5        Mr. Rhule, you also know that in a criminal case you do have

6    the right to remain silent.  It means that you don't have to

7    answer questions of police officers about this case, this

8    criminal case.  If you begin to make a statement to a law

9    enforcement officer about the case, you can stop at any time.

10   And you can ask to have a lawyer be present before or during any

11   questioning.  So you understand all of those rights?

12           THE DEFENDANT:  Yes, Your Honor.

13           THE COURT:  And, Mr. Offenbecher, we also received, and

14   we will file, your written invocation of rights that Mr. Rhule

15   asserts:  not to be questioned, the right to remain silent, and

16   not to be questioned without or unless counsel is present.

17           MR. OFFENBECHER:  Thank you, Your Honor.

18           THE COURT:  So, Mr. Rhule, you probably, when you were

19   in Hawaii, were presented with the Complaint that was filed in

20   this district.

21       And, Mr. Offenbecher, have you received a copy of the

22   Complaint?

23           MR. OFFENBECHER:  I have received a copy.  Thank you,

24   Your Honor.

25           THE COURT:  All right.  So we will go over it again,

1    Mr. Rhule.

2        At this time, Ms. Dalton, if you would advise Mr. Rhule of

3    the general nature of the charge in the Complaint and the

4    possible penalties.

5            MS. DALTON:  Yes, Your Honor.

6        The defendant is charged in a one-count Complaint with

7    conspiracy to manufacture and distribute marijuana or manufacture

8    distillates.  The Complaint alleges beginning no later than

9    October 2014 and continuing and until at least on or about

10   March 2020, in this district, the defendant and others did

11   knowingly and intentionally conspire to manufacture and

12   distribute marijuana.

13       It alleges that the conduct of the defendants involved

14   1,000 kilograms or more of a mixture and substance containing a

15   detectable amount of marijuana, in violation of Title 21,

16   Section 841 and 846.

17       If found to have committed those violations, the defendant

18   faces a mandatory minimum of ten years in prison and up to life

19   imprisonment and up to a $10 million fine, at least five years of

20   supervised release, and a $100 special assessment.

21           THE COURT:  All right.  So, Mr. Rhule, that's the

22   allegation in the Complaint.  It's not the formal criminal

23   charge.  In federal court, you know that formal criminal charges

24   are brought in one of two ways:  normally through the grand jury

25   process, or, for some cases, people agree to be charged by

1    Information.  Neither formal charging document has been filed

2    yet.  So we will set a preliminary hearing.

3        And do we have a date for that?

4        THE CLERK:  Yes, Your Honor.  Preliminary hearing is

5    scheduled for Friday, August 7th, at 1 p.m., before Judge

6    Weinberg.

7        THE COURT:  All right.

8        And by the way, Ms. Rhule, you know that if the grand jury

9    does indict you before then, instead of having a preliminary

10   hearing, we will have a different hearing called an arraignment,

11   and charges will be formally presented to you, and we set a jury

12   trial date at that time, okay?

13       THE DEFENDANT:  Okay, Your Honor.

14       THE COURT:  Mr. Rhule, you know in a criminal case a

15   court -- and this is our case, so we have to make a decision

16   about your custody status.

17       And, Ms. Dalton, I did receive -- and Mr. Offenbecher -- I

18   did receive a U.S. Pretrial Services report prepared by our

19   pretrial office.

20       What is the government's position as to Mr. Rhule's custody

21   status?

22       MS. DALTON:  We are seeking to have Mr. Rhule detained.

23       THE COURT:  All right.  Why don't I hear from the

24   government?  And then Mr. Offenbecher can respond.

25       MS. DALTON:  For our detention presentation, we've

1    prepared just a very brief PowerPoint.  I will go ahead and share

2    my screen now so that you are able to view it.

3              THE COURT:  All right.

4              MS. DALTON:  Are you able to see the PowerPoint, Your

5    Honor?

6              THE COURT:  Yes.  Very fancy.  Very nice.

7              MS. DALTON:  I'm trying to overcome the technological

8    difficulties that we're all facing by not being in person,

9    so ...

10        In this particular case, law enforcement searched the

11   defendant's residence on March 10th, 2020.  They searched the

12   property where the defendant was living, and on that property,

13   they found a number of things.  They found a warehouse where the

14   defendant and his co-conspirators were distilling marijuana.

15   They found over 900 kilograms of bulk marijuana and other

16   marijuana products.  And inside the residence where the defendant

17   was living, they found a number of other items.  One, in his

18   bedroom, they found a computer that was open to the dark web.  It

19   was open to a website where they were selling cannabis products.

20   In addition, they found a number of ledgers scattered about the

21   house, writing down the names of customers and what they had

22   ordered; they found a number of packing envelopes, USPS mailers,

23   getting ready to ship those products to those customers; and they

24   found a variety of marijuana products themselves inside the

25   residence where Mr. Rhule was living.

1      Because of those items that were found and the investigation

2  in this case, we have filed the present charges, and the charges

3  that we have filed carry with them a ten-year mandatory minimum.

