The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KENNETH JOHN RHULE,<br><br>Defendant. | NO. 20-cr-105 JCC<br><br>DEFENDANT RHULE'S MOTION TO REVIEW AND REVOKE MAGISTRATE JUDGE'S DETENTION ORDER AND RELEASE DEFENDANT ON CONDITIONS<br><br>ORAL ARGUMENT REQUESTED<br><br>Noted for:  September 4, 2020 |

## TABLE OF CONTENTS

I.     FACTUAL BACKGROUND OF THE CHARGES ...................................................... 6

    A.    April 2018-February 2020: the government investigates Mr. Rhule's son, and eventually charges him with operating an unlicensed marijuana business, unlicensed money transmitting and money laundering. ..................................... 6

    B.    March 2020: The government searches a property alleged to house Kenneth Warren Rule's unlicensed marijuana business and collects extensive evidence. .................................................................................................................... 7

    C.    July 1, 2020: The government charges Mr. Rhule by sealed Complaint with offenses arising from his son's alleged unlicensed marijuana business. ............ 8

    D.    July 24, 2020: At Mr. Rhule's initial appearance in this District, Magistrate Judge Tsuchida orders him detained. ................................................................. 9

    E.    August 5, 2020: Mr. Rhule is indicted along with his son. ............................... 9

skellengerbender

F.  Current status:  Both defendants were arraigned on August 20, and the matter has been set for trial starting October 5. ........................................................... 10

II.  LEGAL FRAMEWORK ................................................................................... 11

A.  Standard of Review ........................................................................... 11

B.  Applicable Law .................................................................................. 11

III.  DISCUSSION................................................................................................. 14

A.  Mr. Rhule's background and his lifelong connection to the local community suggest a low risk of flight in this case............................................... 14

1.  Mr. Rhule's connection to his family is at the center of his life, and his family is firmly rooted in this District. ................................................ 14

2.  Mr. Rhule has a long history as a founder, owner, and operator of legitimate businesses that employed hundreds of people and contributed positively to the community. ............................................. 18

B.  Mr. Rhule never planned to flee to Russia to avoid prosecution..................... 19

1.  When Mr. Rhule mentioned to his wife Olga on May 10 the possibility he might travel to Russia, he was expressing a desire to support and assist her in attempting to acquire legal immigration status in the United States. ....................................................................... 19

2.  Olga Rhule's compromised immigration status required that Ken and Olga devise a plan of action to give her the best opportunity to eventually adjust her status and live legally in the United States......... 20

3.  The May 10 recorded conversation reflects Ken and Olga Rhule outlining the contours of her voluntary departure from the United States as a first step of an effort to eventually obtain long-term legal status in this country. ..................................................................... 23

4.  Contrary to the government's claim, Mr. Rhule has no "significant ties to Russia." ........................................................................ 26

5.  The shadowy 'second airplane' is not airworthy and sits inert on the tarmac at Lake Chelan Airport. .......................................................... 28

6.  The government's suggestion that ownership of substantial assets by so-called 'shell companies' enhances Mr. Rhule's risk of flight makes no sense. ......................................................................... 31

7.  The State Department's official refusal to issue Mr. Rhule a passport— which occurred after the detention hearing in this case—disables him from traveling to Russia, even if he so desired. ................................... 32

8.  Travel to Russia is extremely dangerous and difficult, and at the present time the living conditions there for an American are grim.................. 33

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 2

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

C.   This Court's actions in other cases—releasing defendants who arguably present a significantly greater risk of flight or threat to public safety than Mr. Rhule—demonstrate that appropriately crafted conditions of release can meet those concerns in all but truly exceptional circumstances. .............................. 35

D.   Mr. Rhule in fact presents a lower risk of danger to the community, or of using internet savvy to facilitate flight from prosecution, than his son Kenneth Warren Rhule, whom the Court has already determined it was safe to release. ................................................................................................................ 38

E.   The new information before this Court, which was not before the Magistrate Judge when he decided that the only option was to jail Mr. Rhule pending resolution of the charges, strongly supports a finding that available conditions of supervision can reasonably assure Mr. Rhule's appearance and preserve the safety of the community. ...................................................................................... 41

   1.   The newly proposed conditions, in combination with those already reviewed and approved as sufficient by Pretrial Services, should greatly increase the Court's confidence that Mr. Rhule may safely be released. ............................................................................................... 41

   2.   Mr. Rhule's parents are prepared to risk their home on Mr. Rhule's appearance at court and his compliance with conditions of release. ..... 44

   3.   Mr. Rhule's sister and her family are prepared to risk their home on Mr. Rhule's appearance at court and his compliance with conditions of release. .................................................................................................. 45

   4.   Ken and Olga Rhule, and their son/step-son Kenneth Warren Rhule, are prepared to secure Mr. Rhule's appearance with their entire interest in all the property targeted for forfeiture in the Indictment. ..................... 45

   5.   Here, as in *Channon*, the newly available statements of Mr. Rhule's family members promising to ensure that he complies with any conditions imposed by this Court shift the balance in favor of release. ............................................................................................... 46

F.   The conduct in which the government alleges Mr. Rhule engaged is not a crime in Washington if proper licenses are obtained. ...................................... 47

G.   Another circumstance that has changed since Mr. Rhule's detention hearing is the rapidly deteriorating COVID-19 health situation at FDC SeaTac and the attendant looming risk to Mr. Rhule's health. ................................................. 49

IV.   CONCLUSION ........................................................................................................ 51

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 3

skellenger bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

Defendant Kenneth John Rhule ("Mr. Rhule") is a 45-year-old retired businessman who has lived in and around the greater Seattle area since childhood and is married to a Russian-born woman who has resided in the United States for nearly twenty years.  The government has accused Mr. Rhule of conspiring to manufacture distillates of marijuana—a crime under federal law, but a legal commercial activity in Washington state if properly licensed.[1]  At Mr. Rhule's detention hearing on July 24, Pretrial Services recommended release on conditions, but Magistrate Judge Tsuchida ultimately agreed with the government that it would be necessary to keep Mr. Rhule jailed until the charges can be resolved.

Mr. Rhule respectfully urges this Court to revisit that conclusion, for three overarching reasons.  First, the Magistrate Judge was apparently concerned by an innocuous remark by Mr. Rhule in a recorded conversation on May 10 with his Russian-born wife Olga, who was then in the custody of immigration authorities. The Magistrate Judge, with the government's encouragement, treated the comment as strong evidence that Mr. Rhule expected to be charged in this case and was intending to flee to Russia.  As we show below, the context and background of that conversation, particularly given Mr. Rhule's solid, extensive, and longstanding family ties to this District, indicate that the Magistrate Judge placed undue weight on that presumed risk of flight.

Second, this motion presents additional relevant information that was not before the Magistrate Judge when he ordered Mr. Rhule detained.  For one thing, we propose additional conditions of release that will enlist members of Mr. Rhule's family to help assure his

---

[1] In deference to Washington's voters, who passed I-502 specifically to allow individuals to grow and distribute marijuana and to make and distribute its distillates, federal prosecutors in this District have rarely charged this offense except where state regulatory requirements have not been followed.

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 4

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

appearance: a home confinement condition, a condition that close relatives act as third-party custodians, and financial property bond conditions to help assure Mr. Rhule's compliance. For another, we are submitting what this Court has elsewhere described as "offers of support" from several family members and a close family friend promising to help hold Mr. Rhule accountable while on release. *See infra*.

Finally, while each detention assessment is individualized, many of the relevant considerations that raise questions about releasing Mr. Rhule apply equally to his son and co-defendant Kenneth Warren Rhule. Yet Magistrate Judge Peterson found that conditions could be imposed that would reasonably assure Kenneth Warren Rhule's appearance while safeguarding the community, and indeed Kenneth Warren Rhule has now been on release for five months without incident.[2]

We respectfully submit that at least after adding our new proposed conditions to the detailed ones that already satisfied Pretrial Services, this Court should reach the same conclusion as to Mr. Rhule. That outcome will keep faith with the vital principle that under our Constitution pretrial detention must be a "carefully limited exception" to the norm of personal liberty, to be invoked "only for the strongest of reasons." *United States v. Salerno*, 481 U.S. 739, 755 (1987); *Sellers v. United States*, 89 S. Ct. 36, 38 (1969) (Black, J., in chambers).

---

[2] *See United States v. Kenneth Warren Rhule*, WAWD No. 20-mj-0097-PLM at Dkt. No. 8. (Both defendants have now been charged by indictment in No. 20-cr-105 JCC.)

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 5

## I.     FACTUAL BACKGROUND OF THE CHARGES

### A.     April 2018-February 2020: the government investigates Mr. Rhule's son, and eventually charges him with operating an unlicensed marijuana business, unlicensed money transmitting and money laundering.

In April 2018, Homeland Security Investigations (HSI) initiated an investigation into Mr. Rhule's son Kenneth Warren Rhule for money laundering, unlicensed money transmitting, and manufacturing and distributing marijuana.   Agents believed that since at least 2015, Kenneth Warren Rhule had been manufacturing marijuana distillates and extracts, selling them on the dark web, laundering the proceeds from those sales through various cryptocurrency exchanges, and running an unlicensed money transmitting business by exchanging cash for cryptocurrency.  *See* Exhibit A (Complaint against Kenneth Warren Rhule).

Agents began investigating Kenneth Warren Rhule's activity in an online peer-to-peer cryptocurrency marketplace where he allegedly advertised his ability to exchange cash for bitcoin and since 2016 had conducted over 1,000 cryptocurrency transactions.  From April to December 2018, an HSI undercover agent met with him often, providing him each time with $10,000–$15,000 in cash.  Kenneth Warren Rhule then exchanged that cash for equivalent bitcoin, which he sent to a cryptocurrency wallet controlled by law enforcement. In total, it is alleged, Kenneth Warren Rhule exchanged $140,000.  *See* Exhibit A.

The government alleges that during these meetings, the undercover agent told Kenneth Warren Rhule that she was bringing young women from Ukraine and Mexico into the U.S. and needed to convert the funds from that illegal activity into an untraceable asset.

Based on this investigation, on February 28, 2020, the government charged Mr. Rhule's son Kenneth Warren Rhule by sealed Complaint with Conducting an Unlicensed Money Transmitting Business, in violation of 18 USC §1960(a), (b)(1)(A), (b)(1)(B), (b)(1)(C) and 2;

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 6

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1  Laundering of Monetary Instruments, in violation of 18 USC §1956(a)(3)(B), (a)(3)(C) and 2;

2  and Conspiracy to Manufacture and Distribute Marijuana, in violation of 21 USC §841(a)(1),

3  (b)(1)(B) and 846.  *See* Exhibit A.

