# EXHIBIT A

_____ FILED      _____ ENTERED
_____ LODGED     _____ RECEIVED

**FEB 28 2020**

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                                    DEPUTY

The Honorable Paula L. McCandlis

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES,<br><br>Plaintiff,<br><br>v.<br><br>KENNETH WARREN RHULE,<br><br>Defendant. | NO.  MJ20-097<br><br>**COMPLAINT FOR VIOLATION**<br><br>Title 18, United States Code, Sections 1956(a)(3) and 1960(a), (b), and 2, and Title 21, United States Code, Sections 841(a)(1), (b)(1)(B), and 846 |

BEFORE United States Magistrate Judge Paula L. McCandlis, Seattle, Washington.  The undersigned complainant being duly sworn states:

### COUNT 1
### (Conducting an Unlicensed Money Transmitting Business)

1.      Beginning at a time unknown, but not later than April 11, 2018, and continuing until at least December 6, 2018, in Snohomish County and King County, within the Western District of Washington, and elsewhere, the defendant, KENNETH WARREN RHULE did knowingly conduct, control, manage, supervise, direct, and own all or part of an unlicensed money transmitting business affecting interstate and foreign commerce, which: (a) was operated without an appropriate money transmitting license in a State where such operation is punishable as a as a misdemeanor and a felony under

COMPLAINT/RHULE - 1
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  State law, to wit, the State of Washington; (b) failed to comply with the money

2  transmitting business registration requirements set forth in Title 31, United States Code,

3  Section 5330, and the regulations prescribed thereunder, and; (c) otherwise involved the

4  transportation and transmission of funds that are known to the defendant to have been

5  derived from a criminal offense and are intended to promote and support unlawful

6  activity.

7       All in violation of Title 18, United States Code, Sections 1960(a), (b)(1)(A),

8  (b)(1)(B), (b)(1)(C), and 2.

## COUNTS 2-7
### (Laundering of Monetary Instruments)

11       2.    On or about the dates listed below, in Snohomish County and King County,

12  within the Western District of Washington, and elsewhere, the defendant, KENNETH

13  WARREN RHULE, with the intent to conceal or disguise the nature, location, source,

14  ownership, and control of property believed to the proceeds of specified unlawful

15  activity, and to avoid a transaction reporting requirement under State and Federal law, did

16  knowingly and willfully conduct and attempt to conduct a financial transaction affecting

17  interstate or foreign commerce involving property represented by a law enforcement

18  officer to be proceeds of specified unlawful activity, to wit, trafficking in persons and

19  recruiting and harboring a person for commercial sex acts:

| COUNT | Date | Description | Transaction Amount |
|---|---|---|---|
| 2 | 6/22/18 | RHULE sold bitcoin for cash | $15,000 |
| 3 | 9/25/18 | RHULE sold bitcoin for cash | $20,000 |
| 4 | 10/10/18 | RHULE sold bitcoin for cash | $20,000 |
| 5 | 10/31/18 | RHULE sold bitcoin for cash | $20,000 |
| 6 | 11/2/18 | RHULE sold bitcoin for cash | $15,000 |
| 7 | 12/6/18 | RHULE sold bitcoin for cash | $20,000 |

All in violation of Title 18, United States Code, Sections 1956(a)(3)(B), (a)(3)(C) and 2.

COMPLAINT/RHULE - 2
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## COUNT 8
### (Conspiracy to Manufacture and Distribute Marijuana)

3.      Beginning no later than April 2015 and continuing until at least on or about December 2019, in Snohomish County, within the Western District of Washington, and elsewhere, the defendant, KENNETH WARREN RHULE, and others known and unknown, did knowingly and intentionally conspire to manufacture and distribute marijuana, a Schedule I controlled substance under Title 21, United States Code, Section 812.

4.      It is further alleged that the conduct of KENNETH WARREN RHULE, as a member of the conspiracy charged in this Count, which includes the reasonably foreseeable conduct of other members of the conspiracy charged in this Count, involved 100 kilograms or more of a mixture or substance containing a detectable amount of marijuana.

All in violation of Title 21, United States Code, Section 841(a)(1), 841(b)(1)(B), and 846.

And the complainant states that this Complaint is based on the following information:

**I, Victor Morales, being first duly sworn on oath, depose and say:**

5.      I am a Special Agent with the Drug Enforcement Administration ("DEA"). As a Special Agent, I investigate violations of the Controlled Substance Act, Title 21, United States Code, Section 801, et seq., and other violations of federal law. I have been in law enforcement for eleven years. I have been a Special Agent with the DEA for the past three years. I have received narcotics enforcement training over the course of seventeen weeks at the DEA Basic Agent Training academy in Quantico, Virginia.

6.      Throughout my career, I have conducted numerous narcotics investigations, including those leading to arrest and prosecution. From these experiences, I have become familiar with common slang terms and codes used by drug traffickers and their associates to refer to drugs, money, guns, vehicles, compartments, and other things related to their

COMPLAINT/RHULE - 3
USAO #2018R00575

1  drug trafficking.  I have learned how they attempt to thwart law enforcement by using

2  code terms, multiple cell phones, concealed compartments, "stash houses," and other

3  means.  I have become familiar with the ways in which drugs commonly are transported,

4  stored, and sold, and also how members of a conspiracy communicate with each other.  I

5  am also familiar with common ways in which drug traffickers attempt to profit from their

6  illegal activities, by hiding drug proceeds in various places in order to conceal the illegal

7  source or their ownership, including hiding and transporting bulk cash, sending funds

8  through wire transfers or bank accounts in other persons' names, or investing in assets

9  placed in other persons' names.  I have participated in the debriefing of defendants,

10  witnesses, and informants, during which time I have discussed with them their methods

11  of drug smuggling, distribution, packaging, trafficking, avoiding law enforcement, and

12  laundering proceeds, among other concerns related to drug trafficking.  I have discussed

13  and learned from other law enforcement investigators in regard to these matters, as well.

14      7.      This affidavit is made in support of a complaint for the arrest of

15  KENNETH WARREN RHULE for violations of Title 18, United States Code, Sections

16  1960(a), (b)(1)(A), (b)(1)(B) and (b)(1)(C) (Operating an Unlicensed Money

17  Transmitting Business) and 1956(a)(3)(B) and (a)(3)(C) (Money Laundering), and Title

18  21, United States Code, Sections 841(a)(1), 841(b)(1)(B), and 846 (Conspiracy to

19  Manufacture and Distribute Marijuana or Marijuana Distillates), and 2 (Attempt).

20  Because this affidavit is submitted for that limited purpose, I am not including every fact

21  known to me about this defendant or the larger investigation.

22      8.      The information in this affidavit is based upon the investigation I have

23  conducted in this case, my conversations with other law enforcement officers who have

24  engaged in various aspects of this investigation, and my review of reports written by

25  other law enforcement officers involved in this investigation.

26

27

28

COMPLAINT/RHULE - 4
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  **PROBABLE CAUSE**

2  **I.    Summary of Investigation**

3        9.      The DEA and Homeland Security Investigations ("HSI") are investigating

4  whether KENNETH RHULE sold bitcoins to individuals in exchange for cash without

5  registering with Financial Crimes Enforcement Network ("FinCEN") or the Washington

6  Department of Financial Institutions ("DFI"), in violation of 18 U.S.C. § 1960.

7        10.     RHULE, using the moniker Gimacut93, advertised in-person cash-for-

8  bitcoin exchanges on the website localbitcoins.com.  From April 2018 until December

9  2018, law enforcement, or a cooperating source working with law enforcement,

10  exchanged more than $140,000 in cash for bitcoin with RHULE or his designee.

11        11.     When completing these transactions, RHULE did not ask any "Know Your

12  Customer" information.  In fact, RHULE conducted these transactions even after the

13  undercover agent explained that at least a portion of the cash involved represented

14  proceeds of human trafficking, in violation of 18 U.S.C. § 1956(a)(3).

15        12.     In addition to selling cryptocurrency, RHULE, along with others known

16  and unknown, also manufactures and distributes marijuana distillates and extracts, in

17  violation of 21 U.S.C. §§ 841 and 846.  RHULE appears to operate the companies

18  HerbinArtisans, Heady.Watr, and KlearKrew and sells his product under those monikers,

19  including through Instagram.  Neither RHULE, HerbinArtisans, KlearKrew, nor

20  Heady.Watr are listed as applicants or licensees to produce, process, transport, or sell

21  marijuana or marijuana products in the State of Washington.

22  **II.    Cryptocurrency Exchanges**

23        13.     From April 2018 until November 2018, law enforcement, or a cooperating

24  source working with law enforcement, exchanged more than $140,000[1] in cash for

25  bitcoin with RHULE or his designee.  A portion of those exchanges are described below.

26

27

28  [1] Unless otherwise specified, all references to dollars refer to United States Currency.

COMPLAINT/RHULE - 5
USAO #2018R00575

1

2      A. First Controlled Exchange of U.S. Currency for Bitcoin

3           14.     In April 2018, HSI Special Agent ("SA") Judson Scott responded to an

4      advertisement posed by "Gimacut93" on the website localbitcoins.com.

5      Localbitcoins.com is a website that allows users to post advertisements, listing exchange

6      rates and payment methods for buying and selling bitcoins, including allowing users to

7      connect with bitcoin sellers in their vicinities through in-person meetings where cash is

8      exchanged for bitcoins.  The advertisement by Gimacut93 offered to sell bitcoin through

9      an in-person exchange at a "public location only."  The advertisement indicated that

10     Gimacut93 sold bitcoin at fiat[2] exchange rate, and would accept various forms of

11     payment to include unregistered prepaid Visa or MasterCard cards and "various other gift

12     cards."  A review of the website localbitcoins.com showed that Gimacut93 was an

13     established, and apparently well-known, bitcoin trader with history dating back two years

14     and more than one thousand confirmed trades.  Gimacut93 advertised a trade limit of

15     $5,000 to $100,000.

16          15.     Based upon messages exchanged via text to the telephone number that

17     Gimacut93 listed on localbitcoins.com—813-506-7673, SA Scott arranged with

18     Gimacut93 to exchange $12,000 for bitcoin.  The parties agreed to conduct the

19     transaction on April 10, 2018, at a Starbucks in Seattle, Washington.

20          16.     On April 10, 2018, an HSI SA acting in an undercover capacity ("UCA-1"),

21     met with Gimacut93—determined to be KENNETH WARREN RHULE base upon a

22     review of Washington Department of Licensing records—inside the Starbucks, located in

23     Seattle, Washington.  This meeting was audio and video recorded.

24          17.     At the meeting, UCA-1 provided $12,000 to RHULE, which RHULE

25     counted.  After RHULE confirmed the amount of U.S. currency tendered by UCA-1, SA

26

27     _____

28     [2] Fiat currency is "sovereign currency" or "real currency, the money of a government." *Interim
       Regulatory Guidance on Virtual Currency Activities* 2 (December 8, 2014).

COMPLAINT/RHULE - 6
USAO #2018R00575

1   Scott texted his bitcoin wallet address to RHULE's cell phone. Using a wallet

2   application on his phone, RHULE transmitted bitcoin to the wallet designated by a SA

3   Scott. UCA-1 described SA Scott as his/her "partner."

4        18.    While waiting for confirmation that the bitcoin was sent to the wallet

5   address provided by SA Scott, RHULE spoke about his current line of work within the

6   CBD[3] industry, explaining at one point during the meeting that he was doing "5, 10, or

7   20,000 kilo" CBD orders.

8        19.    RHULE also spoke at length about bitcoin mining and significant events

9   related to the bitcoin industry. Specifically, he indicated that he and his fraternal twin

10  had previously mined bitcoin. RHULE further indicated that his parents had also

11  invested in bitcoin and bitcoin mining.

12       20.    Notably, in response to UCA-1 indicating that UCA-1's partner was in a

13  cash heavy business, RHULE stated that bitcoin was only pseudo-anonymous and was

14  "extremely easily tracked." RHULE then explained that if he needed to "wash" bitcoin,

15  he would convert it to Monero, which is "a 100% anonymous cryptocurrency."

16       21.    RHULE did not charge a fee for the transaction, but indicated that he had

17  charged a 2-3% fee in the past. He explained that he had a lot of bitcoin that he needed to

18  "dump" right now, and that was the reason why he did not charge a fee. RHULE then

19  explained that he usually had about $100,000 in bitcoin to work with each month, and

20  sometimes more.

21       22.    During the cash-for-bitcoin transaction on April 10, 2018, RHULE did not

22  ask UCA-1 for any "Know Your Customer" information.

23

24

25  ───────────────
    [3] Based upon my training and experience, I know that CBD, or cannabidiol, is derived from the
26  stalk and seed of the cannabis plant. Cannabidiol (CBD) oil or CBD hemp oil is a natural
    botanical concentrate that is high in the compound CBD. Of the numerous cannabinoids
27  identified in the cannabis plant, CBD is the second most common after tetrahydrocannabinoil
    (THC). As CBD oil is derived from the seeds and stalk of the cannabis plant, it does not contain
28  THC and therefore is non-psychotropic.

COMPLAINT/RHULE - 7                                          UNITED STATES ATTORNEY
USAO #2018R00575                                        700 STEWART STREET, SUITE 5220
                                                          SEATTLE, WASHINGTON 98101
                                                                (206) 553-7970

1

2  **B. Second Controlled Exchange of U.S. Currency for Bitcoin**

3      23.     On April 22, 2018, SA Scott sent RHULE a text message—to 813-506-
4  7673—requesting another exchange of U.S. currency for bitcoin. RHULE agreed to
5  conduct an exchange of $20,000 for bitcoin, and the parties decided to conduct the
6  transaction on April 24, 2018, at a Starbucks located in Monroe, Washington.

7      24.     On April 24, 2018, RHULE and UCA-1 met at the Starbucks. This meeting
8  was audio and video recorded. During the meeting, UCA-1 provided RHULE with
9  $20,000 in cash. RHULE did not count the cash, as he had during the first transaction.
10 Instead, RHULE indicated that the amount "looked about right" and then placed the
11 $20,000 in an anti-static bag used for packaging electronics.

12      25.     As with the first transaction, UCA-1 advised RHULE that his/her partner—
13 SA Scott—would provide RHULE with the bitcoin wallet address to which the bitcoin
14 would be sent. RHULE and SA Scott then exchanged text messages, with SA Scott
15 sending the wallet address to RHULE. RHULE then sent bitcoin to the wallet designated
16 to SA Scott using his cell phone.

17      26.     While UCA-1 and RHULE were waiting for two confirmations of the
18 transaction on the blockchain, UCA-1 asked RHULE if he/she could ask RHULE some
19 questions about Monero, the cryptocurrency that RHULE had indicated was anonymous
20 during the first cash-for-bitcoin exchange on April 10, 2018. RHULE explained to UCA-
21 1 that Monero operated under the same concept as any cryptocurrency and was verifiable
22 on the blockchain with one important caveat: wallet addresses could not be tracked.
23 RHULE explained that converting bitcoin to Monero was time consuming, advised that
24 he could sell Monero to UCA-1, but would need advance notice before making the

25

26

27

28

COMPLAINT/RHULE - 8
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  exchange. RHULE also provided UCA-1 with advice on using a "Tor" browser and the
2  "TAILS"[4] operating system to ensure complete anonymity.

3      27.    During the conversation, UCA-1 advised that one of the reasons he/she
4  wanted to maintain anonymity is because he/she would be sending money to Eastern
5  Europe. UCA-1 did not elaborate why he/she wanted anonymity with respect to
6  cryptocurrency exchanges in Eastern Europe, and RHULE did not ask for further details.
7  UCA-1 also inquired if his/her girlfriend in Idaho, who was "heavy in cash," could obtain
8  bitcoins from RHULE by sending currency in the mail. RHULE agreed and provided
9  UCA-1 advice on how best to mail cash so it would not be detected.

10      28.    As with the first exchange, RHULE did not ask UCA-1 for any "Know
11  Your Customer" information.

12  **C. Fourth Controlled Exchange of U.S. Currency for Bitcoin**

13      29.    On June 20, 2018, SA Scott sent RHULE a text message—to 813-506-
14  7673—requesting another exchange of U.S. currency for bitcoin. RHULE agreed to
15  conduct an exchange of $15,000 for bitcoin. The parties agreed to conduct the
16  transaction on June 22, 2018, at a Starbucks located in Seattle, Washington.

17      30.    On June 22, 2018, UCA-1 and RHULE met at the Starbucks. This meeting
18  was audio and video recorded. Upon sitting down at the table with UCA-1, RHULE
19  removed an Apple laptop computer from his bag and turned it on. RHULE explained that
20  he brought the computer because he had to convert some Monero to Bitcoin during their
21  meeting.

22
23
24

_____

25  [4] Based upon my training and experience, I know that TAILS is an acronym for "The Amnesic
26  Incognito Live System." I know that this is an operating system that is designed to be booted
   from a DVD or USB, and is designed to ensure that no digital forensic information is left on a
27  specific machine when TAILS is employed. Among other security feature of the TAILS
   operating system, I know that when a machine is booted from TAILS, all outgoing connections
28  are forced to go through Tor, and all non-anonymous connections are blocked.

COMPLAINT/RHULE - 9                                UNITED STATES ATTORNEY
USAO #2018R00575                                    700 STEWART STREET, SUITE 5220
                                             SEATTLE, WASHINGTON 98101
                                             (206) 553-7970

31.     RHULE explained to UCA-1 that he had told UCA-1's partner—SA Scott—that he would charge a 4% fee for this transaction, as there was an 8-10% drop in the price of Bitcoin overnight.

32.     UCA-1 handed an envelope to RHULE with $15,000 in cash. RHULE proceeded to hand-count the $15,000. As with the first two transactions, SA Scott provided RHULE, via text to RHULE's cell phone, with the bitcoin wallet address to which the bitcoin would be sent. Using his phone and laptop, RHULE then transferred the bitcoin to the wallet designated by SA Scott.

33.     While waiting for the transaction to be complete, UCA-1 explained that he/she was dealing with contacts in Ukraine to assist in bringing women to the United States for the purpose of prostitution. Excerpts of this conversation are included below:

| UCA-1: | With changing the business model that I've been operating under . . . I don't think we've talked about the business. |
| RHULE: | No. |
| UCA-1: | I'm starting to operate with contacts in the Ukraine to help bring women here. I don't want them to have any idea how to get a hold of me . . . identify me. I want it all very anonymous. |
| RHULE: | This is the way to go then. Basically he can go on here and this is the wallet which you use and he can click received. He will just have this one receive address that I send it to and this wallet is anonymous, which you use on TAILS. If we're doing a trade like this and you didn't want to bring in a laptop or whatever, we can go search this address on the blockchain right after I do my transaction and you'll see right after when it is confirmed. But this is the way to do it. |
| RHULE: | So from Ukraine cash to bitcoin for dollars, then the dollars can come into this country untaxed. Any foreign investment dollars going to a business is not taxed. |

***

| UCA-1: | I don't know much my partner's discussed with you. |
| RHULE: | Nothing. |

COMPLAINT/RHULE - 10
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| | | |
|---|---|---|
| 1 | UCA-1: | OK, so we talked about . . . my girlfriend who is also running girls, |
| 2 | | she moved into the oil fields of North Dakota. So she is going to |
| 3 | | send me the cash you the cash. I've got the mailbox now, so can I give you the key. |
| 4 | RHULE: | Sure. |
| 5 | UCA-1: | And you would pick up the cash and just send it to her bitcoin. |
| 6 | RHULE: | Yes, I can do that. |

34.     During this transaction, RHULE offered UCA-1 advice on how to avoid having the mailed cash seized and altered their plan to ensure greater security. After discussing the above details regarding UCA-1's "new business model" of bringing women from Ukraine, as well as making arrangements regarding UCA-1's girlfriend that was also "running girls" and would be sending RHULE cash through the mail to purchase bitcoin, RHULE proceeded to assist UCA-1 with setting up the TAILS operating system on his/her computer. As with prior transactions, RHULE did not ask UCA-1 for any "Know Your Customer" information.

**D. Fifth Controlled Exchange of U.S. Currency for Bitcoin**

35.     On September 18, 2018, SA Scott sent RHULE a text message—to 813-506-7673—in order to arrange an exchange of $20,000 for bitcoin. Initially, the parties agreed to conduct the exchange at a Starbucks in Seattle, Washington, on September 25, 2018.

36.     On September 25, 2018, RHULE contacted SA Scott via text and informed him that he could not make the meet as scheduled, as he was taking a private flight from the Renton Municipal Airport and would be gone for most of the day. SA Scott asked RHULE if he could meet when he returned. RHULE agreed and the meet location was changed to the Top Pot doughnut shop located in Renton, Washington.

37.     Investigators observed RHULE arrive at the Renton Municipal Airport in a private plane. Also on the plane with RHULE was another male, later identified as R.D. After arriving in the private plane, RHULE and R.D. carried two white buckets and two

COMPLAINT/RHULE - 11
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  boxes off the plane and into a hanger.  Moments later, RHULE was then observed

2  carrying what appeared to be the same two buckets to his vehicle.  RHULE and R.D.

3  exited the airport in their respective vehicles.

4       38.     After leaving the airport, RHULE met with UCA-1 inside the Top Pot

5  doughnut shop and conducted the exchange of $20,000 for bitcoin.  RHULE explained

6  that he had just arrived from Portland, Oregon, where he stopped at the "terpene store,"

7  which he explained were "plant extracts isolated down to their molecules."  Based on my

8  training and experience, and information gained during the course of this investigation, I

9  know that terpenes are aromatic oils that give cannabis and CBD distinctive flavors and

10  aromas.

11       39.     RHULE did not charge UCA-1 a fee for this exchange.  As with the

12  previous transactions conducted, RHULE did not ask UCA-1 for any "Know Your

13  Customer" information.

14  **E. Sixth Controlled Exchange of U.S. Currency for Bitcoin**

15       40.     On October 7, 2018, SA Scott sent RHULE a text message—to 813-506-

16  7673—in order to arrange the exchange of $20,000 for bitcoin.  The parties agreed to

17  conduct the exchange at a Starbucks located in Redmond, Washington, on October 10,

18  2018.

19       41.     On October 10, 2018, RHULE and UCA-1 met at the Starbucks in

20  Redmond, Washington.  Once inside, UCA-1 provided RHULE with $20,000 in cash and

21  RHULE sent the equivalent value of bitcoin to a law enforcement controlled wallet.

22       42.     As with each of the previous bitcoin-for-cash transactions, RHULE did not

23  ask UCA-1 any "Know Your Customer" information.  RHULE did not charge UCA-1 a

24  fee for this exchange.

25  **F. Seventh Controlled Exchange of U.S. Currency for Bitcoin**

26       43.     On October 29, 2018, SA Scott sent RHULE a text message to 813-506-

27  7673. SA Scott asked RHULE if he would could pick up $20,000 in cash that had been

28  shipped to a P.O. Box in Mukilteo, Seattle and exchange it for bitcoin.  During a prior

COMPLAINT/RHULE - 12
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

meeting with UCA-1, UCA-1 provided RHULE with a key to this P.O. Box. RHULE agreed that, once the cash was received, he would transfer $20,000 worth of bitcoin to a wallet designated by SA Scott.

44.     On October 31, 2018, HSI SA Maher placed $20,000 into three standard letter envelopes that were then placed into two thicker manila envelopes. SA Maher then placed the manila envelopes containing the cash in a U.S. Mail Priority cardboard mailing box, with the return address listed as "Lindsay Richards" in North Dakota. SA Maher then placed the package into the P.O. Box in Mukilteo, Washington.

45.     On or around October 31, 2018, RHULE agreed to "front" the transfer, *i.e.*, provide the bitcoin to SA Scott prior to retrieving the cash. RHULE then transferred $20,000 worth of bitcoin to a law enforcement controlled wallet.

46.     On November 1, 2018, the tracker installed on RHULE's vehicle showed that the vehicle was located in the area of the U.S. Post Office in Mukilteo, Washington. Shortly thereafter, RHULE advised SA Scott via text that had retrieved the cash from the P.O. Box.

47.     As with previous transactions, RHULE did not require any "Know Your Customer" information before conducting the above transaction with SA Scott. RHULE did not charge a fee for this transaction.

**G. Eighth Controlled Exchange of U.S. Currency for Bitcoin**

48.     On November 1, 2018, HSI SA Scott sent RHULE a text message—to 813-506-7673—in order to arrange the exchange of $15,000 for bitcoin. RHULE agreed to meet to conduct this exchange on November 2, 2018.