4  And because of that, in this case there is a presumption of

5  detention, which makes sense.  Ten years is a lot of time in

6  custody, and so it provides the defendant with a significant

7  motivation to flee.  But that's not the only reason why the

8  defendant wouldn't be motivated to flee in this case.

9      After the government searched the defendant's house, found

10  all of those marijuana products, on that particular day they also

11  arrested the defendant's wife, Olga Rhule.  Olga had overstayed

12  her visa in the United States.  She had come here initially from

13  Russia, and she came here on a fiancée visa and simply

14  overstayed.

15      After overstaying her visa, she met and married Mr. Rhule and

16  has been in this country without lawful status for more than two

17  decades, I believe.  Because they found her with no lawful

18  status, law enforcement agents arrested Mrs. Rhule and they

19  brought her into immigration custody.  She is currently at the

20  Northwest Detention Center where she's facing deportation

21  proceedings.

22      While at the Northwest Detention Center, Mr. Rhule and his

23  wife have had recorded phone conversations, and during one of

24  those conversations, which took place on May 10th, roughly two

25  months after law enforcement found all of those items inside

1   Mr. Rhule's house, we heard Mr. Rhule and his wife discussing how

2   he was going to apply for a passport in order to move to Russia

3   to be with her.

4       I want to play just a segment of that particular call for

5   Your Honor.  Because I understand the audio might be a little

6   difficult to hear, I've also prepared a rough transcript that I

7   will put on the screen as well.

8       (Audio recording played and transcribed as follows:)

9           OLGA:  First of all, let me ask you this:  I'm

10      not getting out any time soon, right?

11          THE DEFENDANT:  I don't think so.

12          OLGA:  How much time, approximately?

13          THE DEFENDANT:  I don't know if there is a time

14      limit that you're going to get out.  I think we might

15      have to have you go back to Russia and me meet you

16      there.

17          OLGA:  Well, if that happens, how much time?

18          THE DEFENDANT:  He couldn't answer that question

19      because of COVID.  But it sounds like your hearing is

20      on the 28th.

21          OLGA:  29th.

22          THE DEFENDANT:  Twenty -- 29th?  I thought it

23      was the 28th.

24      So you can basically --  At the hearing, you're

25      going to -- you're going -- you're going to basically

1      say you're not going to challenge it anymore and that,

2      you know, you want to just proceed with deportation

3      and --

4          OLGA:  Can it not happen sooner?

5          THE DEFENDANT:  He said he doesn't think so, but

6      I'll push that issue more.  I'll see if he can --

7      He'll have to do another one of these, you know,

8      requests to move the hearing up kind of thing, and

9      they will have to grant it or not.

10         OLGA:  Can we try?

11         THE DEFENDANT:  Yes, I can try.  Of course.  But

12     here's the thing.  Even with that, it's going to take

13     me about that long to get my passport and visa and

14     stuff like that situated.  So I'm working on that now.

15     I will try to get that expedited.

16         OLGA:  Okay.

17         THE DEFENDANT:  So I was going to go down this

18     afternoon and get my pictures real quick so I can mail

19     off the passport document, you know, and I would do

20     it, instead of normal, I'm going to do it urgent, in

21     the urgent time frame, and pay the extra money.

22         OLGA:  Okay.

23         THE DEFENDANT:  And then I've got to apply for the

24     visa, so that -- you know, the visa over there.

25     There's some other -- there's some other things I'm

1    working on too, but I can't talk to you about them.

2         OLGA:  I understand.

3         THE DEFENDANT:  You know what I'm talking about,

4    right?

5         OLGA:  I think I have an idea.

6         THE DEFENDANT:  It's what -- it's what you think.

7         OLGA:  Okay.

8         THE DEFENDANT:  So I'm working on all that stuff

9    right now, okay?

10        OLGA:  Okay.

11        THE DEFENDANT:  And, um, yeah.  I mean, I'll be

12   with you no matter what.

13        OLGA:  Promise?

14        THE DEFENDANT:  Yes.  Of course I promise.  Of

15   course I promise.

16                   (End of audio recording.)

17        MS. DALTON:  In that phone conversation, as you've

18   heard, the defendant talked about applying for a passport and

19   expediting that passport so that he could leave with his wife to

20   Russia and meet her there after she had been deported.

21        We did check with USCIS, and there is a passport that is

22   presently pending that the defendant has applied for.  He hasn't

23   received it yet, but it is pending.  So he has taken an action to

24   further that plan of moving with his wife to Russia.

25        In this particular case, I reached out to the immigration

1   attorney who is handling Mrs. Rhule's case and asked some

2   questions about whether or not she would be allowed to return to

3   the United States.  And it's my understanding that if she were

4   deported to Russia -- she has a hearing early next month -- if

5   she was deported to Russia, that she would not be permitted to

6   return to the United States because she has admitted to heroin

7   use, which is a permanent bar on admissibility.

8       In addition, because she overstayed her visa for such a

9   lengthy duration of time, there is a ten-year bar.  She would

10  have to wait ten years in Russia before being able to come back,

11  if that was her only impediment.