4      **B.    March 2020: The government searches a property alleged to house Kenneth**
       **Warren Rule's unlicensed marijuana business and collects extensive**
5      **evidence.**

6          On March 10, the government executed a search warrant at a property in Monroe,

7  Washington, that contained the separate residences of Mr. Rhule and his son as well as adjacent

8  outbuildings.   The search uncovered approximately 1,000 kilograms of bulk marijuana or

9  marijuana extracts, marijuana distillates, drug paraphernalia, processing equipment, and a

10 Dodge Sprinter van suspected of being used to transport marijuana plants for processing *See*

11 Exhibit B (Complaint against Kenneth John Rhule).

12         Agents also located a laptop that was open and running a TOR browser (used to access

13 the dark-net), various cell phones, and a cryptocurrency hardware-wallet.   Seven guns,

14 including rifles and pistols, were seized, two of which are allegedly stolen.  *See* Exhibit B.  Mr.

15 Rhule's son Kenneth Warren Rhule was arrested on the sealed Complaint against him.

16         Mr. Rhule was not arrested.

17         On March 10, the Court—Magistrate Judge Peterson—released Kenneth Warren Rhule

18 without bond, concluding that routine conditions of supervision would reasonably assure public

19 safety and his appearance at trial.   The conditions require Kenneth Warren Rhule to remain

20 within the District, maintain his residence as directed, surrender his passport, and submit to

21 drug testing.   He is also forbidden from transferring virtual currency and from possessing or

22 having access to firearms. Finally, he was initially directed to provide Pretrial Services with

23 specified financial information about assets and liabilities, *see* Exhibit C (Kenneth Warren

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 7

**skellenger**bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

Rhule's Appearance Bond), but the Court later discarded that condition as unnecessary to protect the public or reasonably assure his appearance.  *See* Exhibit D (Order Granting Kenneth Warren Rhule's Motion to Modify).  Released on these conditions, Kenneth Warren Rhule has been living in the community without incident for the past five months, at the same separate residence on the Monroe property where he was arrested.

### C.   July 1, 2020: The government charges Mr. Rhule by sealed Complaint with offenses arising from his son's alleged unlicensed marijuana business.

Nearly four more months passed before Mr. Rhule was charged in this District with related offenses via a sealed Complaint (filed under a separate cause number from the charges against his son Kenneth Warren Rhule).  *See* Exhibit B (Complaint charging Mr. Rhule with Conspiracy to Manufacture Marijuana or Marijuana Distillates).  Mr. Rhule first became aware of the charges two weeks after that, when—on his way to visit his other son Connor and his two grandchildren, all of whom reside in Kona, Hawaii—he was arrested at the Honolulu airport and placed into custody at the local Federal Detention Center.

Following proceedings in district court in Honolulu, undersigned counsel and the government agreed that Mr. Rhule should be allowed to return to Seattle on a commercial flight at his own expense.  On July 23, Mr. Rhule was released from the FDC in Honolulu, escorted to the local airport by an HSI agent, and from there took a commercial flight to SeaTac unaccompanied by anyone.  On the morning of July 24, government agents met Mr. Rhule there and drove him directly to the federal courthouse in Seattle.  Mr. Rhule's return to Seattle thus was accomplished voluntarily and without incident.

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 8

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

**D.    July 24, 2020: At Mr. Rhule's initial appearance in this District, Magistrate Judge Tsuchida orders him detained.**

Upon arriving back in this District on July 24, Mr. Rhule made his initial appearance before Magistrate Judge Tsuchida.  United States Pretrial Services, concluding that there were conditions of release that would reasonably assure the safety of the community and Mr. Rhule's future appearance in this matter, recommended that he be released on conditions.

The government moved for detention.  After hearing argument, Magistrate Judge Tsuchida ordered Mr. Rhule detained.

**E.    August 5, 2020: Mr. Rhule is indicted along with his son.**

On August 5, Mr. Rhule and his son Kenneth Warren Rhule were charged by Indictment in the above-captioned cause number.  Consistent with our understanding that the government's evidence shows that Kenneth Warren Rhule was the principal actor in the alleged illegal activities, the grand jury charged him with multiple very serious offenses, including a § 924(c) count relating to the firearms recovered in Monroe, as well as money laundering and unlicensed money transmitting offenses, while charging Mr. (Kenneth John) Rhule only with being a co-conspirator in his son's alleged unlicensed marijuana distillation business:

| Counts | Offense | Defendant |
|--------|---------|-----------|
| 1 | **Conducting an Unlicensed Money Transmitting Business**—involving the transmission of funds that were known to the defendant to have been derived from a criminal offense and were intended to promote and support unlawful activity—in violation of 18 USC §1960(a), (b)(1)(A), (b)(1)(B), and (b)(1)(C) | Kenneth Warren Rhule |
| 2–7 | **Laundering of Monetary Instruments**—involving property represented by law enforcement to be proceeds of unlawful activity, specifically trafficking in persons and recruiting and harboring a person for | Kenneth Warren Rhule |

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 9

**skellenger**bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

| Counts | Offense | Defendant |
|--------|---------|-----------|
| | commercial sex acts—in violation of 18 USC § 1956(a)(3)(B), (a)(3)(B), (a)(3)(C) and 2. | |
| 8 | **Conspiracy to Manufacture and Distribute Marijuana and Marijuana Distillates**—involving 1,000 kilograms or more of a mixture and substance containing a detectable amount of marijuana—in violation of 21 USC § 841 (a)(1), 841 (b)(1)(A), and 846 | Kenneth Warren Rhule<br>Kenneth John Rhule |
| 9 | **Possessing a Firearm During and in Relation to a Drug Trafficking Crime**—involving a Smith and Wesson M&P 9mm handgun in furtherance of a drug trafficking crime—in violation of 18 USC § 924 (c)(1)(A) | Kenneth Warren Rhule |

Dkt. No. 31.  The government is also seeking forfeiture of the Monroe real property (which consists of two lots totaling approximately 21 acres of land and includes Mr. Rhule's residence), and vehicles, as well as numerous items of personal property alleged to be the proceeds from, or involved in, manufacturing marijuana and related distillates.

> **F.**    **Current status:  Both defendants were arraigned on August 20, and the matter has been set for trial starting October 5.**

Both defendants were arraigned on August 20, and entered pleas of not guilty.  Trial is scheduled to begin on October 5.

Mr. Rhule remains detained at FDC SeaTac.

By this motion, Mr. Rhule now asks the Court to review and revoke the Magistrate Judge's order detaining him and order him released on appropriate conditions under the supervision of Pretrial Services.

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 10

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

## II.      LEGAL FRAMEWORK

### A.      Standard of Review

Title 18 U.S.C. § 3145(b) provides that a person "ordered detained by a magistrate judge" may move "the court having original jurisdiction over the offense" to revoke or amend that order. This Court's review of a magistrate's detention order is *de novo* and extends to any additional evidence the parties may proffer. 18 U.S.C. § 3145(b). *United States v. Koenig*, 912 F.2d 1190, 1192–93 (9th Cir. 1990). The Court then "make[s] its own independent determination whether the magistrate's findings are correct with no deference." *Koenig*, 912 F.2d at 1193.  *See* John L. Weinberg and Evelyn J. Furse, Federal Bail & Detention Handbook 2019, [8:2.3], PLI Press (New York 2019) ("Weinberg & Furse").

### B.      Applicable Law

Mr. Rhule is presumed innocent of any crime. *Taylor v. Kentucky,* 436 U.S. 478 (1978). The purpose of a detention hearing under the Bail Reform Act of 1984 is to determine whether, taking into full consideration the defendant's constitutional rights and the presumption that he is innocent, the Court should nevertheless order him jailed pending trial. *United States v. Motamedi,* 767 F.2d 1403, 1405–08 (9th Cir. 1985).

Under the Bail Reform Act (the "Act"), a defendant must be released pending trial unless the Court finds that *no* condition, or combination of conditions, will reasonably assure that the defendant will make his court appearances and that the community will be safe in the meantime. 18 U.S.C. § 3142(e); *see also United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008).

The mere risk that the defendant will flee, which is present to some degree in nearly every case, does not warrant pretrial incarceration; detention is only appropriate if there are no

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 11

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

conditions that will "reasonably assure" his appearance. *See* 18 U.S.C. § 3142(e)(1); *United States v. Orta*, 760 F.2d 887, 889–90 (8th Cir. 1985) (a court errs if it requires a "guarantee" that the defendant will not flee).  Further, if the question whether to detain the defendant is a close one, the court must side with the accused and set conditions of release. *United States v. Chen*, 820 F. Supp. 1205, 1208 (N.D. Calif. June 18, 1992) ("[t]o give effect to the principle that doubts regarding the propriety of release be resolved in favor of the defendant, the court is to rule against detention in close cases") (citing *Motamedi*, 767 F.2d at 1405–06).

Similarly, even where the accused poses a credible danger to the community, the court nevertheless must release him if there exists some "condition or combination of conditions [that] will reasonably assure. . . the safety of any other person and the community." 18 U.S.C. § 3142(e); *Hir*, 517 F.3d at 1091–92.

To justify keeping the accused locked up until his trial, the government bears the burden of proof under either prong.  It must show by clear and convincing evidence that the defendant poses an unacceptable danger to the community, or it must show by a preponderance of the evidence that he poses an unacceptable flight risk. *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991).

Where there is probable cause to believe that the defendant committed a charged offense which is punishable under the Controlled Substances Act by a penalty of 10 years or more, a rebuttable presumption arises that no condition or combination of conditions will reasonably assure his appearance and protect the safety of the community. 18 U.S.C. §3142(e).  The burden of production imposed upon the accused to rebut this presumption is "small;" he need only present some credible evidence supporting release. *See Chen*, 820 F.Supp at 1207–08; *United States v. Clark*, 791 F.Supp 259, 260 (E.D.Wash. 1992).  Any "evidence of economic and social

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 12

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

stability" can rebut the presumption. *United States v. Dominguez*, 783 F.2d 702 (7th Cir. 1986). Once the defendant has met his small burden of production, it is the Government's job to persuade the Court that he should remain incarcerated until his trial. *Hir*, 517 F.3d at 1086. And to leave the accused in jail pending trial based on his purported dangerousness, the Court must have an "abiding conviction" that even if it imposes conditions that significantly constrain the defendant's freedom of action, he is "highly probable" to cause the community harm. *Sophanthavong v. Palmateer*, 378 F.3d 859, 866–67 (9th Cir. 2004) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)).

If a defendant proffers evidence to rebut the presumption, the Court considers four factors in determining whether the government has met the pretrial detention standard under 18 U.S.C. § 3142(g): (1) the nature and circumstances of the offense charged, including whether the offense involves a controlled substance; (2) the weight of the evidence against the person; (3) the person's history and characteristics, including his character, physical and mental condition, family and community ties, employment, financial resources, past criminal conduct, and history relating to drug or alcohol abuse; and (4) the nature and seriousness of the danger to any person or the community that releasing him would pose.  *See* Weinberg & Furse, [4:1-4:6].