49.     On November 2, 2018, RHULE met UCA-1 at a Starbucks in Bothell, Washington. Once inside, UCA-1 provided RHULE with $15,000 in cash, and RHULE transferred the equivalent amount of bitcoin to a law enforcement controlled wallet.

50.     As with previous transactions, RHULE did not require any "Know Your Customer" information before conducting this bitcoin-for-cash transaction. RHULE did not charge a fee for this transaction.

COMPLAINT/RHULE - 13
USAO #2018R00575

**H. Last Controlled Exchange of U.S. Currency for Bitcoin**

51.     On December 6, 2018, UCA-1 met with RHULE in order to exchange $20,000 for bitcoin.  RHULE agreed to meet UCA-1 at a Starbucks coffee shop in the Monroe, Washington area.

52.     Once inside the Starbucks, RHULE accepted $20,000 in cash from UCA-1 and, in exchange, sent the bitcoin equivalent to a law enforcement controlled cryptocurrency wallet.

53.     While waiting for the cryptocurrency to transfer, UCA-1 advised RHULE that he/she would be spending more time in Arizona and would have her associate take over business activities in Seattle, Washington.  UCA-1 explained that he/she would be reducing the amount of Ukrainians that he/she used in his/her business, instead transitioning to women from Mexico.  RHULE told UCA-1 that he was in the middle of a construction project and that he would be picking up his plane the following day, as it had recently been repaired.

54.     RHULE did not charge UCA-1 a fee for this exchange.  As with the previous transactions conducted, RHULE did not ask UCA-1 for any "Know Your Customer" information.

**I.  Current Status on LocalBitcoins**

55.     Law enforcement recently tried to contact RHULE about purchasing additional cryptocurrency in exchange for cash, but RHULE stopped responding to text messages.

56.     According to the website localbitcoins.com, the moniker Gimacut93 remains active and was "last seen" on January 7, 2020.  The most recent feedback listed for Gimacut93 was on July 1, 2019, indicating that he exchanged cryptocurrency on or around this date.  As of February 3, 2020, a notation was listed on the account indicating that, at least as of November 22, 2019, the account was "banned by staff."

57.     According to a search of local and federal databases conducted as recently as February 25, 2020, neither RHULE nor any of the entities he is associated with—

COMPLAINT/RHULE - 14
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  HerbinArtisans, KlearKrew, Heady.Watr, Frontline LLC, or Frontline Aviators—has

2  registered with FINCEN or DFI as a money services business, as required by law.

3  **III.   RHULE's Manufacture and Sale of Marijuana Distillates and Extracts**

4       58.     In addition to buying and selling cryptocurrency, RHULE, along with

5  others known and unknown, manufactures and sells marijuana distillates and extracts

6  using the business names HerbinArtisans, Heady.Watr, and KlearKrew. These marijuana

7  distillates and extracts include those referred to as "wax," "shatter," "clear," and

8  marijuana buds, products that contain THC and are marijuana products regulated by the

9  State of Washington. According to a search conducted as recently as February 19, 2020,

10  neither RHULE nor his businesses are licensed in the State of Washington to produce,

11  process, transport, or sell marijuana or marijuana products in the State of Washington.

12  **A. HerbinArtisans**

13       59.     RHULE holds himself out as an operator of HerbinArtisans. For example,

14  in email correspondence with a supplier of dry ice—a cooling agent used in

15  manufacturing marijuana distillates and extracts—RHULE used the email address

16  kenny@herbinartisans.com and included the signature line "Kenneth Rhule[,] Cannabis

17  Innovator[,] HerbinArtisans – Sweet Leaf Labs."

18       60.     HerbinArtisans has an Instagram page dedicated to marketing and selling

19  the HerbinArtisans product—high-grade THC distillates. The HerbinArtisans pages

20  includes photos of highly concentrated THC/marijuana extracts, including dabs, shatter,

21  hash oil, hash rosin, sugar wax chips, diamonds, and other forms of extracts and

22  distillates.

23       61.     As of January 29, 2020, the HerbinArtisans account had 324 posts, 1,058

24  followers, and contained the description "PNW Extracts and Distillate[.] All our own

25  work [.] Nothing for sale[.]" Previously, the HerbinArtisans account included the

26  language "DM for inquiries[.] Bitcoin and Crypto Friendly." While the account was

27  previously public, it is currently a private Instagram account. According to information

28

COMPLAINT/RHULE - 15
USAO #2018R00575

1  obtained from Instagram, the HerbinArtisans account was created on March 26, 2016 and
2  remains active. The registered email on the account was kenny@herbinartisans.com.
3      62.     The posts for this account include multiple photographs and videos, with
4  the most recent posted on April 17, 2019. A portion of these photographs are included
5  below:



 **herbinartisans** Some more #goldenticket shatter, who's wants a golden ticket? #herbinartisans



 **herbinartisans** Stable D9 #distillate #cat2

COMPLAINT/RHULE - 16
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



 **herbinartisans** Kilos to Ounces of CBD Isolate available. Hit the DM, COA, stock is in hand. Not a broker! #cbdisolate



 **herbinartisans** BCSP ready to go #herbinartisans #klearkrew #flower #mmj #seattle

COMPLAINT/RHULE - 17
USAO #2018R00575



 **herbinartisans** Cookies coming out
🍪#GSC #seattle #420 #710
#herbinartisans #klearkrew
#heady.watr

63. Based on my training and experience, the products shown in photographs above are consistent with various marijuana distillates and extracts, including those referred to as "shatter," "oil", "clear," and marijuana buds.

64. In addition to posting photographs of marijuana distillates and extracts, RHULE uses the HerbinArtisans Instagram page to send and receive direct messages—private communications—with others regarding HerbinArtisans' products. For example, the following communications were sent to and from the HerbinArtisans Instagram account:

a. On June 18, 2019, coastisclearnj messaged HerbinArtisans "You guys have any d9 liters in the 6-6.5 range? Crypto ready."

b. On May 13, 2019, solteksolutions messaged HerbinArtisans "Can you contact me in regards to bulk shatter and distillate orders? I need 6 lb of shatter currently and 1L of clear distillate."

c. On March 12, 2019 erikkve messaged HerbinArtisans "Warm greetings to you and your crew! . . . I'd like to inquire about a small order of raw distillate (for edible or dab use) . . . I've already sent my WA state medical card." In response, HerbinArtisans directed erikkve to communicate via encrypted messaging service Wickr.

65. Based on my review of the Instagram direct messages, HerbinArtisans will often tell prospective clients to switch over to encrypted messaging services like Wickr

COMPLAINT/RHULE - 18
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  and Signal to continue negotiations for product sales. For example, on July 14, 2017,

2  northwest_dabber sent a message to HerbinArtisans, stating "I Need a ticket on distillate

3  gram syringes bulk and best quality nug run slabs or good white plant/trim runs." In

4  response, HerbinArtisans asked "You have signal" and provided the telephone number

5  813-506-7673—the number that SA Scott used to contact RHULE to arrange

6  cryptocurrency exchanges.

7      66.    In the Instagram direct messages, HerbinArtisans described selling

8  marijuana extracts and distillates manufactured at a facility in Monroe, Washington.

9        a.    For example, on January 28, 2018, mike_b_dabbin sent a message to

10  HerbinArtisans stating "Hey i used to get concentrates from you guys quite often . . . I

11  was wondering if i could get a few slabs from you guys? Always love that terpy shatter."

12  In response, HerbinArtisans replied "we are actually a little deeper now in Monroe but

13  we can cruise to Woodinville or closer when we meet."

14        b.    On January 25, 2018, kylelaroche messaged HerbinArtisans, stating

15  "Hey I used to get some product from you guys . . . Is there anyone I could get linked up

16  with to get some more?" In response, on February 4, 2018, HerbinArtisans messaged

17  kylelaroche, stating "It would be tomorrow, he lives up north too and the shop is in

18  Monroe."

19  **B. Heady.Watr**

20      67.    In addition to HerbinArtisans, RHULE also helps operate the entity

21  Heady.Watr, which sells marijuana distillates and extracts. RHULE is believed to be

22  associated with Heady.Watr because, among other reasons:

23        a.    RHULE received communications addressed to Heady.Watr in his

24  email accounts, including the following:

25            i.    On December 6, 2017, Vapor Connoisseur—a vaporizer and

26  e-cigarette manufacturer—emailed RHULE, at kenny@herbinartisans.com, a picture of a

27  tube with the Heady.Watr label printed on it, stating "Hey Ken, Sorry for the delay on

28  this one. The factory has had such a hard time with the file provided." In response,

COMPLAINT/RHULE - 19
USAO #2018R00575

1 │ RHULE stated "This was for one of my clients and they are being slow. Can I just place
2 │ an order for 10k blank tubes?"

3 │         ii.     On March 19, 2018, RHULE signed a contract, sent to
4 │ kenny@herbinartisans.com, on behalf of Heady.Watr, hiring a third party to "reac[h] out
5 │ and loc[k] in distribution/sales with new markets, dispensaries, recreational marijuana
6 │ shops, smoke shops, and all applicable stores."

7 │         iii.    On November 10, 2017, RHULE received an email attaching
8 │ multiple business card mock ups. The sender stated "I have attached 3 files. 2 are the
9 │ same logo. The 3rd is the HeadyWatr logo, just to see what it will look like on the card.
10 │ But I'm pretty sure we will go with the KlearKrew logo if it looks good." Attached to the
11 │ email were multiple business cards that listed "Kenny Rhule, Refining Extracts" along
12 │ with the HerbinArtisans and KlearKrew logos. As one example, the following document
13 │ was located in RHULE's Google account:



25 │         b.    Heady.Watr held the email address heady.watr@herbinartisan.com.
26 │ Herbinartisan is a G-Suite client, with email addresses hosted by Google. According to
27 │ Google, RHULE is listed as the subscriber for the HerbinArtisans G-Suite account.

28 │

COMPLAINT/RHULE - 20
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    c.    On HerbinArtisans' Instagram page, used by RHULE, the hashtag

2  #heady.watr was often included in the descriptions posted alongside pictures of marijuana

3  extracts and distillates.

4    68.    Like HerbinArtisans, Heady.Watr also has an Instagram page dedicated to

5  marketing and selling Heady.Watr's product—high-grade THC distillates.  On this

6  Instagram page, there are dozens of photos of various highly concentrated

7  THC/marijuana extracts, including dabs, shatter, hash oil, hash rosin, sugar wax chips,

8  diamonds and other forms of extracts and distillates.

9    69.    As of August 21, 2019, the Heady.Watr account contained the description

10  "Premium Herb & Extracts[.]  Nothing for sale[.]"  While the account was previously

11  public, it is currently a private Instagram account with 6,549 followers.  According to

12  information obtained from Instagram, the Heady.Watr account was created on July 15,

13  2017, and remains active, albeit it has deleted all of its posts.  Despite deleting its posts,

14  other users continue to use the hashtag #headywatr to post pictures of Heady.Watr's

15  products, including as recently as June 2019.  According to Instagram, the registered

16  emails on the account were heady.watr@herbinartisans.com and

17  headywatr@protonmail.com.

18    70.    The posts for this account include multiple photographs and videos, with

19  the most recent posted on July 14, 2019.  A portion of these photographs are included

20  below:

21

22

23

24

25

26

27

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9



10  **Date Created** 2019-07-12 01:42:39 UTC
11          **Text** Papaya Cake.▢▢ . . . . #cannabiscommunity #420 #ganja #weed
            #weedstagram #hightimes #thc #kush #maryjane #stoner
12          #weedporn #highlife #highsociety #710 #dabs #mmj
            #weedstagram420 #shatter #stonernation #cannabisculture
13          #cannabissociety #cannabisoil #dabstagram #pnw
            #pnwonderland #CannabisPhotography #headywatr
14



15
16
17
18
19
20
21
22

23  **Date Created** 2019-07-09 00:42:40 UTC
            **Text** Well, hello friend.▢▢ . . . . . #cannabiscommunity #420 #ganja
24          #weed #weedstagram #hightimes #thc #kush #maryjane
            #stoner #weedporn #highlife #highsociety #710 #dabs #mmj
25          #weedstagram420 #shatter #stonernation #cannabisculture
            #cannabissociety #cannabisoil #dabstagram #pnw
26          #pnwonderland #CannabisPhotography #headywatr
27
28

COMPLAINT/RHULE - 22
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Date Created** 2019-04-16 21:13:59 UTC

**Text**

Ak-47 Sugar Chips▢▢▢▢▢ . . . . . #cannabiscommunity #420 #ganja #weed #weedstagram #hightimes #thc #kush #maryjane #stoner #weedporn #highlife #highsociety #710 #dabs #mmj #weedstagram420 #shatter #stonernation #cannabisculture #cannabissociety #cannabisoil #dabstagram #pnw #pnwonderland #CannabisPhotography #headywatr



**Date Created**
2018-05-31 20:22:55 UTC
**Text** Top shelf life ▢

COMPLAINT/RHULE - 23
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

71. Based on my training and experience, the products shown in photographs above are consistent with various marijuana distillates and extracts, including those referred to as "wax," "shatter," "clear," and marijuana buds.

72. Although "Nothing for sale" is listed in the "About me" section of Heady.Watr's Instagram profile, numerous individuals communicate with Heady.Watr asking to purchase marijuana products using Instagram direct messages.

a. For example, on March 6, 2018, take_care_111 messaged Heady.Watr "I would still love to stock up on all your products." In response, Heady.Watr stated "We are In The north west. We deal in crypto maily and have a really good team out here" and "Well we can send a sample no problem, we do however only accept crypto atm, are you familiar with it?" Thereafter, Heady.Watr responded "You have signal messanger? Or wickr?" and encouraged take_care_111 to communicate via these encrypted applications.

b. On March 19, 2018, jacksonmcmillen messaged Heady.Watr, stating "I'm tryna get some cartridges." Heady.Watr responded "We can work something out for sure man, are you able to pay in crypto?" Thereafter, Heady.Watr told jacksonmcmillon "Down load signal messenger or wickr," advising that they communicate via these encrypted applications. Heady.Watr also told jacksonmcmillen that they only accept cryptocurrency because, otherwise they "will get banned from any of these money services quickly."

c. Also on March 19, 2018, mikey_kline messaged Heady.Watr asking "So does it have thc?" and "Is it distillate?" Heady.Watr responded that they "make distillate." Mikey_kline asked "do you ship" to Texas, and Heady.Watr replied "Shouldn't be a problem if you can pay in crypto" and advised that "We accept just about any of the top 3" cryptocurrencies.

73. In these direct messages, Heady.Watr advised potential customers that they were based in the Pacific Northwest and discussed licensing requirements to sell marijuana products in the region.

COMPLAINT/RHULE - 24
USAO #2018R00575

1     a. For example, on May 29, 2018, highimharry messaged Heady.Watr

2 and asked "Where are you based out of?" and Heady.Watr responded "Seattle area."

3     b. On May 29, 2018, smokebythepound messaged Heady.Watr and

4 asked "What state do you operate out of?" and Heady.Watr responded "Washington."

5     c. On May 29, 2018, pharmtechnm messaged Heady.Watr and asked

6 "Hey bro where are you located again" and Heady.Watr responded "NW Seattle area" but

7 said "We will actually have a representative out in California this upcoming week or so."

8 Pharmatechnm told Heady.Watr "I want to sell your products out here but need you to

9 have a license first." Heady.Watr replied that it would be "leasing out [a license] from a

10 third party."

11     d. On November 28, 2018, le_roi_du_mouille messaged Heady.Watr,

12 stating "I'm always looking for your stuff in the shops, but I guess you guys don't sell as

13 north as Whidbey lol." Heady.Watr replied "We dont do 502 retail in washington."

14  **C.** **KlearKrew**

15  74. In addition to HerbinArtisans and Heady.Watr, RHULE also helps operate

16 the entity KlearKrew, which sells marijuana distillates and extracts. RHULE is believed

17 to be associated with KlearKrew because, among other reasons:

18     a. On November 13, 2017, RHULE received an email to his

19 kenny@herbinartisans.com account attaching a business card listing the HerbinArtisans

20 and KlearKrew logos.



**HERBIN ARTISANS**

**KENNY RHULE**
REFINING EXTRACTS

℡ 813.506.7673
@ HERBINARTISANS
KENNY@HERBINARTISANS.COM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

b.      In his email account, RHULE had copies of chemical residue testing conducted for KlearKrew distillates.

c.      On November 9, 2018, RHULE received an email, sent to his kenny@herbinartisans.com account, confirming that he would be attending a conference in Las Vegas, Nevada as a representative of KlearKrew.   Additionally, on January 30, 2019, RHULE received an email, sent to his kenny@herbinartisans.com account, confirming that he would be attending a conference in Seattle, Washington as a representative of KlearKrew.

d.      On HerbinArtisans' Instagram page, used by RHULE, the hashtag #klearkrew was often included in the descriptions posted alongside pictures of marijuana extracts and distillates.

e.      During a portion of the previously described UC cryptocurrency exchanges, RHULE arrived wearing a KlearKrew t-shirt and had a KlearKrew sticker on his laptop.

f.      Within the messages sent to the KlearKrew Instagram page, a potential customer sent "Kenny, You getting my calls or messages?"

75.      Like HerbinArtisans and Heady.Watr, KlearKrew also has an Instagram page dedicated to marketing and selling KlearKrew's product—high-grade THC distillates.  On this Instagram page, there are dozens of photos of various highly concentrated THC/marijuana extracts, including dabs, shatter, hash oil, hash rosin, sugar wax chips, diamonds and other forms of extracts and distillates.

76.      As of August 12, 2019, the KlearKrew account contained the description "#thechoiceisklear[.] 21+ only"  While the account was previously public, it is currently a private account with approximately 9,184 followers.  According to information obtained from Instagram, the KlearKrew account was created on July 6, 2016 and remains active, albeit it appears to have deleted all but one of its posts.  Despite deleting its posts, other users continue to use the hashtag #KlearKrew to post pictures of its products, including

1　as recently as December 24, 2019. According to Instagram, the registered emails on the
2　account were klearkrew@protonmail.com and terpman710@gmail.com.

3　　　　77.　　The posts for this account include multiple photographs and videos, with
4　the most recent posted on July 16, 2019. A portion of these photographs are included
5　below:



**Taken** 2019-06-14 20:35:32 UTC



**Taken** 2018-12-06 13:59:49 UTC

COMPLAINT/RHULE - 27
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970



**Taken** 2018-07-30 20:00:04 UTC



**Taken** 2018-06-22 19:37:54 UTC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

78.     Based on my training and experience, the products shown in photographs above are consistent with various marijuana distillates and extracts, including those referred to as "wax," "shatter," "clear," and marijuana buds.

79.     Although "Nothing for sale!" is listed in the "About me" section of KlearKrew's current Instagram profile, numerous individuals communicate with KlearKrew asking to purchase marijuana products using Instagram direct messages.

          a.     For example, on September 4, 2016, livingfl messaged KlearKrew "U ship?" In response, KlearKrew said "Hit me up on Wickr."

          b.     On February 7, 2017, cannabis4two messaged KlearKrew "Product is looking real good!!! You guys ship anywhere or what?" KlearKrew responded "Hi, Thank you! We can get you some product for sure. Do you have a Wickr?"

          c.     On March 12, 2018, amoderatelife messaged KlearKrew "Could I please have your wickr? If that's what platform you're on." KlearKrew responded "Hey, how's it going? We are currently only working with wholesale outside of the events." Amoderatelife replied "I'm into wholesale, if that's between 50-100 pieces." KlearKrew then stated "download signal private messenger and give me a holler."

          d.     On January 8, 2019, KlearKrew messaged roberthaller "We're currently filling bulk orders. Oz & over." Roberthaller responded "Goodman, just finishing up at work, oz dabs? Or tree? Usually i get q's of erl at a time but i can cop more if needed. Moneys no issue for me." KlearKrew responded "700/oz" and "multiple flavors." Roberthaller replied "Okay, can we meetup friday?"

80.     In these direct messages, KlearKrew advised potential customers that they were based in the Pacific Northwest and discussed licensing requirements to sell marijuana products in the region.

          a.     For example, on March 26, 2018, KlearKrew messaged sarahjain420 "we extract close to Seattle and most of our sales are in Miami."

          b.     On April 5, 2018, KlearKrew messaged kushkweeen.lv "we are blasting in Washington state and Florida is where we handle most of our sales."

COMPLAINT/RHULE - 29
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 │ KlearKrew told kushkweeen.lv "100% able to make a purchase. We accept bitcoin,
2 │ Ethereum, and paypal. Usually have it out the same day that the order is placed."

3 │          c.        On August 23, 2018, KlearKrew messaged miami.mango305, stating
4 │ "Our shop isn't in Fl." Miami.mango305 responded "Someone told me otherwise."
5 │ KlearKrew replied "Distribution is. Our manufacturing is not" and explained that
6 │ manufacturing was in "Washington."

7 │          d.        On October 8, 2018, iheartcanna_ messaged KlearKrew "Are you
8 │ guys fully licensed?!" KlearKrew responded "Not yet."

9 │     D.        **RHULE's Involvement in Manufacturing Marijuana Extracts and**
10 │                **Distillates**

11 │     81.       While operating under the business names HerbinArtisans, Heady.Watr,
12 │ and KlearKrew, RHULE manufactures marijuana extracts and distillates. RHULE has
13 │ been manufacturing marijuana extracts and distillates since at least 2015.

14 │     82.       Initially, RHULE grew marijuana plants in order to manufacture distillates
15 │ and extracts. Law enforcement obtained information from Google and Apple, pursuant to
16 │ search warrants, and found a large number of photographs stored in RHULE's Google
17 │ and iCloud accounts, depicting him growing and drying marijuana.

18 │          a.        For example, the following photographs were obtained from
19 │ RHULE's Google account, and were last modified on May 27-29, 2015. The individual
20 │ in the photographs appears to be RHULE, based upon comparisons to RHULE's
21 │ Washington State driver's license and his appearance during the UC cryptocurrency
22 │ meetings.

23
24
25
26
27
28

COMPLAINT/RHULE - 30
USAO #2018R00575

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17





18  83.  In addition to these photographs, RHULE's Google, iCloud, and Instagram

19  accounts also contain photographs of indoor and outdoor marijuana grows.

20  a.  For example, RHULE's Google account contained the following

21  photograph, last modified on April 17, 2015:

22
23
24
25
26
27
28

COMPLAINT/RHULE - 31
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10



        b.     RHULE's Google account also contained the following photographs,

11 last edited on November 15, 2015:
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT/RHULE - 32
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970



c.   RHULE's Google account also contained the following photograph, last modified on March 9, 2016:

d.   HerbinArtisans' Instagram account also contained the following photograph, posted on September 16, 2016:

COMPLAINT/RHULE - 33
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9



10   84.   According to information obtained from Instagram, RHULE stopped

11   growing marijuana after his grow operation was robbed. On May 29, 2018,

12   HerbinArtisans sent a message to thehealingarmchairchemist stating "my whole growing

13   time was basically R&D best I ever did was 4.2lbs a 1000W light, then they robbed the

14   place and broke everything, and said screw it. Too much time and energy just to be

15   destroyed."

16   85.   Currently, it appears that RHULE sources marijuana trim[5] from legalized

17   marijuana grows in the State of Washington and Oregon, which is then processed using

18   chemicals such as $CO_2$, dry ice, propane, flavored terpenes, silica gel and bentonite clay

19   to create the products being offered for sale by RHULE. While trim is regulated under

20   Washington and Oregon law, regulations regarding disposing marijuana trim vary based

21   upon the quantity of THC that the trim contains, and there are lax procedures in place to

22   account for marijuana trim and ensure it's not diverted to unlicensed manufacturers.

23   Based on my training and experience, and information gained during the course of this

24   investigation, I know that marijuana trim is also less expensive to acquire than marijuana

25   bud, allowing RHULE to maximize profit. Additionally, the income generated from the

26   _____
[5] Trim is the waste product of the growing cannabis plants. Throughout the growing process the
27   plants leaves are trimmed to focus on the buds produced by the plant. The buds are the most
sought-after part of the plant. The trim produced is considered waste but has become a popular
28   product to be used in the production of marijuana distillates.

COMPLAINT/RHULE - 34                                    UNITED STATES ATTORNEY
USAO #2018R00575                                        700 STEWART STREET, SUITE 5220
                                                        SEATTLE, WASHINGTON 98101
                                                        (206) 553-7970

1   sale of the marijuana trim, which would otherwise go unsold, is another revenue stream
2   for the legalized grows.

3       86.     A large number of photographs are stored in RHULE's Google and iCloud
4   accounts depict marijuana trim, which law enforcement believes that RHULE uses to
5   create marijuana extracts and distillates.