12      So in order for the defendant to keep his promise that he

13  will be with his wife of 19 years no matter what, he would have

14  to leave for Russia.  He made these statements a mere two months

15  after agents searched his home, after agents found all of that

16  incriminating evidence in his bedroom and his residence.  And so

17  it's my expectation that he knew at this juncture.  It's a

18  reasonable assumption for him to have known that he was under

19  investigation.

20      So in addition to having the means -- or the motive, I

21  suppose, to flee, the ten-year imprisonment coupled with the

22  desire to be with his wife in Russia and the actions he's taken

23  in furtherance of that goal, he also has a variety of means to

24  flee.

25      Mr. Rhule has historically used multiple social security

1   numbers.  You can see in the report from the Hawaii probation

2   officer that she looked into one of Mr. Rhule's social security

3   numbers and found that it was associated with his former wife.

4   In the course of our investigation, we have identified numerous

5   others in conversations between Mr. Rhule and his son describing

6   how they have to have bank accounts and other items not in their

7   own social security numbers.

8       In addition to using other social security numbers, Mr. Rhule

9   holds his assets in shell companies.  He doesn't register his

10  house or his cars or his airplanes in his own name, but instead

11  has incorporated numerous shell companies.  And for one example,

12  the house where he lived, where we found all the marijuana, where

13  he now wants to go back to on this release plan, that house is

14  owned in the name of Frontline LLC.  That company was

15  incorporated in Delaware, and the owner of that company is

16  purportedly Mr. Rhule's wife's father who lives in Russia.  The

17  business address for that company is a Russian address.

18  Mr. Rhule has cars in yet another shell company name, RKK

19  Associates.  His airplanes are held in yet another shell company,

20  Frontline Aviators LLC.

21      But in addition to having multiple social security numbers,

22  multiple shell companies, Mr. Rhule is also simply very

23  proficient in remaining anonymous on the internet.  When we went

24  into his bedroom, when we found that laptop that was opened up to

25  the dark web, it was running a Tor browser.  We also have

1    communications with Mr. Rhule where he discusses using the

2    anonymizing-browser Tails.  When incorporating those shell

3    companies, for instance, Mr. Rhule used e-mail addresses and held

4    himself out to be other people.  He used a fake name, "John

5    Kuhn."  And when talking about their marijuana distribution and

6    grow, Mr. Rhule and his son and their customers used encrypted

7    chat communications like Signal.

8         Mr. Rhule also happens to be a pilot.  And Frontline

9    Aviators, which he says he's the half owner of, owns two private

10   planes.  We have seized one of those planes.  We have been unable

11   to locate the second plane.  It may be worth noting that one of

12   those planes, before we seized it, it was seen essentially flying

13   over the Northwest Detention Center where Olga Rhule is currently

14   being held.  I guess Mr. Rhule was trying to make contact with

15   her in the yard and flew too low over the Northwest Detention

16   Center and caused the entire center to go into lockdown.  Which

17   you would think if law enforcement agents had just searched your

18   home and found these marijuana products and incriminating

19   evidence, you'd lay low and probably not fly an airplane over a

20   detention center.  But that was not his choice.

21        Mr. Rhule has also been traveling pretty extensively.  He

22   recently was in Montana.  After that, he was in Hawaii.  When we

23   arrested him in Hawaii, we searched his luggage, and we found

24   bulk cash, $10,000 in just cash in his luggage and another $700

25   in his wallet.

1     And its seems that Mr. Rhule has a tremendous amount of

2  cryptocurrency assets.  On March 10, 2020, we found, on a thumb

3  drive in Mr. Rule's residence, Bitcoin that was worth

4  approximately $200,000.

5     In addition, Mr. Rhule, one of his roles at his company --

6  his marijuana company is called Herbin Artisans -- one of his

7  roles was to fastidiously update their income statements using a

8  cloud-based accounting software called Xero.  We got a search

9  warrant for those records, and this is what they've shown.  It

10  essentially shows that over the course of 2015 to 2019, Herbin

11  Artisans sold $13 million in product, marijuana product.  From

12  this, there was $4.9 million in gross profit.  We can see from

13  the underlying records that support this income statement that

14  were also found in Xero that Mr. Rhule received a lot of his

15  profits in cryptocurrency, and we have seen that Mr. Rhule has

16  cryptocurrency accounts with a variety of cryptocurrency wallet

17  providers.

18     So all of that combined, we think, gives him the means to

19  flee.  In addition to that, you can see also see in the PSR that

20  he's failed to appear in the past, and he does have a charge for

21  obstructing a law enforcement officer.

22     In addition to the flight risk, there is also a dangerousness

23  assessment here.  When we went into Mr. Rhule's home, he had a

24  number of weapons.  To be clear, Mr. Rhule is not a felon, so

25  he's not a prohibited party, but he did have three different

1    stolen weapons in that home:  a stolen pistol that was loaded and

2    under his bed, a stolen Ruger and a stolen shotgun -- the shotgun

3    was loaded -- in the rest of the house.  And for those reasons,

4    the possession of those stolen weapons, we do believe that he

5    poses a dangerousness as well.