Although under § 3142(g) the Court may "consider the nature of the offense and the evidence of guilt," it may do so "only in terms of the likelihood that the person will fail to appear or will pose a danger to any person or to the community"—not in prejudging guilt. *Motamedi*, 767 F.2d at 1408 (citing *United States v. Honeyman*, 470 F.2d 473, 474 (9th Cir. 1972); *United States v. Edson*, 487 F.2d 370, 372 (1st Cir. 1973)). Indeed, the weight of the

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 13

skellenger bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1   evidence against the accused with respect to the charged offense is the least important factor in

2   this analysis. *Motamedi*, 767 F.2d at 1408 (citing *Honeyman*, 470 F.2d at 474).

3       An analysis of the facts of Mr. Rhule's case shows that there *are* conditions that can

4   reasonably assure his presence and the safety of the community, and accordingly that he should

5   not remain incarcerated while the charge against him remains unresolved.

6   **III.   DISCUSSION**

7       **A.   Mr. Rhule's background and his lifelong connection to the local community suggest a low risk of flight in this case.**

8

9           **1.   Mr. Rhule's connection to his family is at the center of his life, and his family is firmly rooted in this District.**

10       Kenneth Rhule is 45 years old.  He was born to Johanna and Kenneth Rhule in Salinas,

11   California on May 17, 1975.  He has one sister, Keri, who is five years his junior. Mr. Rhule

12   has lived in the Seattle area since age 11, when his family moved here from California.  He

13   attended local schools in Woodinville: Cottage Lake Elementary, Leota Junior High (now Leota

14   Middle School), and Woodinville High School.  Mr. Rhule also attended Lake Washington

15   Vocational College (now Lake Washington Institute of Technology) in King County.

16       During those years growing up in King County, Mr. Rhule's mother Johanna was

17   employed in the insurance industry at Safeco (later Symmetra), where she worked for a total of

18   29 years.  *See* Exhibit E (Letter from Johanna and Ken Rhule).  She served as a high-level

19   claims manager, eventually overseeing the work of three different offices (in Bellevue, WA,

20   Miami, FL, and Norcross, GA).  *Id.* Mr. Rhule's father Kenneth ran the maintenance program

21   for Starbucks' corporate offices in Seattle, and later contracted with the national commercial

22

23

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 14

skellenger bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

real estate firm CBRE, for which he worked as a Service Engineer on the Washington

Mutual/Chase Bank accounts for 17 years before retiring.  *Id*.[3]

   Mr. Rhule married his high-school sweetheart Leah, and in 1993 the couple welcomed

twin sons, Kenneth and Conner, who were born at Swedish Hospital in Seattle.  He raised his

boys in Western Washington, first with Leah and later with his second wife Olga, whom he

married in April 2002 after his marriage to Leah had ended.  *See* Exhibit F (Marriage

Certificate).  Throughout both marriages, Mr. Rhule never lived anywhere besides the greater

Seattle area.[4]

   Mr. Rhule's sister Keri Street also lives in the greater Seattle area.  She is a Senior

Technical Project Manager, currently working on a contract assignment with T-Mobile through

TEKsystems.  She has been in the Technical Program/Project Management field for roughly 20

years.  Her husband Jeremy Street has been a driver for UPS for more than 20 years.  Keri and

Jeremy have two elementary-school-age children and reside in Bothell.

   The mere presence of relatives in the District is one thing.  Enduring, intimate family

ties are another—and those are the kind of bonds that link the three generations of Mr. Rhule's

family.

---

[3] In 2012, after living in Woodinville for nearly thirty years, Johanna and Kenneth retired to the warm climate of Mesquite, Nevada.  But they return often to Washington State, for "months at a time," to be with their children, grandchildren, and great-grandchildren. *See* Exhibit E.

[4] Although Mr. Rhule and Olga (full prior name Olga Vladimirovna Goncharova) were married in Las Vegas, they dated and fell in love in the Northwest.  And while Olga is a Russian citizen, during their 18-year marriage, Mr. Rhule and Olga have never traveled to Russia.  In March, Olga was detained by immigration authorities.  She has since been granted voluntary departure to Russia.  Olga has been released on conditions (with a GPS ankle monitor) so that she may arrange her affairs prior to her departure.

skellenger**bender**

1    Mr. Rhule's sister Keri, for example, confirms that he "loves his family dearly," calling

2    him "a loving Father and Grandfather," "a wonderful Son," and "the best brother I could ask

3    for."  *See* Exhibit G (Letter from Keri Street).  He is "wonderful" with her children and "has

4    played a huge role in helping to raise" them.  *Id*.  Mr. Rhule has "a very special bond" with his

5    nephew [D.S.].  *Id*.  D.S. "has special needs and is extremely close with his uncle," who seems

6    to understand D.S. like no one else can.  *Id*.  In "this time of COVID, uncertainty, and remote

7    learning, [D.S.] is missing his uncle tremendously and is struggling to grasp why he can't see

8    him."  *Id*.  In his sister's words, Mr. Rhule is "extremely … generous," someone who "has

9    always looked out for me and his entire family."  *Id*.  As Keri sums up her family's powerful

10   connection to Mr. Rhule, "It takes a village and Ken is a huge part of ours."  *Id*.

11   Mr. Rhule's mother Johanna, too, describes the family as "very close knit," bound by

12   "strong ties."  *See* Exhibit E (Letter from Johanna and Ken Rhule).  She is proud that Mr. Rhule

13   "has done so much over the years for our family and the community," and points to how Mr.

14   Rhule has helped defray the costs associated with keeping her brother, who has a mental illness,

15   living with the family.  *Id*.  In short, "Ken has always been there when any of us has needed his

16   help."  *Id*.  The family is ready to provide the same support to this "kind, generous man": "We

17   know that together as a family we will get through these challenges that we are all facing. It is

18   not just him that is impacted, but our whole family that is feeling the pain ….  I know that

19   together we will get through this and be together again as a family."  *Id*.

20   Mr. Rhule's uncle Greg Weiner, who also recently moved to Nevada in retirement, also

21   admires Mr. Rhule's family commitment and generosity.  The family spent time with one

22   another outdoors—"camping trips, boating, skiing, fishing and hiking"—and made a point of

23   coming together at the holidays, when "Ken and Olga would always host Christmas Eve."

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 16

**skellenger**bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

Exhibit H (Letter from Greg Weiner). Mr. Weiner notes that "[a]ll of Ken's adult life he has worked very hard to support and take care of his family. . . and helped all of us in so many ways," including helping Mr. Weiner "many times over the years" with a mentally ill brother who shares Mr. Weiner's home. *Id*. Mr. Weiner describes how every year, Ken would lead the family in a trek around Seattle, giving out "all kinds of items" to homeless people—"sleeping bags, socks, toothbrush[es], clothing, McDonald[s'] gift cards, even shoes." *Id*. These actions show Mr. Rhule to be "a kind, loving person," to whom "helping those less fortunate" was always important. *Id*. Mr. Weiner points out that Mr. Rhule's generosity towards others was made possible by working hard from a young age to establish his legitimate businesses. *Id*.

Other members of the community share the same warm regard for Mr. Rhule. Longtime close family friend Megan Fletcher of Woodinville, too, calls Mr. Rhule "one of the most generous and heartfelt people I know," someone who "would literally give you the shirt off his back." *See* Exhibit Q (Letter from Megan Fletcher). She has known the family through good times and bad, and says Mr. Rhule has "always been the first one to share in the excitement, or console others during stress and heartache." *Id*. "He is always there for others without question or hesitation." *Id*.

Leah Barger is Mr. Rhule's ex-wife and mother of his twin sons. Leah describes the early years of their marriage when Mr. Rhule "started a computer business" while still a teenager "and was able to financially support [their] family" as examples of how Mr. Rhule is always willing to "take responsibility for his actions." *See* Exhibit I (Letter from Leah Barger). Leah reports that their three generations of extended and now blended families have "remain[ed] close" over the past 24 years, gathering to celebrate birthdays "together along with other holidays," and that enjoying their common grandchildren, whom they "adore," has

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 17

**skellenger**bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

brought the families "even closer." *Id.* Leah also reports that she has "remained close with Ken and Johanna as well as Keri and her two kids." *Id.* Leah expresses her confidence that Mr. Rhule would obey any release conditions imposed by the Court:

> I understand that the charges against Ken and Kenny are very serious. We don't agree on everything but one thing Ken does is take responsibility for his actions. He would not violate a court order or abandon his family. At the age of 17 he figured out a way to support his family. He is not one to run but takes on what is necessary to succeed. I do not believe that Ken would flee to Russia or anywhere else in violation of a court order.

*Id.*

### 2. Mr. Rhule has a long history as a founder, owner, and operator of legitimate businesses that employed hundreds of people and contributed positively to the community.

In 1993, before he even turned twenty, Mr. Rhule co-founded CompuCare, a computer hardware/software retailer. In just six years, Mr. Rhule grew CompuCare from a two-employee start-up to one of the industry's leading firms, ranked as both a top 100 National Computer Retailer and a Top 100 National System Builder. As a system builder, CompuCare assembled and distributed several thousand PC systems each month. CompuCare also built networks and provided maintenance and repair services in its physical locations, as well as through onsite service calls. CompuCare began as one of the first companies in the USA to purchase used desktop computers in volume from Fortune 1000 companies and then refurbish and market the machines with warranty and support services.

In 1999, Mr. Rhule sold CompuCare to concentrate full-time on developing his next venture, FocusMicro. FocusMicro was a business-to-business enterprise that sold security technology and installed and serviced security cameras for many Fortune 500 companies, including Albertsons, Panera, Starbucks and Walmart, as well as federal government facilities,

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 18

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

including airports and prisons, which work required Mr. Rhule to obtain certain government clearances.  On average, FocusMicro employed 250 people at any one time, ranging from engineers to project managers to electricians, and provided living wages with health and vacation benefits.  In just five years, Mr. Rhule and co-founder Bill White grew FocusMicro into a $36 million-dollar-a-year concern.  In 2015, Mr. Rhule wound down the company and went into semi-retirement.