6           b.     For example, RHULE's Google account contained the following
7   photograph, last edited on January 7, 2018:



8
9
10
11
12
13
14
15
16
17
18
            c.     The following photograph was contained in RHULE's iCloud
19
    account, last edited on February 8, 2017:
20
21
22
23
24
25
26
27
28
    COMPLAINT/RHULE - 35                                    UNITED STATES ATTORNEY
    USAO #2018R00575                                       700 STEWART STREET, SUITE 5220
                                                           SEATTLE, WASHINGTON 98101
                                                              (206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12



13    d.    RHULE's Google account also contained the following photograph,

14  last edited on October 17, 2016:

15
16
17
18
19
20
21
22
23

24    87.    RHULE also exchanges emails or other communications regarding

25  marijuana trim using his Google account and HerbinArtisans' Instagram account.

26    a.    For example, on May 1, 2019, RHULE, using the email address

27  kennyrhule@gmail.com, saved what appears to be a draft email or note, stating "94lbs

28  @125 trim Rick," among other items.

COMPLAINT/RHULE - 36
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1          b.     Similarly, on April 19, 2019, RHULE, using the same email address,

2 saved a draft email, stating "Log 95k to Luke[.] Trim 110[.] Old invoice 1500."

3          c.     On January 10, 2016, RHULE also received an extraction

4 worksheet, listing the various steps for extracting marijuana, including "Trim weight" in

5 the initial worksheet.

6          d.     On June 1, 2016, HerbinArtisans received a bill from "Big B" for 39,

7 believed to be pounds, of "Trim for extraction."

8          e.     On August 10, 2016, HerbinArtisans messaged amshaww using

9 Instagram direct messages, stating "I got the 2lb extractor online yesterday, after our

10 pumps arrived, and I manufactured a manifold to allow recovery of two separate

11 extractors using 3 pumps; and can easily run any sequence of pumps on either machine.

12 We are scheduled to run that trim Thursday morning, or tomorrow evening it looks like."

13          f.     On September 16, 2016, HerbinArtisans messaged i_luv_thc via

14 Instagram, stating "We process 50lbs of trim a day with our CLS, if you need some

15 done."

16          g.     On January 17, 2017, HerbinArtisans messaged redheadrasta "We

17 don't even run short on trim, and our extractor runs 18hours a day.  We do run splits on a

18 priority scale.  It should get run the day after we get the material, then we will prep the

19 distillation."

20          h.     On or around January 22, 2017, HerbinArtisans recorded a bill for

21 16 pounds of "Trim for extraction."

22          i.     On February 7, 2018, remixthelife messaged HerbinArtisans "You

23 guys running nug run or trim?"  In response, HerbinArtisans stated "Both."

24          j.     On March 27, 2017, HerbinArtisans messaged redheadrasta via

25 Instagram, stating "We run 350lbs of trim a week."

26          k.     On July 27, 2017, HerbinArtisans messaged hashin_wit_passion

27 "We process about 350lbs of trim a week."

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

88.     In addition to marijuana, a large number of photographs are stored in RHULE's iCloud account, and RHULE's friend's Instagram account, depicting RHULE near machinery that extracts or distills marijuana products.

a.     For example, RHULE's iCloud account contained the following photograph, last edited on February 28, 2019:



b.     Additionally, RHULE's friend's Instagram account contained the following photograph, posted on August 2, 2016:

COMPLAINT/RHULE - 38
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12



13  89.     Additionally, based on my training and experience, along with information
14  gained during the course of this investigation, I have identified the following photographs
15  in RHULE's Google and iCloud accounts that depict marijuana extraction or distillation
16  equipment.

17         a.    For example, RHULE's Google account contained the following
18  photograph last edited on April 25, 2019:

19
20
21
22
23
24
25
26
27
28



COMPLAINT/RHULE - 39
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1      b.    RHULE's Google account also contained the following photograph,

2    last edited on January 2, 2019:



14      c.    RHULE's Google account contained the following video, excerpts

15    of which are included below, last edited on May 8, 2019:



1          d.     RHULE's Google account also contained the following photograph,

2 last edited on September 9, 2016:



14          e.     RHULE's Google account also contained the following photograph,

15 last edited on July 11, 2016:



26          f.     RHULE's iCloud account also contained the following photograph,

27 last modified on March 23, 2018:

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9



10   g.   RHULE's iCloud account also contained the following photograph,

11   last modified on August 1, 2016:

12
13
14
15
16
17
18
19
20

21   90.   RHULE has purchased large processing equipment in an effort to maximize

22   effort, time and profit. The larger processing area and equipment allow RHULE to make

23   "runs" in larger quantities making production more efficient. Based on the documents

24   received, the equipment, as well as the supplies to run and maintain the processing

25   equipment, have been delivered to a property in Monroe, Washington.

26   a.   For example, on August 21, 2019, RHULE purchased an Xtractor

27   Depot Vacuum Pump, among other items, and had it shipped to the Monroe property.

28

COMPLAINT/RHULE - 42
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Xtractor Depot sells various extraction equipment, including that used by those extracting
2  and distilling marijuana products.

3          b.      On April 30, 2019, RHULE purchased a compression port
4  connector, among other items, from Open Source Steel and had it shipped to the Monroe
5  Property.  Open Source Steel manufactures extraction supplies, including a portion of
6  those shown in the equipment photographs above.

7      91.      According to emails obtained from Google, RHULE also frequently orders
8  products which, based on my training experience, would be used to facilitate the
9  production of THC/marijuana extracts, including dabs, shatter, hash oil, hash rosin, sugar
10  wax chips, diamonds and other forms of extracts and distillates. These products include
11  large amounts of latex gloves, vacuum sealer bags, filter papers, plastic syringes, pre-
12  printed labels and THC/CBD tanks or cartridges.

13          a.      For example, on August 22, 2019, RHULE purchased 55 gallons of
14  ethanol—a product used when distilling and extracting marijuana—and had it shipped to
15  the Monroe property.

16          b.      On August 12, 2019, RHULE purchased six milliliter glass
17  concentrate containers and had them shipped to the Monroe property.

18          c.      On August 6, 2019, RHULE purchased twenty kilograms of silica
19  gel and activated alumina and had them shipped to the Monroe property.

20          d.      On July 29, 2019, RHULE purchased micron filter plates and had
21  them shipped to the Monroe property.

22      92.      RHULE's iCloud and Google accounts also contain numerous photos of
23  THC/marijuana extracts, including dabs, shatter, hash oil, hash rosin, sugar wax chips,
24  diamonds and other forms of extracts and distillates, which are the same products
25  advertised by the Heady.Watr, HerbinArtisans and KlearKrew Instagram pages.

26          a.      For example, RHULE's Google account contained the following
27  photograph, last edited on January 9, 2019:

28

COMPLAINT/RHULE - 43
USAO #2018R00575



b.      RHULE's Google account also contained the following photograph, last edited on July 5, 2019:

c.      RHULE's Google account also contained the following photograph, last edited on February 21, 2019:

COMPLAINT/RHULE - 44
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11



12          d.      RHULE's Google account contained the following photograph, last

13   edited on September 16, 2019:

14
15
16
17
18
19
20
21
22

23          e.      RHULE's iCloud account contained the following photograph, last

24   edited on February 2, 2019:

25
26
27
28

COMPLAINT/RHULE - 45
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970



        f.     RHULE's iCloud account also contained the following photograph, last edited on September 26, 2018:

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## BACKGROUND ON UNLICENSED MONEY TRANSMISSION

93. Pursuant to Title 18, United States Code, Section 1960(a)(1), it is a crime to knowingly conduct, control, manage, supervise, direct, or own all or part of an unlicensed money transmitting business. The term "money transmitting," as defined by statute, "includes transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier." 18 U.S.C. § 1960(b)(2).

94. Section 1960 sets forth three prongs defining when a business constitutes an "unlicensed money transmitting businesses." First, Section 1960(b)(1)(A) makes it a crime to operate a money transmitting business without an appropriate state license where one is required. Second, Section 1960(b)(1)(B) makes it a crime to operate a money transmitting business without registering with federal authorities if required by federal regulation. Finally, Section 1960(b)(1)(C) makes it a crime to operate a money transmitting business—whether licensed by, or registered with, any authority or not—that "involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity[.]"

95. Pursuant to the first prong, as set forth above, Section 1960(b)(1)(A) makes it a crime to operate a money transmitting business without an appropriate state license where such operation is punishable as a misdemeanor or felony under state law. The State of Washington requires such a license when a person engages in the business of accepting cash in exchange for transmitting virtual currencies (which are described further below). Specifically, Section 19.230.30(1)(a) of the Washington State Code provides that "[a] person may not engage in the business of money transmission, or advertise, solicit, or hold itself out as providing money transmission, unless the person is . . . [l]icensed as a money transmitter." "Money transmission," in turn, is defined as "receiving money or its equivalent value (equivalent value includes virtual currency) to transmit, deliver, or instruct to be delivered to another location, inside or outside the

COMPLAINT/RHULE - 47
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    United States, by any means including but not limited to by wire, facsimile, or electronic

2    transfer." R.C.W. § 19.230.10(18).

3        96.    The Washington Department of Financial Institutions ("DFI") has issued

4    interim regulatory guidance providing that "[p]ersons engaged in the business of buying

5    or selling virtual currency fall under the definition of money transmission in the Act."

6    *See Interim Regulatory Guidance on Virtual Currency Activities* 2 (December 8, 2014).

7    The DFI specifically addressed the following situation:

8           [T]he buyer of virtual currency provides sovereign currency[6] to a business
9           that either holds value in the form of a desired virtual currency or who upon
            receipt of sovereign currency executes a purchase of the virtual currency
10          from another source. In either case the business ultimately transmits virtual
11          currency value to the buyer. The value is transmitted to a wallet location
            either designated by the buyer or generated by the business.
12

13   *Id.* at 3.  The DFI clarified that this type of transaction constitutes "money transmission

14   and the business must hold a Washington money transmitter license when providing the

15   service to Washington residents." *Id.*

16       97.    Pursuant to the second prong, as set forth above, Section 1960(b)(1)(B)

17   makes it a crime to operate a money transmitting business without complying with the

18   money transmitting business registration requirements under 31 U.S.C. § 5330 and the

19   regulations prescribed thereunder.  Section 5330 provides that a money transmitting

20   business must be registered not later than 180 days after the establishment of the

21   business.  31 U.S.C. § 5330(a)(1)(B); 31 C.F.R. § 1022.380(b)(4).  The filing of false or

22   materially incomplete information in connection with the registration of a money

23   transmitting business shall be considered a failure to comply with the registration

24   requirements.  31 U.S.C. § 5330(a)(4); 31 C.F.R. § 1022.380(e).

25       98.    FinCEN has stated that an exchanger of a virtual currency is required to

26   register with FinCEN as a money services business ("MSB").  *See Application of*

27   _____

28   [6] "Sovereign currency" is defined as "fiat or real currency, the money of a government." *Interim
Regulatory Guidance on Virtual Currency Activities* 2 (December 8, 2014)

COMPLAINT/RHULE - 48
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 | *FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual*
2 | *Currencies*, FIN-2013-G001, Department of the Treasury, Financial Crimes Enforcement
3 | Network (March 18, 2013) ("FinCEN Guidance"). Specifically, FinCEN's regulations
4 | provide that an MSB includes persons operating as a "money transmitter"—i.e., "a
5 | person that provides money transmission services." 31 C.F.R. § 1010.100(ff)(5).
6 | "Money transmission services," in turn, means "the acceptance of . . . funds or other
7 | value that substitutes for currency from one person *and* the transmission of . . . funds, or
8 | other value that substitutes for currency to another location or person by any means." *Id.*
9 | § 1010.100(ff)(5)(i)(A). FinCEN has clarified that the "definition of a money transmitter
10 | does not differentiate between real currencies and convertible virtual currencies." *See*
11 | FinCEN Guidance at 3.

12 |     93.     Pursuant to the third prong, as set forth above, Section 1960(b)(1)(C)
13 | provides that it is unlawful to operate a money transmitting business that "otherwise
14 | involves the transportation or transmission of funds that are known to the defendant to
15 | have been derived from a criminal offense or are intended to be used to promote or
16 | support unlawful activity."

17 |                    **BACKGROUND ON CRYPTOCURRENCY**

18 |     94.     Cryptocurrency, a type of virtual currency, is a decentralized, peer-to peer,
19 | network-based medium of value or exchange that may be used as a substitute for fiat
20 | currency to buy goods or services or exchanged for fiat currency or other
21 | cryptocurrencies. Cryptocurrency can exist digitally on the Internet, in an electronic
22 | storage device, or in cloud-based servers. Although not usually stored in any physical
23 | form, public and private keys (described below) used to transfer cryptocurrency from one
24 | person or place to another can be printed or written on a piece of paper or other tangible
25 | object. Cryptocurrency can be exchanged directly person to person, through a
26 | cryptocurrency exchange, or through other intermediaries. Generally, cryptocurrency is
27 | not issued by any government, bank, or company; it is instead generated and controlled
28 | through computer software operating on a decentralized peer-to-peer network. Most

COMPLAINT/RHULE - 49
USAO #2018R00575

1  cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the

2  decentralized network, containing an immutable and historical record of every

3  transaction.[7]   Cryptocurrency is not illegal in the United States.

4       95.    Bitcoin[8] is a type of cryptocurrency.  Payments or transfers of value made

5  with bitcoins are recorded in the Bitcoin blockchain and thus are not maintained by any

6  single administrator or entity.  As mentioned above, individuals can acquire bitcoins

7  through exchanges (i.e., online companies which allow individuals to purchase or sell

8  cryptocurrencies in exchange for fiat currencies or other cryptocurrencies), Bitcoin

9  ATMs, or directly from other people.  Individuals can also acquire cryptocurrencies by

10  "mining."  An individual can "mine" bitcoins by using his/her computing power to solve

11  a complicated algorithm and verify and record payments on the blockchain.  Individuals

12  are rewarded for this task by receiving newly created units of a cryptocurrency.

13  Individuals can send and receive cryptocurrencies online using many types of electronic

14  devices, including laptop computers and smart phones.

15       96.    Even though the public addresses of those engaging in cryptocurrency

16  transactions are recorded on a blockchain, the identities of the individuals or entities

17  behind the public addresses are not recorded on these public ledgers.  If, however, an

18  individual or entity is linked to a public address, it may be possible to determine what

19  transactions were conducted by that individual or entity.  Bitcoin transactions are

20  therefore sometimes described as "pseudonymous," meaning that they are partially

21  anonymous.  And while it is not completely anonymous, Bitcoin allows users to transfer

22  funds more anonymously than would be possible through traditional banking and credit

23  systems.

24

25  [7] Some cryptocurrencies operate on blockchains that are not public and operate in such a way to
26  obfuscate transactions, making it difficult to trace or attribute transactions.
   [8] Since Bitcoin is both a cryptocurrency and a protocol, capitalization differs.  Accepted practice
27  is to use "Bitcoin" (singular with an uppercase letter B) to label the protocol, software, and
   community, and "bitcoin" (with a lowercase letter b) or "BTC" to label units of the
28  cryptocurrency.  That practice is adopted here.

COMPLAINT/RHULE - 50
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

97.     Cryptocurrency is stored in a virtual account called a wallet. Wallets are software programs that interface with blockchains and generate and/or store public and private keys used to send and receive cryptocurrency. A public key (or public address) is akin to a bank account number, and a private key (or private address) is akin to a Personal Identification Number ("PIN") number or password that allows a user the ability to access and transfer value associated with the public address or key. To conduct transactions on a blockchain, an individual must use the public key and the private key. A public address is represented as a case-sensitive string of letters and numbers. Each public address is controlled and/or accessed through the use of a unique corresponding private key—the cryptographic equivalent of a password or PIN—needed to access the address. Only the holder of an address's private key can authorize any transfers of cryptocurrency from that address to another cryptocurrency address.

98.     Although cryptocurrencies such as Bitcoin have legitimate uses, cryptocurrency is also used by individuals and organizations for criminal purposes such as money laundering, and is an oft-used means of payment for illegal goods and services on hidden services websites operating on the Tor network. By maintaining multiple wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track purchases within the dark web marketplaces.

99.     Exchangers and users of cryptocurrencies store and transact their cryptocurrency in a number of ways, as wallet software can be housed in a variety of forms, including: on a tangible, external device ("hardware wallet"); downloaded on a Personal Computer ("PC") or laptop ("desktop wallet"); with an Internet-based cloud storage provider ("online wallet"); as a mobile application on a smartphone or tablet ("mobile wallet"); as printed public and private keys ("paper wallet"); and as an online account associated with a cryptocurrency exchange. Because these desktop, mobile, and online wallets are electronic in nature, they are located on mobile devices (e.g., smart phones or tablets) or at websites that users can access via a computer, smart phone, or any device that can search the Internet. Moreover, hardware wallets are located on some type

COMPLAINT/RHULE - 51
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  of external or removable media device, such as a Universal Serial Bus ("USB") thumb

2  drive or other commercially available device designed to store cryptocurrency (e.g.

3  Trezor, Keepkey, or Nano Ledger). In addition, paper wallets may contain an address

4  and a QR code[9] with the public and private key embedded in the code.  Paper wallet keys

5  are not stored digitally.  Wallets can also be backed up into, for example, paper printouts,

6  USB drives, or CDs, and accessed through a "recovery seed" (random words strung

7  together in a phrase) or a complex password.  Additional security safeguards for

8  cryptocurrency wallets can include two-factor authorization (such as a password and a

9  phrase).

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  [9] A QR code is a matrix barcode that is a machine-readable optical label.

COMPLAINT/RHULE - 52
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1                                    **CONCLUSION**

2         100.    Based on the foregoing, I respectfully submit there is probable cause to

3 believe that KENNETH RHULE has committed violations of Title 18, United States

4 Code, Sections 1960(a), (b)(1)(A), (b)(1)(B) and (b)(1)(C) (Operating an Unlicensed

5 Money Transmitting Business) and 1956(a)(3)(B) and (a)(3)(C) (Money Laundering),

6 and Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B), and 846 (Conspiracy

7 to Manufacture and Distribute Marijuana or Marijuana Distillates), and 2 (Attempt).

8

9

10                                   Victor Morales, Complainant

                                    Special Agent

11                                   Drug Enforcement Administration

12

13         Based on the Complaint and Affidavit sworn to before me, and subscribed in my

14 presence, the Court hereby finds that there is probable cause to believe the defendant

15 committed the offenses set forth in the Complaint.

16

17                       DATED this $28$ day of February, 2020.

18

19

20

21                         HON. PAULA L. MCCANDLIS

                        United States Magistrate Judge

22

23

24

25

26

27

28

COMPLAINT/RHULE - 53
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

# EXHIBIT B

The Honorable Brian A. Tsuchida

CERTIFIED TRUE COPY
ATTEST: WILLIAM M. MCCOOL
Clerk, U.S. District Court
Western District of Washington

By _Stephanie Mather_
Deputy Clerk

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES,<br><br>Plaintiff,<br><br>v.<br><br>KENNETH JOHN RHULE,<br><br>Defendant. | NO. MJ20-390<br><br>**COMPLAINT FOR VIOLATION**<br>Title 21, United States Code, Sections 841(a)(1), (b)(1)(A), and 846 |

BEFORE United States Magistrate Judge Brian A. Tsuchida, Seattle, Washington. The undersigned complainant being duly sworn states:

## COUNT 1
### (Conspiracy to Manufacture and Distribute Marijuana or Marijuana Distillates)

Beginning no later than October 2014 and continuing until at least in or about March 2020, in Snohomish County, within the Western District of Washington, and elsewhere, the defendant, KENNETH JOHN RHULE, and others known and unknown, did knowingly and intentionally conspire to manufacture and distribute marijuana, a Schedule I controlled substance under Title 21, United States Code, Section 812.

It is further alleged that the conduct of KENNETH JOHN RHULE, as a member of the conspiracy charged in this Count, which includes the reasonably foreseeable

COMPLAINT/RHULE - 1
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

conduct of other members of the conspiracy charged in this Count, involved 1,000 kilograms or more of a mixture and substance containing a detectable amount of marijuana.

All in violation of Title 21, United States Code, Section 841(a)(1), 841(b)(1)(A), and 846.

And the complainant states that this Complaint is based on the following information:

**I, Ernest McGeachy, being first duly sworn on oath, depose and say:**

1.      I am a Special Agent with the U.S. Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), assigned to the Special Agent in Charge ("SAC"), in Seattle, Washington.  I have been a special agent with HSI since October 2010.  HSI is responsible for enforcing the customs and immigration laws and federal criminal statutes of the United States.  As part of my duties, I investigate criminal violations relating to cybercrimes on the Dark Net, narcotics, and human smuggling and trafficking.  I have investigated and/or participated in many federal criminal investigations involving narcotics, human smuggling and trafficking, and cybercrimes on the Dark Net.

2.      I am a graduate of the Federal Law Enforcement Training Center ("FLETC") Basic Criminal Investigator Training Program, the Immigration and Customs Special Agent Training Program, and the Naval Criminal Investigative Service ("NCIS") Special Agent Training Program.  Before joining HSI, I worked as a special agent with NCIS, and as a Customs and Border Protection officer.  I have been a federal law enforcement officer for over twenty years.  I hold a bachelor's degree in Political Science from Western Washington University.  I also hold a master's degree in Human Relations from the University of Oklahoma.

3.      This affidavit is made in support of a complaint for the arrest of KENNETH JOHN RHULE for violations of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846 (Conspiracy to Manufacture and Distribute Marijuana

COMPLAINT/RHULE - 2
USAO #2018R00575

or Marijuana Distillates).  Because this affidavit is submitted for that limited purpose, I am not including every fact known to me about this defendant or the larger investigation.

4.      The information in this affidavit is based upon the investigation I have conducted in this case, my conversations with other law enforcement officers who have engaged in various aspects of this investigation, and my review of reports written by other law enforcement officers involved in this investigation.

5.      This affidavit is being presented by electronic means pursuant to Local Criminal Rule 41(d)(3).

## PROBABLE CAUSE

### I.      Summary of Investigation

6.      The DEA and Homeland Security Investigations ("HSI") have been investigating whether KENNETH JOHN RHULE (hereinafter referred to as "RHULE"), his son Kenneth Warren Rhule, and others, manufactured and distributed marijuana distillates and extracts, in violation of 18 U.S.C. §§ 841 and 846.

7.      That investigation has shown that, from at least October 2014 until March 2020, RHULE, along with his co-conspirators, manufactured and sold marijuana distillates and extracts.  These marijuana distillates and extracts include those referred to as "wax," "shatter," "clear," and marijuana buds—products that contain THC and are regulated by the State of Washington.  Despite selling marijuana products, neither RHULE nor his company, HerbinArtisans, is listed as an applicant or licensee to produce, process, transport, or sell marijuana or marijuana products in the State of Washington.

### II.     RHULE's Manufacture and Sale of Marijuana Distillates and Extracts

8.      Since at least October 2014, RHULE, along with Kenneth Warren Rhule and others, has been manufacturing and selling marijuana distillates and extracts.  As described herein, RHULE: (1) made the initial capital investment necessary to manufacture marijuana products, (2) produced and sold marijuana distillates and extracts,

COMPLAINT/RHULE - 3
USAO #2018R00575

(3) recorded sales and inventory for HerbinArtisans—the label used by RHULE to sell his products, and (4) profited from the illicit marijuana sales.

**A.  Initial Operations**

9.    RHULE, along with Kenneth Warren Rhule and others, began manufacturing and selling marijuana products no later than October 2014.

10.    RHULE provided a substantial portion of the initial capital needed to begin growing and distilling marijuana.  RHULE described these investments in the following text messages sent to his son, Kenneth Warren Rhule:

a.    According to a text message sent by RHULE on March 30, 2015, RHULE told his son, in relevant part: " I've got well over 6 figures into this, and I've received a grand total of $425 from a QP on the first aero trial run."

b.    Similarly, on April 21, 2015, RHULE sent a message to his son, which stated, in part:

> All working capital has come from me, all infrastructure has come from me, all tools, equipment, inventory, vehicles, etc. have come from me, the building rent and utilities are paid by me, and he is still having a hard time cash flowing... Like I told [J] day 1... You need to model the business around a dead minimum of $200k per month in revenues, otherwise the baseline expenses will be too high to make any worthwhile profits...