6        I want to address just two items, in addition to this risk

7    assessment, to explain to the Court how we got here.  We worked

8    with defense counsel to get Mr. Rhule from Hawaii via a

9    commercial flight.  We did that not because we didn't think he

10   posed a flight risk, but because we learned that it would take a

11   significant period of time to transport Mr. Rhule from Hawaii to

12   Seattle via the U.S. Marshals and that there was a possibility

13   that he would be transported through jurisdictions where there

14   are significant COVID outbreaks.  So we were able to come up with

15   a plan where, essentially, Mr. Rhule remained in prison for the

16   totality of the time he was in Hawaii.  We had law enforcement

17   officers escort him from the prison, put him on the aircraft, see

18   the airplane take off, and then law enforcement officers meet him

19   on this end and immediately bring him to the U.S. Marshals to be

20   booked.  And so, functionally speaking, since his landing in

21   Hawaii, he has not been free except for perhaps on that airplane.

22       The other point I want to address is that we did --  In this

23   case there is a co-defendant.  The defendant's son is a

24   co-defendant.  We did not ask for the son to be detained but

25   rather attained a bond for the son.  We didn't do so because, for

1    one reason, at the time we charged the son, he was only charged

2    with (b)(1)(b) level offenses, and so there was no presumption of

3    detention.  In addition, the son just has a very different

4    flight-risk profile.  The son has never made statements about

5    wanting to go to Russia, he has no Russian wife, and he did not

6    take actions, like getting a passport, to actually leave for

7    Russia.  And so for those reasons we felt that a bond was

8    appropriate in the context of his son, but we do not believe a

9    bond is appropriate in the context of the defendant.

10       The release plan, which is essentially that the defendant go

11   back and live on these premises where they were growing

12   marijuana -- or distilling marijuana and go and live with his

13   co-defendant on the same property is really problematic.  That,

14   combined with the other elements in our presentation, lead us to

15   recommend that the defendant be detained.

16       In this case we do not believe that there are any conditions

17   or combination of conditions that are adequate to ensure the

18   presence of the defendant at future proceedings or the safety of

19   the community.

20            THE COURT:  All right.  Thank you very much, Ms. Dalton.

21   Mr. Offenbecher.

22   You are on mute yet.

23            MR. OFFENBECHER:  Thank you, Your Honor.

24   Perhaps Ms. Dalton could take down her sharing screen there.

25   Is there a way to take that down?

1          THE COURT:  Yeah.  I don't see it anymore.  Maybe it's

2     only on yours.

3          MR. OFFENBECHER:  Okay.  There's --  Okay.  It just got

4     down.  Thank you, Your Honor.

5          Thank you, Your Honor.  Peter Offenbecher for Mr. Rhule, who

6     is present in court in custody.

7          Your Honor, we are endorsing and ask the Court to release

8     Mr. Rhule on the conditions that have been crafted by pretrial

9     services.  This has been staffed by the --  including Ms. Bolle,

10    who has done quite a bit of work on this, it's been staffed by

11    the senior staff at pretrial services, and they believe that

12    these conditions are satisfactory.  And they are.

13         I would also commend to the Court's consideration the order

14    of Judge Peterson in the co-defendant case.  Now, they didn't

15    charge him with a mandatory minimum ten-year, but, of course,

16    they're co-defendants, and they were partners in this operation,

17    it seems quite clear.  Both the son, Kenneth Warren Rhule, and

18    the father, Kenneth John Rhule, who is before the court now,

19    have been doing this operation together for many, many years.

20         And virtually every single factor that Ms. Dalton has pointed

21    out, which causes their office to apparently want to detain

22    Mr. Rhule, was also present in Kenneth Warren Rhule's case.  For

23    example, they own this Frontline Aviation together, and they are

24    both pilots.  Mr. Kenneth Warren Rhule, who was released by Judge

25    Peterson, is also a private pilot.  The kind of planes, of

1  course, that they fly are small Cessna airplanes.  They're not
2  planes so you can fly to Russia.  And all of those factors that
3  Ms. Dalton has pointed out are the same for Mr. Kenneth John
4  Rhule as they were for Mr. Kenneth Warren Rhule.
5      And Judge Peterson, in the order that's before the Court,
6  which I think we have submitted, and I hope the Court has -- if
7  the Court doesn't, then we can re-email it -- but it was an order
8  on modification, a motion by his lawyer for modification of the
9  conditions of release with respect to financial conditions.  And
10  Judge Peterson very carefully, in that order, went through the
11  factors that the Court should apply in any case about appearances
12  required, flight risk, about safety of the community, and she
13  pointed out, for example, that Mr. Kenneth Warren Rhule, there
14  are no allegations that he's currently engaged in a marijuana
15  operation, and so the safety of the community is satisfied in
16  that case.
17      So, Your Honor, we would ask the Court to release on the
18  conditions that are here.  If there are any other conditions that
19  the Court feels are appropriate, we're happy to comply with them
20  as well.
21      The first factor this Court ought to consider is the
22  seriousness of the case.  The seriousness of the case.  This is a
23  marijuana case.  They can charge it as a ten-year mandatory at
24  their own discretion, as they have in Kenneth John Rhule's case,
25  but not in Kenneth Warren Rhule's case.  But this is still a