These successful legitimate businesses that Mr. Rhule built at a very young age benefited not only the public but hundreds of employees (and, through their taxes, their communities and the nation at large).  With the proceeds from his work as an entrepreneur, Mr. Rhule has been able to support himself and Olga comfortably.[5]

**B.     Mr. Rhule never planned to flee to Russia to avoid prosecution.**

**1.     When Mr. Rhule mentioned to his wife Olga on May 10 the possibility he might travel to Russia, he was expressing a desire to support and assist her in attempting to acquire legal immigration status in the United States.**

At the detention hearing, the government placed heavy weight on Mr. Rhule's statements to his wife Olga during a recorded telephone call on May 10, while Olga was housed at the Northwest Immigration Detention Center.  In that conversation, Mr. Rhule said that if Olga went back to Russia, he might travel there, too, and that he had applied for a passport to facilitate that travel.  The government characterized this remark as evidence that Mr. Rhule was imminently planning to flee the country to avoid prosecution, arguing that once the search in

---

[5]  Ken and Olga Rhule reported more than two and a half million dollars in adjusted gross income in their federal tax filing for 2006, for example, and more than one million dollars in adjusted gross income in 2009.  *See* Exhibit J (Redacted Tax Records)

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 19

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

Monroe had yielded evidence of an unlicensed marijuana business, Mr. Rhule surely knew he was under investigation.

The government's contention ignores both the immediate context of the May 10 conversation and Olga's then-existing legal situation with respect to her immigration status. Namely, on that date—two months after the government had searched the property in Monroe where he resided, seizing extensive evidence—Mr. Rhule had not been charged with any crime. That fact might well have led him to believe that he was not going to be drawn into the thorny legal situation arising from any unregulated marijuana business or sketchy financial activities in which his son may have been involved.

More important, the background to the conversation—that Mr. Rhule at the time was focused on his wife's legal options for resolving both her immediately pending immigration matter and the long-term question of her legal status in the United States—provides essential context for understanding its content. Nothing said in the exchange hints at any fear that he might be about to face charges in connection with his son's alleged unlicensed marijuana business. The conversation reflects what was on Mr. Rhule's mind at that moment: the legal advice they had received regarding Olga's best chance of obtaining lawful status in the United States, her home for more than half her life. The history of Mr. Rhule's relationship with Olga, and of how her immigration status in the United States evolved over time, provides additional essential context for understanding the import of the recorded conversation from May 10.

        **2.**     **Olga Rhule's compromised immigration status required that Ken and Olga devise a plan of action to give her the best opportunity to eventually adjust her status and live legally in the United States.**

Olga came to the United States on a student visa in the late 1990s, at age 17, to attend college. Olga later met and became engaged to a man (not Mr. Rhule) who then successfully

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 20

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

petitioned for her to re-enter the United States on a K-1 (fiancée) visa.  Their marriage never materialized, and Olga's K-1 visa was withdrawn or expired.

The K-1 visa allows the fiancée of a U.S. citizen to enter the United States in order to marry that U.S. citizen.  The newly married non-citizen spouse is then permitted to adjust their status to become a Lawful Permanent Resident (LPR). The caveat is that within 90 days of entering the U.S., the non-citizen must marry the person who filed the K-1 visa.  If the non-citizen does not marry the person who filed the K-1 visa (if she does not marry at all, for example, or marries someone else), she cannot adjust her status to become an LPR..

Because Olga never married the U.S. citizen who applied for her K-1 visa, the moment that visa was withdrawn or expired, Olga lost the opportunity to adjust her status while here in the United States.  Since that time, as a matter of immigration law, Olga has lacked legal status in the United States.

While living in the Seattle area, Olga met Ken.  They fell in love and were married in April 2002.  Despite being married, Ken and Olga encountered difficulties in applying to have Olga's immigration status in the U.S. lawfully adjusted, because Ken was not the person who had petitioned for Olga to enter the United States on the since-withdrawn or expired K-1 fiancée visa.  In 2006, they managed to obtain an approved immigrant petition for relative (*see* Exhibit K) but ultimately proved unable to proceed further, despite going all the way to the United States Congress in the attempt.

When that effort failed, Olga faced the difficult choice of remaining at Ken's side in the United States without properly adjusted legal status or departing for Russia so that she might apply for permission to return to the U.S. based on their marriage.  Because they did not want

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 21

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1   to be apart and neither wanted to live even temporarily in Russia, Olga made the difficult

2   decision to risk staying in the United States without legal status.

3          When the search warrant was executed on Mr. Rhule's residence in March, ICE agents

4   encountered Olga, determined that she did not currently possess legal immigration status, and

5   remanded her to immigration custody to face removal proceedings.

6          Olga was indeed subject to removal, but ultimately learned of three potential avenues

7   for relief that could give her a possible route to eventually adjusting her status so that she might

8   reside legally in the United States with her husband Ken.  The three potential avenues for relief

9   from removal were:  (1) asylum, the withholding of removal due to the prospect of mistreatment

10  in the immigrant's home country; (2) cancellation of removal for non-permanent residents due

11  to hardship to a United States citizen spouse; or (3) a voluntary departure to Russia and consular

12  processing—essentially, returning to Russia to apply from there for a visa and a waiver of

13  inadmissibility (see below), based on her marriage to a U.S. citizen.  *See* Exhibit L (Letter from

14  Olga Rhule) and Exhibit R (Declaration of Nicholas Marchi).

15         Olga and Ken determined that the third option, voluntary departure followed by consular

16  processing, was her best option for eventually adjusting her status so that she could reside

17  legally with her husband and his family in the United States.  That goal, however, would have

18  to be pursued by interim steps.

19         First, rather than fighting removal, Olga would need to depart voluntarily from the U.S.

20  and return to Russia.  Once there, as a consequence of having previously overstayed her K-1

21  fiancée visa, she would be barred from reentering the United States for ten years.  *However*,

22  that ten-year inadmissibility bar is waivable at the discretion of a U.S. consular officer in Russia,

23  so long as the applicant has a qualifying United States citizen relative, such as a spouse.  Thus,

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 22

skellenger bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

departing voluntarily for Russia would preserve some hope for Olga of adjusting her status from afar, and then returning lawfully to the United States. *See* Exhibit L (Letter from Olga Rhule) and Exhibit R (Declaration of Nicholas Marchi).

> **3. The May 10 recorded conversation reflects Ken and Olga Rhule outlining the contours of her voluntary departure from the United States as a first step of an effort to eventually obtain long-term legal status in this country.**

This then, is the context in which the May 10 recorded conversation between Mr. Rhule and Olga, which featured so prominently in the government's presentation at the detention hearing, unfolded.

| | |
|---|---|
| Olga Rhule | First of all, let me ask you this. I'm not getting out anytime soon, right? |
| Ken Rhule | I don't think so. |
| Olga Rhule | How much time, approximately? |
| Ken Rhule | I don't know if there is a time limit that you are going to get out. I think we might have to have you go back to Russia and me meet you there. |
| Olga Rhule | And if that happens, how much time? |
| Ken Rhule | He couldn't answer that question because of Covid but it sounds like your hearing is on the 28th? |
| Olga Rhule | 29th. |
| Ken Rhule | 29th? I thought it was the 28th. So you can basically – at the hearing – you're gonna – you're gonna – you're gonna basically get -- say you're not gonna challenge it anymore, you know, and that you want to go and just proceed with deportation. |
| Olga Rhule | Can that happen sooner? |
| Ken Rhule | He said he didn't think so, but I'll – I'll push that issue tomorrow. I'll see if he can. He's going to have to do another one of these requests to move the hearing up kind of thing and they'll have to grant it or not. |

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 23

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

| Olga Rhule | Can you try? |
|---|---|
| Ken Rhule | Yes, I can try, of course.  But here's the thing, even with that, it's going to take me that long to get my passport and visa and stuff like that situated, so I'm working on that now and trying to get that expedited. |

The government suggests that Mr. Rhule's true motivation for traveling to Russia was to evade an anticipated prosecution, and that he had significant preexisting ties to Russia that would facilitate such flight.  But if those things were true, why would Mr. Rhule have gone two months—after seeing agents swarming over the premises where he lived, seizing evidence left and right, and ultimately taking his son away in handcuffs—without taking any steps whatsoever to put such a plan into motion?  The commonsense inference is that Mr. Rhule's May 10 surmise that he might have to travel to Russia arose in response to Olga's quite difficult immigration legal dilemma, and was motivated by his desire to give Olga the best avenue to eventually successfully adjust her status so that they might resume their life together in Seattle.

As Olga herself confirms in her letter supporting this motion, "Ken discussed getting a passport and meeting me in Russia to help me get acclimated to a country I have not known in 18 years," and to help get underway her consular application to adjust her status.  *See* Exhibit L (Letter from Olga Rhule).  Since Mr. Rhule knew that his telephone conversations with Olga were being recorded, it seems unlikely that he would have discussed with her the concept of voluntary departure, or talked openly about the prospect of getting his passport and a visa for a spontaneous trip to Russia, if he were genuinely plotting to flee prosecution.  Instead, he was simply laying out for his wife the legal strategy that they believed might well be the only route to successfully adjusting her legal status.

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 24

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

And as her attorney Nicholas Marchi has advised, Olga Rhule has now in fact chosen voluntary departure to Russia—the avenue that will best keep alive her chances of one day legally reentering the United States.  She has every intention of returning, if possible, because as she puts it, "I have built a life for myself here," "I want to live in the United States."  *See* Exhibit L. And crucially, Mr. Rhule is aware that if this Court sees fit to release him on conditions, and he then attempts to abscond, (1) Olga *will never obtain the consular waiver that is essential for her to acquire legal permission to return to the United States;* and (2) if Mr. Rhule were ever allowed to enter Russia—which seems extremely unlikely—he would face a lifetime sentence of exile in an unfamiliar and hostile land, likely never seeing his family again, much less returning to the community where he has spent nearly all of his life.

Mr. Marchi has emphasized to undersigned counsel that if Mr. Rhule becomes a fugitive from justice and a warrant is issued for his arrest, there will be zero chance that United States consular officials in Russia will ever grant the discretionary waiver that would allow Olga to come back to the United States. Thus, Mr. Rhule knows full well that failing to appear as required by his conditions of release would destroy any hope of Olga's ever adjusting her legal status and reentering the country where she has spent the last twenty years and desperately wants to live.

Setting aside Olga, who will be returning at least temporarily to Russia, all the members of Mr. Rhule's family—with whom he has extremely strong ties—reside in the United States, as is shown graphically below.

| Family Members Inside the United States | | | Family Members Outside the United States | | |
|---|---|---|---|---|---|
| **Name** | **Relation** | **Length of Relationship** | **Name** | **Relation** | **Length of Relationship** |
| Johanna Rhule | Mother | 45 years | Olga Rhule | Wife | 18 years |
| Kenneth Rhule | Father | 45 years | | | |

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 25

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

| Family Members Inside the United States | | | Family Members Outside the United States | | |
|---|---|---|---|---|---|
| **Name** | **Relation** | **Length of Relationship** | **Name** | **Relation** | **Length of Relationship** |
| Greg Weiner | Uncle | 45 years | | | |
| Bruce Weiner | Uncle | 45 years | | | |
| Keri Street | Sister | 40 years | | | |
| Conner Rhule | Son | 27 years | | | |
| Kenny Rhule | Son | 27 years | | | |
| Jeremy Street | Brother-in-Law | 12 years | | | |
| S.S. | Niece | 10 years | | | |
| D.S. | Nephew | 7 years | | | |
| A.R. | Grandchild | 4 years | | | |
| A.R. | Grandchild | 2 years | | | |
| **Total Years of Family Relationships** | | **309 years** | | | **18 years** |

And within the United States, the family's nexus is Washington State, where its members connect frequently year-round. Mr. Rhule will continue to reside in the greater Seattle area, which he has called home for more than thirty years.