11.    In these conversations with Kenneth Warren Rhule, RHULE also described the quantity of marijuana they hoped to grow and sell, along with the profits they expected to make.

a.    For example, on March 30, 2015,[1] RHULE told his son, in relevant part:

> This op at the warehouse is 95% done.  It's setup to generate 2535lbs per room every 60 days (which is 2535 lbs once per month out of alternating rooms) that is $5070k per month, plus the trim that it yields. That, along with supplemental oil to keep the system running is another 2535k per

---

[1] This is a continuation of the text message described in the prior paragraph.

COMPLAINT/RHULE - 4
USAO #2018R00575

month. That can be run smoothly with just [C and M2] (or 2 employees ). That's roughly 100k per month in revenue with costs of less that 18k per month... That leaves uswith 80k per month for you and I. When the construction is finished, that output becomes a walk in the park. As the employees get familiar with the systems, they dial them in further and can do it in their sleep. It doesn't need to be stessful. It doesn't need [M], end user sales, etc. Simply moving volume wholesale to a small handful of people. After the setup is done, this whole thing can operate with A couple of people, it really won't be that involved. It's time consuming because it involved construction and learning the industry. Both of those variables are nearly complete now.

   b.   Similarly, on August 7, 2015, RHULE sent a text message to his son, which stated, in relevant part:

At 2 runs a day, 5 days a week, after paying the cost of material, at 12% yield, and $12 per gram sell price, there should be $39k in profit per month. If we say all business expenses are $10k, including rent, utilities, supplies, has, food, etc. that should leave $29k... We should each take 5k and put the other 19k in the safe... This doesn't count any harvest, that's simply 2 runs per day, 5 days per week at an average of 12% yield, with a sell price of a smidge over 5k per lb....

12.   In the initial years of their operations, RHULE, along with Kenneth Warren Rhule, grew a portion of the marijuana plants they used to manufacture distillates and extracts.

   a.   For example, on October 10, 2014, RHULE sent the following picture, via text message, to Kenneth Warren Rhule, which depicted part of their marijuana grow:

COMPLAINT/RHULE - 5
USAO #2018R00575

1
2
3
4
5
6
7
8
9
10
11



12   b.   Similarly, on May 16, 2015, RHULE also sent the following picture,
13   via text message, to his son:
14
15
16
17
18
19
20
21
22
23
24   Along with this picture, RHULE stated "Not training for scrog since they are getting vert
25   lighting also..."  Based on my training and experience, and information gained during the
26   course of this investigation, I recognize the term "scrog" to refer to a method of growing
27   marijuana to increase yields.
28

COMPLAINT/RHULE - 6
USAO #2018R00575

13.     After growing these plants, RHULE and his co-conspirators used them to manufacture marijuana distillates and extracts, include those referred to as "wax," "shatter," "clear," and marijuana buds—products that contain THC and are regulated by the State of Washington.

a.     For example, on October 22, 2014, Kenneth Warren Rhule texted RHULE the following picture:



Based on my training and experience, and other information learned during the course of this investigation, I know the product shown in photograph above is consistent with the marijuana distillate or extract referred to as "shatter." In response to receiving this picture, along with others, RHULE replied "That first pic shows how clear it is! How long did you purge that? Is it the same stuff that you were making into pills. Or is that the stuff we pulled down?"

b.     RHULE also discussed the extraction process with his son, including informing him of the steps RHULE had taken to manufacture marijuana distillates and isolates. For example, on July 19, 2015, RHULE sent his son the following messages, via text: "I did a bho run… I also did the initial purge/muffin. Two Slabs are in the oven (oven is off now) with a vac pulled but no heat. What r u doing today?"

**B.  HerbinArtisans**

COMPLAINT/RHULE - 7
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

14.     Starting no later than February 2015, RHULE, along with his co-conspirators, began manufacturing marijuana products using the company name HerbinArtisans.   I believe that RHULE served as the Chief Executive Officer ("CEO") of HerbinArtisans, for reasons described in further detail below.

### 1.     RHULE's Use of the HerbinArtisans' Google Account

15.     On February 10, 2015, Kenneth Warren Rhule registered for an enterprise account[2] with Google, using the domain name @herbinartisans.com.  After this account was created, RHULE was assigned, and used, the email address ken@herbinartisans.com.

16.     In addition to sending and receiving emails regarding HerbinArtisans' grow operations, sales, and other items, RHULE and his co-conspirators used HerbinArtisans' Google Drive folder to access and store files related to HerbinArtisans' business, distillation and extraction process, and organization.

a.     For example, in HerbinArtisans' Google Drive, which RHULE had access to, there were logos for the company, including the following:



---

[2] A Google Enterprise account is a Google product that provides cloud computing, productivity, and collaboration tools for business clients.  HerbinArtisans' files were stored in a Google Drive account associated with Kenneth Warren Rhule's kenny@herbinartisans.com account, and were shared with RHULE's ken@herbinartisans.com account.

COMPLAINT/RHULE - 8
USAO #2018R00575

b.      Additionally, HerbinArtisans' Google Drive also held an organizational chart, created on January 18, 2016, which listed "Ken"—whom I believe to be RHULE—as the "CEO," while "Kenny"—a name used by Kenneth Warren Rhule—was listed as the "COO" of the organization.  While this organizational chart is not titled, and does not state which organization it describes, I believe it is an organizational chart for HerbinArtisans.  Notably, other individuals, known to also be associated with HerbinArtisans, were listed in subordinate roles with the titles "Garden technician," "Processing lead," "Processor," and "VP" on this chart.

**2.      RHULE's Involvement in Selling HerbinArtisans' Products**

17.      After forming HerbinArtisans, Kenneth Warren Rhule created an Instagram page to advertise and sell the company's products.  The HerbinArtisans account was created on March 26, 2016, using the registered email address kenny@herbinartisans.com, used by Kenneth Warren Rhule.

18.      On January 29, 2020, the HerbinArtisans account had 324 posts, 1,058 followers, and contained the description "PNW Extracts and Distillate[.]  All our own work [.]  Nothing for sale[.]"  Previously, the HerbinArtisans account included the language "DM for inquiries[.]  Bitcoin and Crypto Friendly."  As of June 12, 2020, the account remained active, but has since been changed to a private page.

19.      The posts for this account include multiple photographs and videos, with the most recent posted on April 17, 2019.  Some of these photographs are included below:

COMPLAINT/RHULE - 9
USAO #2018R00575

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**herbinartisans** Some more #goldenticket shatter, who's wants a golden ticket? #herbinartisans



**herbinartisans** Stable D9 #distillate #cat2



**herbinartisans** BCSP ready to go #herbinartisans #klearkrew #flower #mmj #seattle

COMPLAINT/RHULE - 10
USAO #2018R00575



 herbinartisans Cookies coming out
🖤#GSC #seattle #420 #710
#herbinartisans #klearkrew
#heady.watr

20.     Based on my training and experience, the products shown in photographs above are consistent with various marijuana distillates and extracts, including those referred to as "shatter," "oil", "clear," and marijuana buds.

21.     In addition to posting photographs of marijuana distillates and extracts, Kenneth Warren Rhule and his co-conspirators also used the HerbinArtisans Instagram page to send and receive direct messages— private communications—with others regarding selling HerbinArtisans' products.  For example, the following communications were sent to and from the HerbinArtisans Instagram account:

a.     On June 18, 2019, coastisclearnj messaged HerbinArtisans "You guys have any d9 liters in the 6-6.5 range?  Crypto ready."

b.     On May 13, 2019, solteksolutions messaged HerbinArtisans "Can you contact me in regards to bulk shatter and distillate orders?  I need 6 lb of shatter currently and 1L of clear distillate."

c.     On March 12, 2019 erikkve messaged HerbinArtisans "Warm greetings to you and your crew! . . . I'd like to inquire about a small order of raw distillate (for edible or dab use) . . . I've already sent my WA state medical card."  In response, HerbinArtisans directed erikkve to communicate via encrypted messaging service Wickr.

22.     Based on my review of the Instagram direct messages, HerbinArtisans would often tell prospective clients to switch over to encrypted messaging services like

COMPLAINT/RHULE - 11
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Wickr and Signal to continue negotiations for product sales. For example, on July 14, 2017, northwest_dabber sent a message to HerbinArtisans, stating "I Need a ticket on distillate gram syringes bulk and best quality nug run slabs or good white plant/trim runs." In response, HerbinArtisans asked "You have signal" and provided a telephone number associated with Kenneth Warren Rhule.

23. Although it appears that Kenneth Warren Rhule was predominately responsible for selling marijuana products using the HerbinArtisans Instagram page, RHULE was also involved in selling marijuana distillates and extracts, including via Craigslist and the dark web.

a. For example, on November 12, 2015, RHULE texted Kenneth Warren Rhule stating, in part, "I'm putting out more ad's with better keywords... There[3] ads don't pop up with the keywords, and are pretty basic... I'm jazzing them ups bit and making them more visible, but wanted to set prices to be able to hand it off to them where they make a reasonable profit built in..." Five minutes after sending this text, RHULE also sent his son the following: "How much should I put in a Craig's list as so they will be happy with the markup they make on the leads I forward to them?"

b. On December 22, 2015, RHULE emailed a Craigslist response to Kenneth Warren Rhule. The response stated "How much for a 4 gram eighth I live by manormarket off 164." RHULE forwarded this response to Kenneth Warren Rhule, stating "Do you wanna help this guy he sounds close to you ..." Kenneth Warren Rhule replied to the Craigslist poster, stating "I can do $100 for 4gr of shatter. It's grape ape x middle fork." Based on my training and experience, and information learned during the course of this investigation, I recognize these emails to describe the sale of marijuana products.

---

[3] It appears that RHULE was referring to other employees of HerbinArtisans who were responsible for selling marijuana products.

COMPLAINT/RHULE - 12
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

c.      In addition to selling marijuana products on Craigslist, RHULE also sold marijuana products on the dark web.  For example, on April 24, 2015, RHULE texted Kenneth Warren Rhule, in relevant part, "Also, I have some KILLER deep web locations for selling..."

d.      Similarly, on May 16, 2015, RHULE texted Kenneth Warren Rhule "Also, online deep web... Setup a couple order takers... The proceeds go into a bitcoin account we control... They send in the orders each day, we ship them, and we pay out the commission when the Bitcoin escrow is released..."

### 3.      RHULE's Involvement in Acquiring Marijuana Trim

24.      While initially, RHULE and his co-conspirators grew at least a portion the marijuana plants used to manufacture distillates and extracts, they also purchased marijuana trim[4] from other growers in order to produce their marijuana products.  Later in their operations, it appears that RHULE and his co-conspirators were predominately using purchased trim to manufacture their products.

a.      For example, on August 15, 2015, RHULE texted Kenneth Warren Rhule "Did [C.E.] get with you for the trim contact? I gave him prepaid funds to get 13 lbs, and told him to call me if we needed more). That with the 7 lbs we have wi[ll] be enough for full runs next week though."

b.      Similarly, on September 11, 2015, RHULE texted Kenneth Warren Rhule "When r u going to get trim, and how many pounds? Lemon skunk was 345 and produced 51... It smells incredible, but just a hair under 15%.

c.      On December 4, 2015, RHULE sent an email to Kenneth Warren Rhule, forwarding a Craigslist email that said "have lb or 2 i'd like to have processed if you do such jobs.  % to you.  & can trade bud for your products."  Based on my training

---

[4] Trim is the waste product of the growing cannabis plants. Throughout the growing process the plants leaves are trimmed to focus on the buds produced by the plant. The buds are the most sought-after part of the plant. The trim produced is considered waste but has become a popular product to be used in the production of marijuana distillates.

COMPLAINT/RHULE - 13
USAO #2018R00575

and experience, and information learned during the course of this investigation, I know that bud refers to marijuana.

        d.    Kenneth Warren Rhule's personal Google account and iCloud account also contained photographs of marijuana trim, including the following photograph, last edited on January 7, 2018:



### 4.    RHULE's Role in Distilling and Extracting Marijuana Products

25.    After obtaining the marijuana trim, RHULE, along with his co-conspirators, used that trim to manufacture marijuana distillates and extracts. RHULE participated in distilling and extracting marijuana products, including by drafting a distillation worksheet in an effort to standardize their operations.

        a.    For example, on January 10, 2016, RHULE sent Kenneth Warren Rhule an email, stating:

> I quickly drafted a very basic extraction worksheet.  This is a 1 page document that needs to follow the extraction process from the very beginning to the end. Its designed to place accountability on each the extract technician, and the purge technician.  Additionally, its a document that will hang by clip on the column, to the stainless table, to the oven and act as a quick visual to each batch (with all the info we need).  Take a look, I am sure it can be more robust, but this is just to get us going.  We need

1    this in place Monday morning.  Feel free to enhance it if....  Print out 50-
2    100 of these at the shop and we need to make sure everyone uses them.

3    RHULE attached an "Extraction Process Worksheet" to the email, which listed items like
4    "Trim weight," "Strain used," and "Concentrate packaged for sale."

5         b.    Similarly, on November 4, 2015, RHULE texted Kenneth Warren
6    Rhule: "I did last night... Broke the assembly patty into 3 patties and muffins them...
7    They initial purged out good at 104107.  I flipped them and did a quick purge in the other
8    side... They are probably 80% purged..."  Based on my training and experience, along
9    with information gathered during the course of this investigation, I recognize these
10   statements to refer to marijuana distillation and extraction.

11        **5.    RHULE's Involvement in Recording HerbinArtisans' Profits**
12             **and Expenses**

13        26.    In order to record HerbinArtisans' sales, profits, expenses, invoices, and
14   other data, RHULE used Xero, a cloud-based accounting software.  RHULE, along with
15   others, was responsible for updating Xero's records.

16        a.    According to information obtained from Xero, "Ken R," using the
17   email address krhule@icloud.com—an email address associated with RHULE, was listed
18   as an active user for the account, with the following roles: "Financial Adviser; Standard;
19   Manage Users; Payroll Administration; Subscriber; Bank Account Admin."  RHULE,
20   using this account, was also listed as the primary "Subscriber" for the Xero account,
21   while all other individuals were listed as "Invited User[s]."

22        b.    RHULE logged into Xero and updated HerbinArtisans' records over
23   200 times from August 2015 until December 2019.

24        c.    RHULE also advised others on how to record items in Xero.  For
25   example, on December 2, 2015, C.E. emailed RHULE and Kenneth Warren Rhule,
26   stating "Hey guys, I took 2 oz of O.G. Kush to settle a personal debt.  I'm not sure how
27   we should enter it into the system."  Based on my training and experience, and

28

COMPLAINT/RHULE - 15
USAO #2018R00575

1   information learned during the course of this investigation, I know that O.G. Kush refers
2   to a marijuana product.  That same day, RHULE responded:

> Ok, thats a pretty simple transaction… Invoice the 2 ounces out to you at
> wholesale rate.  When thats done let me know the invoice #, and I will go in
> to xero and apply payment in full to the invoice, but instead of having you
> pay that in cash, I will apply the payment to your advances instead.  The net
> result would be the same as taking an advance for the wholesale price of the
> oil.

27.     Additionally, the Xero data indicates that RHULE is a part owner or
operator of HerbinArtisans.

        a.      According to an Income Statement saved in this account, from 2015
until 2019, HerbinArtisans earned a "Total [Gross] Income" of $13,710,069.27 and a
"Net Income" of $2,574,850.33.

        b.      From August 2015 until April 2017, HerbinArtisans issued more
than $25,000 in payments to "Kenneth Rhule," "Ken R," or "Ken Rhule"—believed to be
RHULE.

        c.      From December 2015 until May 2018, "Kenneth J"—believed to be
RHULE—also received more than $150,000 in payments from HerbinArtisans for,
among other things, payroll, expense reimbursement, and loan repayments.

**C. Search of HerbinArtisans' Production Facility**

28.     Since August 2016, HerbinArtisans has been extracting and distilling
marijuana products at a property located at 29428 181st Street SE, Monroe, Washington,
which is also assigned the address 29209 Cedar Ponds Road, Monroe, Washington
(hereinafter referred to as the "Monroe Property").  On March 10, 2020, agents searched
this location, along with others, pursuant to warrants.

29.     On March 10, 2020, RHULE was found to be living at the Monroe
Property, in a residence located nearby the warehouse where marijuana products were
being extracted.  RHULE was present when law enforcement agents executed the search
warrants.  The distance between RHULE's residence (bottom of photograph with brown

COMPLAINT/RHULE - 16
USAO #2018R00575

roof) and the warehouse (top of photograph with white roof) is depicted in the following aerial surveillance photograph:



30.     As described below, during the search of the Monroe Property, agents located bulk marijuana, marijuana distillates, and drug paraphernalia, among other items.

        a.     Inside a warehouse located on the property, agents found processing equipment and materials dedicated to the extraction and concentration of marijuana including: various types of industrial-grade machinery, steel tables, industrial amounts of dry ice, dry-ice storage bin coolers, metal cylinders of various sizes, flexible metal hoses, pressure cylinders, various pumps, industrial scales, stainless steel pressure cylinders, pressure covers, vacuum pumps, electric motors, a mini dryer, a terpene trap, tube racks, mixers, chemistry mixers, multiple ovens and drying racks containing marijuana distillate products.

        b.     Inside the warehouse, agents also found associated materials and equipment, including a label maker, bins, buckets, industrial fans, multiple industrial

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

sized pressurized gas tanks, a shop-vac, heavy-duty dollies, ladders, welding equipment, industrial amounts of "monodisperse silica gel," "aromatizing clay," large quantities of mylar bags, multiple jars and lids, rubber gloves, and other items used to manufacture and produce controlled substances.

      c.    Inside the warehouse, agents also found approximately 29 large garbage bags filled with marijuana plant material and multiple glass jars containing refined marijuana distillate products.  Agents further found a large rotary evaporator with multiple large glass flasks, a heavy-duty press, and a 50-gallon tank of pressurized butane.

      d.    Agents found numerous pre-printed documents headlined "Hydrocarbon Inventory Process worksheet" throughout the warehouse which detailed the weight and results of the extraction process.  These pre-printed worksheets were completed with handwritten notes from various individuals whose identities have not been verified.  Fields on the work sheet include: "Date" and "Assembly" (often filled out with a name or left blank).  Each worksheet contained information for four "columns" (steel cylinders used to extract THC) with a "weight" and "strain" field for each column.  Three fields for "Wet Weight," "Dry Weight," and "Slab Count" were present.

      e.    Between the residence, where RHULE was residing at the time, and the warehouse, investigators located a tent containing:  (1) six 50-gallon drums of "N-Heptane," a highly flammable alcohol used in the marijuana distillate extraction process; and (2) three assault rifles with loaded magazines.  Next to the tent, investigators found a white 2008 Dodge Sprinter transport van.  An extension cord running from a nearby shed into the front passenger side of the van was plugged into an electric air purifier which rested on the dashboard.  Numerous small air-fresheners were scattered around the van.  Modifications had been made to block the ventilation system along the front wall of the separate rear cargo transport area.  Investigators believe that this cargo van was used to transport unprocessed marijuana plants for the production and manufacturing of marijuana distillate products.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

f.      In total, agents found approximately 1,000 kilograms of bulk marijuana or marijuana extracts, with packaging, when they executed search warrants in connection with this case in March 2020.[5]  Approximately 986.4 of these kilograms were located in the warehouse on the Monroe Property.

31.     In the Instagram direct messages, HerbinArtisans described selling marijuana extracts and distillates manufactured at a facility in Monroe, Washington, believed to be the Monroe Property searched by law enforcement.

a.      For example, on January 28, 2018, mike_b_dabbin sent a message to HerbinArtisans stating "Hey i used to get concentrates from you guys quite often . . . I was wondering if i could get a few slabs from you guys?  Always love that terpy shatter." In response, HerbinArtisans replied "we are actually a little deeper now in Monroe but we can cruise to Woodinville or closer when we meet."

b.      On January 25, 2018, kylelaroche messaged HerbinArtisans, stating "Hey I used to get some product from you guys . . . Is there anyone I could get linked up with to get some more?"  In response, on February 4, 2018, HerbinArtisans messaged kylelaroche, stating "It would be tomorrow, he lives up north too and the shop is in Monroe."

32.     For his role in the conspiracy, on March 10, 2020, Kenneth Warren Rhule was arrested and charged with Conducting an Unlicensed Money Transmitting Business, in violation of 18 U.S.C. § 1960, Money Laundering, in violation of 18 U.S.C. § 1956, and Conspiracy to Manufacture and Distribute Marijuana, in violation of 21 U.S.C. §§ 841 and 846.

---

[5] Law enforcement searched the Monroe Property, RHULE's residence, RHULE's vehicle, and RHULE's person.

COMPLAINT/RHULE - 19
USAO #2018R00575

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**CONCLUSION**

33. Based on the foregoing, I respectfully submit there is probable cause to believe that KENNETH JOHN RHULE has committed violations of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846 (Conspiracy to Manufacture and Distribute Marijuana or Marijuana Distillates).


Ernest McGeachy, Complainant
Special Agent
Homeland Security Investigations


The above-named agent provided a sworn statement attesting to the truth of the contents of the foregoing Complaint and Affidavit on  1st  day of July, 2020.  Based on the sworn Complaint and Affidavit, the Court hereby finds that there is probable cause to believe the defendant committed the offenses set forth in the Complaint.


BRIAN A. TSUCHIDA
United States Magistrate Judge

# EXHIBIT C

 

# United States District Court
*Western District of Washington*

---

UNITED STATES OF AMERICA,

vs.

## KENNETH WARREN RHULE

# APPEARANCE BOND
## CASE No: MJ20-097

I understand that I may be released from custody, pending further proceedings in this case, on the conditions marked below:

- **Court Appearances.** I must appear in court at the *United States Courthouse, 700 Stewart Street, Seattle, Washington; Courtroom 12B*, on Tuesday, March 31, 2020 at 1:00 PM and at all other hearings in this case, including turning myself in to begin serving a sentence, should that occasion arise. **I UNDERSTAND THAT A WILLFUL FAILURE TO APPEAR IN COURT AT A TIME SET FOR HEARING IS A SEPARATE CRIMINAL OFFENSE, PUNISHABLE BY UP TO 10 YEARS IMPRISONMENT AND A FINE OF $250,000.**
- **No Law Violations.** I must not commit a federal, state, or local crime during the period of release. I understand that if I commit a felony while on release, my sentence can be increased by a maximum of ten years. If I commit a misdemeanor while on release, my sentence can be increased by a maximum of one year. These sentences would be consecutive to all other applicable sentences.
- **DNA Testing.** I must cooperate in the collection of a DNA sample if the collection is authorized by 42 U.S.C. § 14135a.
- **No Controlled Substances.** I must not use, consume or possess any controlled substances, including medication, unless prescribed by a physician and approved in advance by the Pretrial Services Officer.
- **Address.** I must furnish my attorney, and/or Pretrial Services if supervised, with my current address and telephone number (if any) where I will reside upon release and where I will receive any notices of hearing dates. I must report any changes in that address or telephone number to my attorney, and/or Pretrial Services if supervised, within one business day.
- **Restrictions on Travel.** I must not travel outside the Continental United States or as directed below under 'Other Conditions'.
- **Victim and Witness Protection.** I must not harass, threaten, intimidate, tamper with, improperly influence, or injure the person or property of witnesses, jurors, informants, victims of crime, judicial officers, or other persons related to official proceedings before the Court, in violation of 18 U.S.C. § 1503, 1512, and 1513.
- **Pretrial Supervision.** I am subject to Pretrial Services supervision by the Pretrial Services Office of the Court and must abide by such of the general and special conditions of release as that office shall impose. I must report to the Office of Pretrial Services, (206) 370-8950, United States Courthouse, 700 Stewart Street, Seattle, Washington within 24 hours of my release unless released during a weekend or on a holiday in which case I must report at 9:00 a.m. the following court day.

**OTHER SPECIAL CONDITIONS:**

- Submit to drug testing, to include urinalysis or hand-held testing devices, as directed by Pretrial Services. You shall not use, consume, or possess alcohol, any product containing alcohol, or other intoxicants, including medication, unless prescribed to you by a physician and under the direction of Pretrial Services. Obtain an alcohol/substance abuse evaluation and follow any treatment recommendations as directed by Pretrial Services. You shall participate as directed in a program approved by the probation and pretrial services office for treatment of narcotic addiction, drug dependency, or substance abuse, which may include testing to determine if the defendant has reverted to the use of drugs or alcohol.
- Travel is restricted to the Western District of Washington, or as directed by Pretrial Services.
- Surrender all current and expired passports and travel documents to the court. Do not apply for/obtain a new passport or travel document from any country without permission of the court. If the surrendered passport is a foreign passport, it shall be forwarded to Immigration and Customs Enforcement if defendant is convicted of an offense, unless otherwise ordered by the Court.
- Maintain residence as directed. Do not change residence without prior approval of Pretrial Services or as directed by Pretrial Services.
- Defendant cannot directly or indirectly transfer any virtual currency, also known as cryptocurrency, in or over which Defendant has any right, title, interest, or control unless permitted by Pretrial Services.
- You are prohibited from possessing or having access to firearms and dangerous weapons. All firearms and dangerous weapons must be removed from your residence(s), vehicle(s), and place of employment. This condition operates in conjunction with any restrictions imposed under Title 18, USC 922, and the Washington State Revised Code, Chapter 9.41.
- Provide Pretrial Services with any requested information regarding your financial status, income sources, and investments. Sign a Release of Information form for Credit Bureau Verification if requested by Pretrial Services.