1   marijuana case.  This activity is legal in Washington if they had

2   applied for and obtained a license.  They are distilling

3   marijuana plants and selling it.  It's a legal thing to do in

4   Washington.

5        The seriousness.  This is not a case about cocaine, about

6   fentanyl, about methamphetamine, or oxycodone pills that are

7   killing people.  It's a marijuana case.  It's not about child

8   molesting, child pornography, or any violent crime.  If Mr. Rhule

9   were really so dangerous as the government is now arguing to the

10  Court, then we would not have all agreed to put him on a plane

11  yesterday by himself and fly alone on a commercial airplane from

12  Seattle -- from Honolulu to Seattle.  He's not a dangerous

13  person.  And no one would have taken that risk, including

14  Ms. Dalton or the agents or the magistrate judge in Honolulu

15  would have done that.

16       They can charge this up as a ten-year mandatory minimum by

17  extending the period of time of the conspiracy, but we need to

18  think back to when the last time was that people in this district

19  were sentenced to ten-year mandatory minimums in a marijuana

20  case.  Those are cases that we look back on in history and regret

21  that we did them, regret that we prosecuted people and put them

22  in prison for 30 years for marijuana.  And it seems very unlikely

23  to me that this is going to end up being a ten-year mandatory

24  case in any case.

25       Second, the second factor, the COVID crisis.  As the Court is

1  well aware, an FDC staff member has now tested -- an FDC SeaTac

2  staff member has now tested positive.  It appears to me from the

3  correspondence, although the Court would have better information,

4  that perhaps at least one inmate has also tested positive.

5  Thus -- and the Court is well aware of this -- the calculus of

6  people in pretrial custody has changed now and likely will be

7  changed until there is a vaccine or a treatment for it.

8      There is serious health concerns.  As you can see, he has,

9  Mr. Rhule, Kenneth John Rhule, has some allergy problems that

10  cause him to have medicine for having difficulty breathing, and

11  he's a person who would be at high risk if he were in the FDC and

12  contracted the COVID virus.

13      I would like to address the immigration calls for a moment.

14  I have spoken with Nick Marchi, who is Mr. -- who is Olga

15  Rhule's lawyer in this matter.  They have a hearing coming up.

16  And I discussed with him this idea of why Olga would do a

17  voluntary departure, and he said that was part of his advice to

18  her and to Mr. Rhule, that the reason they need to go back to

19  Russia is to apply for the visa.  Since she overstayed her visa,

20  she's not eligible to pursue her petition for an adjustment of

21  status while she's here.  She has to go back to the original

22  country and do that.

23      Mr. Marchi told me, and then provided me with documentation,

24  that they have approved the petition for adjustment of her status

25  due to her marriage to Mr. Rhule.  They have been married since

1    2002.  And Mr. Marchi advises me that they would, under normal
2    circumstances, go back to Russia, make the application.  And
3    some of these draconian things that Ms. Dalton has suggested are
4    subject to waiver.  This is not a case where she's automatically
5    going to be deported.  They have a hearing coming up.  He has a
6    number of arguments to make.  And even if she has to go back to
7    Russia to do the reapplication, she is eligible for adjustment of
8    her status.  She has been in the United States since the 1990s
9    and really is -- her ties to Russia are minimal.  Her main ties
10   are here.  She has raised Mr. Rhule's sons, her sons here in the
11   United States.
12        The Court has to also remain in context.  He didn't say "I'm
13   going to flee the United States because I'm in trouble."  In
14   fact, he was not charged with a crime.  His son was charged with
15   a crime at that time, but he wasn't charged with a crime.  But
16   things are different now.  He's charged with a crime, he's going
17   to be subject to conditions of release, and he can't go back to
18   Russia.  This was not a plan that he put forward in order to
19   avoid the criminal charges.  Far from it.  He was on the phone
20   with his wife, who's been his wife since 2002, trying to reassure
21   her that if she had to go back to Russia, he would go with her
22   until they could make that reapplication.  That's a perfectly
23   natural thing to do.  And it doesn't suggest at all that he was
24   trying to flee a prosecution.  As far as he knew, he wasn't
25   charged and wasn't being prosecuted.  But now he is prosecuted.

1  So if he had that conversation with her now, he would be telling

2  her -- he would be saying, "Look, you may have to go back and

3  make the application.  I can't go because I'm subject to

4  conditions of release now."  He didn't know he was going to be

5  charged.  He didn't know he was charged.  It's not a reasonable

6  interpretation of that.  If you listen to that conversation, it's

7  a man reassuring his wife that he is not going to abandon her.

8  But now there's a new factor.  He's here.  He's going to have to

9  stay here until this gets resolved.  We don't know how it's going

10  to be resolved.  Perhaps he will be acquitted, perhaps this case

11  will be settled for some other charges or, you know, some amount

12  of time that's reasonable and down the road he will be able to

13  join his wife in Russia.  We just don't know.