### 4. Contrary to the government's claim, Mr. Rhule has no "significant ties to Russia."

Mr. Rhule has never been to Russia. *See* Exhibit E (Letter from Johanna and Ken Rhule).

Mr. Rhule does not speak Russian.[6] *Id.*

Although Mr. Rhule's wife Olga is a Russian citizen, she has lived in the United States for more than half of her life and has not returned to Russia in almost twenty years. *See* Exhibit L (Letter from Olga Rhule).

That Mr. Rhule's Russian father-in-law, who lives in the city of Khabarovsk, near the Chinese frontier, was at one time listed by Mr. Rhule on a document as a member of an LLC that owns Mr. Rhule's residence does not establish "significant ties to Russia." The government

---

[6] And only 5.48 percent of Russians speak English, making it a distinctly inhospitable place for a non-Russian-speaker to get along. *See* https://bit.ly/2DDOfND (last visited August 10, 2020).

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 26

**skellenger**bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

has proffered no evidence that Mr. Rhule has had any kind of relationship with his father-in-law that would support an inference that the latter would risk assisting Mr. Rhule if he absconded and somehow managed to make his way to Russia. Especially given that his father-in-law speaks no English and Mr. Rhule speaks no Russian, this incidental connection is an extremely weak basis upon which to rest a finding that Mr. Rhule has "significant ties" to that faraway nation.[7]

Moreover, even that slender thread has been broken. Official records of the State of Delaware show that Olga's father is no longer the managing member of the LLC that owns the residence. Mr. Rhule is now—and has been for several years—the managing member of the LLC that purchased and owns the Monroe property:



> **STATEMENT OF AUTHORIZED PERSON**
>
> STATEMENT OF ORGANIZATION
>
> OF THE AUTHORIZED PERSON OF
>
> <u>Frontline LLC</u>
>
> We, Harvard Business Services, Inc., the Authorized Person of Frontline LLC – a Delaware Limited Liability Company – hereby certify pursuant to Section 18-201 of the Delaware Limited Liability Company Act and to the best of my knowledge that:
>
> 1. The Certificate of Formation of Frontline LLC was filed with the Secretary of State of Delaware on March 14, 2016.
>
> 2. On March 14, 2016 the following person(s) were named as the Managing Manager(s) of the Limited Liability Company until their successors are elected and qualify:
>
> Kenneth Rhule
>
> 3. The undersigned signatory hereby resigns as the authorized person of the above named Limited Liability Company.
>
> In witness whereof, I have signed this instrument as of the date when these actions were so taken this 14th day of March, 2016.
>
> Harvard Business Services, Inc., Authorized Person
> By: Richard H. Bell, President

---

[7] This is particularly true since an equally good surmise is that identifying Olga's father as a member of the LLC may have simply been an unsophisticated –and temporary—attempt to preserve her community property interest in the Monroe property (acquired during her marriage to Ken), in light of Olga's legal status as an undocumented immigrant.

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 27

**skellenger**bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

It is Mr. Rhule, not his father-in-law, who is the beneficial owner, Managing Member, and authorized person who signed all the escrow paperwork and other necessary documents to purchase the Monroe property in 2016:



### 5. The shadowy 'second airplane' is not airworthy and sits inert on the tarmac at Lake Chelan Airport.

During the detention hearing, the government proffered that although it had seized one airplane associated with Mr. Rhule, a 'second airplane' could not be located by agents. The government argued that with Mr. Rhule being a pilot, the existence of this other plane created

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 28

skellenger bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

an unacceptable risk that Mr. Rhule would flee by air to Russia.  *See* Exhibit M (July 24, 2020 Detention Hearing Transcript at 14) (noting that Mr. Rhule "happens to be a pilot," and is the beneficial owner of "two private planes," and that although the government has "seized one of those planes," it has been "unable to locate the second plane"); *see also id*. at 30 (government's counsel: "I think really what's driving here is this connection to Russia, his very strong connection to Russia. His wife is going to be living there. He has in-laws there that have helped him set up companies. He has the ability to leave, *to fly out*.")

A slightly deeper examination of the facts reveals this contention as unfounded. Attached as Exhibit N is the (now expired) FAA request for transfer of registration for "the second airplane." The aircraft in question is a 1960 single-engine Cessna 210, tail number N149S.  Frontline Aviators, LLC, of which Kenneth Warren Rhule is the managing member, applied to change the registration of this plane in 2019; that application now appears to have expired.

Undersigned counsel has been informed and believes that this aircraft, pictured below in what has been represented to counsel to be a recent photograph, is currently sitting on the tarmac at Lake Chelan Airport.  Undersigned counsel has been informed that this aircraft—in addition to lacking a propeller—is not airworthy, not the least because the engine crankcase is cracked, leaking oil, and, per FAA regulations, now unrepairable.

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 29

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1
2
3
4
5
6
7
8
9



10  Photo of plane reported to have been taken in August 2020.

11          Regardless of any representations about the airworthiness—or lack thereof—of this

12  airplane, the government can no longer maintain that it is "unable to locate the second plane"

13  in arguing to the Court to detain Mr. Rhule as a flight risk.  The plane is at the Lake Chelan

14  Airport.  This is another new fact that was not before the Magistrate Judge at the time of the

15  detention hearing.

16          Further, as the government well knows (because this fact is reflected in the discovery

17  recently provided to undersigned counsel), Mr. Rhule is actually only a *student* pilot, having

18  completed just a few hours of solo flight time, who is not even authorized to take up other

19  persons, even under visual flight rule conditions. Commonsense would indicate that he is not

20  at all qualified to fly a single engine airplane to Russia.

21          For all these reasons, it is much clearer now that the Court need not worry that if it

22  releases Mr. Rhule from custody, he will wing his way to Russia in this battered, sixty-year-old

23  Cessna with a leaky crankcase and no propeller.

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 30

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1

2

      **6.**    **The government's suggestion that ownership of substantial assets by so-called 'shell companies' enhances Mr. Rhule's risk of flight makes no sense.**

3

      At his detention hearing, the government intimated that the fact that Mr. Rhule holds

4

assets, such as his house and cars, in 'shell companies' rather than registering them in his own

5

name, was somehow nefarious and pointed to an increased flight risk.

6

      The Monroe property on which Mr. Rhule's house is located is registered to Frontline

7

LLC, of which Mr. Rhule is the managing member.  It was Mr. Rhule who, as managing

8

member of Frontline LLC, signed the escrow paperwork for the purchase of the house.  *See*

9

*above.*

10

      As documents disclosed by the government to undersigned counsel confirm, other assets

11

are openly registered to entities where other family members are named as managing members.

12

The cars, for example, are registered to RKK Associates LLC, for which Olga Rhule is the

13

managing member.  And the sole airworthy plane (now seized by the government) is registered

14

to Frontline Aviators LLC, for which Kenneth Warren (Kenny) Rhule is the managing member.

15

      The fact that family members have chosen the corporate form of ownership for certain

16

substantial assets—not a particularly unusual practice, and perfectly legal in Washington and

17

throughout the rest of the country—is not evidence of illegal behavior.  The individual

18

beneficial owners can be immediately identified from the readily and publicly available records

19

of these LLCs, belying any nefarious purpose.  The government has failed to even offer an

20

argument linking these facts to a higher likelihood that Mr. Rhule will attempt to abscond or

21

succeed if he tries.  Certainly, nothing about this circumstance justifies leaving a United States

22

citizen and long-term local resident in jail, at the mercy of a frightening pandemic, while

23

skellenger bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1   awaiting the resolution of criminal charges for non-violent conduct that, when properly

2   licensed, is fully legal in this State.

3           **7.      The State Department's official refusal to issue Mr. Rhule a**
                       **passport—which occurred after the detention hearing in this case—**
4                      **disables him from traveling to Russia, even if he so desired.**

5           By letter dated August 7, 2020, the National Passport Center of the U.S. State

6   Department has notified Mr. Rhule that he is "ineligible" to receive a passport due to a pending

7   tax dispute with the IRS:



DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 32

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

*See* Exhibit O (State Department Passport Denial Letter).  Since the State Department will not issue Mr. Rhule a passport, the standard Pretrial Services condition routinely ordered in this District (and also imposed on co-defendant Kenneth Warren Rhule)—that Mr. Rhule surrender any travel documents in his possession and refrain from seeking new ones—is sufficient to provide reasonable assurance that Mr. Rhule will not flee.  This is another new fact not before the Magistrate Judge at the time of the detention hearing.

> **8.      Travel to Russia is extremely dangerous and difficult, and at the present time the living conditions there for an American are grim.**

Due to the United States' ongoing inability to control the spread of the COVID-19 pandemic within its own borders, most governments around the world are refusing entry to U.S. citizens.  *See*, *e.g.*, "E.U. Formalizes Reopening, Barring Travelers from U.S.," The New York Times (June 30, 2020).

Additionally, this month the State Department issued a Level 4 "Do Not Travel" advisory for Russia due to COVID-19 as well as the persistent threat of "terrorism, harassment, and the arbitrary enforcement of local laws."

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 33

skellenger bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/russia-travel-advisory.html (last accessed August 23, 2020).

And in addition to the sheer logistical complexity of traveling to Russia, the fact is that Mr. Rhule, if the Court ultimately decides to release him, will be under 24/7 GPS monitoring, as recommended by Pretrial Services, from the moment he walks out of jail.  His every move

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 34

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

will be tracked.[8]  That circumstance, taken together with the hurdles outlined above, and in light

of Mr. Rhule's longstanding and deep ties to this community and his powerful desire not to

inflict financial harm on his family (by causing them to forfeit the property they are willing to

risk to secure his release, *see infra*), sufficiently minimizes any risk that Mr. Rhule might

abscond.

> **C.    This Court's actions in other cases—releasing defendants who arguably present a significantly greater risk of flight or threat to public safety than Mr. Rhule—demonstrate that appropriately crafted conditions of release can meet those concerns in all but truly exceptional circumstances.**

Respectfully, in many recent cases judges in this District have released on conditions

defendants who present a significantly greater risk of non-appearance or pose a substantially

greater threat to community safety than Mr. Rhule. A few examples usefully illustrate the

contrast.