Appearance Bond
Page 2 of 2

Case 2:20-cr-00105-LGC Document 48-1 Filed 08/25/20 Page 78 of 158
Case 2:20-mj-05009-PLM Document 8 Filed 03/10/20 Page 2 of 2

KENNETH WARREN RHULE

MJ20-097

**AGREEMENT BY DEFENDANT:** I understand and agree to comply with every condition marked above, and I understand that if I fail to comply with any conditions of my release, the Court will immediately issue a warrant for my arrest, and I will be subject to a revocation of release, an order of detention, and prosecution for contempt of court. I understand this appearance bond remains in effect during any proceeding on appeal or review.

| X | March 10, 2020 | Seattle, WA |
|---|---|---|
| Signature | Date Signed | City, State of Residence |

---

### ORDER OF RELEASE

It is therefore ORDERED:
(1) Defendant shall comply with all conditions of this appearance Bond;
(2) Defendant shall be released from custody, and shall remain at liberty so long as he or she complies with the provisions of this Appearance Bond, or until further order of the Court.

| March 10, 2020 | |
|---|---|
| Date Signed | Michelle L. Peterson |
| | UNITED STATES MAGISTRATE JUDGE |

*cc: Defendant, Defense Counsel, U.S. Attorney, U.S. Marshal, Pretrial Services*

# EXHIBIT D

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

                Plaintiff,

    v.

KENNETH WARREN RHULE,

                Defendant.

Case No. MJ20-97

ORDER

## I.      INTRODUCTION

This matter is before the Court on Defendant Kenneth Rhule's motion to modify conditions of pretrial release. (Mot. (Dkt. # 17).) The government filed a response (Resp. (dkt. # 22)), and Mr. Rhule filed a reply (Reply (dkt. # 24)). The Court, having reviewed the parties' submissions, the governing law, and the balance of the record, hereby ORDERS that Mr. Rhule's motion is GRANTED.

## II.      BACKGROUND

Mr. Rhule is charged by complaint with allegedly conducting an unlicensed money transmitting business in violation of 18 U.S.C § 1960, laundering of monetary instruments in violation of 18 U.S.C § 1956, and conspiracy to manufacture and distribute marijuana in

violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and 846. (Compl. (Dkt. # 1).) Mr. Rhule appeared

for his initial appearance and detention hearing on March 10, 2020. (Dkt. # 6.) The parties and

Pretrial Services recommended release. (*Id.*) The Undersigned released Mr. Rhule, conditioned

upon a bond with special conditions. (*Id.*) At issue in the instant motion is the following special

condition:

> Provide Pretrial Services with any requested information regarding your financial
> status, income sources, and investment. Sign a Release of Information form for
> Credit Bureau Verification if requested by Pretrial services."

(Dkt. # 8 at 1.)

Since the detention hearing, Mr. Rhule provided a release regarding his credit report

information and a requested "Monthly Cash Flow Statement." (Eakes Decl. (Dkt. # 18) at ¶¶ 3,

5.) Pretrial Services also requested Mr. Rhule submit a "Net Worth Statement." (*Id.* at ¶ 3.) Mr.

Rhule requested Pretrial Services rescind its request for a net worth statement, arguing it

implicates his Fifth Amendment right against compulsory self-incrimination. (*Id.* at ¶ 6.) After

conferring with the U.S. Attorney's Office, Pretrial Services declined to rescind its request but

agreed to suspend it until resolution of the instant motion. (*Id.* at ¶ 7.)

Mr. Rhule's motion specifically requests the Court issue an order clarifying that his bond

does not require a complete accounting of his assets and liabilities. (Mot. at 2.) Mr. Rhule also

argues that if he is required to submit a net worth statement, he should be granted immunity

from any direct or indirect use by the government regarding the statement. (Reply at 1.)

### III.    DISCUSSION

#### A.    18 U.S.C. § 3142

18 U.S.C. § 3142 empowers a court to release a defendant "subject to the least restrictive

further condition, or combination of conditions, that … will reasonably assure the appearance of

the person as required and the safety of … the community." 18 U.S.C. § 3142(c)(1)(B). In

deciding whether and what conditions to impose, a court must consider: (1) the nature and

circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3)

the history and characteristics of the defendant; and (4) the nature and seriousness of the danger

to any person or the community that would be posed by the defendant's release. 18 U.S.C. §

3142(g). To prevent a defendant's release, the government must prove that a defendant is a

danger to the community by clear and convincing evidence, or it must prove that a defendant is a

flight risk by a clear preponderance of the evidence. *United States v. Motamedi,* 767 F.2d 1403,

1406 (9th Cir. 1985). "Doubts regarding the propriety of release are to be resolved in favor of

defendants." *United States v. Townsend,* 897 F.2d 989, 994 (9th Cir. 1990).

The Court previously considered the factors enumerated in 18 U.S.C. § 3142 and found

release with special bond conditions warranted. For the reasons discussed below, release remains

warranted without the condition of providing a net worth statement.

### 1. *Appearance as Required*

Mr. Rhule argues his appearance as required is reasonably assured by the current bond

conditions that he not travel outside the district, maintain his residence as directed, and surrender

his passport.[1] (Mot. at 4.) In support of his argument, Mr. Rhule argues he is not a flight risk

because he has extensive ties to the community, does not hold foreign citizenship, and has no

criminal history. (*Id.*) Mr. Rhule also argues that a complete accounting of his assets and

liabilities is unnecessary to provide visibility into his financial activities given that he is already

providing monthly cash flow statements. (Reply at 3.)

---

[1] Mr. Rhule surrendered his passport on March 12, 2020. (Dkt. # 9.)

The government argues that because Mr. Rhule allegedly has access to substantial assets, the reporting of his monthly cash flow and release for credit report information are inadequate to evaluate the extent of his financial resources. (Resp. at 7-8.) Specifically, the government argues that Mr. Rhule is charged with having access to assets held outside of financial institutions and held in the name of shell companies. (*Id.*) The government argues that without a net worth statement, it is unknown what cash reserves Mr. Rhule has access to or if he is liquidating assets in an effort to abscond. (*Id.* at 9.)

Here, the Court agrees with Mr. Rhule that a net worth statement is unnecessary to assure his appearance. Mr. Rhule was raised in this district and maintains his residence here. (Reply at 2.) He has no criminal history and since his detention hearing, it appears he has actively worked with Pretrial Services to ensure compliance with his bond conditions. Further, Mr. Rhule relinquished his passport and is bound to not travel outside the district. Although alleged sums of cash may be considered in determining if a defendant will appear as required, *see United States v. Nguyen*, 2008 WL 4163135 at *2 (W.D. Wash. Sept. 4, 2008), the other narrowly tailored conditions, namely the disclosure of monthly cash flow statements, will reasonably assure that Mr. Rhule is not amassing large sums of money to flee the jurisdiction.

### 2. *Safety of the Community*

Mr. Rhule argues the safety of the community is reasonably assured by the bond conditions that he not possess firearms or dangerous weapons, not transfer any virtual currencies, and that he continue to provide monthly cash flow statements. (Mot. at 4.) Mr. Rhule asserts that although the government alleges he manufactured marijuana products, there are no allegations that he is currently engaged in a marijuana operation. (*Id.*) Mr. Rhule further argues that the monthly cash flow statements allow Pretrial Services to monitor any potential ongoing

ORDER - 4

criminal activity, whereas disclosure of a net worth statement would only provide information regarding his past financial activities. (*Id.* at 4-5.)

The government argues Mr. Rhule poses a risk to the community because the alleged manufacturing of marijuana products involved highly combustible chemicals and multiple firearms, including stolen firearms. (Resp. at 10.) The government asserts that without a complete list of current assets, it is unknown whether Mr. Rhule continues to manufacture or sell marijuana. (*Id.* at 9-10.)

The Court finds disclosure of a net worth statement unnecessary to assure the safety of the community. Although production of marijuana products may involve dangerous chemicals, there is no evidence that Mr. Rhule is currently engaged in a marijuana operation or any other criminal activity. Further, the sale of any marijuana products would presumably be detected in his monthly cash flow statements. Similarly, there is no evidence Mr. Rhule presents a threat to the community based on his alleged former possession of firearms. While the allegations regarding possession of stolen firearms is concerning, there are no allegations he currently has access to firearms and the bond conditions expressly prohibit him from possessing dangerous weapons. It is unclear how providing a net worth statement, given the combination of other conditions, is necessary to assure the safety of the community. Because the current bond conditions reasonably assure both Mr. Rhule's appearance and the safety of the community, the Court declines to impose the more restrictive condition of requiring a complete accounting of his assets and liabilities.

**B. Fifth Amendment Implications**

The Self-Incrimination Clause of the Fifth Amendment provides that "[n]o person … shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.

ORDER - 5

1   For that reason, violation of the right against self-incrimination can only occur "if one has been

2   compelled to be a witness against himself in a criminal case." *Chavez v. Martinez*, 538 U.S. 760,

3   770 (2003).

4       Mr. Rhule argues that requiring him to disclose his net worth implicates his Fifth

5   Amendment right against compulsory self-incrimination given the government's accusations that

6   he ran unlicensed business operations. (Mot. at 5.) Specifically, Mr. Rhule argues disclosure

7   could provide a link to incriminating evidence about the extent of the alleged operations, which

8   could in turn expose him to further charges or a more severe sentence if he is convicted. (Mot. at

9   5; Reply at 4.) The government responds that Mr. Rhule's Fifth Amendment rights are protected

10  by the confidentiality rules codified in 18 U.S.C. § 3153(c) that provides information given to

11  Pretrial Services is not admissible against defendants except in limited circumstances. (Resp. at

12  3-7.) Because the Court finds a net worth statement is not necessary to assure Mr. Rhule's

13  appearance or the safety of the community pursuant to 18 U.S.C. § 3142, the Court need not

14  address this line of argument.

15              **IV.    CONCLUSION**

16      For the foregoing reasons, Mr. Rhule's motion (dkt. # 17) is GRANTED. The special

17  bond conditions do not require Mr. Rhule to provide a net worth statement at this time, however,

18  the parties may seek guidance from the Court if other disputes regarding pretrial financial

19  disclosures arise. Defendant is directed to continue providing Pretrial Services with monthly cash

20  flow statements.

21      DATED this 27th day of May, 2020.

22

23                          MICHELLE L. PETERSON
                            United States Magistrate Judge

# EXHIBIT E

August 11, 2020

The Honorable John C. Coughenour
United States District Judge
United States Courthouse
700 Stewart Street
Seattle, WA 98101

Regarding:  Kenneth John Rhule, Case No. NO. 20-cr-105 JCC

Dear Judge Coughenour,

We are writing this letter to the Court for your consideration of our son's release, Kenneth John Rhule. I refer to him as Ken.

My name is Johanna Rhule, Kenneth John Rhule's mother.  I am 65 years of age.  I was born in Yokohama, Japan (my father was in the United States Army), and have  lived all over the country at various army bases. Our family finally settled in Salinas, California, where I went to high school and met my husband Kenneth Rhule (whose father was also a U.S. Army veteran).  We married and started our family in Salinas, where Ken was born.

My occupation has been in the insurance industry.  I am now retired, but I worked for 29 years in a number of positions at Safeco/Symetra Insurance.  I eventually worked up to a position of senior management.  When I retired, I was the Claims Manager for Excess Loss Medical, re-insurance, for employers that are self funded for their medical insurance. I completed high school and many industry and management courses through my career. I managed 3 offices in Bellevue, Washington, Miami, Florida, and Norcross, Georgia.

My husband Kenneth William Rhule (also retired), contracted with CBRE for the last 17 years of his career, working as a Service Engineer on the Washington Mutual/Chase Bank accounts. Prior to that he worked for Starbucks and ran their maintenance program for their corporate offices in Seattle.

Ken was born in Salinas, California.  We moved to Woodinville, Washington in 1986 when Ken was 11 years old.  He has lived in the Northwest since that time. He attended Cottage Lake Elementary School, Leota Jr. High, Woodinville, High and Washington Vocational College.  Ken has deep ties to the Northwest.

He married his first wife, Leah, who was his high school sweetheart and had 2 twin boys.  He also started his first business (Compucare) at 18 year old and opened 4 computer stores.  He sold these after establishing his second business FocusMicro which was a security company.  He basically retired around 2013

We lived in our family home for almost 30 years. Prior to our retirement we purchased our retirement home in a Del Web community in Mesquite, Nevada.  We are still very close to our family and visit often.  They also visit us at our home in Mesquite.  We spend months at a time here in the Northwest.

Our son Kenneth is a great son, husband, father, brother, grandfather, and uncle. We have every confidence that he will remain in Washington to answer the charges against him. We firmly believe that now that he has been charged, that he would not flee to Russia or anywhere else, but see the process through since his arrest.  He has never been to Russia nor does he speak the language.  He loves his family and would never jeopardize his family by fleeing.

We have just recently been able to speak with our son from the Federal Detention Center.  We are more than willing to put up our home that we own free and clear to secure his bond. My husband and I are the trustees of the trust that owns it, with all the powers to dispose of it as we wish.  I would estimate the value of our home at $400,000.00-$425,000.00. We would be willing to sign a promissory note to secure Ken's appearance in court and compliance with the conditions of release that is secured by the equity in our home. We are confident that Ken will stay in Washington to face these charges.

We have reviewed the pretrial service officer's suggested conditions and, have every confidence that Ken would comply with any and all conditions imposed by the Court.  My husband and I are willing to act as third-party custodians to assist the Court, and, pretrial services in making sure Ken complies with all of the conditions of release.

Our family is a very close knit family.  We have enjoyed many camping trips and water sports.  Our son has done so much over the years for our family and the community.  I have a brother who has a mental illness; he has helped with costs to keep him with our family.  Ken has always been there when any of us has needed his help. Our family also spends time and money to support various charities including helping the homeless.

We are very concerned that Ken is more likely to acquire the COVID-19 virus while in jail and become very sick or worse.  He has no control over his health situation while there.  Ken has had intermittent stress-induced asthma since he was a child, and has been prescribed and used an Albuterol inhaler for many years.  I am not sure, but I think this may make him more susceptible to serious illness if he gets the virus.

We love our son dearly. He is a kind, generous man with strong ties to his family.  We know that together as a family we will get through these challenges that we are all facing. It is not just him that is impacted, but our whole family that is feeling the pain of these trying times.  I know that together we will get through this and be together again as a family.

We ask that you take all this into consideration in making your determination whether to release Ken from jail while these charges are pending.

Sincerely,

*Johanna Rhule   Kenneth W Rhule*

Ken and Johanna Rhule

# EXHIBIT F

State of Nevada

# Marriage Certificate

State of Nevada
County of Clark } ss:

No. **D430879**

This is to certify that the undersigned, *Rev. Bettie M. Rainey*,

did on the *28TH* day of *April* A.D., 20 *02*,

at *Chapel of the Bells, Las Vegas*, Nevada,
(ADDRESS OR CHURCH)

join in lawful wedlock **KENNETH JOHN RHULE**

of **MUKILTEO** , State/Country of **WASHINGTON** ,

and **OLGA VLADIMIROVNA GONTCHAROVA**

of **MUKILTEO** , State/Country of **WASHINGTON** ,

with their mutual consent, in the presence of *Kris H. Thurmond*

*Rev. Bettie M. Rainey*
Signature of official performing marriage   (black ink only)

*Rev. Bettie M. Rainey*
Print name and title of official

*Shirley B. Parraguirre*
Shirley B. Parraguirre, County Clerk

SEAL — UNITED STATES OF AMERICA — OF THE — COUNTY OF CLARK — STATE OF NEVADA

Original: To be given to the parties married

Scanned with CamScanner

## CERTIFICATE

To order a certified copy of a marriage CERTIFICATE (proof of marriage), include the bride and groom names, date of marriage and  the certificate number.  Send with fee of ~~$7~~ per copy to: *10⁰⁰*

           Clark County RECORDER
           500 South Grand Central Parkway
           2nd Floor
           P.O. Box 551510
           Las Vegas, NV 89155-1510
           U S A

---

## LICENSE

To  order  a  certified  copy  of  a  marriage LICENSE, include the bride and groom names, date of marriage and the certificate number.  Send money order (U.S. funds only) of $4 per copy to:

           Clark County
           Marriage Bureau
           200 S. Third Street
           P.O. Box 551603
           Las Vegas, NV 89155-1603
           U S A

Scanned with CamScanner

# EXHIBIT G

Judge John C. Coughenour
United States District Judge
United States Courthouse
700 Stewart Street
Seattle, WA 98101

Dear Judge Coughenour,

My name is Keri Street I am Kenneth John Rhule's sister.  My Husband's name is Jeremy Street.  We are married and live in Bothell, WA with our two children ages 10 and 7.  I am a Sr. Technical Project Manager, currently working on a contract assignment with T-Mobile through TEKsystems.  I have been in the Technical Program/Project Management field for roughly 20 years.  My husband has been a driver for UPS for over 20 years.   We have an extremely close relationship with my brother and all of our family.

Ken and I grew up together, he is my older and only sibling, whom I love and adore to pieces.   He has always looked out for me and his entire family.  Ken is an extremely smart and generous man.  He loves his family dearly and would never do anything to put any of us in jeopardy.  We would like to request your consideration to release Ken so he can be home with his family while he awaits next steps.   I have reviewed the conditions suggested by the pretrial services officer and am confident that Ken will comply with all conditions imposed by the Court.   I do not believe that Ken would flee to Russia or anywhere else in violation of a court order to remain here.   I know that Ken will remain in Washington to answer the charges against him.

Ken is a loving Father and Grandfather. He is a wonderful Son, and the best brother I could ask for.  He is wonderful with my children and they love him dearly.  My Son has special needs and is extremely close with his uncle.  Nobody seems to understand D█████ quite like his uncle does.  They have a very special bond.  During this time of COVID, uncertainty, and remote learning, D████ is missing his uncle tremendously and is struggling to grasp why he can't see him.   Ken has played a huge role in helping to raise our children.  We did the same for his.  His sons, my nephews and I are very close.   It takes a village and Ken is huge part of ours.

My husband and I are willing to act as third-party custodians to assist the court and pretrial services in making sure that Ken complies with all conditions imposed by the Court and appears for all of his court dates.   We are willing to contact the court or pretrial services to report any violations of conditions that would be imposed.

We are also willing to sign a promissory note in the amount of $200,000, which is the approximate equity we have in our house, to help secure Ken's appearance for court.  We are willing to sign a note for that amount, secured by our house, to assist the court in this respect.

We hope that you have the power and the willingness to trust that Ken will follow all rules set forth and release him in good faith that he will comply with them.

Sincerely,



Keri and Jeremy Street

# EXHIBIT H

August, 13, 2020

Regarding: Kenneth John Rhule

Your honor,

I am writing this letter in regards to my nephew Kenneth John Rhule. I am Ken's uncle, and lived in Seattle since 1987. I moved to Nevada this past October when I retired.

All of Ken's adult life he has worked vey hard to support and take care of his family. He has helped all of us in so many ways. He has been an excellent father to his twin boys and is now a wonderful grandfather to his grandchildren.
He has helped me many times over the years with my mentally ill brother who lives with me. As a result of so many homeless people having mental illness, every year our families would go down to Seattle to pass out all kinds of items. Ken would provide sleeping bags, socks, toothbrush, clothing, Mc Donald gift cards, even shoes. We always felt that we where helping those less fortunate.

As a family we did a lot of camping trips, boating, skiing fishing and hiking. We always spend the holiday's together, Ken and Olga would always host Christmas Eve. I wanted to share that he is a kind loving person. He was also a business man who worked hard to establish his businesses even at a young age.

Thank you for your time.

Sincerely,

Greg Weiner

# EXHIBIT I

The Honorable John C. Coughenour
United States District Judge
United States Courthouse
700 Stewart Street
Seattle, WA 98101


Dear Judge Coughenour,

My name is Leah Barger and I am Ken Rhule's ex wife and the mother of our twin boys.  I was born in Everett Washington. At the age of seven, my family relocated to Mercer Island Washington. I attended Lakeridge Elementary, Islander Middle School  and Mercer Island High School.  In the summer of 1991, when I was 15 years old when I met Ken at a mutual friend's birthday party. I knew from the moment that I met him that I wanted to marry him. He was my first love and high school sweetheart. I enrolled in the running start program my junior year so that I could have my AA degree when I graduated.  I found out that I was pregnant in late November 1992.  We found out we were having twin boys in January 1993. We got married a month after I turned 17 in March of 1993. The plan was to live with his parents until he graduated High school in June of 1993.  My mother, Laurie Schiffman, was a real estate agent and insisted we look at the option of purchasing a home over renting. In September of 1993, we closed and moved into our condo in Kirkland.  We bought our 2nd home in December of 1994, which was a cute little house in Monroe with a fenced yard for the boys to play in.  Ken had started a computer business sometime in 1993 and was able to financially support our family. We bought our final home together in Bothell in the summer of 1996.  Ken and I and our twin boys lived together until October of 1996 when we separated.  We divorced but our families remain close.  The families both mine and his, spent every birthday of Kenny and Connor together along with other holidays. I have remained close with Ken and Johanna as well as Keri and her two kids.  I am aunty Leah to her kids and she is aunty Keri to the twins plus my other two children from my current marriage of almost 20 years.  Ken and I share two grandchildren which we adore and have brought our families even closer.  I understand that the charges against Ken and Kenny are very serious.  We don't agree on everything but one thing Ken does is take responsibility for his actions.  He would not violate a court order or abandon his family. At the age of 17 he figured out a way to support his family. He is not one to run but takes on what is necessary to succeed. I do not believe that Ken would flee to Russia or anywhere else in violation of a court order. Please let me know if you have any questions.