14      The passport.  He applied for a passport.  Well, of course,

15  he did, because at that point he was trying to reassure his wife

16  that he was going to be with her.  The passport is at the State

17  Department.  They're not going to issue the passport, I'm quite

18  sure.  But if they did, he would turn it in like any other

19  defendant before the Court.  If he had a passport, he surrenders

20  it to the Court.  There's no reason why that condition, which is

21  used in many cases, including much more serious cases than a

22  marijuana case, could not satisfy the interests of the Court.

23      Finally, Your Honor, the -- well, not finally -- but

24  Ms. Dalton has raised the issue about some guns.  There were guns

25  found.  They were seized.  Those guns are gone.  We require that

1  every defendant who is subject to pretrial services' release

2  surrender all their guns.  It's as simple as that.  Whether they

3  have one gun, five guns, or a hundred guns, whether a couple of

4  the guns turn out to be stolen, which sometimes happens,

5  unbeknownst to a person who is owning the gun, who has bought it

6  in a market, you know, some kind of flea market or something like

7  that.  Sometimes guns turn out to be stolen.  It doesn't make him

8  more dangerous because the gun turns out to be stolen.  These

9  guns have been taken away, and you require that, Your Honor, of

10  every single defendant who's under supervision.  And if he

11  violates that, he gets revoked.  It does not make him more

12  dangerous.

13      Mr. Kenneth Warren, who Judge Peterson had the hearing for,

14  also lives on the same premises where the guns were, where all of

15  this marijuana was, and he was also -- and he's also a pilot and

16  he's a co-owner of Frontline Aviators, which owns, you know, the

17  plane.  And so all of these things that Ms. Dalton has pointed

18  out apply equally to Kenneth Warren, and yet Judge Peterson has

19  carefully analyzed the factors and determined that even without

20  that financial condition, the interests of the community are

21  satisfied.  And you should find that here as well.

22      One final thing, these connections to Russia.  Look, the fact

23  is that they set up an LLC and they had Kenneth John Rhule's

24  father-in-law be, you know, one of the managing members.  And is

25  that unusual?  No, it's not unusual.  But that is an artifact of

1   history.  He is no longer a managing member.  There are now --

2   there's -- it's these folks here.  But be that as it may, it

3   doesn't make him --  Because his father-in-law lives in Russia

4   doesn't make it like he had some connections other than what we

5   know.  We know that his wife is from Russia, and, of course, her

6   family lives in Russia, but that doesn't make him more likely to

7   flee.

8       Let's remember what his ties to this community are.  And

9   that's what the pretrial services report is relying on.  He has

10  lived in the King County area since he was 11 years old.  He has

11  been born and raised in the United States of America.  He is not

12  going to try to flee, I would respectfully suggest to the Court,

13  because he's been charged with this marijuana case, which

14  probably, I'm suggesting, will get resolved.  And he's not going

15  to leave the country that he's been.  He's never lived in Russia.

16  He's lived in this country all of this time.  The only reason --

17  and this was on the advice of his lawyer -- that they would go to

18  Russia is to make this application from Russia because of a

19  technicality of immigration law, which, frankly, I don't

20  understand, but Mr. Marchi does, that requires him to -- requires

21  Olga to be in Russia in order to make the application because she

22  overstayed her visa here.

23      Your Honor, all of the concerns --  And, you know, the fact

24  that he's gone on whatever the dark web is, that he's used -- you

25  know, he's sold the marijuana.  Of course.  They're making

 1    distillation products, which would be legal here if they had

 2    gotten a license.  They should have gotten a license and they

 3    didn't.  All of this applies equally to Kenneth Warren Rhule, his

 4    son.  All of these factors apply the same, and the Court should

 5    adopt the conditions and any other conditions.  If the Court is

 6    concerned about him being on the internet, then the Court can

 7    restrict his internet access as well.  But there's no suggestion

 8    that with pretrial services' supervision that the interests of

 9    the Court and the safety of the community cannot be satisfied.

10        The safety of the community.  It's one of the least serious

11    cases, frankly, that the Court sees.  You know, they're trying to

12    make it into a gun case because that sounds more dangerous and

13    it makes him sound like a more dangerous person.  But it's not a

14    gun case.  It's a marijuana case.  And in terms of felony crimes,

15    this is not only a marijuana case, but it's a marijuana case in a

16    state where it's legal to do what they're doing.  They just

17    didn't apply for the license.  So that makes it not a very

18    serious case.

19        And the location monitoring that is being proposed by

20    pretrial services and the conditions are quite comprehensive.

21    The restriction of travel, the surrender of the passport, and the

22    residential restrictions are all satisfactory, as they were with

23    Kenneth Warren Rhule, to assure his appearance here and to notify

24    the authorities if there is anything untoward that happens.  The

25    Court could also impose a third-party custodian, and we offered

1  that to pretrial services, but they didn't think it was

2  necessary.  They thought these conditions were satisfactory.  And

3  I agree.

4      Under all the circumstances, Your Honor, I think the Court

5  ought to adopt the recommendation of the pretrial services

6  report, put him on pretrial services' supervision, and not remand

7  him to the custody of the FDC in a case like this where it's not

8  necessary at this time.