In *United States v. Margaret Channon*, WAWD No. MJ 20-336, the defendant was

charged with five counts of arson after allegedly engaging in vandalism during a protest in

downtown Seattle on May 30, 2020.  According to the government, Ms. Channon set fire to a

total of five police vehicles using an aerosol can and a lighter; she also purportedly damaged

the interior of a clothing store, stole a shirt, smashed the façade of a cell phone store, and

ransacked a sandwich shop.  Despite the seriousness of these allegations and Ms. Channon's

---

[8] GPS monitoring—an accepted judicial mechanism to monitor a defendant's whereabouts (*see* Federal Location Monitoring https://www.uscourts.gov/services-forms/probation-and-pretrial-services/supervision/federal-location-monitoring (last accessed August 5, 2020) and Weinberg & Furse, [5.5(iv)] ("'House arrest' is . . . a statutorily permissible condition. . . " as is the wearing of an electronic monitoring device."))—and often used by mariners for close quarters navigation, is generally considered to be accurate "to within three meters."  *See* https://www.brickhousesecurity.com/gps-trackers/gps-accuracy/#:~:text=Ultimately%2C%20most%20GPS%20tracking%20devices,stronger%20signals%20and%20greater%20accuracy. (last accessed on August 25, 2020).

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 35

**skellenger bender**

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

arguably limited ties to the community, this Court affirmed the magistrate judge's decision to release her on conditions.

The Court reasoned that although Ms. Channon had failed to appear or been arrested for failing to appear six times in 2016-17, and was facing mandatory minimum prison terms, the conditions imposed on her release (including a third-party custodian and GPS monitoring) were sufficient to mitigate any flight risk. *Channon*, WAWD No. MJ 20-336, No. 35 at 5. The Court was "bolstered" in this conclusion by the "help and support" that Channon's family members had stepped forward to offer since her arrest, promising their "best efforts" to help her comply with the conditions governing her release. *Id.* As to dangerousness, the Court noted that the conditions in place, specifically requiring Ms. Channon to reside at a specific location, keep a curfew, and have her whereabouts monitored by Pretrial Services would "help keep the community safe" by making it "incredibly difficult" for her to commit dangerous acts. *Id.* at 8. And the Court again observed that "the many supportive people in Channon's life" would "help hold her accountable while she is released." *Id.* Accordingly, the Court concluded that "these offers of support" left it "reasonably assured" that the community would be safe if Ms. Channon were released pending trial. *Id.*

In *United States v. Friedrich*, WAWD No. MJ 20-193, the government alleged that Mr. Friedrich had sold counterfeit Percocet pills laced with fentanyl to a U.S. Navy sailor, who after being found unresponsive in his workspace aboard ship was pronounced dead at the scene by first responders. A search of Mr. Friedrich's apartment netted approximately 100 grams of suspected cocaine, a semiautomatic handgun, and a bag containing approximately 100 pills suspected to be counterfeit Percocet containing fentanyl. Even though Mr. Friedrich possessed a semiautomatic firearm and had engaged in conduct involving a highly lethal controlled

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 36

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

substance that actually resulted in the death of a U.S. serviceman, the Court saw fit to release him on conditions.  *United States v. Friedrich*, WAWD No. MJ 20-193, Dkt. No. 9.

In *United States v. Donnie Barnes, Sr.*, WAWD No. MJ 18-5048, the defendant was accused of producing and distributing child pornography.  The allegations were extremely grave, involving claims that Mr. Barnes personally produced child pornography victimizing his 11-year old stepdaughter and then distributed the images online.  The charged offense was both a crime of violence and a crime involving a minor victim. *See* 18 U.S.C. § 3142(f)(1)(A) (referring to a "crime of violence"); 18 U.S.C. § 3156(a)(4)(C) (defining "crime of violence" as "any felony under chapter . . . 110," which includes 18 U.S.C. § 2252).  When arrested, Mr. Barnes admitted to being the person who had produced the images and to having taken other, similar images of his stepdaughter.  Despite these most serious allegations (which ultimately resulted in a 180-month prison sentence), and testimony at the detention hearing about the terrible impact of the crimes on the victim and the community, the court was convinced that Mr. Barnes' supportive family network would hold him accountable for complying with the conditions of release, which included a third-party custodian.

Federal prosecutors in this District have very recently brought an Indictment in a large scale, 20-defendant methamphetamine and heroin conspiracy (*see United States v. Gomez-Marentes et al.*, WAWD No. 20-cr-00092-JCC).  Despite the demonstrated harm that these very drugs have inflicted on the community, the mandatory minimum prison terms very likely to be imposed upon conviction, and the relatively high flight risk inherent in such cases, many of these defendants— with far fewer ties to this community than Mr. Rhule—have been released on conditions.  *See id.*, Dkt. No. 109 (Appearance Bond for Amanda Meyer); Dkt. No. 122 (Appearance Bond for Blanca Medina); Dkt. No. 134 (Appearance Bond for Ruth Melisa Gomez-Marentes); Dkt. No. 148

skellengerbender

(Appearance Bond for Luis Castillo-Barragan); and Dkt. No. 232 (Appearance Bond for Efrain Luna-Rodriguez).

> **D.** **Mr. Rhule in fact presents a lower risk of danger to the community, or of using internet savvy to facilitate flight from prosecution, than his son Kenneth Warren Rhule, whom the Court has already determined it was safe to release.**

Every release decision ultimately reflects an "individualized evaluation" of the relevant facts and circumstances surrounding a particular defendant. *United States v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019). But fundamental fairness suggests that where cases are related and their facts overlap extensively, a decision to release one co-defendant and confine another deserves careful scrutiny.

When originally released on standard conditions, Mr. Rhule's son Kenneth Warren Rhule was directed to provide Pretrial Services with a list of all his financial assets and liabilities. He thereafter moved the Court to remove that requirement. The government opposed the change, arguing strenuously that Kenneth Warren Rhule has a history of avoiding financial institutions and hiding his assets in shell companies to evade law enforcement. It proffered further that he had possessed sufficient cryptocurrency to provide more than $140,000 worth of bitcoin to an undercover agent working a cash-for-bitcoin exchange, and that a substantial portion of the $13 million in gross sales (over several years) generated from HerbinArtisans' sale of marijuana products likewise was held in cryptocurrency.

The Complaint itself alleges that Kenneth Warren Rhule was proficient in staying anonymous online, as evidenced by his telling the undercover agent during the investigation that she could better conceal her identity by dealing in untraceable cryptocurrency, using a TOR-based operating system, and avoiding sending funds through the U.S. Postal Service. For

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 38

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

all these reasons, the government argued, without a full accounting of Kenneth Warren Rhule's financial assets and liabilities, Pretrial Services would be unable to assess whether he might be liquidating his assets in advance of an attempt to flee the jurisdiction. *See United States v. Kenneth Warren Rhule*, WAWD No. 20-mj-0097-PLM, Opposition to Motion to Modify Conditions of Release, Dkt. No. 22.

The Court firmly disagreed that this special condition was warranted. Magistrate Judge Peterson held that even though Kenneth Warren Rhule was familiar with cryptocurrency and the techniques of online anonymity, there were conditions that could reasonably assure his appearance at future proceedings: barring him from traveling outside the District and requiring him to maintain his residence and surrender his passport. She further found that in combination with these conditions, Kenneth Warren Rhule's longstanding ties to this District (where he was born and raised) were sufficient to assure his appearance. *See* Exhibit D (Order Granting Kenneth Warren Rhule's Motion to Modify).

Thus, five months ago Mr. Rhule's son and co-defendant, Kenneth Warren Rhule, was released pending resolution of their joint case, in which he faces by far the more serious charges, despite facts that could give a reasonable person pause about his risk of non-appearance and the danger he might pose to the community. Magistrate Judge Peterson found that the proposed conditions of release—which are quite a bit less onerous than the ones that Pretrial Services and Mr. Rhule himself have proposed here—were sufficient to reasonably allay those concerns. And to date, as far as undersigned counsel is aware, Kenneth Warren Rhule is successfully complying with those conditions and no problems have resulted.

Yet, the case for detaining Kenneth Warren Rhule as a possible flight risk and threat to public safety is arguably stronger than any that can be mounted against Mr. Rhule. According

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 39

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

to a government agent, Kenneth Warren Rhule was familiar with the tools and technology necessary to access the dark-web and was actively involved in converting cash to cryptocurrency there (a service he is alleged to have offered even when he had reason to believe that the cash represented proceeds from serious crimes against persons, including human sex trafficking).  Kenneth Warren Rhule even tutored the undercover agent in how to preserve her anonymity online while engaging in illicit financial transactions.

And, as the discovery in the government's possession and now provided to defense counsel reveals, Kenneth Warren Rhule actually *is* a licensed airplane pilot, not a student pilot like his father.

Taken as true, these facts certainly increase the risk that Kenneth Warren Rhule might flee to avoid prosecution, as this specialized knowledge and these unusual skills could help him evade detection while on the run or in hiding.  Some might argue that his demonstrated familiarity and comfort with engaging in potentially illegal financial transactions on the dark-web also suggests an elevated risk to the community, as financial pressure resulting from his arrest and the seizure of his business might tempt him to seek out funds via the dark-web again.

But Magistrate Judge Peterson rightly concluded that these concerns, while genuine, could be minimized by imposing reasonably strict conditions on Kenneth Warren Rhule's release.  The same is certainly true for Mr. Rhule.  While no one would deny that Mr. Rhule knows a lot about computers, having personally founded and built two different successful technology businesses, there is no reason to believe that Mr. Rhule is a more sophisticated user

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 40

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

of the dark-web than his son who has been deemed an acceptable risk to release from custody.[9]

**E.      The new information before this Court, which was not before the Magistrate Judge when he decided that the only option was to jail Mr. Rhule pending resolution of the charges, strongly supports a finding that available conditions of supervision can reasonably assure Mr. Rhule's appearance and preserve the safety of the community.**

**1.      The newly proposed conditions, in combination with those already reviewed and approved as sufficient by Pretrial Services, should greatly increase the Court's confidence that Mr. Rhule may safely be released.**

As previously noted, at Mr. Rhule's detention hearing United States Pretrial Services recommended that he be released, subject to a set of conditions that staff and supervisors in that office had evaluated and approved.  We are now proposing additional conditions of release to those previously proposed and approved by Pretrial Services.  These additional conditions—such as, for example a third-party custodian—were not thought necessary by Pretrial Services and so were not offered to or discussed by the Magistrate Judge at the detention hearing.  The total package of conditions of release now proposed would include the following:

- Submit to drug and alcohol testing, to include urinalysis, breathalyzer, or hand-held testing devices, as directed by Pretrial Services. You shall not use, consume, or possess alcohol, any product containing alcohol, or other intoxicants, including medication, unless prescribed to you by a physician and under the direction of Pretrial Services. Obtain an alcohol/substance abuse evaluation and follow any treatment recommendations as directed by Pretrial Services. You shall participate as directed in a

---

[9] Along the same lines, the government at Mr. Rhule's detention hearing voiced a "dangerousness" concern arising from the agents' recovery of firearms from the premises in Monroe. The government has since obtained an indictment against Mr. Rhule and his son, but it charges only the latter with any violation related to those weapons.  If Kenneth Warren Rhule's connection to those firearms is insufficient to deny him release, the same has to be true for Mr. Rhule.