Thank you,
Leah Barger
████████████

# EXHIBIT J

Form **1040X**

(Rev. February 2007)

Department of the Treasury - Internal Revenue Service

## Amended U.S. Individual Income Tax Return
▶ See separate instructions.

OMB No. 1545-0074

This return is for calendar year ▶ 2006 , or fiscal year ended ▶

| Your first name and initial | Last name | Your social security number |
|---|---|---|
| KEN J. RHULE | | ▓▓▓▓▓ |
| If a joint return, spouse's first name and initial | Last name | Spouse's social security number |
| OLGA RHULE | | |

Home address (no. and street) or P.O. box if mail is not delivered to your home — Apt. no. — Phone number

City, town or post office, state, and ZIP code

**A** If the address shown above is different from that shown on your last return filed with the IRS, would you like us to change it in our records? ............................................ ▶ ☐ Yes ☐ No

**B** Filing status. Be sure to complete this line. **Note.** You cannot change from joint to separate returns after the due date.
On original return ▶ ☐ Single ☒ Married filing jointly ☐ Married filing separately ☐ Head of household ☐ Qualifying widow(er)
On this return ▶ ☐ Single ☒ Married filing jointly ☐ Married filing separately ☐ Head of household* ☐ Qualifying widow(er)
* If the qualifying person is a child but not your dependent, see page 3 of the instructions.

| | Use Part II on page 2 to explain any changes<br>**Income and Deductions (see instructions)** | | A. Original amount<br>or as previously<br>adjusted<br>(see page 3) | B. Net change -<br>amount of increase<br>or (decrease) -<br>explain in Part II | C. Correct<br>amount |
|---|---|---|---|---|---|
| 1 | Adjusted gross income (see page 3) ............ | 1 | 3791308. | -1,270,091. | 2,521,217. |
| 2 | Itemized deductions or standard deduction (see page 3) ... | 2 | 134,588. | 25,401. | 159,989. |
| 3 | Subtract line 2 from line 1 .................. | 3 | 3656720. | -1,295,492. | 2,361,228. |
| 4 | Exemptions. If changing, fill in Parts I and II on page 2 (see page 4) ... | 4 | 4,400. | | 4,400. |
| 5 | Taxable income. Subtract line 4 from line 3 ...... | 5 | 3652320. | -1,295,492. | 2,356,828. |
| 6 | Tax (see page 5). Method used in col. C  QDCGTW | 6 | 1244102. | -453,423. | 790,679. |
| 7 | Credits (see page 5) .................... | 7 | | | |
| 8 | Subtract line 7 from line 6. Enter the result but not less than zero | 8 | 1244102. | -453,423. | 790,679. |
| 9 | Other taxes (see page 5) .................. | 9 | | | |
| 10 | Total tax. Add lines 8 and 9 ................ | 10 | 1244102. | -453,423. | 790,679. |
| 11 | Federal income tax withheld and excess social security and tier 1<br>RRTA tax withheld. If changing, see page 5 ...... | 11 | 68,182. | | 68,182. |
| 12 | Estimated tax payments, including amount applied from<br>prior year's return ..................... | 12 | 1330940. | | 1,330,940. |
| 13 | Earned income credit (EIC) ................. | 13 | | | |
| 14 | Additional child tax credit from Form 8812 ........ | 14 | | | |
| 15 | Credits: Federal telephone excise tax or from Forms 2439, 4136, or 8885 | 15 | 60. | | 60. |
| 16 | Amount paid with request for extension of time to file (see page 5) ............ | | | 16 | |
| 17 | Amount of tax paid with original return plus additional tax paid after it was filed ............ | | | 17 | |
| 18 | Total payments. Add lines 11 through 17 in column C ............ | | | 18 | 1399182. |

**Refund or Amount You Owe**

| | | | | |
|---|---|---|---|---|
| 19 | Overpayment, if any, as shown on original return or as previously adjusted by the IRS ............ | | 19 | 155,080. |
| 20 | Subtract line 19 from line 18 (see page 6) ............ | | 20 | 1244102. |
| 21 | **Amount you owe.** If line 10, column C, is more than line 20, enter the difference and see page 6 ............ | | 21 | |
| 22 | If line 10, column C, is less than line 20, enter the difference ............ | | 22 | 453,423. |
| 23 | Amount of line 22 you want **refunded to you** ............ | | 23 | 453,423. |
| 24 | Amount of line 22 you want **applied to your**                estimated tax ............ | 24 | | |

**Sign Here**
Joint return?
See page 2.
Keep a copy
for your
records.

Under penalties of perjury, I declare that I have filed an original return and that I have examined this amended return, including accompanying schedules and statements, and to the best of my knowledge and belief, this amended return is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which the preparer has any knowledge.

TAXPAYER'S COPY | TAXPAYER'S COPY

Your signature — Date

Spouse's signature. If a joint return, **both** must sign. — Date

**Paid Preparer's Use Only**

| Preparer's signature | _S. ___ | Date 9/22/11 | Check if self-employed ☐ | Preparer's SSN or PTIN |
|---|---|---|---|---|
| Firm's name (or yours if self-employed), address, and ZIP code | LARSON GROSS PLLC<br>1616 CORNWALL AVENUE, SUITE 205<br>BELLINGHAM, WA 98225 | | EIN<br>Phone no. 360-734-4280 | |

CCH
610701
02-12-07

For Paperwork Reduction Act Notice, see separate instructions.

Form **1040X** (Rev. 2-2007)

| Form **8879** | **IRS e-file Signature Authorization** | OMB No. 1545-0074 |
|---|---|---|
| Department of the Treasury Internal Revenue Service | ▶ Do not send to the IRS. This is not a tax return. ▶ Keep this form for your records. See instructions. | **2009** |

Declaration Control Number (DCN) ▶ ████████████████████

| Taxpayer's name | Social security number |
|---|---|
| KEN J RHULE | ████████████ |
| Spouse's name | Spouse's social security number |
| OLGA RHULE | ████████████ |

### Part I — Tax Return Information - Tax Year Ending December 31, 2009 (Whole Dollars Only)

| | | | |
|---|---|---|---:|
| 1 | Adjusted gross income (Form 1040, line 38; Form 1040A, line 22; Form 1040EZ, line 4) | 1 | 1,070,218. |
| 2 | Total tax (Form 1040, line 60; Form 1040A, line 37; Form 1040EZ, line 11) | 2 | 308,343. |
| 3 | Federal income tax withheld (Form 1040, line 61; Form 1040A, line 38; Form 1040EZ, line 7) | 3 | 55,418. |
| 4 | Refund (Form 1040, line 73a; Form 1040A, line 46a; Form 1040EZ, line 12a; Form 1040-SS, Part I, line 13a) | 4 | |
| 5 | Amount you owe (Form 1040, line 75; Form 1040A, line 48; Form 1040EZ, line 13) * | 5 | 255,910. |

### Part II — Taxpayer Declaration and Signature Authorization (Be sure you get and keep a copy of your return)

Under penalties of perjury, I declare that I have examined a copy of my electronic individual income tax return and accompanying schedules and statements for the tax year ending December 31, 2009, and to the best of my knowledge and belief, it is true, correct, and complete. I further declare that the amounts in Part I above are the amounts from my electronic income tax return. I consent to allow my intermediate service provider, transmitter, or electronic return originator (ERO) to send my return to the IRS and to receive from the IRS **(a)** an acknowledgement of receipt or reason for rejection of the transmission, **(b)** an indication of any refund offset, **(c)** the reason for any delay in processing the return or refund, and **(d)** the date of any refund. If applicable, I authorize the U.S. Treasury and its designated Financial Agent to initiate an ACH electronic funds withdrawal (direct debit) entry to the financial institution account indicated in the tax preparation software for payment of my Federal taxes owed on this return and/or a payment of estimated tax, and the financial institution to debit the entry to this account. I further understand that this authorization may apply to future Federal tax payments that I direct to be debited through the Electronic Federal Tax Payment System (EFTPS). In order for me to initiate future payments, I request that the IRS send me a personal identification number (PIN) to access EFTPS. This authorization is to remain in full force and effect until I notify the U.S. Treasury Financial Agent to terminate the authorization. To revoke a payment, I must contact the U.S. Treasury Financial Agent at 1-888-353-4537 no later than 2 business days prior to the payment (settlement) date. I also authorize the financial institutions involved in the processing of the electronic payment of taxes to receive confidential information necessary to answer inquiries and resolve issues related to the payment. I further acknowledge that the personal identification number (PIN) below is my signature for my electronic income tax return and, if applicable, my Electronic Funds Withdrawal Consent.

**\*AMOUNT DUE WITH LATE PENALTIES AND INTEREST:**     268,621.

**Taxpayer's PIN: check one box only**

[X] I authorize HASCAL SJOHOLM AND COMPANY PLLC      to enter or generate my PIN    ████████
              **ERO firm name**                                            Enter five numbers, but
as my signature on my tax year 2009 electronically filed income tax return.             do not enter all zeros

[ ] I will enter my PIN as my signature on my tax year 2009 electronically filed income tax return. Check this box **only** if you are entering your own PIN **and** your return is filed using the Practitioner PIN method. The ERO must complete Part III below.

Your signature ▶ _____     Date ▶ 10/15/2010

**Spouse's PIN: check one box only**

[X] I authorize HASCAL SJOHOLM AND COMPANY PLLC      to enter or generate my PIN    ████████
              **ERO firm name**                                            Enter five number, but
as my signature on my tax year 2009 electronically filed income tax return.             do not enter all zeros

[ ] I will enter my PIN as my signature on my tax year 2009 electronically filed income tax return. Check this box **only** if you are entering your own PIN **and** your return is filed using the Practitioner PIN method. The ERO must complete Part III below.

Spouse's signature ▶ _____     Date ▶ 10/15/2010

## Practitioner PIN Method Returns Only - continue below

### Part III — Certification and Authentication - Practitioner PIN Method Only

**ERO's EFIN/PIN.** Enter your six-digit EFIN followed by your five-digit self-selected PIN.   ████████████
                                                                    do not enter all zeros

I certify that the above numeric entry is my PIN, which is my signature for the tax year 2009 electronically filed income tax return for the taxpayer(s) indicated above. I confirm that I am submitting this return in accordance with the requirements of the Practitioner PIN method and **Publication 1345**, Handbook for Authorized IRS e-file Providers of Individual Income Tax Returns.

ERO's signature ▶ _____     Date ▶ _____

919995
10-17-09

### ERO Must Retain This Form - See Instructions
### Do Not Submit This Form to the IRS Unless Requested To Do So

LHA    **For Paperwork Reduction Act Notice, see instructions.**                      Form **8879** (2009)

# EXHIBIT K

## THE UNITED STATES OF AMERICA

| RECEIPT NUMBER | | CASE TYPE I130 IMMIGRANT PETITION FOR RELATIVE, |
|---|---|---|
| WAC-05-235-50625 | | FIANCE(E), OR ORPHAN |

| RECEIPT DATE | PRIORITY DATE | PETITIONER |
|---|---|---|
| August 26, 2005 | August 19, 2005 | RHULE, KENNETH J. |

| NOTICE DATE | PAGE | BENEFICIARY |
|---|---|---|
| April 10, 2006 | 1 of 1 | RHULE, OLGA V. |

KENNETH J. RHULE

███████████████

**Notice Type:** Approval Notice
Section: Husband or wife of U.S.
         Citizen, 201(b) INA

Courtesy Copy: Original sent to: WU ESQ, JIMMY

This courtesy notice is to advise you of action taken on this case. The official notice has been mailed to the attorney or representative indicated above. Any relevant documentation included in the notice was also mailed as part of the official notice.

The above petition has been approved. We have sent the original visa petition to the **Department of State National Visa Center (NVC), 32 Rochester Avenue, Portsmouth, NH 03801-2909.** NVC processes all approved immigrant visa petitions that need consular action. It also determines which consular post is the appropriate consulate to complete visa processing. NVC will then forward the approved petition to that consulate.

The NVC will contact the person for whom you are petitioning(beneficiary) concerning further immigrant visa processing steps.

If you have any questions about visa issuance, please contact the NVC directly. However, please allow at least 90 days before calling the NVC if your beneficiary has not received correspondence from the NVC. The telephone number of the NVC is **(603) 334-0700.**

The approval of this visa petition does not in itself grant any immigration status and does not guarantee that the alien beneficiary will subsequently be found to be eligible for a visa, for admission to the United States, or for an extension, change, or adjustment of status.

This courtesy copy may not be used in lieu of official notification to demonstrate the filing or processing action taken on this case.

THIS FORM IS NOT A VISA NOR MAY IT BE USED IN PLACE OF A VISA.

Please see the additional information on the back. You will be notified separately about any other cases you filed.
U.S. CITIZENSHIP & IMMIGRATION SVC
CALIFORNIA SERVICE CENTER
P. O. BOX 30111
LAGUNA NIGUEL CA 92607-0111
**Customer Service Telephone: (800) 375-5283**



# EXHIBIT L

DocuSign Envelope ID: C8E2DADA-232B-4943-A6C8-529695D60B77

The Honorable John C. Coughenour
United States District Judge
United States Courthouse
700 Stewart Street
Seattle, WA 98101

August 25, 2020

Regarding: Kenneth John Rhule, Case No. 20-cr-105 JCC

Dear Honorable Judge Coughenour,

My name is Olga Rhule and I am Kenneth John Rhule's wife (I call him Ken). We have been married since April 2002.

I first entered the United States in 1998 on a student visa. In January 2002, I entered the United States on a K-1 (fiancée) visa, which was later withdrawn. I had met Ken in Washington earlier and we became reacquainted and were married in April 2002. I have been involved in the care of Ken's twin sons Kenny and Connor since they were 9 years old. I have helped raise Kenny and Connor as their step-mother.

For a period of time in 2005 and 2006, Ken and I attempted to adjust my legal immigration status with the Immigration Service in the United States, but we were unsuccessful. I have an approved I-130 Petition through Ken. We even tried to go to the United States Congress for extraordinary relief, but were unsuccessful.

I have lived in Washington for the past 18 years out of status and have never left the United States since 2002. For the past 18 years, Ken and I have always lived together in Western Washington. Ken has never traveled to Russia and he does not speak any Russian.

I became Ken's wife after he had built a very successful computer business called Compucare, and was working to establish another very successful business, FocusMicro, a security integration system company.

Ken is very close to his family, including his parents, Johanna and his father Kenneth; his sister Keri Street and her husband and children; and his sons Kenny and Connor and Connor's children, who are Ken's grandchildren. Ken is a caring son, father, husband, grandfather and uncle, who cherishes his relationships with his family and extended family. Ken has always helped out his family members who are in need. Holiday celebrations for the whole family are often organized by Ken and have been held at our home.

I am certain that Ken would never leave all of these relationships behind to avoid these criminal charges, and I would strongly encourage him not to do so. I will support him through this process every step of the way.

I am confident that Ken would obey all of the conditions of release imposed by the Court and U.S. Pretrial Services.

I am confident that Ken would not try to flee the United States because of these charges, nor would I ever want him to or encourage him to do so.

DocuSign Envelope ID: C8E2DADA-232B-4942-A6C8-520695D69B77

If he is released by the Court, I will encourage Ken to stay in the United States to face the charges, regardless of the outcome.

I want to live in the United States. I have built a life for myself here in Western Washington. I have not lived in Russia, or even visited Russia, for almost 20 years. My mother passed away three years ago. I believe that I will have a good opportunity to be able to apply for a visa to return to the United States because I have been granted a voluntary departure by the immigration judge.

While in the Northwest Detention Center, Ken discussed getting a passport and meeting me in Russia to help me get acclimated to a country I have not known in 18 years, and to help me file a visa petition for a change in status. These discussions were not about leaving to flee any criminal charges. Ken had not been charged with any crimes at that time. Instead, we were discussing consular processing based on our approved visa petition, which I understand needs to be pursued by me while I am in Russia.

We were talking about the best way for me to obtain legal status so that I could return legally to the United States as a permanent resident. It was my understanding that I should seek permission for a voluntary departure, return to Russia, and then proceed with consular processing through our approved petition. This is my only option to return to the United States.

I have been told, if Ken violated the terms of his release and a warrant for his arrest were issued, that I would not be able to go forward with the consular processing for permanent residence, as the consular officers would likely deny the request due to the warrant.

I would not do anything to prevent my return to the United States and I know that Ken would not do anything—including violating any conditions of release—that could hurt my last chance of obtaining legal status, so that I can return to this country and the life that I have built here.

I am also willing to put up all of my interest in the property the government seeks to forfeit as security for Ken's compliance with the appearance bond in this case. I have reviewed the list of real property, vehicles, and other personal property listed in the indictment that the government seeks to forfeit. I will sign the proper documents to forfeit that property if Ken should fail to appear in court in this matter, which I believe he will not; I know he will appear for court.

I will always encourage Ken to stay in Washington to face these charges because it is the right thing to do and because it is in our best interests as a couple and as a family for him to stay and comply with the Court's orders, so that I will have the best chance to obtain approval of the visa petition.

Sincerely,

DocuSigned by:

37784AC67027496...

Olga Rhule

# EXHIBIT M

1      UNITED STATES DISTRICT COURT

2    WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3 _____

            )
4 UNITED STATES OF AMERICA,  ) MJ20-390
            )
5      Plaintiff,  ) SEATTLE, WASHINGTON
            )
6 v.        ) July 24, 2020 -
            ) 2:00 P.M.
7 KENNETH JOHN RHULE,   )
            )
8     Defendant.  ) WEBEX INITIAL
            ) APPEARANCE HEARING
9 _____
            )
10 _____

11     VERBATIM REPORT OF PROCEEDINGS
    BEFORE THE HONORABLE BRIAN A. TSUCHIDA
12     UNITED STATES MAGISTRATE JUDGE
 _____

13

14 APPEARANCES:

15 For the Plaintiff:  Marie M. Dalton
          U.S. Attorney's Office
16          700 Stewart Street
          Suite 5220
17          Seattle, WA  98101

18

19 For the Defendant:  Peter Offenbecher
          Skellenger Bender
20          1301 5th Avenue
          Suite 3401
21          Seattle, WA  98101

22

23

24

25

**Proceedings stenographically reported and transcript produced with computer-aided technology**

1          THE CLERK:  The United States District Court for the

2    Western District of Washington is in session.  The Honorable

3    Brian A. Tsuchida presiding.

4        The matter before the Court is an initial appearance in Cause

5    No. MJ20-390, United States of America v. Kenneth John Rhule.

6        We will take appearances, starting with the government,

7    followed by defense counsel, and then pretrial services.

8          MS. DALTON:  Good afternoon, Your Honor.  Marie Dalton

9    for the United States.

10          THE COURT:  Ms. Dalton, good afternoon.

11          MR. OFFENBECHER:  Peter Offenbecher appearing for

12    Kenneth Rhule.  Good afternoon, Your Honor.

13          THE COURT:  Mr. Offenbecher, good afternoon.

14          MS. BOLLE:  Good afternoon, Your Honor.  Lorraine Bolle

15    for pretrial services.

16          THE COURT:  And, Ms. Bolle, good afternoon.

17        Mr. Rhule, good afternoon.  Can you hear and see everything

18    so far?

19          THE DEFENDANT:  Yes, sir.

20          THE COURT:  If at any time you can't hear or something

21    happens in the video, please let us know so we can make

22    adjustments or go over things, okay?

23          THE DEFENDANT:  Okay, Your Honor.

24          THE COURT:  We are conducting this hearing by

25    audio-visual technology due to the COVID health crisis.  We

 1   normally have these hearings in person, where everybody is in the

 2   same courtroom.  Because this is sort of a deviation from the

 3   normal rule, I just wanted to check with you and your lawyer

 4   whether you have any objection going forward this way, if you

 5   would approve going this way.

 6       So, Mr. Offenbecher, any objection going forward by

 7   audio-visual?

 8           MR. OFFENBECHER:  No.  Under the circumstances, we have

 9   no objection, Your Honor.

10           THE COURT:  Okay.

11       And, Mr. Rhule, are you okay with this?

12           THE DEFENDANT:  Yes, Your Honor.

13           THE COURT:  All right.  Also, you know, because this is

14   a public hearing, a criminal case, and normally if we had it in

15   the courthouse, people could wander into the courthouse and

16   wander into the courtroom and listen.  So we do try to make

17   available to the public the ability to call in so they can listen

18   to the hearing if they want to, and they're invited to do that.

19       Of course, the same rules apply, that these hearings cannot

20   be recorded, they cannot be rebroadcast.  And so if anyone else

21   is calling in and listening, you are welcome, but please do not

22   record, please do not rebroadcast.

23       So, Mr. Rhule, this is a criminal case that you're here on.

24   And I know you just came from Hawaii and you appeared there in

25   fact.  I understand Mr. Offenbecher is your retained counsel.

1        Mr. Offenbecher, is that correct?

2            MR. OFFENBECHER:  That's correct, Your Honor.

3            THE COURT:  All right.  So he's representing you here in

4    this federal district.

5        Mr. Rhule, you also know that in a criminal case you do have

6    the right to remain silent.  It means that you don't have to

7    answer questions of police officers about this case, this

8    criminal case.  If you begin to make a statement to a law

9    enforcement officer about the case, you can stop at any time.

10   And you can ask to have a lawyer be present before or during any

11   questioning.  So you understand all of those rights?

12           THE DEFENDANT:  Yes, Your Honor.

13           THE COURT:  And, Mr. Offenbecher, we also received, and

14   we will file, your written invocation of rights that Mr. Rhule

15   asserts:  not to be questioned, the right to remain silent, and

16   not to be questioned without or unless counsel is present.

17           MR. OFFENBECHER:  Thank you, Your Honor.

18           THE COURT:  So, Mr. Rhule, you probably, when you were

19   in Hawaii, were presented with the Complaint that was filed in

20   this district.

21       And, Mr. Offenbecher, have you received a copy of the

22   Complaint?

23           MR. OFFENBECHER:  I have received a copy.  Thank you,

24   Your Honor.

25           THE COURT:  All right.  So we will go over it again,

1    Mr. Rhule.

2        At this time, Ms. Dalton, if you would advise Mr. Rhule of

3    the general nature of the charge in the Complaint and the

4    possible penalties.

5            MS. DALTON:  Yes, Your Honor.

6        The defendant is charged in a one-count Complaint with

7    conspiracy to manufacture and distribute marijuana or manufacture

8    distillates.  The Complaint alleges beginning no later than

9    October 2014 and continuing and until at least on or about

10   March 2020, in this district, the defendant and others did

11   knowingly and intentionally conspire to manufacture and

12   distribute marijuana.

13       It alleges that the conduct of the defendants involved

14   1,000 kilograms or more of a mixture and substance containing a

15   detectable amount of marijuana, in violation of Title 21,

16   Section 841 and 846.

17       If found to have committed those violations, the defendant

18   faces a mandatory minimum of ten years in prison and up to life

19   imprisonment and up to a $10 million fine, at least five years of

20   supervised release, and a $100 special assessment.

21           THE COURT:  All right.  So, Mr. Rhule, that's the

22   allegation in the Complaint.  It's not the formal criminal

23   charge.  In federal court, you know that formal criminal charges

24   are brought in one of two ways:  normally through the grand jury

25   process, or, for some cases, people agree to be charged by

```
 1   Information.  Neither formal charging document has been filed
 2   yet.  So we will set a preliminary hearing.
 3        And do we have a date for that?
 4             THE CLERK:  Yes, Your Honor.  Preliminary hearing is
 5   scheduled for Friday, August 7th, at 1 p.m., before Judge
 6   Weinberg.
 7             THE COURT:  All right.
 8        And by the way, Ms. Rhule, you know that if the grand jury
 9   does indict you before then, instead of having a preliminary
10   hearing, we will have a different hearing called an arraignment,
11   and charges will be formally presented to you, and we set a jury
12   trial date at that time, okay?
13             THE DEFENDANT:  Okay, Your Honor.
14             THE COURT:  Mr. Rhule, you know in a criminal case a
15   court -- and this is our case, so we have to make a decision
16   about your custody status.
17        And, Ms. Dalton, I did receive -- and Mr. Offenbecher -- I
18   did receive a U.S. Pretrial Services report prepared by our
19   pretrial office.
20        What is the government's position as to Mr. Rhule's custody
21   status?
22             MS. DALTON:  We are seeking to have Mr. Rhule detained.
23             THE COURT:  All right.  Why don't I hear from the
24   government?  And then Mr. Offenbecher can respond.
25             MS. DALTON:  For our detention presentation, we've
```

1    prepared just a very brief PowerPoint.  I will go ahead and share

2    my screen now so that you are able to view it.

3              THE COURT:  All right.

4              MS. DALTON:  Are you able to see the PowerPoint, Your

5    Honor?

6              THE COURT:  Yes.  Very fancy.  Very nice.

7              MS. DALTON:  I'm trying to overcome the technological

8    difficulties that we're all facing by not being in person,

9    so ...

10       In this particular case, law enforcement searched the

11   defendant's residence on March 10th, 2020.  They searched the

12   property where the defendant was living, and on that property,

13   they found a number of things.  They found a warehouse where the

14   defendant and his co-conspirators were distilling marijuana.

15   They found over 900 kilograms of bulk marijuana and other

16   marijuana products.  And inside the residence where the defendant

17   was living, they found a number of other items.  One, in his

18   bedroom, they found a computer that was open to the dark web.  It

19   was open to a website where they were selling cannabis products.

20   In addition, they found a number of ledgers scattered about the

21   house, writing down the names of customers and what they had

22   ordered; they found a number of packing envelopes, USPS mailers,

23   getting ready to ship those products to those customers; and they

24   found a variety of marijuana products themselves inside the

25   residence where Mr. Rhule was living.

1      Because of those items that were found and the investigation

2  in this case, we have filed the present charges, and the charges

3  that we have filed carry with them a ten-year mandatory minimum.

4  And because of that, in this case there is a presumption of

5  detention, which makes sense.  Ten years is a lot of time in

6  custody, and so it provides the defendant with a significant

7  motivation to flee.  But that's not the only reason why the

8  defendant wouldn't be motivated to flee in this case.

9      After the government searched the defendant's house, found

10  all of those marijuana products, on that particular day they also

11  arrested the defendant's wife, Olga Rhule.  Olga had overstayed

12  her visa in the United States.  She had come here initially from

13  Russia, and she came here on a fiancée visa and simply

14  overstayed.

15      After overstaying her visa, she met and married Mr. Rhule and

16  has been in this country without lawful status for more than two

17  decades, I believe.  Because they found her with no lawful

18  status, law enforcement agents arrested Mrs. Rhule and they

19  brought her into immigration custody.  She is currently at the

20  Northwest Detention Center where she's facing deportation

21  proceedings.