9          THE COURT:  All right.

10     Ms. Dalton, do you have any response regarding, I guess, the

11  claim that it's not that serious of a case and there's no flight

12  risk?

13     You are on mute yet.

14     You're still on mute.  There you go.

15         MS. DALTON:  Yes, there we are.

16     I think we're going to respectfully disagree about the

17  severity of this particular case.  It is a federal offense, and

18  it is adequately charged as a federal offense with a ten-year

19  mandatory minimum.

20     The flight risk, I think there's a couple of items that we

21  could talk about.  Defense counsel said, essentially, there is an

22  approved petition already with ICE and that all they need to do

23  is go back to Russia and then return, and upon return, she will

24  have lawful status.  I have checked those facts with the ICE

25  attorney working on this case, and he disagrees with the advice

1    that Mr. Offenbecher has received.  There is an approved

2    petition, but the approved petition does not mean that she can

3    come back into the United States.  There is a second step, that

4    you have to demonstrate eligibility to return to the United

5    States.  And because of her admitted heroin use in the

6    immigration proceeding, that is a permanent bar that is not

7    subject to waiver.  And so it is this attorney's opinion that she

8    would not be able to adjust her status and become a lawful

9    permanent residence or a green card holder, or what have you,

10   because she could never come back to the United States.  And in

11   that sense, Mr. Rule's 19-year marriage to her is more of a risk

12   of flight than it is a reason for him to stay in Washington.

13   That is, a long, committed relationship and his need to be with

14   her, as he's promised, would require him to go to Russia.

15       In terms of the COVID risk there, I think the Court is aware

16   of the current situation at the FDC.  There is one staff member

17   who has tested presumptively positive for COVID.  There's been no

18   inmates that they've identified as linked to that staff member

19   who have received COVID from him.  There is one inmate who has

20   tested positive for COVID.  That inmate was recently arrested,

21   has been in solitary the entire time, has not been exposed to

22   other inmates.  And so there is not an outbreak currently at the

23   FDC SeaTac.  It seems, in contrast, that SeaTac COVID procedures

24   are working.  Their requirement that all inmates, upon arrival,

25   are quarantined for a period of time did work to prevent the

1   spread of COVID from that one inmate.  And the one inmate, I

2   understand, that had it is asymptomatic at this point in time, so

3   is not sick.

4       I understand Mr. Rhule's medical condition is limited to

5   allergies, and his son indicated he takes Claritin in order to

6   address those allergies.  I would submit that that's probably not

7   the kind of situation that would place Mr. Rhule at high risk.

8       I think that the contrast between Kenneth Warren Rhule and

9   Kenneth John Rhule is the connection to Russia.  It's the

10  connection to Russia, combined with the fact that at the time

11  that we charged Kenneth Warren Rhule -- we charged him before we

12  searched the compound -- at the time we charged him, we did not

13  know how much marijuana was involved in this case.  We did not

14  have enough for an A-level violation.  Of course, upon searching

15  that compound, we found all these guns, we found all this

16  marijuana, we found all this installation equipment that brought

17  us to the level of an A-level charge and showed us the true

18  severity of this crime.  It was after we charged Kenneth Warren

19  Rhule that we figured out that they stored these accounting

20  records online and the profits that they had truly made.  And so

21  when we made a decision, when we asked the Court to release

22  Kenneth Warren Rhule on bond, it was with that lesser quantity

23  being charged.  And so I'm not sure that there is an

24  apples-to-apples comparison here.

25      Kenneth Warren Rhule did not live on that property.  He lived

1  elsewhere.  And so the guns found on the property inside the

2  residence are more equally attributable to Kenneth John Rhule

3  than to Kenneth Warren Rhule.

4      But I think really what's driving here is this connection to

5  Russia, his very strong connection to Russia.  His wife is going

6  to be living there.  He has in-laws there that have helped him

7  set up companies.  He has the ability to leave, to fly out.  He

8  can go on, you know, another social security number, what have

9  you.

10      The thing, honestly, that struck me, from reading the PSI in

11 this case from Hawaii as well, is when the officer asked Kenneth

12 John Rhule, "Where is your passport?" he said, "It's lost.  I

13 have misplaced it."  He never told her, "I have applied for a new

14 passport, and I had these plans to move to Russia."  If this was

15 so innocuous, why didn't he tell the probation officer in Hawaii?

16      So for those reasons we still believe that this is a case for

17 detention and that it's, in fact, appropriate.

18          THE COURT:  Mr. Offenbecher, are you --  Yeah, now we

19 can hear you.

20          MR. OFFENBECHER:  Okay.  Sorry.

21      First of all, with respect to the passport, Mr. Rhule never

22 had a chance to review that pretrial services report in Honolulu.

23 I reviewed it with him here today.  He said that's not true, I

24 did apply for a passport, and it's pending.  And we corrected

25 that.  And you can see that in this report before the Court.  It

1    does say that he indicated to the pretrial services officer that

2    he had applied for a passport and he had not received it.  And,

3    of course, it will be returned as soon as he can.  So that was

4    fully acknowledged to the pretrial trial services officer here,

5    as soon as he had an opportunity to read it.