In any case, it is a standard condition of pretrial release in this District that all firearms possessed by a defendant—which possession is not unusual, particularly in a rural Monroe household—be surrendered for the duration of the case.  As far as undersigned counsel is aware, enforcing this condition has not been a problem.

Finally, all the firearms discovered at the premises in Monroe have been seized by law enforcement agents and secured as evidence, eliminating any possible danger from them.

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1  program approved by the probation and pretrial services office for treatment of narcotic
2  addiction, drug dependency, or substance abuse, which may include testing to determine
   if the defendant has reverted to the use of drugs or alcohol.

3  •  Travel is restricted to the Western District of Washington, or as directed by Pretrial
4     Services.

5  •  Surrender all current and expired passports and travel documents to the court. Do not
      apply for/obtain a new passport or travel document from any country without permission
6     of the court. If the surrendered passport is a foreign passport, it shall be forwarded to
      Immigration and Customs Enforcement if defendant is convicted of an offense, unless
7     otherwise ordered by the Court.

8  •  Maintain residence as directed. Do not change residence without prior approval of
      Pretrial Services or as directed by Pretrial Services.

9  •  You are prohibited from possessing or having access to firearms and dangerous
10    weapons. All firearms and dangerous weapons must be removed from your residence(s),
      vehicle(s), and place of employment. This condition operates in conjunction with any
11    restrictions imposed under Title 18, USC 922, and the Washington State Revised Code,
      Chapter 9.41.

12 •  Provide Pretrial Services with any requested information regarding your financial status,
      income sources, and investments. Sign a Release of Information form for Credit Bureau
13    Verification if requested by Pretrial Services. The defendant is exempt from providing
      a new worth statement and/or information regarding his assets and liabilities.

14 •  You must contribute towards the costs of the services required by this bond, to the extent
15    you are financially able to do so, as determined by Pretrial Services.

16 •  You shall not possess or use any Social Security number, identification, or documents
      in any name other than your own.

17 •  You shall not have direct contact or indirect contact with any existing and/or future co-
18    defendant(s) in this case, with exception to his son, Kenneth Warren Rhule. He is not to
      discuss the case with his son.

19 •  You shall not have direct contact or indirect contact with any existing and/or future
20    witnesses in this case, with exception to his son, Kenneth Warren Rhule. He is not to
      discuss the case with his son.

21 •  The defendant shall comply with Stand Alone Monitoring component of Location
22    Monitoring Program. The defendant shall be monitored by Active Global Positioning
      Satellite technology which shall be utilized for purposes of verifying compliance with
      any court-imposed condition of supervision. The defendant shall abide by all program
23    requirements, and must contribute towards the costs of the services, to the extent

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 42

financially able, as determined by the location monitoring specialist. **The location monitoring specialist will coordinate the defendant's release with the U.S. Marshals**.

- The defendant shall abide by all federal, state, and local directives regarding the COVID-19 pandemic.

- The defendant cannot directly or indirectly transfer any virtual currency, also known as cryptocurrency, in or over which the defendant has any right, title, interest, or control unless permitted by Pretrial Services.

*Added Condition A:* *Release to the third-party custody of Johanna Rhule (defendant's mother) and Keri Street (defendant's sister). Both Johanna Rhule and Keri Street agree to monitor the defendant's compliance with the conditions of release and report any violations to Pretrial Services Officer.*

*Added Condition B:* *Appearance bond, completed as directed by the Court on U.S. Courts Forms AO-100 and AO-98, secured as follows:*

*B-1: Johanna and Kenneth Rhule (defendant's parents): Promise to pay $400,000 with, at the Court's discretion, the addition of a property bond encumbering their residence in Mesquite, Nevada.*

*B-2: Keri Street (defendant's sister): Promise to pay $200,000, with, at the Court's discretion, the addition of a property bond encumbering the Street family residence in Bothell, Washington.*

*B-3: Kenneth John Rhule (the defendant): If he defaults, the defendant agrees that he will forfeit all of his interest in all real and personal property identified in the section titled FORFEITURE ALLEGATIONS at page 3-7 of the Indictment.*

*B-4: Kenneth Warren Rhule (the co-defendant and son of the defendant Kenneth John Rhule): In the event that Kenneth John Rhule defaults, Kenneth Warren Rhule also agrees to forfeit all his interest in all real and personal property identified in the section titled FORFEITURE ALLEGATIONS at pages 3-7 of the Indictment.*

*B-5: Olga Rhule (the defendant's wife): To the extent she has a community property interest in such property, Mrs. Rhule also agrees that if the defendant Kenneth John Rhule defaults, she will forfeit all of her interest in all real and personal property identified in the section titled FORFEITURE ALLEGATIONS at pages 3-7 of the Indictment.*

*Added Condition C:* *The defendant is restricted to his residence at all times except for employment or as otherwise approved by a location monitoring specialist.*

skellenger bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

*Added Condition D:   At the Court's discretion, the defendant's access to the internet is restricted to: (1) access to devices only as permitted by the Pretrial Services Officer; (2) access only on a monitored device; and/or (3) no access to any device that can access the internet with the exception of a telephone to be used for maintaining contact with third-party custodians, family members, the Pretrial Services Officer, approved employment contacts, and counsel of record.*

These new conditions—again, which proposals were not previously recommended by Pretrial Services nor considered by the Magistrate Judge—represent a significant change because added conditions A and B bring Mr. Rhule's family members directly into the picture. One would place Mr. Rhule in the third-party custody of his sister Keri Street and his mother Johanna Rhule, making them personally answerable to the Court for his appearance at court and his compliance with other conditions.  The other would place his parents' primary residence and his sister's family's primary residence in this Court's hands, such that Mr. Rhule's failure to appear could result in his mother and father *and* his sister and her family losing their homes.[10] These new conditions represent powerful constraints and will reasonably assure Mr. Rhule's compliance with the orders of the Court.

### 2.   Mr. Rhule's parents are prepared to risk their home on Mr. Rhule's appearance at court and his compliance with conditions of release.

Mr. Rhule's mother and father, Johanna and Kenneth, live in a home that is unencumbered by any interest.  *See* Exhibit E (Letter from Johanna and Ken Rhule).  It is owned by a trust of which they are the trustees, with full legal authority to encumber or dispose of the property.  *Id*.  *See* Exhibit P (Letter from attorney Brett Harrison).  The residence is in a Del Webb development in Mesquite, Nevada, about an hour from Las Vegas, and is worth

---

[10] *See* Weinberg & Furse, [5.5(xii)] ("[T]he court may permit another person to act as surety if satisfied that the relationship reasonably assures defendant's appearance." "While the statute suggests that a surety will agree to forfeit a specified 'amount,' not specific real or personal property. . . .the court can require an agreement by the surety to forfeit specific property.").

**skellenger**bender

approximately $400,000 (four hundred thousand dollars).  *See* Exhibit E.  Mr. Rhule's mother and father have volunteered to sign a promissory note, secured by the equity in their home if required by the Court, as a condition of their son's release.  *Id.*

This promise represents a substantial financial risk for this retired couple who, while secure, are not lavishly wealthy.  Mr. Rhule's parents are willing to make this promise because they "have every confidence" that their son "will remain in Washington to answer these charges" and "comply with any and all conditions imposed by the Court." *Id.*  They reject any suggestion that he might "flee to Russia or anywhere else."  *Id.*  Instead, they say, Mr. Rhule can be trusted to "see the process through," because "[h]e loves his family and would never jeopardize his family by fleeing."  *Id.*

> **3.  Mr. Rhule's sister and her family are prepared to risk their home on Mr. Rhule's appearance at court and his compliance with conditions of release.**

Similarly, Keri Street and her husband are prepared to risk significant financial assets and perhaps their family home to assist the Court in maintaining Mr. Rhule's compliance with the conditions of release.  They are comfortable taking this chance because they believe that what Mr. Rhule wants is simply to "be home with his family while he awaits next steps."  *See* Exhibit G (Letter from Keri Street).  The Streets are "confident that Ken will comply with all conditions imposed by the Court" and "do not believe that Ken would flee to Russia," because he is committed to "remain in Washington to answer the charges against him."  *Id.*

> **4.  Ken and Olga Rhule, and their son/step-son Kenneth Warren Rhule, are prepared to secure Mr. Rhule's appearance with their entire interest in all the property targeted for forfeiture in the Indictment.**

Importantly, in the extremely unlikely event that Mr. Rhule defaults on his bond, Ken and Olga Rhule and their son (and step-son) Kenneth Warren Rhule are prepared to forfeit all

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 45

**skellenger**bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

their interest in the real and personal property identified in the section titled FORFEITURE

ALLEGATIONS at pages 3–7 of the Indictment.   This promise represents a significant

additional assurance from the involved parties that Mr. Rhule will fully comply with the

conditions imposed by the Court.

> **5.     Here, as in *Channon*, the newly available statements of Mr. Rhule's family members promising to ensure that he complies with any conditions imposed by this Court shift the balance in favor of release.**

As noted above, in the *Channon* case this Court placed significant weight on the fact

that members of Ms. Channon's family had pledged to help hold her accountable for complying

with the conditions imposed by the Court.  *Channon*, WAWD No. MJ 20-336, No. 35 at 8.  As

the Court put it, such "offers of support" helped provide reasonable assurance that Ms. Channon

would appear for court and refrain from endangering the community during her period of

pretrial release.  *Id*.

Likewise, numerous family members here have stepped forward to express their love

for Mr. Rhule, their unwavering confidence that he will walk a straight path if released, and

their willingness to help him do so.  Mr. Rhule's parents, who have reviewed the conditions

recommended by Pretrial Services and discussed them with undersigned counsel, have stated

unequivocally that they are "willing to act as third-party custodians to assist the Court, and,

pretrial services in making sure Ken complies with all of the conditions of release."  *See* Exhibit

E (Letter from Johanna and Ken Rhule).[11]

---

[11] *See* Weinberg & Furse, [5.5(i)] (Third-party custody is an appropriate condition of release and "[t]he custodian must agree to supervise the defendant and to report to the court any violation of the release order.")