22      While at the Northwest Detention Center, Mr. Rhule and his

23  wife have had recorded phone conversations, and during one of

24  those conversations, which took place on May 10th, roughly two

25  months after law enforcement found all of those items inside

1   Mr. Rhule's house, we heard Mr. Rhule and his wife discussing how

2   he was going to apply for a passport in order to move to Russia

3   to be with her.

4       I want to play just a segment of that particular call for

5   Your Honor.  Because I understand the audio might be a little

6   difficult to hear, I've also prepared a rough transcript that I

7   will put on the screen as well.

8       (Audio recording played and transcribed as follows:)

9           OLGA:  First of all, let me ask you this:  I'm

10      not getting out any time soon, right?

11          THE DEFENDANT:  I don't think so.

12          OLGA:  How much time, approximately?

13          THE DEFENDANT:  I don't know if there is a time

14      limit that you're going to get out.  I think we might

15      have to have you go back to Russia and me meet you

16      there.

17          OLGA:  Well, if that happens, how much time?

18          THE DEFENDANT:  He couldn't answer that question

19      because of COVID.  But it sounds like your hearing is

20      on the 28th.

21          OLGA:  29th.

22          THE DEFENDANT:  Twenty -- 29th?  I thought it

23      was the 28th.

24      So you can basically --  At the hearing, you're

25      going to -- you're going -- you're going to basically

1     say you're not going to challenge it anymore and that,

2     you know, you want to just proceed with deportation

3     and --

4          OLGA:  Can it not happen sooner?

5          THE DEFENDANT:  He said he doesn't think so, but

6     I'll push that issue more.  I'll see if he can --

7     He'll have to do another one of these, you know,

8     requests to move the hearing up kind of thing, and

9     they will have to grant it or not.

10         OLGA:  Can we try?

11         THE DEFENDANT:  Yes, I can try.  Of course.  But

12    here's the thing.  Even with that, it's going to take

13    me about that long to get my passport and visa and

14    stuff like that situated.  So I'm working on that now.

15    I will try to get that expedited.

16         OLGA:  Okay.

17         THE DEFENDANT:  So I was going to go down this

18    afternoon and get my pictures real quick so I can mail

19    off the passport document, you know, and I would do

20    it, instead of normal, I'm going to do it urgent, in

21    the urgent time frame, and pay the extra money.

22         OLGA:  Okay.

23         THE DEFENDANT:  And then I've got to apply for the

24    visa, so that -- you know, the visa over there.

25    There's some other -- there's some other things I'm

1       working on too, but I can't talk to you about them.

2           OLGA:  I understand.

3           THE DEFENDANT:  You know what I'm talking about,

4       right?

5           OLGA:  I think I have an idea.

6           THE DEFENDANT:  It's what -- it's what you think.

7           OLGA:  Okay.

8           THE DEFENDANT:  So I'm working on all that stuff

9       right now, okay?

10          OLGA:  Okay.

11          THE DEFENDANT:  And, um, yeah.  I mean, I'll be

12      with you no matter what.

13          OLGA:  Promise?

14          THE DEFENDANT:  Yes.  Of course I promise.  Of

15      course I promise.

16                  (End of audio recording.)

17          MS. DALTON:  In that phone conversation, as you've

18      heard, the defendant talked about applying for a passport and

19      expediting that passport so that he could leave with his wife to

20      Russia and meet her there after she had been deported.

21          We did check with USCIS, and there is a passport that is

22      presently pending that the defendant has applied for.  He hasn't

23      received it yet, but it is pending.  So he has taken an action to

24      further that plan of moving with his wife to Russia.

25          In this particular case, I reached out to the immigration

1   attorney who is handling Mrs. Rhule's case and asked some

2   questions about whether or not she would be allowed to return to

3   the United States.  And it's my understanding that if she were

4   deported to Russia -- she has a hearing early next month -- if

5   she was deported to Russia, that she would not be permitted to

6   return to the United States because she has admitted to heroin

7   use, which is a permanent bar on admissibility.

8       In addition, because she overstayed her visa for such a

9   lengthy duration of time, there is a ten-year bar.  She would

10  have to wait ten years in Russia before being able to come back,

11  if that was her only impediment.

12      So in order for the defendant to keep his promise that he

13  will be with his wife of 19 years no matter what, he would have

14  to leave for Russia.  He made these statements a mere two months

15  after agents searched his home, after agents found all of that

16  incriminating evidence in his bedroom and his residence.  And so

17  it's my expectation that he knew at this juncture.  It's a

18  reasonable assumption for him to have known that he was under

19  investigation.

20      So in addition to having the means -- or the motive, I

21  suppose, to flee, the ten-year imprisonment coupled with the

22  desire to be with his wife in Russia and the actions he's taken

23  in furtherance of that goal, he also has a variety of means to

24  flee.

25      Mr. Rhule has historically used multiple social security

1    numbers.  You can see in the report from the Hawaii probation

2    officer that she looked into one of Mr. Rhule's social security

3    numbers and found that it was associated with his former wife.

4    In the course of our investigation, we have identified numerous

5    others in conversations between Mr. Rhule and his son describing

6    how they have to have bank accounts and other items not in their

7    own social security numbers.

8        In addition to using other social security numbers, Mr. Rhule

9    holds his assets in shell companies.  He doesn't register his

10   house or his cars or his airplanes in his own name, but instead

11   has incorporated numerous shell companies.  And for one example,

12   the house where he lived, where we found all the marijuana, where

13   he now wants to go back to on this release plan, that house is

14   owned in the name of Frontline LLC.  That company was

15   incorporated in Delaware, and the owner of that company is

16   purportedly Mr. Rhule's wife's father who lives in Russia.  The

17   business address for that company is a Russian address.

18   Mr. Rhule has cars in yet another shell company name, RKK

19   Associates.  His airplanes are held in yet another shell company,

20   Frontline Aviators LLC.

21       But in addition to having multiple social security numbers,

22   multiple shell companies, Mr. Rhule is also simply very

23   proficient in remaining anonymous on the internet.  When we went

24   into his bedroom, when we found that laptop that was opened up to

25   the dark web, it was running a Tor browser.  We also have

1  communications with Mr. Rhule where he discusses using the

2  anonymizing-browser Tails.  When incorporating those shell

3  companies, for instance, Mr. Rhule used e-mail addresses and held

4  himself out to be other people.  He used a fake name, "John

5  Kuhn."  And when talking about their marijuana distribution and

6  grow, Mr. Rhule and his son and their customers used encrypted

7  chat communications like Signal.

8      Mr. Rhule also happens to be a pilot.  And Frontline

9  Aviators, which he says he's the half owner of, owns two private

10  planes.  We have seized one of those planes.  We have been unable

11  to locate the second plane.  It may be worth noting that one of

12  those planes, before we seized it, it was seen essentially flying

13  over the Northwest Detention Center where Olga Rhule is currently

14  being held.  I guess Mr. Rhule was trying to make contact with

15  her in the yard and flew too low over the Northwest Detention

16  Center and caused the entire center to go into lockdown.  Which

17  you would think if law enforcement agents had just searched your

18  home and found these marijuana products and incriminating

19  evidence, you'd lay low and probably not fly an airplane over a

20  detention center.  But that was not his choice.

21      Mr. Rhule has also been traveling pretty extensively.  He

22  recently was in Montana.  After that, he was in Hawaii.  When we

23  arrested him in Hawaii, we searched his luggage, and we found

24  bulk cash, $10,000 in just cash in his luggage and another $700

25  in his wallet.

1     And its seems that Mr. Rhule has a tremendous amount of

2  cryptocurrency assets.  On March 10, 2020, we found, on a thumb

3  drive in Mr. Rule's residence, Bitcoin that was worth

4  approximately $200,000.

5     In addition, Mr. Rhule, one of his roles at his company --

6  his marijuana company is called Herbin Artisans -- one of his

7  roles was to fastidiously update their income statements using a

8  cloud-based accounting software called Xero.  We got a search

9  warrant for those records, and this is what they've shown.  It

10  essentially shows that over the course of 2015 to 2019, Herbin

11  Artisans sold $13 million in product, marijuana product.  From

12  this, there was $4.9 million in gross profit.  We can see from

13  the underlying records that support this income statement that

14  were also found in Xero that Mr. Rhule received a lot of his

15  profits in cryptocurrency, and we have seen that Mr. Rhule has

16  cryptocurrency accounts with a variety of cryptocurrency wallet

17  providers.

18     So all of that combined, we think, gives him the means to

19  flee.  In addition to that, you can see also see in the PSR that

20  he's failed to appear in the past, and he does have a charge for

21  obstructing a law enforcement officer.

22     In addition to the flight risk, there is also a dangerousness

23  assessment here.  When we went into Mr. Rhule's home, he had a

24  number of weapons.  To be clear, Mr. Rhule is not a felon, so

25  he's not a prohibited party, but he did have three different

1   stolen weapons in that home:  a stolen pistol that was loaded and

2   under his bed, a stolen Ruger and a stolen shotgun -- the shotgun

3   was loaded -- in the rest of the house.  And for those reasons,

4   the possession of those stolen weapons, we do believe that he

5   poses a dangerousness as well.

6       I want to address just two items, in addition to this risk

7   assessment, to explain to the Court how we got here.  We worked

8   with defense counsel to get Mr. Rhule from Hawaii via a

9   commercial flight.  We did that not because we didn't think he

10  posed a flight risk, but because we learned that it would take a

11  significant period of time to transport Mr. Rhule from Hawaii to

12  Seattle via the U.S. Marshals and that there was a possibility

13  that he would be transported through jurisdictions where there

14  are significant COVID outbreaks.  So we were able to come up with

15  a plan where, essentially, Mr. Rhule remained in prison for the

16  totality of the time he was in Hawaii.  We had law enforcement

17  officers escort him from the prison, put him on the aircraft, see

18  the airplane take off, and then law enforcement officers meet him

19  on this end and immediately bring him to the U.S. Marshals to be

20  booked.  And so, functionally speaking, since his landing in

21  Hawaii, he has not been free except for perhaps on that airplane.

22      The other point I want to address is that we did --  In this

23  case there is a co-defendant.  The defendant's son is a

24  co-defendant.  We did not ask for the son to be detained but

25  rather attained a bond for the son.  We didn't do so because, for

1    one reason, at the time we charged the son, he was only charged

2    with (b)(1)(b) level offenses, and so there was no presumption of

3    detention.  In addition, the son just has a very different

4    flight-risk profile.  The son has never made statements about

5    wanting to go to Russia, he has no Russian wife, and he did not

6    take actions, like getting a passport, to actually leave for

7    Russia.  And so for those reasons we felt that a bond was

8    appropriate in the context of his son, but we do not believe a

9    bond is appropriate in the context of the defendant.

10    The release plan, which is essentially that the defendant go

11    back and live on these premises where they were growing

12    marijuana -- or distilling marijuana and go and live with his

13    co-defendant on the same property is really problematic.  That,

14    combined with the other elements in our presentation, lead us to

15    recommend that the defendant be detained.

16    In this case we do not believe that there are any conditions

17    or combination of conditions that are adequate to ensure the

18    presence of the defendant at future proceedings or the safety of

19    the community.

20    THE COURT:  All right.  Thank you very much, Ms. Dalton.

21    Mr. Offenbecher.

22    You are on mute yet.

23    MR. OFFENBECHER:  Thank you, Your Honor.

24    Perhaps Ms. Dalton could take down her sharing screen there.

25    Is there a way to take that down?

1          THE COURT:  Yeah.  I don't see it anymore.  Maybe it's

2     only on yours.

3          MR. OFFENBECHER:  Okay.  There's -- Okay.  It just got

4     down.  Thank you, Your Honor.

5          Thank you, Your Honor.  Peter Offenbecher for Mr. Rhule, who

6     is present in court in custody.

7          Your Honor, we are endorsing and ask the Court to release

8     Mr. Rhule on the conditions that have been crafted by pretrial

9     services.  This has been staffed by the --  including Ms. Bolle,

10    who has done quite a bit of work on this, it's been staffed by

11    the senior staff at pretrial services, and they believe that

12    these conditions are satisfactory.  And they are.

13         I would also commend to the Court's consideration the order

14    of Judge Peterson in the co-defendant case.  Now, they didn't

15    charge him with a mandatory minimum ten-year, but, of course,

16    they're co-defendants, and they were partners in this operation,

17    it seems quite clear.  Both the son, Kenneth Warren Rhule, and

18    the father, Kenneth John Rhule, who is before the court now,

19    have been doing this operation together for many, many years.

20         And virtually every single factor that Ms. Dalton has pointed

21    out, which causes their office to apparently want to detain

22    Mr. Rhule, was also present in Kenneth Warren Rhule's case.  For

23    example, they own this Frontline Aviation together, and they are

24    both pilots.  Mr. Kenneth Warren Rhule, who was released by Judge

25    Peterson, is also a private pilot.  The kind of planes, of

1  course, that they fly are small Cessna airplanes.  They're not

2  planes so you can fly to Russia.  And all of those factors that

3  Ms. Dalton has pointed out are the same for Mr. Kenneth John

4  Rhule as they were for Mr. Kenneth Warren Rhule.

5      And Judge Peterson, in the order that's before the Court,

6  which I think we have submitted, and I hope the Court has -- if

7  the Court doesn't, then we can re-email it -- but it was an order

8  on modification, a motion by his lawyer for modification of the

9  conditions of release with respect to financial conditions.  And

10 Judge Peterson very carefully, in that order, went through the

11 factors that the Court should apply in any case about appearances

12 required, flight risk, about safety of the community, and she

13 pointed out, for example, that Mr. Kenneth Warren Rhule, there

14 are no allegations that he's currently engaged in a marijuana

15 operation, and so the safety of the community is satisfied in

16 that case.

17     So, Your Honor, we would ask the Court to release on the

18 conditions that are here.  If there are any other conditions that

19 the Court feels are appropriate, we're happy to comply with them

20 as well.

21     The first factor this Court ought to consider is the

22 seriousness of the case.  The seriousness of the case.  This is a

23 marijuana case.  They can charge it as a ten-year mandatory at

24 their own discretion, as they have in Kenneth John Rhule's case,

25 but not in Kenneth Warren Rhule's case.  But this is still a

1    marijuana case.  This activity is legal in Washington if they had

2    applied for and obtained a license.  They are distilling

3    marijuana plants and selling it.  It's a legal thing to do in

4    Washington.

5         The seriousness.  This is not a case about cocaine, about

6    fentanyl, about methamphetamine, or oxycodone pills that are

7    killing people.  It's a marijuana case.  It's not about child

8    molesting, child pornography, or any violent crime.  If Mr. Rhule

9    were really so dangerous as the government is now arguing to the

10   Court, then we would not have all agreed to put him on a plane

11   yesterday by himself and fly alone on a commercial airplane from

12   Seattle -- from Honolulu to Seattle.  He's not a dangerous

13   person.  And no one would have taken that risk, including

14   Ms. Dalton or the agents or the magistrate judge in Honolulu

15   would have done that.

16        They can charge this up as a ten-year mandatory minimum by

17   extending the period of time of the conspiracy, but we need to

18   think back to when the last time was that people in this district

19   were sentenced to ten-year mandatory minimums in a marijuana

20   case.  Those are cases that we look back on in history and regret

21   that we did them, regret that we prosecuted people and put them

22   in prison for 30 years for marijuana.  And it seems very unlikely

23   to me that this is going to end up being a ten-year mandatory

24   case in any case.

25        Second, the second factor, the COVID crisis.  As the Court is

1    well aware, an FDC staff member has now tested -- an FDC SeaTac

2    staff member has now tested positive.  It appears to me from the

3    correspondence, although the Court would have better information,

4    that perhaps at least one inmate has also tested positive.

5    Thus -- and the Court is well aware of this -- the calculus of

6    people in pretrial custody has changed now and likely will be

7    changed until there is a vaccine or a treatment for it.

8         There is serious health concerns.  As you can see, he has,

9    Mr. Rhule, Kenneth John Rhule, has some allergy problems that

10   cause him to have medicine for having difficulty breathing, and

11   he's a person who would be at high risk if he were in the FDC and

12   contracted the COVID virus.

13        I would like to address the immigration calls for a moment.

14   I have spoken with Nick Marchi, who is Mr. -- who is Olga

15   Rhule's lawyer in this matter.  They have a hearing coming up.

16   And I discussed with him this idea of why Olga would do a

17   voluntary departure, and he said that was part of his advice to

18   her and to Mr. Rhule, that the reason they need to go back to

19   Russia is to apply for the visa.  Since she overstayed her visa,

20   she's not eligible to pursue her petition for an adjustment of

21   status while she's here.  She has to go back to the original

22   country and do that.

23        Mr. Marchi told me, and then provided me with documentation,

24   that they have approved the petition for adjustment of her status

25   due to her marriage to Mr. Rhule.  They have been married since

1    2002.  And Mr. Marchi advises me that they would, under normal

2    circumstances, go back to Russia, make the application.  And

3    some of these draconian things that Ms. Dalton has suggested are

4    subject to waiver.  This is not a case where she's automatically

5    going to be deported.  They have a hearing coming up.  He has a

6    number of arguments to make.  And even if she has to go back to

7    Russia to do the reapplication, she is eligible for adjustment of

8    her status.  She has been in the United States since the 1990s

9    and really is -- her ties to Russia are minimal.  Her main ties

10   are here.  She has raised Mr. Rhule's sons, her sons here in the

11   United States.

12       The Court has to also remain in context.  He didn't say "I'm

13   going to flee the United States because I'm in trouble."  In

14   fact, he was not charged with a crime.  His son was charged with

15   a crime at that time, but he wasn't charged with a crime.  But

16   things are different now.  He's charged with a crime, he's going

17   to be subject to conditions of release, and he can't go back to

18   Russia.  This was not a plan that he put forward in order to

19   avoid the criminal charges.  Far from it.  He was on the phone

20   with his wife, who's been his wife since 2002, trying to reassure

21   her that if she had to go back to Russia, he would go with her

22   until they could make that reapplication.  That's a perfectly

23   natural thing to do.  And it doesn't suggest at all that he was

24   trying to flee a prosecution.  As far as he knew, he wasn't

25   charged and wasn't being prosecuted.  But now he is prosecuted.

1    So if he had that conversation with her now, he would be telling

2    her -- he would be saying, "Look, you may have to go back and

3    make the application.  I can't go because I'm subject to

4    conditions of release now."  He didn't know he was going to be

5    charged.  He didn't know he was charged.  It's not a reasonable

6    interpretation of that.  If you listen to that conversation, it's

7    a man reassuring his wife that he is not going to abandon her.

8    But now there's a new factor.  He's here.  He's going to have to

9    stay here until this gets resolved.  We don't know how it's going

10   to be resolved.  Perhaps he will be acquitted, perhaps this case

11   will be settled for some other charges or, you know, some amount

12   of time that's reasonable and down the road he will be able to

13   join his wife in Russia.  We just don't know.

14        The passport.  He applied for a passport.  Well, of course,

15   he did, because at that point he was trying to reassure his wife

16   that he was going to be with her.  The passport is at the State

17   Department.  They're not going to issue the passport, I'm quite

18   sure.  But if they did, he would turn it in like any other

19   defendant before the Court.  If he had a passport, he surrenders

20   it to the Court.  There's no reason why that condition, which is

21   used in many cases, including much more serious cases than a

22   marijuana case, could not satisfy the interests of the Court.

23        Finally, Your Honor, the -- well, not finally -- but

24   Ms. Dalton has raised the issue about some guns.  There were guns

25   found.  They were seized.  Those guns are gone.  We require that

1   every defendant who is subject to pretrial services' release

2   surrender all their guns.  It's as simple as that.  Whether they

3   have one gun, five guns, or a hundred guns, whether a couple of

4   the guns turn out to be stolen, which sometimes happens,

5   unbeknownst to a person who is owning the gun, who has bought it

6   in a market, you know, some kind of flea market or something like

7   that.  Sometimes guns turn out to be stolen.  It doesn't make him

8   more dangerous because the gun turns out to be stolen.  These

9   guns have been taken away, and you require that, Your Honor, of

10  every single defendant who's under supervision.  And if he

11  violates that, he gets revoked.  It does not make him more

12  dangerous.

13      Mr. Kenneth Warren, who Judge Peterson had the hearing for,

14  also lives on the same premises where the guns were, where all of

15  this marijuana was, and he was also -- and he's also a pilot and

16  he's a co-owner of Frontline Aviators, which owns, you know, the

17  plane.  And so all of these things that Ms. Dalton has pointed

18  out apply equally to Kenneth Warren, and yet Judge Peterson has

19  carefully analyzed the factors and determined that even without

20  that financial condition, the interests of the community are

21  satisfied.  And you should find that here as well.

22      One final thing, these connections to Russia.  Look, the fact

23  is that they set up an LLC and they had Kenneth John Rhule's

24  father-in-law be, you know, one of the managing members.  And is

25  that unusual?  No, it's not unusual.  But that is an artifact of

1   history.  He is no longer a managing member.  There are now --

2   there's -- it's these folks here.  But be that as it may, it

3   doesn't make him --  Because his father-in-law lives in Russia

4   doesn't make it like he had some connections other than what we

5   know.  We know that his wife is from Russia, and, of course, her

6   family lives in Russia, but that doesn't make him more likely to

7   flee.

8       Let's remember what his ties to this community are.  And

9   that's what the pretrial services report is relying on.  He has

10  lived in the King County area since he was 11 years old.  He has

11  been born and raised in the United States of America.  He is not

12  going to try to flee, I would respectfully suggest to the Court,

13  because he's been charged with this marijuana case, which

14  probably, I'm suggesting, will get resolved.  And he's not going

15  to leave the country that he's been.  He's never lived in Russia.

16  He's lived in this country all of this time.  The only reason --

17  and this was on the advice of his lawyer -- that they would go to

18  Russia is to make this application from Russia because of a

19  technicality of immigration law, which, frankly, I don't

20  understand, but Mr. Marchi does, that requires him to -- requires

21  Olga to be in Russia in order to make the application because she

22  overstayed her visa here.

23      Your Honor, all of the concerns --  And, you know, the fact

24  that he's gone on whatever the dark web is, that he's used -- you

25  know, he's sold the marijuana.  Of course.  They're making

1  distillation products, which would be legal here if they had

2  gotten a license.  They should have gotten a license and they

3  didn't.  All of this applies equally to Kenneth Warren Rhule, his

4  son.  All of these factors apply the same, and the Court should

5  adopt the conditions and any other conditions.  If the Court is

6  concerned about him being on the internet, then the Court can

7  restrict his internet access as well.  But there's no suggestion

8  that with pretrial services' supervision that the interests of

9  the Court and the safety of the community cannot be satisfied.

10      The safety of the community.  It's one of the least serious

11  cases, frankly, that the Court sees.  You know, they're trying to

12  make it into a gun case because that sounds more dangerous and

13  it makes him sound like a more dangerous person.  But it's not a

14  gun case.  It's a marijuana case.  And in terms of felony crimes,

15  this is not only a marijuana case, but it's a marijuana case in a

16  state where it's legal to do what they're doing.  They just

17  didn't apply for the license.  So that makes it not a very

18  serious case.

19      And the location monitoring that is being proposed by

20  pretrial services and the conditions are quite comprehensive.

21  The restriction of travel, the surrender of the passport, and the

22  residential restrictions are all satisfactory, as they were with

23  Kenneth Warren Rhule, to assure his appearance here and to notify

24  the authorities if there is anything untoward that happens.  The

25  Court could also impose a third-party custodian, and we offered

1   that to pretrial services, but they didn't think it was

2   necessary.  They thought these conditions were satisfactory.  And

3   I agree.

4       Under all the circumstances, Your Honor, I think the Court

5   ought to adopt the recommendation of the pretrial services

6   report, put him on pretrial services' supervision, and not remand

7   him to the custody of the FDC in a case like this where it's not

8   necessary at this time.

9           THE COURT:  All right.

10      Ms. Dalton, do you have any response regarding, I guess, the

11  claim that it's not that serious of a case and there's no flight

12  risk?

13      You are on mute yet.

14      You're still on mute.  There you go.

15          MS. DALTON:  Yes, there we are.

16      I think we're going to respectfully disagree about the

17  severity of this particular case.  It is a federal offense, and

18  it is adequately charged as a federal offense with a ten-year

19  mandatory minimum.