6        Second, this trying to distinguish it between Kenneth Warren

7    Rhule, we didn't know how serious of a case it was.  But isn't

8    the point that Kenneth Warren Rhule is fully complying with all

9    the conditions of release?  He's not a danger to the community.

10   He's not a risk of flight.  He knows what's going on in this

11   case.  He knows that his father has been charged with a ten-year

12   mandatory minimum.  And I guess what the prosecutor is suggesting

13   is that she's going to charge Kenneth Warren Rhule with a

14   ten-year mandatory minimum too.  I don't know.

15       But the point is, that knowing all of that -- he's got a very

16   good lawyer working with him on the case -- his lawyer knows that

17   and he knows it, and he's fully complying with these conditions

18   of release, he's not a danger to the community, and he is not an

19   undue risk of non-appearance such that he ought to be put in the

20   FDC at this point before we have a chance to deal with the case.

21       And finally, frankly, furthermore, with this COVID crisis, as

22   the Court can see over these past few days, the FDC gets shut

23   down, lawyers can't communicate with their clients, they can't

24   work on the cases.  It's very, very difficult to make this

25   criminal justice process work.  And the presumption ought to be

1  in favor of releasing defendants and letting them deal under

2  these very strict conditions; the presumption of not putting

3  people in harm's way from the virus, but letting them deal with

4  the case, particularly in a marijuana case where there's no

5  danger to the community.

6          THE COURT:  All right.  Thank you very much.

7      So, Mr. Rhule, we have gone back and forth between the

8  lawyers, so I have to make a decision right now.  And I'm sorry,

9  but I'm not going to release you today.

10     Number one, I don't like to compare one defendant with

11 another.  It's like saying if somebody was detained, you should

12 be detained also; if somebody got released, you should be

13 released.  Everybody is in a different situation.  So we look at

14 the cases separately.  One other --  Another defendant's

15 situation doesn't necessarily drive your situation, and vice

16 versa.

17     And I think the real challenge for me right here is, is that,

18 you know, you're in a difficult position.  And it's unfortunate

19 that your wife does not have legal status.  She's in immigration

20 detention.  The fact that she's in detention, they haven't let

21 her out, and the fact that the ICE agents are telling Ms. Dalton

22 "We're not letting her back," there's no, like, guarantee she's

23 just going to be able to leave and come back.  I think that

24 supports the government's case that her situation is very

25 difficult, and that when they remove her from the country or

1  deport her from the country, it's going to be a very difficult

2  task to ever come back.  So, of course, you know, your ties to

3  her and to the country are important, and it's a distinguishing

4  factor, of course, from your son, who doesn't have the same kinds

5  of ties.

6      Now, we can go round and round and round about how serious

7  this case is.  Maybe it could get more serious.  There were guns

8  found in the residence where you allegedly were living.  Maybe it

9  could get less serious.  But that's way down the road.  I'm not

10  in the position to have a crystal ball to know exactly how your

11  case is going to resolve.  All we know right now is that this is

12  not like a small possession of marijuana, right?  This is an

13  allegation of a substantial enterprise generating large sums of

14  money over a significant period of time, and the money is

15  allegedly converted and hidden through the use of various

16  corporate -- corporations or corporate shells, the use of

17  encrypted and also shielded internet transactions involving

18  cryptocurrency.  So, you know, it's not an insignificant case.

19      So, unfortunately, I am sorry, Mr. Rhule.  That, you know,

20  given what I have heard, the government's proffer regarding, I

21  think, legitimate concerns, this is a unique situation.  It's not

22  just that you face a lot of prison time if convicted.  But you

23  are in a peculiar situation in which you have a peculiar motive

24  to leave the country, to maintain a very long and important

25  relationship:  your wife.  Because you know that if she left the

1    country and you were here, you wouldn't see her.  If you were

2    convicted, as Ms. Dalton is charging, you wouldn't see her for a

3    long, long, long time.

4         So I will issue a detention order today.  I am sorry.  And I

5    don't disagree with Mr. Offenbecher.  The times we face have

6    created tremendous challenges for all of us, including the

7    prosecution of the case, the defense of the case, and the ability

8    to -- or inability to have, you know, face-to-face hearings.

9         All right.  I will issue the detention order today.

10        Mr. Offenbecher and Ms. Dalton, is there anything further

11   from either side?

12             MS. DALTON:  No.  Thank you, Your Honor.

13             THE COURT:  All right.

14        All right.  Mr. Rhule, hang in there.

15        We'll be at recess.

16             THE CLERK:  Court is in recess.

17                       (Adjourned.)

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3      I, Nickoline M. Drury, RMR, CRR, Court Reporter for the

4  United States District Court in the Western District of

5  Washington at Seattle, do certify that the foregoing is a correct

6  transcript, to the best of my ability, from the record of

7  proceedings in the above-entitled matter.

8

9                    /s/ Nickoline Drury

10                   Nickoline Drury

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25