**skellenger**bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

His sister Keri Street and her husband Jeremy similarly offer their assurances that "Ken will comply with all conditions imposed by the Court," with their help if necessary, and express their belief that Mr. Rhule would never "flee to Russia or anywhere else in violation of a court order to remain here." *See* Exhibit G (Letter from Keri Street). Indeed, Ms. Street offers to act as third-party custodian for her brother, whom she "love[s] … to pieces," promising to help make sure that he complies with all conditions imposed by the Court and appears for all his court dates. *Id.* She promises to keep a close eye on him and will "contact the court or pretrial services to report any violations." *Id.*

Mr. Rhule's ex-wife, Leah Barger has expressed her full confidence that Mr. Rhule will "take responsibility for his actions" and would never "violate a court order or abandon his family." *See* Exhibit I (Letter from Leah Barger). And while Mr. Rhule's wife Olga will not be here to help him comply, she has stated emphatically she will "always encourage Ken to stay in Washington to face these charges because it is the right thing to do." *See* Exhibit L (Letter from Olga Rhule).

F.     **The conduct in which the government alleges Mr. Rhule engaged is not a crime in Washington if proper licenses are obtained.**

It is true that Mr. Rhule faces charges that carry a 10-year mandatory minimum sentence. But that fact is a function of the charging decision and nothing else. This is not the kind of case that will cause Mr. Rhule to flee and abandon his mother, father, sons, and other close family members for the life of a fugitive in an inhospitable foreign country he has never visited and whose language he does not speak, nor is it the kind of case that presents a grave threat to public safety. Mr. Rhule is charged with unlawfully distributing marijuana and its

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 47

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

distillates, substances any adult over age 21 can legally purchase at many establishments across this State.

As the parties are well aware, voters legalized the recreational use of marijuana in Washington State in December 2012 by passing Initiative 502. The measure led to enactments that swept away the state-law criminal and civil penalties previously imposed on adults who produced, distributed, possessed, or used marijuana. In place of those failed measures, Washington has erected a regime of licensing and regulation administered by a state agency, the Liquor and Cannabis Board. *See* WAC 314-55 (Marijuana Licenses, Application Process, Requirements, and Reporting).[12] Marijuana sales are now taxed, and the revenues are earmarked to benefit the public.[13]

Had the manufacturing and distillation facilities that are the subject of Count 8 of the Indictment (the only charge against Mr. Rhule) been properly licensed, the alleged conduct would have been a completely legal commercial activity under Washington state law, and would almost certainly not have been targeted for prosecution by federal authorities. That fact helps put the seriousness of the charges against Mr. Rhule into perspective, insofar as they bear on whether appropriate conditions of release can acceptably reduce the risk that he will abscond, or the danger he poses to the community while on release. Simply put, this is not the kind of case that will cause Mr. Rhule to abandon the life he has spent forty-five years building, or the

---

[12] In August 2013, then-Deputy Attorney General James M. Cole issued a Memorandum to guide federal prosecutors concerning marijuana enforcement under the Controlled Substances Act in light of state ballot initiatives making it legal to possess marijuana and providing for the regulation of marijuana production, processing, and sale. In essence, the memorandum provided that the federal government would refrain from interfering with state-level legalization of marijuana, as long as the states strictly regulated distribution and sales.
*See* https://www.justice.gov/iso/opa/resources/3052013829132756857467.pdf

[13] https://guides.lib.uw.edu/law/cannabis/wa

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 48

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

family whose love and support sustain him (rendering his parents and his sister's family homeless in the bargain) to be a fugitive for the rest of his life in an unpredictable foreign country ruled by a brutal and volatile regime.

> **G.   Another circumstance that has changed since Mr. Rhule's detention hearing is the rapidly deteriorating COVID-19 health situation at FDC SeaTac and the attendant looming risk to Mr. Rhule's health.**

At the detention hearing on July 24, the government argued that the FDC's procedures for preventing or containing any COVID-19 outbreaks at its facility were working, and that therefore Mr. Rhule faced no imminent risk to being locked up there:

> In terms of the COVID risk there, I think the Court is aware of the current situation at the FDC. There is one staff member who has tested presumptively positive for COVID. There's been no inmates that they've identified as linked to that staff member who have received COVID from him. There is one inmate who has tested positive for COVID. That inmate was recently arrested, has been in solitary the entire time, has not been exposed to other inmates. And so there is not an outbreak currently at the FDC SeaTac. It seems, in contrast, that SeaTac COVID procedures are working. Their requirement that all inmates, upon arrival, are quarantined for a period of time did work to prevent the spread of COVID from that one inmate. And the one inmate, I understand, that had it is asymptomatic at this point in time, so is not sick.

*See* Exhibit M (July 24, 2020 Detention Hearing Transcript at 28–29)

This rosy account—of only two infections, one a staff member and the other a recent arrestee who likely arrived already infected—is no longer true.

As of Wednesday, August 19, the Warden of the FDC reported to the federal court stakeholders meeting that there are 21 confirmed inmate COVID-19 infections and 5 confirmed staff members infected, with many other staff in quarantine.  These numbers are among the worst for pretrial facilities in the entire BOP system—only MCC San Diego, with 49 cases (46

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

inmates, 3 staff) and FDC Miami, with 43 (18 inmates, 25 staff), are comparably high.[14] As we have learned from national and international events, these numbers are unlikely to go down any time soon.

Surely the calculus of release in this case must seriously consider balancing the gravity of the allegations (manufacture of marijuana distillates, a legal commercial activity in Washington if properly licensed) against the risk of death or serious health impairment due to COVID-19 that Mr. Rhule may suffer if he remains jailed in the FDC for a period that will likely stretch into a year.[15]  And since Mr. Rhule has suffered his entire life with stress-induced asthma treated with a prescription inhaler (*see* Exhibit E (Letter from Johanna and Ken Rhule)), he may be among the more vulnerable of the FDC population.[16]

Compounding that dilemma is the difficulty that counsel faces in communicating with Mr. Rhule to prepare his defense or otherwise work toward a resolution of the charges as long as the FDC remains overwhelmed by the pandemic.  Undersigned counsel has experienced and is currently experiencing, and numerous other criminal defense lawyers have expressed, the hit-and-miss (mostly miss) quality of the confidential electronic communication available through Bureau of Prisons channels, which is burdensome to access and too often unreliable in practice.

---

[14] These are the relevant statistics as of August 23, 2020.  Current statistics are available at https://www.bop.gov/coronavirus/ (last visited August 23, 2020).

[15] While trial is set to begin October 5, that seems unrealistic given the volume of discovery and magnitude of the allegations.  The discovery just now provided to undersigned counsel consists of over 340,000 pages of material.  More will undoubtedly be forthcoming. Counsel's inability to safely review this volume of discovery in person with an incarcerated client, as well as the FDC's inability to safely provide detainees with adequate computer time in the common areas of the facility, make it unlikely that this case will move swiftly to resolution, further backlogging the system.

[16] *See* CDC guidelines for people with certain medial conditions, including asthma. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last accessed August 25, 2020).

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 50

**skellenger**bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

The extraordinary challenge of facilitating adequate attorney-client communication alone can be expected dramatically to impede the defense's ability to bring a case of this magnitude to prompt resolution.

## IV.    CONCLUSION

During the detention hearing, the government argued forcefully that what should "driv[e the decision about whether to release Mr. Rhule] is this connection to Russia, *his very strong connection to Russia*. His wife is going to be living there. He has in-laws there that have helped him set up companies. He has the ability to leave, to fly out." *See* Exhibit M (July 24, 2020 Detention Hearing Transcript at 30 (emphasis added)).

The Magistrate Judge, on the limited record before him at Mr. Rhule's first appearance in this District, found it difficult to overcome that concern. *See*, *e.g.*, *id*. at 32 (calling Olga Rhule's immigration situation and the possibility that it might lead Mr. Rhule to flee for Russia the "real challenge for me right here"), 33 (Mr. Rhule's "ties to her and to the country [of Russia] are important," and constitute "a distinguishing factor" absent from the case of Mr. Rhule's son and co-defendant); *id*. (Mr. Rhule is "in a peculiar situation in which you have a peculiar motive to leave the country"). Seeing no alternative, the Magistrate Judge consigned Mr. Rhule to indefinite custody at FDC SeaTac (where, the Magistrate Judge had no way of knowing, the COVID-19 pandemic would soon become a much more acute threat).

On a fully developed record, this Court can now recognize the concern that beset the Magistrate Judge as overstated, because Mr. Rhule *has no* "very strong connection" to Russia— a country whose language he does not speak, where he has never set foot, and which he has no prospect of reaching given the U.S. government's refusal to issue him a passport. At a minimum, this Court can now see that concern in proper perspective, as a risk that might be real

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 51

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

but can be tolerably minimized by the conditions of release now proposed.  Those conditions

will hold Mr. Rhule accountable because failing to comply will cost his parents and his sister's

family their homes, as well as costing him the relationships that he values most in life.  Equally

important, Mr. Rhule recognizes that defaulting on his conditions would rob Olga of her one

remaining chance to obtain legal status in this country, so that she may at some point in the

future return here to live with Mr. Rhule and the Rhule family.

The larger truth is that federal courts routinely see people facing stiff mandatory

minimum sentences cooperate with pretrial supervision, make all their court appearances, and

surrender as scheduled for their sentences.  And while it is conceivable that as a result of these

charges Mr. Rhule might someday be sentenced to spend some time in custody, there is no

sufficient reason to keep him there *now*, while the world—and most particularly the BOP—are

locked in a daily struggle with a lethal global pandemic that for the time being threatens each

of us with long-term serious health problems or even untimely death.

There is no urgent need to force this marijuana case forward towards resolution *now*,

when medical experts the world over are tirelessly working to develop effective treatments or

even a vaccine, and the next few months are likely to see real advances on both fronts.  In short,

what this situation calls for is a little reasonable patience, and reliance on the types of conditions

of release that have been shown in countless cases, many more aggravated than this, to

reasonably assure the defendant's appearance and protect the safety of the community.

Mr. Rhule understands that he is in a bad situation but urgently wants to avoid making

things worse and appreciates the risk that his family is assuming by committing themselves and

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 52

skellenger bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

their property wholeheartedly to his release.  Mr. Rhule is determined to return that confidence

and support by complying with whatever conditions this Court sees fit to impose.

Dated this 25th day of August, 2020.

Peter Offenbecher, WSBA No. 11920
SKELLENGER BENDER, P.S.
Attorneys for Kenneth John Rhule

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 53

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1

**CERTIFICATE OF SERVICE**

2

   I, Jule S. Freeman, certify that on August 5, 2020, I electronically filed Defendant

3

Rhule's Motion to Review and Revoke Magistrate Judge's Detention Order and Release

4

Defendant on Conditions (together with Exhibits A–R) with the Clerk of the Court using the

5

CM/ECF system, which will send notification of such filing to all attorneys of record.

6

   DATED this 25th day of August, 2020.

7

8

_____
Jule Freeman
SKELLENGER BENDER, P.S.

9

Case Analyst

10

11

12

13

14

15

16

17

18

19

20

21

22

23

skellenger**bender**

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501