20      The flight risk, I think there's a couple of items that we

21  could talk about.  Defense counsel said, essentially, there is an

22  approved petition already with ICE and that all they need to do

23  is go back to Russia and then return, and upon return, she will

24  have lawful status.  I have checked those facts with the ICE

25  attorney working on this case, and he disagrees with the advice

1    that Mr. Offenbecher has received.  There is an approved

2    petition, but the approved petition does not mean that she can

3    come back into the United States.  There is a second step, that

4    you have to demonstrate eligibility to return to the United

5    States.  And because of her admitted heroin use in the

6    immigration proceeding, that is a permanent bar that is not

7    subject to waiver.  And so it is this attorney's opinion that she

8    would not be able to adjust her status and become a lawful

9    permanent residence or a green card holder, or what have you,

10   because she could never come back to the United States.  And in

11   that sense, Mr. Rule's 19-year marriage to her is more of a risk

12   of flight than it is a reason for him to stay in Washington.

13   That is, a long, committed relationship and his need to be with

14   her, as he's promised, would require him to go to Russia.

15        In terms of the COVID risk there, I think the Court is aware

16   of the current situation at the FDC.  There is one staff member

17   who has tested presumptively positive for COVID.  There's been no

18   inmates that they've identified as linked to that staff member

19   who have received COVID from him.  There is one inmate who has

20   tested positive for COVID.  That inmate was recently arrested,

21   has been in solitary the entire time, has not been exposed to

22   other inmates.  And so there is not an outbreak currently at the

23   FDC SeaTac.  It seems, in contrast, that SeaTac COVID procedures

24   are working.  Their requirement that all inmates, upon arrival,

25   are quarantined for a period of time did work to prevent the

1   spread of COVID from that one inmate.  And the one inmate, I

2   understand, that had it is asymptomatic at this point in time, so

3   is not sick.

4        I understand Mr. Rhule's medical condition is limited to

5   allergies, and his son indicated he takes Claritin in order to

6   address those allergies.  I would submit that that's probably not

7   the kind of situation that would place Mr. Rhule at high risk.

8        I think that the contrast between Kenneth Warren Rhule and

9   Kenneth John Rhule is the connection to Russia.  It's the

10  connection to Russia, combined with the fact that at the time

11  that we charged Kenneth Warren Rhule -- we charged him before we

12  searched the compound -- at the time we charged him, we did not

13  know how much marijuana was involved in this case.  We did not

14  have enough for an A-level violation.  Of course, upon searching

15  that compound, we found all these guns, we found all this

16  marijuana, we found all this installation equipment that brought

17  us to the level of an A-level charge and showed us the true

18  severity of this crime.  It was after we charged Kenneth Warren

19  Rhule that we figured out that they stored these accounting

20  records online and the profits that they had truly made.  And so

21  when we made a decision, when we asked the Court to release

22  Kenneth Warren Rhule on bond, it was with that lesser quantity

23  being charged.  And so I'm not sure that there is an

24  apples-to-apples comparison here.

25       Kenneth Warren Rhule did not live on that property.  He lived

1  elsewhere.  And so the guns found on the property inside the

2  residence are more equally attributable to Kenneth John Rhule

3  than to Kenneth Warren Rhule.

4      But I think really what's driving here is this connection to

5  Russia, his very strong connection to Russia.  His wife is going

6  to be living there.  He has in-laws there that have helped him

7  set up companies.  He has the ability to leave, to fly out.  He

8  can go on, you know, another social security number, what have

9  you.

10      The thing, honestly, that struck me, from reading the PSI in

11  this case from Hawaii as well, is when the officer asked Kenneth

12  John Rhule, "Where is your passport?" he said, "It's lost.  I

13  have misplaced it."  He never told her, "I have applied for a new

14  passport, and I had these plans to move to Russia."  If this was

15  so innocuous, why didn't he tell the probation officer in Hawaii?

16      So for those reasons we still believe that this is a case for

17  detention and that it's, in fact, appropriate.

18          THE COURT:  Mr. Offenbecher, are you --  Yeah, now we

19  can hear you.

20          MR. OFFENBECHER:  Okay.  Sorry.

21      First of all, with respect to the passport, Mr. Rhule never

22  had a chance to review that pretrial services report in Honolulu.

23  I reviewed it with him here today.  He said that's not true, I

24  did apply for a passport, and it's pending.  And we corrected

25  that.  And you can see that in this report before the Court.  It

1    does say that he indicated to the pretrial services officer that

2    he had applied for a passport and he had not received it.  And,

3    of course, it will be returned as soon as he can.  So that was

4    fully acknowledged to the pretrial trial services officer here,

5    as soon as he had an opportunity to read it.

6        Second, this trying to distinguish it between Kenneth Warren

7    Rhule, we didn't know how serious of a case it was.  But isn't

8    the point that Kenneth Warren Rhule is fully complying with all

9    the conditions of release?  He's not a danger to the community.

10   He's not a risk of flight.  He knows what's going on in this

11   case.  He knows that his father has been charged with a ten-year

12   mandatory minimum.  And I guess what the prosecutor is suggesting

13   is that she's going to charge Kenneth Warren Rhule with a

14   ten-year mandatory minimum too.  I don't know.

15       But the point is, that knowing all of that -- he's got a very

16   good lawyer working with him on the case -- his lawyer knows that

17   and he knows it, and he's fully complying with these conditions

18   of release, he's not a danger to the community, and he is not an

19   undue risk of non-appearance such that he ought to be put in the

20   FDC at this point before we have a chance to deal with the case.

21       And finally, frankly, furthermore, with this COVID crisis, as

22   the Court can see over these past few days, the FDC gets shut

23   down, lawyers can't communicate with their clients, they can't

24   work on the cases.  It's very, very difficult to make this

25   criminal justice process work.  And the presumption ought to be

1  in favor of releasing defendants and letting them deal under

2  these very strict conditions; the presumption of not putting

3  people in harm's way from the virus, but letting them deal with

4  the case, particularly in a marijuana case where there's no

5  danger to the community.

6      THE COURT:  All right.  Thank you very much.

7  So, Mr. Rhule, we have gone back and forth between the

8  lawyers, so I have to make a decision right now.  And I'm sorry,

9  but I'm not going to release you today.

10  Number one, I don't like to compare one defendant with

11  another.  It's like saying if somebody was detained, you should

12  be detained also; if somebody got released, you should be

13  released.  Everybody is in a different situation.  So we look at

14  the cases separately.  One other --  Another defendant's

15  situation doesn't necessarily drive your situation, and vice

16  versa.

17  And I think the real challenge for me right here is, is that,

18  you know, you're in a difficult position.  And it's unfortunate

19  that your wife does not have legal status.  She's in immigration

20  detention.  The fact that she's in detention, they haven't let

21  her out, and the fact that the ICE agents are telling Ms. Dalton

22  "We're not letting her back," there's no, like, guarantee she's

23  just going to be able to leave and come back.  I think that

24  supports the government's case that her situation is very

25  difficult, and that when they remove her from the country or

1   deport her from the country, it's going to be a very difficult

2   task to ever come back.  So, of course, you know, your ties to

3   her and to the country are important, and it's a distinguishing

4   factor, of course, from your son, who doesn't have the same kinds

5   of ties.

6       Now, we can go round and round and round about how serious

7   this case is.  Maybe it could get more serious.  There were guns

8   found in the residence where you allegedly were living.  Maybe it

9   could get less serious.  But that's way down the road.  I'm not

10   in the position to have a crystal ball to know exactly how your

11   case is going to resolve.  All we know right now is that this is

12   not like a small possession of marijuana, right?  This is an

13   allegation of a substantial enterprise generating large sums of

14   money over a significant period of time, and the money is

15   allegedly converted and hidden through the use of various

16   corporate -- corporations or corporate shells, the use of

17   encrypted and also shielded internet transactions involving

18   cryptocurrency.  So, you know, it's not an insignificant case.

19       So, unfortunately, I am sorry, Mr. Rhule.  That, you know,

20   given what I have heard, the government's proffer regarding, I

21   think, legitimate concerns, this is a unique situation.  It's not

22   just that you face a lot of prison time if convicted.  But you

23   are in a peculiar situation in which you have a peculiar motive

24   to leave the country, to maintain a very long and important

25   relationship:  your wife.  Because you know that if she left the

1    country and you were here, you wouldn't see her.  If you were

2    convicted, as Ms. Dalton is charging, you wouldn't see her for a

3    long, long, long time.

4        So I will issue a detention order today.  I am sorry.  And I

5    don't disagree with Mr. Offenbecher.  The times we face have

6    created tremendous challenges for all of us, including the

7    prosecution of the case, the defense of the case, and the ability

8    to -- or inability to have, you know, face-to-face hearings.

9        All right.  I will issue the detention order today.

10       Mr. Offenbecher and Ms. Dalton, is there anything further

11   from either side?

12            MS. DALTON:  No.  Thank you, Your Honor.

13            THE COURT:  All right.

14       All right.  Mr. Rhule, hang in there.

15       We'll be at recess.

16            THE CLERK:  Court is in recess.

17                         (Adjourned.)

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3        I, Nickoline M. Drury, RMR, CRR, Court Reporter for the

4    United States District Court in the Western District of

5    Washington at Seattle, do certify that the foregoing is a correct

6    transcript, to the best of my ability, from the record of

7    proceedings in the above-entitled matter.

8

9                        /s/ Nickoline Drury

10                       Nickoline Drury

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT N

## Aircraft Inquiries®

N-Number
Serial Number
Name
Make / Model
Engine Reference
Dealer
Document Index
State and County
Territory and Country
Pending Expiration
Report
Expired/Pending
Cancellation Report
Canceled Registration
Report
Recent Registration
N-Number Availability
  Request A Reserved
  N-Number
––   Online
––   In Writing
  Reserved N-Number
  Renewal
––   Online
  Request for Aircraft
  Records
––   Online
Help
––   Main Menu
––   Aircraft Registration
––   Aircraft Downloadable
    Database
––   Definitions
––   N-Number Format
––   Registrations at Risk
––   Contact Aircraft
    Registration

FAA Home » Licenses & Certificates » Aircraft Certification » Aircraft Registration » Aircraft Inquiry » N-number Inquiry

## FAA REGISTRY

### N-Number Inquiry Results

**N149S is Assigned**

Data Updated each Federal Working Day at Midnight




### Aircraft Description

| | | | |
|---|---|---|---|
| Serial Number | 57054 | Status | Cert Terminated |
| Manufacturer Name | CESSNA | Certificate Issue Date | None |
| Model | 210 | Expiration Date | None |
| Type Aircraft | Fixed Wing Single-Engine | Type Engine | Reciprocating |
| Pending Number Change | None | Dealer | No |
| Date Change Authorized | None | Mode S Code (base 8 / oct) | 50142657 |
| MFR Year | 1960 | Mode S Code (base 16 / hex) | A0C5AF |
| Type Registration | Individual | Fractional Owner | NO |

### Registered Owner

| | | | |
|---|---|---|---|
| Name | REGISTRATION PENDING | | |
| Street | 13110 NE 177TH PL PMB 115 | | |
| City | WOODINVILLE | State | WASHINGT( |
| County | KING | Zip Code | 98072-5740 |
| Country | UNITED STATES | | |

### Airworthiness

| | | | |
|---|---|---|---|
| Engine Manufacturer | CONT MOTOR | Classification | Standard |
| Engine Model | I0-470 SERIES | Category | None |
| A/W Date | 01/05/1960 | Exception Code | No |

The information contained in this record should be the most current Airwor hiness information available in the historical aircraft record. However, this data does not provide the basis for a determination regarding the airworthiness of an aircraft or the current aircraft configuration. For specific information, you request a copy of the aircraft record at http://aircraft.faa.gov/e.gov/ND/

### Other Owner Names

| | |
|---|---|
| APPLICANT FRONTLINE AVIATORS LLC | APPLICATION DATED 092319 120-DAY 123119 |

### Temporary Certificates

| |
|---|
| None |

### Fuel Modifications

| |
|---|
| None |

Data Updated each Federal Working Day at Midnight




# EXHIBIT O



**United States Department of State**

*National Passport Center*
*207 International Drive*
*Portsmouth, New Hampshire 03801-6827*

August 7, 2020

Kenneth John Rhule

██████████████

RE: 684812142

Dear Mr. Rhule:

Thank you for your recent passport application. Unfortunately, you are ineligible to receive passport services because the Department of Treasury's Internal Revenue Service (IRS) certified that you have a seriously delinquent tax debt.

♦  Section 51.60(h)(2) of Title 22 of the Code of Federal Regulations reads as follows:

51.60 – Denial of Passports
(h)  The Department may not issue a passport, except a passport for direct return to the United States, in any case in which the Department determines or is informed by a competent authority that:
(2)  The applicant is certified by the Secretary of the Treasury as having a seriously delinquent tax debt as described in 26 U.S.C. 7345.

*Neither this passport agency nor the Department of State has information concerning your seriously delinquent tax debt. You can contact the IRS at:*

> Department of the Treasury
> Internal Revenue Service
> Attn: Passport
> PO Box 8208
> Philadelphia, PA 19101-8208
> Phone: 1-855-519-4965
> International: 1-267-941-1004

You must contact and make appropriate arrangements with the IRS within ninety (90) days from the date of this letter. After you have made these arrangements, you must notify our office in writing or by calling the National Passport Information Center (NPIC) at the number listed below. If you have urgent travel, please contact our office as soon as possible after you have made these arrangements.

Once the Secretary of the Treasury has certified to the Secretary of State that you have satisfied the seriously delinquent tax debt, your name will be removed from the certified list. If satisfactory payment arrangements have not been made within 90 days of the date of this letter, your application will be denied.   The Department of State cannot change, override, or appeal this policy.

If you have any questions please contact the National Passport Information Center: 1-877-487-2778 (TTY/TDD: 1-888-874-7793).

**For general passport information or to check the status of your passport application, please visit us on-line at <u>travel.state.gov.</u>**

<u>**PLEASE RETURN A COPY OF THIS LETTER WITH YOUR REPLY TO THE ADDRESS LISTED ABOVE.**</u>

Sincerely,


Customer Service Department

# EXHIBIT P



Attorney At Law
Living Trusts & Wills

BRETT HARRISON
(435) 656-1291
(702) 232-8965

To whom it may concern,

I, Brett Harrison, am the drafter of the Kenneth W. Rhule and Johanna E. Rhule Revocable Living Trust dated March 1st, 2017. The house ████████████████████████████ is one of the assets of the trust. Kenneth and Johanna are the trustees of the trust with full powers to dispose of the assets of the trust as they choose, including encumbering or pledging the value of the house.

Brett Harrison

**ST. GEORGE OFFICE**
491 N BLUFF STE 301
ST. GEORGE, UT 84770

**LAS VEGAS OFFICE**
800 N RAINBOW BLVD STE 208-14
LAS VEGAS, NV 89107

# EXHIBIT Q

August 13, 2020

Judge John C. Coughenour
United States District Judge
700 Stewart Street
Seattle, WA 98101

Dear Honorable Judge Coughenour,

My name is Megan Fletcher, I live in Woodinville Washington and I am writing this letter
to share my thoughts and insights on behalf of Kenneth John Rhule.  I am hopeful that
my words will give you a picture of the Ken I have known for the better part of my life.

I first met Ken in 1986 when his younger sister, Keri, and I were both attending the
same elementary school.  Keri and I became fast friends and have remained close ever
since.  I feel like I am an extended member of their family after 34 years and am truly
blessed to have all of them in my life.  Over the years, there have been many vacations,
sleep overs, holidays and dinners with the Rhule family…

Let me start by saying that Ken is one of the most generous and heartfelt people I know.
He treats his family, neighbors, friends and community with the same respect, care and
concern that most people can only try a lifetime to achieve.  He is without a doubt, the
type of person that would literally give you the shirt off his back.

Over the years, the Rhule's have had trials and tribulations, joy and celebration just like
any other family.  During these times, Ken had always been the first one to share in the
excitement, or console others during stress and heartache.

I've watched Ken become a parent and grandparent over the last 27 years.  He was
immediately changed with the birth of his sons.  Ken was mesmerized, watching them
grow, concerned for their wellbeing, always spending every second he could with them.
As his kids have gotten older, that hasn't changed.

Ken is always the first one to buy girl scout cookies from his niece, or whatever silly
fundraising prize the school is selling to raise money and the first to show up at an
important event or milestone in someone's life.  He is always there for others without
question or hesitation.

I've only written and shared a small portion of the Ken that I know.  It's the small things
that are the hardest to convey.  The daily interactions that you can see but not fully

explain.  The Ken I see with the waiter at a restaurant, the mechanic working on a car, the checker at the grocery store, that's the man I feel like I'm not doing justice with my words.

Ken is an invaluable part of so many lives.



Megan Fletcher

# EXHIBIT R

The Honorable John C. Coughenour

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9    UNITED STATES,

10                    Plaintiff,

11        v.

12    KENNETH JOHN RHULE,

13                    Defendant.

NO. CR 20-105 JCC

DECLARATION OF
NICHOLAS MARCHI

14

15        Nicholas Marchi declares under penalty of perjury under the laws of the United States

16    that the following is true:

17        1.        I have been an attorney licensed to practice law in the in the State of Washington

18    for 28 years.  My law office is located in Seattle.

19        2.        My primary areas of practice are criminal law and immigration law.  I am a

20    member of the Criminal Justice Act Panel for the United States District Court for the Western

21    District of Washington.

22        3.        I represent Olga Rhule, wife of Kenneth John Rhule, in her removal proceedings

23    before the Immigration Judge.

DECLARATION OF NICHOLAS MARCHI - 1

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

4.      I was hired by Kenneth John Rhule to represent Olga Rhule.

5.      Olga Rhule is a Russian citizen who entered the United States on a student visa and then obtained a K-1 Visa.

6.      At some point, Olga Rhule overstayed her K-1 visa.

7.      Because of this, she has no legal status in the United States.

8.      Olga Rhule's lack of legal status in the United States is why she was arrested when ICE agents encountered and questioned her in the course of arresting her step-son Kenneth Warren Rhule and searching the premises in Monroe, Washington, on March 10, 2020.

9.      At the time of my entry into Ms. Rhule's immigration matter, both Ms. Rhule and Kenneth John Rhule clearly stated to me that their goal was to obtain an adjustment of Ms. Rhule's status so that she could legally remain in, or return to, the United States to live with her husband (to whom she had been married, and with whom she had lived in Washington, for approximately 18 years) and the step-children she had helped raise from a young age.

10.      Olga Rhule told me that before I entered the case, she and her husband were discussing the option of a voluntary departure.

11.      Ms. Rhule had already conceded grounds for removal (the previous overstay of her K-1 visa) at her initial hearing in the immigration case, and a subsequent hearing was set to present evidence on her request for relief from removal.

12.      The three potential avenues for relief were (1) asylum; withholding of removal and Convention Against Torture;(2) cancellation of removal due to hardship to a United States citizen spouse; (3) or voluntary departure under safeguards. Under this third option, Ms. Rhule could then apply for a visa and a waiver of inadmissibility based on her marriage to a United States citizen.

DECLARATION OF NICHOLAS MARCHI - 2

skellenger bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

13.    On August 7, 2020, I appeared with Ms. Rhule before the immigration judge for the scheduled hearing on the merits of her applications for relief from removal.

14.    As noted above, one of the avenues for relief from removal which was available to Ms. Rhule was to request an order of voluntary departure under safeguards.  If granted voluntary departure, she would then apply visa through consular processing, based on her husband's approved petition.

15.    A person granted the privilege of a voluntary departure by the immigration judge may be eligible to seek a visa to return to the United States as the spouse of a United States citizen.

16.    Because Ms. Rhule had earlier overstayed her K-1 visa, she needed to return to Russia and make the application from her home country, based on her husband's application.

17.    During the course of our merits hearing, I concluded that Ms. Rhule's best avenue for eventual relief and to return to live in the United States with her husband and step-children was to request an order of voluntary departure, return to Russia, and then apply for consular processing through an application filed by her husband.

18.    Ms. Rhule agreed with me and we elected to make this request.

19.    The Assistant Chief Counsel for the United States Department of Homeland Security was representing the government at Ms. Rhule's hearing.

20.    The Assistant Chief Counsel agreed not to oppose our request for voluntary departure.

21.    The Immigration Judge agreed and entered an order that Ms. Rhule voluntarily depart the United States within 60 days, which is attached to this Declaration as Exhibit A.

DECLARATION OF NICHOLAS MARCHI - 3

22.     Ms. Rhule was then released on a GPS ankle monitor.  At the present time, she is living at home.

23.     As a result of this decision and order of the Immigration Judge, Ms. Rhule does not have a removal order or deportation order on her record.

24.     The presence of a removal or deportation order would have made it much harder for Ms. Rhule to return to the United States based on her approved petition through her husband.

25.     If, for some reason, Kenneth John Rhule had a warrant for his arrest pending in federal district court, then, in my opinion, Ms. Rhule would almost certainly be denied the visa petition that she will be requesting from the State Department.

Dated this 25th day of August, 2020.


_____s/ Nicholas Marchi_____
Nicholas Marchi
WSBA No. 19982

DECLARATION OF NICHOLAS MARCHI - 4

skellenger bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

Exhibit A to Declaration of Nicholas Marchi

**U.S. DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**IMMIGRATION COURT**
**1623 EAST J. STREET, SUITE 3**
**TACOMA, WA 98421**

*Carney & Marchi, P.S.*
*Attorneys at Law*

In the Matter of:

**GONCHAROVA, OLGA VLADIMIROVNA**

Case No.: ▮▮▮▮▮▮

AUG 1 1 2020

Respondent

Received

IN REMOVAL PROCEEDINGS

## ORDER OF THE IMMIGRATION JUDGE

This is a summary of the oral decision entered on **August 6, 2020.**
This memorandum is solely for the convenience of the parties. If the proceedings should be appealed or reopened, the oral decision will become the official opinion in the case.

[ ]   The respondent was ordered removed from the United States to _____

[ ]   Respondent's application for voluntary departure was denied and respondent was ordered removed to _____.

[✓]   Respondent's application for voluntary departure was granted until **10-5-2020** under safeguards with an alternative order of removal to **Russia** _____. *Time Period for VD may be extended for complications associated with covid.*

Respondent's application for:

[✓]   Asylum was ( ) granted ( ) denied (✓) withdrawn ( ) other.

[✓]   Withholding of removal was ( ) granted ( ) denied (✓) withdrawn ( ) other.

[✓]   Respondent's application for [✓] withholding of removal [ ] deferral of removal under Article III of the Convention Against Torture was ( )granted ( ) denied (✓) withdrawn ( ) other.

[ ]   A Waiver under section _____ was ( ) granted ( ) denied ( ) withdrawn ( ) other.

[ ]   Cancellation of removal under section 240A(a) was ( ) granted ( ) denied ( ) withdrawn ( ) other.

Respondent's application for:

[✓]   Cancellation under section 240A(b)(1) was ( ) granted ( ) denied (✓) withdrawn ( ) other. If granted, it was ordered that the respondent be issued all appropriate documents necessary to give effect to this order.

[ ]   Cancellation under section 240A(b)(2) was ( ) granted ( ) denied ( ) withdrawn ( ) other. If granted, it was ordered that the respondent be issued all appropriate documents necessary to give effect to this order.

[ ]   Adjustment of Status under section _____ was ( ) granted ( ) denied ( ) withdrawn ( ) other. If granted, it was ordered that respondent be issued all appropriate documents necessary to give effect to this order.

[ ]   Respondent's status was rescinded under section 246.

[ ]   Respondent is admitted to the United States as a _____ until _____.

[ ]   As a condition of admission, respondent is to post a $_____ bond.

[ ]   Respondent knowingly filed a frivolous asylum application after proper notice.

[ ]   Respondent's request to withdraw application for admission into the United States and returned to _____ under 8 C.F.R. section 1240.1d has been granted.

[ ]   Proceedings were terminated.

[✓]   Respondent waived the opportunity to apply for asylum, withholding of removal, and withholding under convention against torture.

[✓]   Other: **RE-ENTRY & FAILURE TO DEPART WARNINGS PROVIDED**

Date: August 6, 2020

Charles N. Floyd
Immigration Judge

Appeal: WAIVED / RESERVED ( A / I / B )
**IF RESERVED – APPEAL DUE BY: September 8, 2020**

## CERTIFICATE OF SERVICE

THIS DOCUMENT WAS SERVED BY: **MAIL (M)** PERSONAL SERVICE (P) ELECTRONIC SERVICE (E)
TO: [ ] ALIEN      [ ] ALIEN c/o Custodial Officer      [M] ALIEN's ATT/REP      [M] DHS
DATE: **08/06/2020**      BY: COURT STAFF
Attachments: [ ] EOIR-33 [ ] EOIR-28 [ ] Legal Services List [✓] FTD Advisal [✓] VD Advisal [ ] EOIR-26 Appeal Packet
[ ] Other:_____

Q6