The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

                              Plaintiff,

        v.

KENNETH JOHN RHULE,

                              Defendant.

CASE NO. CR20-105 JCC

**OPPOSITION TO MOTION FOR
REVIEW OF DETENTION
ORDER**

## I.      INTRODUCTION

The Defendant, KENNETH JOHN RHULE, has been charged with an offense carrying a mandatory minimum sentence of ten years' imprisonment.  He is also simultaneously facing the loss of his wife, who has been ordered by immigration authorities to self-deport to Russia, with no lawful path to return to the United States.  Confronted with these dire circumstances, the Defendant has already made his choice—a choice to flee, to avoid incarceration, to avoid marital separation, to return to Russia with his spouse.

The Defendant made this choice in May 2020, during a recorded phone call while his wife was held at the Northwest Detention Center.  In May 2020, the Defendant knew that he would be charged with a drug trafficking offense.  Two months earlier, law enforcement searched the Defendant's property, finding a functioning marijuana processing laboratory,

1   almost 1,000 kilograms of bulk marijuana, and drug paraphernalia on the premises.  On May

2   4, 2020, the Defendant learned the consequences of that search—law enforcement met him

3   as he landed his airplane in Snohomish County, served him with a warrant to search the

4   aircraft, and informed him that he was a target of their investigation.

5       Faced with this mounting pressure, and what could rationally be seen as an inevitable

6   arrest, on May 7, 2020, the Defendant told his wife he would flee with her to Russia.  As the

7   Defendant explained, he had already applied for an expedited passport, he would seek a

8   Russian visa to travel, and, once she was deported, he would join her in Russia.  The

9   Defendant made this choice knowing not only that he had a compelling motive to flee—to

10  avoid lengthy incarceration and separation from his wife—but also that he had the means to

11  flee.  The Defendant has long been honing his ability to hide from law enforcement—using

12  shell companies to conceal his assets; opening financial and online accounts using alternative

13  names, addresses, and telephone numbers; concealing his identity using Tor browsers,

14  encrypted applications, and the darkweb; and amassing substantial cryptocurrency assets.

15  Fortunately, the Defendant was arrested before he could put his plan in motion—before his

16  wife was deported, before he obtained his passport.

17      Recognizing that a presumption of detention applied, given the severity of the

18  Defendant's charges, Magistrate Judge Tsuchida appropriately decided that there were no

19  conditions or combination of conditions that would reasonably assure the Defendant's

20  appearance at trial or the safety of the community.  Five weeks after this detention order was

21  issued, the Defendant filed this appeal, offering essentially the same argument presented to

22  Judge Tsuchida.  For the same reasons, the Defendant's motion should be denied—he has

23  failed to rebut the presumption of detention, posing both a flight risk and danger to the

24  community, and should be ordered detained pending trial.

25                              **II. APPLICABLE LAW**

26      The Bail Reform Act of 1984 permits pretrial detention of a defendant where "no

27  conditions or combination of conditions will reasonably assure the appearance of the person

28  as required . . . ." 18 U.S.C. § 3142(e).  A presumption arises that no condition will

1  reasonably assure the person's appearance "if the judicial officer finds that there is probable
2  cause to believe that the person committed an offense for which a maximum term of
3  imprisonment of ten years or more is prescribed in the . . . Controlled Substances Import and
4  Export Act." 18 U.S.C. § 3142(e)(3)(A).

5      The defendant may proffer contrary evidence to rebut the presumption of detention,
6  but the presumption remains as an "evidentiary finding militating against release, to be
7  weighed along with other evidence relevant to factors in § 3142(g)." *United States v. Hir*,
8  517 F.3d 1081, 1086 (9th Cir. 2008).  The factors in § 3142(g) include: (1) the nature and
9  circumstances of the offense charged; (2) the weight of the evidence against the defendant;
10  (3) the history and characteristics of the person, including his character, physical and mental
11  condition, employment, financial resources, length of residence in the community,
12  community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and
13  record concerning appearance at court proceedings; and (4) nature and seriousness of danger
14  posed by release.  *See* 18 U.S.C. § 3142(g)(1)-(4); *United States v. Winsor*, 785 F.2d 755,
15  757 (9th Cir. 1986); *United States v. Motamedi*, 767 F.2d 1403, 1407 (9th Cir. 1985).  The
16  presumption in favor of detention, as well as the § 3142(g) factors, demonstrate that the
17  Defendant should remain detained.

18              **II.    BACKGROUND**

19      The Defendant was arrested on July 14, 2020, while disembarking a flight at the
20  Honolulu airport.  The Defendant had flown from Washington to Hawaii, carrying with him
21  a small duffel bag of clothing, a drone, and $10,000 in cash.[1]  For the two weeks prior
22  arriving in Hawaii, law enforcement had been communicating with the Defendant, under the
23  guise of returning various pieces of property, in order to arrest him on an outstanding
24  warrant.  Perhaps suspecting he would be arrested, rather than meeting with law
25  enforcement, the Defendant sent his son's girlfriend to collect his property.  With her in his
26
27
28  _____
[1] The Defendant's son, Connor Rhule, was residing in Hawaii at the time.

1  place, the Defendant traveled to Superior, Montana, where he remained until he traversed

2  through Washington on his way to Hawaii.[2]

3       After arriving in Hawaii, the Defendant was arrested and held in the Federal

4  Detention Center in Honolulu.  In light of the Marshals' limited flight schedule due to

5  COVID-19, the United States made alternative arrangements to expeditiously transport the

6  Defendant to Washington.  Specifically, the government arranged to have the Defendant

7  escorted by law enforcement from the Honolulu prison, placed on a commercial flight to

8  Washington, collected by law enforcement from the SeaTac airport, and brought to the

9  courthouse for an initial appearance.  On July 24, 2020, Magistrate Judge Tsuchida ordered

10  the Defendant detained pending trial.

11  ### IV.  ARGUMENT

12  **A. The Defendant has a Compelling Motive to Flee**

13       The Defendant faces not only a lengthy prison sentence but also the certain separation

14  from his wife, either of which would be sufficient to compel the Defendant to flee rather than

15  appear at trial.

16      **a.  The Defendant Faces a Mandatory Minimum Prison Sentence of Ten**

17           **Years**

18       From 2014 through 2020, the Defendant, along with his son, KENNETH WARREN

19  RHULE, manufactured and distributed marijuana and marijuana distillates, ultimately

20  earning more than $13.5 million in income.  For this conduct, the Defendant has been

21  charged by Indictment with Conspiring to Manufacture and Distribute Marijuana and

22  Marijuana Distillates, in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846.  If found guilty of

23  this offense, the Defendant faces a mandatory minimum sentence of ten years'

24  imprisonment.  Facing the daunting prospect of serving a decade in prison, the Defendant has

25  a strong incentive to flee to avoid prosecution.  As described herein, the weight of the

26  evidence favors conviction in this case.

27  

28  [2] This information was obtained pursuant to a tracker warrant.

### i. Law Enforcement Found Substantial Evidence Implicating the Defendant when they Searched the Monroe Compound and the Defendant's Residence on March 10, 2020

On March 10, 2020, law enforcement searched several properties owned by the Defendant and KENNETH WARREN RHULE, including a property located in Monroe, Washington, where the Defendant and his co-conspirators manufactured and distributed marijuana products. As described in the complaint, the Defendant and his co-conspirators set up a laboratory on this property, designed to produce marijuana extracts. In this lab, the Defendant used chemicals and solvents—including combustible butane and propane, carbon dioxide, and dry ice—to extract THC from marijuana plants and create concentrated marijuana products. These products were sold in the form of gels, liquids, and solid crystalline substances, included those commonly referred to as "clear" and "shatter," shown in the images below.



On March 10, 2020, in a warehouse located on the property, law enforcement found a fully-functioning extraction lab, including following laboratory equipment, along with an employee who was in the midst of conducting an extraction:[3]

---

[3] RHULE_00329701.

1
2
3
4
5
6
7
8

  

In that warehouse, law enforcement also found dozens of trash bags filled with more than 900 kilograms of bulk marijuana.

  

At the time of the search, the Defendant was living in a residence located on the Monroe property, in close proximity to this laboratory:



Laboratory

Defendant's Residence

Upon entering the Defendant's residence, law enforcement determined that the home was used to sell and ship the marijuana products manufactured in the lab.  For example, on a desk in the Defendant's bedroom, agents found marijuana products stored in individual jars, next to a drug ledger, packing labels, and USPS shipping boxes.[4]



Agents found additional packages, sealed and ready to ship, containing marijuana products and affixed with shipping labels bearing fake sender names and fake sender addresses.  Next to the Defendant's bed, law enforcement found a laptop, open to a darkweb vendor page, advertising the sale of marijuana products.[5]



Inside the residence, law enforcement also located multiple firearms, including two stolen weapons, and over $300,000 worth of cryptocurrency.

---

[4] RHULE_00331838.
[5] RHULE_00331836.

The evidence gathered on March 10, 2020, alone would be sufficient to convict the Defendant of the charged offense, which carries with it a ten year mandatory minimum term of imprisonment.  Faced with this substantial evidence, the Defendant has a strong motive to flee rather than face conviction and lengthy incarceration.

### ii.    Law Enforcement Found Substantial Additional Evidence Implicating the Defendant During the Course of their Investigation

In addition to the evidence gathered on the Monroe property, during the course of its investigation, law enforcement has also obtained electronic evidence proving that the Defendant conspired to manufacture and distribute marijuana products.

Specifically, law enforcement determined that the Defendant and his co-conspirators sold their marijuana products under the label HerbinArtisans.  HerbinArtisans held a Google Enterprise account, which the Defendant accessed using the email address ken@herbinartisans.com.  In this account, law enforcement found emails sent by the Defendant describing his marijuana operations.  For example, the Defendant sent the following email to his son, KENNETH WARREN RHULE, on January 10, 2016, creating a protocol for extracting marijuana products.[6]

---

[6] RHULE_00256445.

OPPOSITION TO MOTION FOR REVIEW OF DETENTION ORDER
*United States v. Rhule* – 8

## worksheet extraction

| | |
|---|---|
| **From:** | Jon Kuhn <ken@herbinartisans.com> |
| **To:** | Kenneth Rhule <kenny@herbinartisans.com> |
| **Date:** | Sun, 10 Jan 2016 19:13:58 -0800 |
| **Attachments:** | extractionworksheetdraft.rtf (3.1 kB) |

Kenny,

I quickly drafted a very basic extraction worksheet.  This is a 1 page document that needs to follow the extraction process from the very beginning to the end.
Its designed to place accountability on each the extract technician, and the purge technician.  Additionally, its a document that will hang by clip on the column, to the stainless table, to the oven and act as a quick visual to each batch (with all the info we need).  Take a look, I am sure it can be more robust, but this is just to get us going.  We need this in place Monday morning.  Feel free to enhance it if....

Print out 50-100 of these at the shop and we need to make sure everyone uses them..

Agents also located the following self-drafted organizational chart,[7] found on KENNETH WARREN RHULE's laptop and the HerbinArtisans Google account, showing that the Defendant served as the CEO of this operation, overseeing multiple employees.

---

[7] RHULE_00020633. This chart was saved in a Google Photos folder for kenny@herbinartisans.com titled "2016-01-18."  Based on the individuals identified in the chart, it is believed to represent the organizational structure for HerbinArtisans.

1
2
3
4
5
6
7
8
9
10
11
12



13  Additionally, on KENNETH WARREN RHULE's laptop, agents located text
14  messages exchanged between the Defendant and KENNETH WARREN RHULE outlining,
15  among other things, the Defendant's ambitions for his marijuana operations:
16
17  Defendant:   This op at the warehouse is 95% done.  It's setup to generate 2535lbs per
               room every 60 days (which is 2535 lbs once per month out of alternating
18             rooms) that is $5070k per month, plus the trim that it yields. That, along with
19             supplemental oil to keep the system running is another 2535k per month.
               That can be run smoothly with just [C and M2] (or 2 employees ).  That's
20             roughly 100k per month in revenue with costs of less that 18k per month...
               That leaves uswith 80k per month for you and I. When the construction is
21             finished, that output becomes a walk in the park. As the employees get
22             familiar with the systems, they dial them in further and can do it in their
               sleep.  It doesn't need to be stessful. It doesn't need [M], end user sales, etc.
23             Simply moving volume wholesale to a small handful of people.  After the
24             setup is done, this whole thing can operate with A couple of people, it really
               won't be that involved.  It's time consuming because it involved construction
25             and learning the industry.  Both of those variables are nearly complete now.[8]
26
27
28  _____
    [8] RHULE_00338456 (March 30, 2015).

1   Finally, in order to track HerbinArtisans' income and expenses, the Defendant and his
2   co-conspirators used the cloud-based accounting software, Xero.  Using this program, the
3   Defendant tracked HerbinArtisans' sale of marijuana products, purchase of bulk marijuana
4   from growers, and employee expenses.  In the Xero records, the Defendant is described as
5   the subscriber on the account, which he routinely logged into, including as recently as
6   December 2019.[9]  In sum, the electronic evidence gathered in this case, coupled with the
7   items found during the search of the Defendant's property, weigh in favor of conviction.
8   Faced with this evidence, and the prospect of serving a lengthy prison sentence, the
9   Defendant has a compelling motive to flee.

10              **iii.    On May 4, 2020, Law Enforcement Informed the Defendant**
11                        **that he was a Target of the Investigation**

12   Less than two months after law enforcement searched the Defendant's home, locating
13   substantial evidence implicating the Defendant in the conspiracy to manufacture and
14   distribute marijuana products, officers informed the Defendant that he was a target of their
15   investigation.  On May 4, 2020, law enforcement met the Defendant at the Harvey Airfield in
16   Snohomish, Washington.[10]  On that date, agents served a warrant to search the Defendant's
17   Cessna airplane.  At the time the agents arrived, the Defendant was flying in the aircraft with
18   his son, Connor Rhule.  When the plane landed, it was searched and, after a drug detection
19   dog alerted to a locked rear compartment in the tail of the aircraft, the plane was seized.

20   During the search, the Defendant approached law enforcement and explained that the
21   aircraft was jointly owned by him and Connor Rhule, a statement that Connor Rhule denied.
22   Agents then advised the Defendant to stop flying over the Northwest Detention Center,
23   where Olga Rhule was held, since his low flights were causing the Center to go into
24   lockdown.  Before departing, an agent explained to the Defendant that "it was likely he
25   would be receiving a target letter, as [the Defendant] did have a connection to the

26
27   _____
28   [9] RHULE_00331038.
     [10] Exhibit 1 (RHULE_00331038).

1  investigation of his son KENNETH W. RHULE."[11]  As a result, the Defendant was

2  expressly told that he was under investigation and was a target in the case.

3       After being advised that he was a target of the investigation, the Defendant didn't

4  appear shocked or express surprise.  And this makes sense.  Based on the substantial amount

5  of evidence taken from the Defendant property, residence, and bedroom on March 10, 2020,

6  and the agent's seizure of his airplane on May 4, 2020, any reasonable person would

7  conclude that they were under investigation for manufacturing and distributing marijuana.

8  Accordingly, as of May 4, 2020, the Defendant could no longer deny he was under

9  investigation, he knew that a target letter was imminent, and, based on the evidence gathered

10  against him, his arrest was nearly inevitable.

11       **b.  The Defendant Also Faces Certain Separation from His Wife of 19 Years**

12       In addition to his desire avoid arrest and lengthy incarceration, the Defendant also has

13  a second compelling reason to flee the jurisdiction, his desire to avoid separating from his

14  wife of nineteen years, who has been ordered to return to Russia.  On March 10, 2020, law

15  enforcement arrested the Defendant's wife, Olga Rhule, for immigration-related violations.

16  Although Olga Rhule immigrated from Russia on a fiancé visa, she did not marry her

17  betrothed, instead remaining in the United States without status.  Although she ultimately

18  married the Defendant, as a visa overstay, Olga Rhule was unable to adjust her status and has

19  no lawful basis to remain in the United States.

20       In May 2020, Olga Rhule was detained at the Northwest Detention Center awaiting

21  deportation.  Facing his wife's impending removal from the United States, and fearful he

22  would be arrested, the Defendant began making arrangements to flee to Russia.   The

23  Defendant applied for an expedited passport, prepared to obtain a Russian visa to travel, and

24  began preparing to live in Russia for an extended period of time.  The Defendant called his

25

26

27

28  [11] *Id*. at p. 7.

1 | wife and informed her of these plans on May 7, 2020—a mere three days after law
2 | enforcement informed him of his target status and seized his airplane—stating:[12]

3
4

    **Olga Rhule:**    First of all let me ask you this.  I'm not getting out any time soon right?

5

    **Defendant:**    I don't think so.

6
7

    **Olga Rhule:**    How much time.. approximately?

8
9

    **Defendant:**    I don't know if there is  a time limit that you're going to get out. **I think we may have to have you go back to Russia, and me meet you there.**

10
11

    **Olga Rhule:**    Well if that happens how much time?

12
13

    **Defendant:**    He couldn't answer that question because of COVID. But it sounds like your hearing is on the 28th.

14

    **Olga Rhule:**    29th.

15
16
17

    **Defendant:**    29th. Is it the 29th? I thought it was the 28th. So you can basically, um… At the hearing you're gonna, you're gonna basically say you're not gonna challenge it any more, you know and you want to go just proceed with the deportation.

18
19

    **Olga Rhule:**    Can it not happen sooner?

20
21
22

    **Defendant:**    He said from there—He said he didn't think so but I'll push that issue more but . . . I'll see if—He'll have to do another one of these requests to move the hearing up kind of thing and they'll have to grant it or not.

23

    **Olga Rhule:**    Can you try?

24
25
26
27

    **Defendant:**    Yes I can try.  Of course. Um.. But here's the thing, even with that, **it's gonna take me about that long to get my passport and visa and stuff like that situated so I'm working on that now to get that expedited.**

28

---

[12] Exhibit 2 at 1:25-4:08 (RHULE_00340777) (emphasis added).

| | | |
|---|---|---|
| Olga Rhule: | OK. | |
| Defendant: | I was gonna go down this afternoon and get my pictures real quick so I can mail off the passport document and I'm gonna do it instead of normal, **I'm gonna do it urgent, you know the urgent time frame and pay the extra money.** | |
| Olga Rhule: | OK. | |
| Defendant: | And then I got to apply for the visa, you know the visa over there… There's some other things I'm working on, but I can't talk to you about them.[13] | |
| Olga Rhule: | I understand. | |
| Defendant: | You know what I'm talking about right? | |
| Olga Rhule: | I think I maybe- | |
| Defendant: | It's what you think. | |
| Olga Rhule: | OK. | |
| Defendant: | So I'm working on all that stuff right now. OK? | |
| Olga Rhule: | OK. | |
| Defendant: | And um yeah, **I'll be with you no matter what**. | |
| Olga Rhule: | Promise? | |
| Defendant: | **Yes. Of course I promise… Of course I promise**. | |

The United States has confirmed that the Defendant did, in fact, apply for an expedited passport, intent on leaving for Russia.  Had the Defendant's passport arrived, and had Olga

---

[13] Given the amount of cryptocurrency owned by the Defendant, discussed below, the United States believes that this reference could have described moving funds so that the Defendant and his wife could live comfortably in Russia.

1  Rhule been deported, the United States believes that the Defendant would have fled to

2  Russia.

3      Since this conversation occurred, Olga Rhule was released from immigration custody

4  on bond and has been ordered to leave the United States by October 5, 2020.  Rather than

5  mitigate the Defendant's risk of flight, his wife's release has made the situation more dire.

6  Olga Rhule now has a final order from the immigration judge requiring her to voluntarily

7  leave the United States and return to Russia within the next month and a half.[14]  In light of

8  this order, the Defendant is faced with two choices: (1) remain in the United States, appear at

9  trial, serve a substantial jail sentence, and leave his wife to return to Russia alone; or (2) flee

10  with his wife and hide in the United States, Russia, or any other country, and avoid

11  separation and a prison term.  Not surprisingly, as the Defendant stated during that recorded

12  phone conversation, he had already chosen to flee.

13              **i.  Olga Rhule Will Not be Permitted to Return to the United States**

14      According to the Defendant, now that Olga Rhule has been permitted to voluntarily

15  depart for Russia, rather forcibly deported, she will be able to imminently return to the

16  United States.  However, the Defendant neglects to mention that Olga Rhule faces two

17  barriers to returning to the United States: (1) having overstayed her fiancé visa, she is barred

18  from returning to country for a period of ten years; and (2) as a prior drug user with a

19  conviction for solicitation of heroin, she is permanently barred from reentering the country.

20  While there is a chance that Olga Rhule might obtain a discretionary waiver for overstaying

21  her visa,[15] prior drug use cannot be waived.

22      Specifically, once she returns to Russia, when completing the immigrant visa

23  application (form DS-260), Olga Rhule will be asked the following question: "Have you ever

24

25  _____

26  [14] This deadline may be extended due to COVID but statutorily may not be extended more than 120 days (or until February 2, 2021).

27  [15] The Defendant admits that waiver of the first barrier—overstaying her visa—is fully discretionary and is not guaranteed.  The Defendant agrees that, even if she were granted a waiver, Olga Rhule would have to remain in Russia while awaiting this discretionary decision.

28

OPPOSITION TO MOTION FOR REVIEW OF DETENTION ORDER
*United States v. Rhule* – 15

1   violated, or engaged in a conspiracy to violate, any law related to controlled substances?"

2   Based on her prior drug conviction,[16] Olga Rhule will be required to answer in the

3   affirmative.  Section 212(a)(2)(A)(II) of the Immigration and Nationality Act provides:

4   > Except as provided in clause (ii), any alien convicted of, or who admits having
5   > committed, or who admits committing acts which constitute the essential
6   > elements of— (II) a violation of (or a conspiracy or attempt to violate) any law
    > or regulation of a State, the United States, or a foreign country relating to a
7   > controlled substance (as defined in section 802 of title 21), . . . is inadmissible.

8   Olga Rhule will be deemed permanently inadmissible based on her prior drug use, described

9   in her conviction.  She may also be deemed permanently inadmissible based on

10  uncharged drug use, manufacture, or sale, including the type of drug trafficking described in

11  the complaint.[17]  Once deemed inadmissible, there is no waiver that Olga Rhule could obtain

12  to enter the United States—rather, prior drug possession and use is a complete bar to

13  returning.

14          Under similar circumstances, the petitioner in *Pazcoguin v. Radcliffe*, 292 F.3d 1209

15  (9th Cir. 2001), was denied admission to the United States.  In *Pazcoguin*, a Philippine

16  national arrived at the Honolulu International Airport and applied to enter the country.  In his

17  immigrant visa application, the petitioner admitted to previously smoking marijuana in

18  violation of law.  Having learned of this drug use, an Immigration Judge found the petitioner

19  excludable from the United States under INA § 212(a)(2)(A)(i)(II).  The Ninth Circuit

20  affirmed this finding, determining that the petitioner was excludable despite the fact that he

21  his absence would pose a hardship for the petitioner's mother, who was a United States

22  citizen.  *Id.* at 1218-19.

23          As with the petitioner in *Pazcoguin*, Olga Rhule's prior heroin use would prevent her

24  from returning the United States.  Absent an available mechanism to immigrate, the only

---

[16] This conviction is appended as Exhibit 3 (under seal).

[17] This form also poses the question "Are you the spouse, son, or daughter of an individual who has violated any
controlled substance trafficking law, and have knowingly benefitted from the trafficking activities in the past five
years?"  It's also noteworthy that Olga Rhule shared the bedroom (where the marijuana products, drug ledger, and laptop
open to the darkweb were found) with the Defendant.

1   way for the Defendant to maintain his nineteen year relationship with his wife would be to
2   flee together.

3               **ii.    The Denial of the Defendant's Passport Application Does not**
                **Eliminate his Flight Risk**
4

5       On August 7, 2020, the State Department denied the Defendant's passport application,
6   informing him he was ineligible for a travel document because of an ongoing tax dispute
7   with the Internal Revenue Service and his "seriously delinquent tax debt."  Dkt. 48, Ex. A at
8   146.  Absent a passport, the Defendant claims he is incapable of fleeing the jurisdiction.
9   However, as the Court knows, individuals enter and exit the United States on a near daily
10  basis without lawful passports.  The United States land border is extensive, human smugglers
11  are prevalent, and fraudulent passports can be readily purchased.  Additionally, now that the
12  Defendant's wife has been released from immigration custody, the Defendant is no longer
13  required to return to Russia.  Instead, the two could flee virtually anywhere in the world—
14  Mexico, Canada, an alternative city in the United States.  Once reunited out of custody, the
15  two could travel to any preferred location to avoid prosecution and separation.  The
16  Defendant has already shown a willingness to break the law.  Traveling without a passport,
17  or obtaining a fraudulent passport, would be far a less serious charge than the charge the
18  Defendant is already facing.

19      It is also worth noting that, when asked by the Probation Officer in Hawaii, the
20  Defendant did not report that he had applied for his passport and expected to receive one on
21  an expedited basis.  Instead, he stated that he his passport was missing and did not know its
22  current whereabouts.  Ultimately, the Probation Officer only learned that the Defendant had
23  applied for an expedited passport when she interviewed the Defendant's son, Connor Rhule,
24  who reported that the Defendant had recently submitted a passport application.

25      Facing the prospect of a substantial jail sentence, separation from his wife, and her
26  exclusion from the United States, the Defendant may reasonably conclude that he would be
27  better served fleeing prosecution.  The Defendant has already taken substantial steps towards
28  fleeing—applying for an expedited passport, preparing to obtain a Russian visa, and planning

1   to meet his wife in Russia.  The Defendant took these steps knowing that he was under

2   investigation, knowing that substantial evidence establishing his guilt had been uncovered,

3   and knowing that he could reunite with his wife in Russia where he would not face

4   extradition.  Since the Defendant initially made the decision to flee, his situation has only

5   gotten worse.   The Defendant is now aware that he has been charged with an offense that

6   carries a ten year mandatory minimum prison sentence.  The Defendant has now served over

7   a month in custody and does not want to remain incarcerated.  The Defendant now knows

8   that, by court order, his wife must voluntarily depart the United States.  The Defendant made

9   his intentions clear during that May 7, 2020 phone call, and the events that have occurred

10  since that date have only made his motives to flee more compelling.

11  **B. The Defendant has the Means to Flee Prosecution**

12          The Defendant not only has a compelling motive to flee prosecution—to avoid a

13  lengthy prison sentence and separation from his spouse—he also has the means to evade law

14  enforcement detection.  The Defendant has long been honing his ability to hide from law

15  enforcement—using shell companies to conceal his assets; opening financial and online

16  accounts using alternative names, addresses, and telephone numbers; concealing his identity

17  using Tor browsers, encrypted applications, and the darkweb; and amassing substantial

18  cryptocurrency assets.

19          **a.  The Defendant Has Used Aliases, Fake Social Security Numbers,**
20          **Alternative Addresses, and Fake Telephone Numbers to Hide His Identity**

21          While committing the charged offense, the Defendant has proven adept at using

22  alternative names, social security numbers, addresses, or telephone numbers when

23  purchasing property, applying for cryptocurrency accounts, and communicating online.

24                  **i.  The Defendant Uses Aliases to Hide His Identity**

25          When opening corporations and online accounts, the Defendant has used the aliases

26  "John Kuhn" and "Jon Kuhn."  For example, "John Kuhn" is the subscriber listed on the

27  Defendant's intellivisioninc@gmail.com account, while "Jon Kuhn" is the subscriber listed

28  on the Defendant's ken@herbinartisans.com account.  On January 10, 2016, the Defendant

sent the following email to his son, KENNETH WARREN RHULE, noting the alias and

indicating that he may have logged into the email address using a "stealth account."[18]

## RE: worksheet extraction

| | |
|---|---|
| From: | Jon Kuhn <ken@herbinartisans.com> |
| To: | Kenneth Rhule <kenny@herbinartisans.com> |
| Date: | Sun, 10 Jan 2016 19:48:39 -0800 |

My name is stuck as john juhn on this... not sure how that happened, I may have been logged into a
stealth account when I first logged on. I cant change my name, are you able to?

The Defendant also used the alias "John Kuhn" when incorporating RKK Associates,

a shell company that the Defendant used to register his vehicles, including a van used to

transport marijuana products.  In February 2016, the Defendant used this alias when

communicating with Harvard Business Services, which incorporated RKK Associates,

including by sending the following email:[19]

From: John Kuhn [mailto:intellivisioninc@gmail.com]
Sent: Sunday, February 21, 2016 8:13 PM
To: Harvard Filings Team ██████████████
Subject: Re: RKK Associates LLC 5966611

Hi,

When should We expect to receive the EIN information that we had you file?

John

Similarly, the Defendant has also opened financial accounts using the alias "John

Ruhl," or variations thereof.  For example, the Defendant opened cryptocurrency accounts at

Coinbase using the names "John K Rhule," "John Rhule," and "John Ruhl."[20]  The

Defendant also opened Neteller and PayPal accounts in the name "John Ruhl."[21]

---

[18] RHULE_00256449.
[19] RHULE_00325257.
[20] RHULE_00328579-81, 00002970.
[21] RHULE_00334253, 00334261, 00334302 (Neteller accounts allow users to send and receive money online).

### ii.     The Defendant Avoids Associating Accounts with his Social Security Number

In addition to employing aliases, the Defendant has used a fake social security number to avoid associating his financial accounts with his true identity.  For example, the Defendant opened an account at Coinbase, an online cryptocurrency wallet provider, in the name of "Kenneth Rhule," listing a social security number not associated with him.[22]  This practice is consistent with the advice the Defendant offered KENNETH WARREN RHULE regarding the need to use credit cards that are not tied to their names and identifiers.  On November 4, 2015, the Defendant sent KENNETH WARREN RHULE a photograph of a credit card, stating:

> This one is tied to my name and SSN, so it's more of a short term deal... But we could load a million dollars on to this card and I can justify to the irs that it was from the cash sale of assets acquired on taxes I had already paid and that I had no capital gain in selling the "stuff"... So they can f[*]ck themselves...[23]

Similarly, in May 2015, KENNETH WARREN RHULE advised the Defendant that he had two bank accounts and "didn't think either ha[d] [his] correct social."[24]

### iii.    The Defendant Uses Mailing Addresses that are Not Tied to his Home

To further conceal his identity, the Defendant has also avoided having his online accounts and assets registered to his home address, instead listing postal boxes, his parents' home, or seemingly random locations as his mailing addresses.[25]

For example, the Defendant has used a postal box held at Pony Mailbox & Business Center in Woodinville, Washington, to register his vehicles,[26] receive shipments mailed to

---

[22] RHULE_00002975.
[23] RHULE_00338056.   The Hawaii PSR also noted that the social security number the Defendant provided to the Probation Officer was not associated with him.  It's unclear which social security number this report is referencing.
[24] RHULE_00338056.  The United States has confirmed that KENNETH WARREN RHULE uses a fake social security number when opening financial accounts.
[25] Notably, the Defendant does have mail and packages delivered to his home address, so the use of alternative mailing address is not due to insufficient mail service.
[26] RHULE_00022294.

his shell company—RKK Associates,[27] and register one of his aircrafts—owned by the shell company Frontline Aviators LLC.[28]  Additionally, the Defendant used a second postal box, held at a mail forwarding service in Grandville, Michigan, to incorporate RKK Associates.[29]

The Defendant also uses his parents' address in Nevada, including to register a Gemini cryptocurrency account,[30] register for a credit card,[31] and pay taxes on the Defendant's property in Monroe, Washington—owned by the shell company Frontline LLC.[32]  The Defendant has also used seemingly random addresses to register for additional cryptocurrency accounts,[33] and to serve as return addresses when mailing packages containing marijuana products to customers.[34]

### iv.      The Defendant Uses Google Voice Numbers When Opening Accounts

Moreover, the Defendant uses Voice Over Internet Protocol ("VOIP") numbers, rather than his personal cell phone, to register payment accounts and incorporate shell companies. For example, the Defendant used Google Voice numbers to register a cryptocurrency account at Coinbase in the name of "John K. Rhule," communicate with Stripe—an online payment processor—regarding his account, serve as contact information for RKK Associates, and text message KENNETH WARREN RHULE regarding their marijuana manufacturing and distribution operation.[35]

By using these diffuse strategies—false names, false social security numbers, false addresses, false telephone numbers—the Defendant avoided law enforcement detection, and the closure of his accounts by financial institutions, for a considerable length of time.  The

---

[27] RHULE_00006595, 00331926.
[28] RHULE_00333586, 00333635.
[29] RHULE_00325257.
[30] RHULE_00003710.
[31] RHULE_00000501,
[32] RHULE_00326509, 00329015.
[33] RHULE_00329249.
[34] RHULE_00331627.RU
[35] RHULE_00002969, 00326762, 00329680, 00338056, 00335200, 00337405.

1  Defendant could employ these same strategies to effectively evade arrest and access funds

2  while fleeing prosecution.

3  **b.  The Defendant Hides His Assets, Vehicles and Residence by Using Shell**

4  **Corporations**

5  Not only has the Defendant attempted to conceal his identity by providing false

6  information, he has also incorporated shell companies in order to further hide his assets and

7  avoid association with marijuana manufacturing and distribution.  The Defendant

8  incorporated these entities, held in the names of family members, listing their principal

9  places of business as addresses in Russia or domestic postal box locations.

10  For example, in March 2016, the Defendant incorporated Frontline LLC in Delaware

11  using the registered agent Harvard Business Services.[36]  Frontline LLC was used to purchase

12  the property in Monroe where the Defendant manufactured marijuana products, along with a

13  vehicle driven by the Defendant's wife.[37]  By incorporating this entity, and using a registered

14  agent service, the Defendant was able to avoid being publicly linked to the corporation.

15  Instead, when one requests information from the State of Delaware related to this

16  corporation, only the following information appears:

17

18

19

20

21

22

23

24

25

26

27  [36] RHULE_00325257.

28  [37] RHULE_00328593.  As described above, on March 10, 2020, law enforcement located a number of USPS mailers containing marijuana products ready to be shipped inside this vehicle.

OPPOSITION TO MOTION FOR REVIEW OF DETENTION ORDER
*United States v. Rhule* – 22

| Entity Details | | | |
|---|---|---|---|
| File Number: | 5988268 | Incorporation Date / Formation Date: | 3/14/2016 (mm/dd/yyyy) |
| Entity Name: | FRONTLINE LLC | | |
| Entity Kind: | Limited Liability Company | Entity Type: | General |
| Residency: | Domestic | State: | State: |
| Status: | Good Standing | Status Date: | 3/14/2016 |

**REGISTERED AGENT INFORMATION**

| Name: | HARVARD BUSINESS SERVICES, INC. | | |
|---|---|---|---|
| Address: | 16192 COASTAL HWY | | |
| City: | LEWES | County: | Sussex |
| State: | DE | Postal Code: | 19958 |
| Phone: | 302-645-7400 | | |

Adding a further layer of anonymity, when incorporating this entity with Harvard Business Services, the Defendant designated his Russian father-in-law, V.G., as the company's "managing member."[38]  Additionally, on the incorporation paperwork, the Defendant listed the principal place of business for Frontline LLC as Khabarovsk, Russia.  The same managing member and business address were submitted to the IRS in order to obtain an EIN.

In February 2016, the Defendant also incorporated RKK Associates LLC in Delaware, again using the registered agent Harvard Business Services, Inc.[39]  RKK Associates LLC was used to purchase the vehicles the Defendant and KENNETH WARREN RHULE drove,[40] including a van used to transport marijuana and marijuana products.  As with Frontline LLC, this corporation is not publicly linked to the Defendant.  In fact,

---

[38] Although the Defendant now states that he is the managing member of Frontline LLC, that document appended to the Defendant's motion is not publicly available and was not produced by Harvard Business Services in response to a subpoena.  As a result, despite the Defendant's protestations to the contrary, that document does not effectively link Frontline LLC to the Defendant.
[39] RHULE_00325257.
[40] On March 10, 2020, law enforcement located bulk marijuana and a cash counter inside this vehicle.

according to the State of Delaware, there is no registered agent currently assigned to this entity:

| Entity Details | |
| --- | --- |
| THIS IS NOT A STATEMENT OF GOOD STANDING | |
| File Number: 5966611 | Incorporation Date / Formation Date: 2/17/2016 (mm/dd/yyyy) |
| Entity Name: RKK ASSOCIATES LLC | |
| Entity Kind: Limited Liability Company | Entity Type: General |
| Residency: Domestic | State: DELAWARE |
| **REGISTERED AGENT INFORMATION** | |
| Name: UNASSIGNED AGENT | |
| Address: | |
| City: | County: |
| State: NullValue | Postal Code: 95050 |
| Phone: | |

Instead, the Defendant's wife—using her maiden rather than married name—is listed as the managing member for this corporation.  Additionally, an address in Grandville, Michigan, associated with a mail forwarding business, is listed as RKK Associates LLC's principal place of business.  This same managing member and business address were submitted to the IRS to obtain an EIN.  Furthermore, as described above, when communicating with Harvard Business Services to incorporate this entity, the Defendant used the alias "John Kuhn."

These corporations were created to distance the Defendant from his marijuana operations, designed to avoid taxation and criminal enforcement.  As the Defendant explained to KENNETH WARREN RHULE in February 2015:  "The Delaware business needs to be something generic like R holdings llc," noting "[w]e don't want any tax filings with names that li[nk] to business markets … We won't form a corporation under any of those names, we will have an unrelated corp trademark the rights to those names…"[41]

---

[41] RHULE_00338056 (ellipses in original).  It is believed that the Defendant is referencing the trade names used to manufacture marijuana products, including HerbinArtisans, when discussing "names that li[nk] to business markets."

1    KENNETH WARREN RHULE responded "Yeah I figured it would be something like that.

2    But we need to get an off shore corp going [first]."

### c. The Defendant Has Extensive Cryptocurrency Holdings and Financial Reserves

5    The Defendant also has access to substantial assets, including those held in

6    cryptocurrency, providing him with further means to flee.  As alleged in the complaint, in

7    order to record HerbinArtisans' inventory, expenses, payroll, and sales, the Defendant used

8    the cloud-based accounting software, Xero.  The Defendant fastidiously maintained those

9    accounting records, which law enforcement obtained pursuant to a search warrant.

10   According to those records, between 2015 and 2020, HerbinArtisans made over $13 million

11   in income.

# Income Statement
Herbin Artisans
For the year ended December 31, 2020

| Account | 2020 | 2019 | 2018 | 2017 | 2016 | 2015 |
|---|---|---|---|---|---|---|
| **Income** | | | | | | |
| Other Revenue | 0.00 | 25,000.00 | 0.00 | 0.00 | 2,590.00 | 0.00 |
| Sales | 0.00 | 4,153,546.80 | 4,547,426.72 | 2,892,168.30 | 1,786,434.31 | 302,903.14 |
| **Total Income** | 0.00 | 4,178,546.80 | 4,547,426.72 | 2,892,168.30 | 1,789,024.31 | 302,903.14 |
| | | | | | | |
| **Cost of Goods Sold** | | | | | | |
| Bad Debt | 0.00 | 29,256.99 | 6,202.49 | 22,207.75 | 8,900.00 | 1,516.29 |
| Cost of Goods Sold | 0.00 | 3,372,737.85 | 2,651,187.26 | 1,654,389.70 | 910,337.59 | 138,036.62 |
| **Total Cost of Goods Sold** | 0.00 | 3,401,994.84 | 2,657,389.75 | 1,676,597.45 | 919,237.59 | 139,552.91 |
| | | | | | | |
| **Gross Profit** | 0.00 | 776,551.96 | 1,890,036.97 | 1,215,570.85 | 869,786.72 | 163,350.23 |

22   Furthermore, those records show that HerbinArtisans held a substantial portion of its

23   earnings in cryptocurrency, avoiding financial institutions that could report suspicious

24   activity to law enforcement.[42]

25   While operating HerbinArtisans, the Defendant held accounts at numerous

26   cryptocurrency exchanges and wallet providers.  For example, the Defendant held accounts

---

[42] *See, e.g.*, Exhibit 4 (under seal).

at Coinbase, Gemini, BitPay, CEX.IO, Bitfinex, Paxful, Bittrex, BitGo, BTC.com, Copay, X Wallet, and LocalBitcoins.com.[43]  As described above, the Defendant has opened multiple accounts at these entities, using slightly different names, mailing addresses, or other identifiers to avoid anti-money laundering internal controls.  Using these accounts, the Defendant converted a substantial amount of cryptocurrency into cash.  For example, between November 2015 and January 2017, the Defendant used his LocalBitcoins.com account to sell over $180,000 worth of Bitcoin to others in exchange for gift cards and cash.[44]  Additionally, from August 2017 through November 2018, the Defendant transferred over $80,000 to his BitPay card, using that card to make purchases and withdraw cash at ATMs.[45]

Additionally, when law enforcement searched the Defendant's residence in Monroe, Washington, they located multiple pieces of paper containing seed phrases—lists of randomly generated words that can be used to access a cryptocurrency wallet.  Using these seed phrases, law enforcement seized more than 28 bitcoins, currently worth over $300,000, from the Defendant.[46]  Law enforcement also seized multiple hardware wallets from the Defendant's residence—electronic devices capable of storing cryptocurrency.

It's not surprising that the Defendant has such vast cryptocurrency reserves.  As the Defendant and KENNETH WARREN RHULE discussed in 2015, in order to profit from their drug ventures they needed to find a way to spend their proceeds without detection.  For example, on April 29, 2015, the Defendant and KENNETH WARREN RHULE exchanged the following text messages:[47]

Defendant:   There is also a new service that will send you a credit card which is linked to a Bitcoin wallet address and it will convert at market price and transact at any location that accepts credit cards

---

[43] RHULE_00002963, 00002973, 00003719, 00003638, 00328572, 00328582, 00329253, 00329258, 00334743, 00338048, 00341471.
[44] RHULE_00338022.
[45] RHULE_00325739.
[46] RHULE_00333402.
[47] RHULE_00338056.

1   KWR:        Yeah I can. I'd like to do all of that using tails,[48] or a bit more anonymous
2                    than my PC

3   KWR:        We need to do it ASAP

4   Defendant:  That's the thing... Bitcoin can be 100% anonymous. If setup correctly ... Once
5                    a week we dump all excess profit into an offline wallet, but first run it
6                    through a wash service...[49]

7   Similarly, on October 29, 2015, KENNETH WARREN RHULE sent his father and an

8   employee, C.E., the following email:[50]

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

---

27   [48] TAILS is a Tor based, portable operating system that increases a user's anonymity online.
     [49] Ellipses in original.
28   [50] RHULE_00254668.

OPPOSITION TO MOTION FOR REVIEW OF DETENTION ORDER
*United States v. Rhule* – 27

## Credit cards

**From:** Kenneth Rhule <kenny@herbinartisans.com>
**To:** Jon Kuhn <ken@herbinartisans.com>, C███ E███████ ██████@herbinartisans.com>
**Date:** Thu, 29 Oct 2015 18:55:02 -0700

Secret spending.
We need to have a solution for online transactions, and local ones at that (credit card).... Bitcoin is the most anonymous currency available. Problem is spending it!

Bank accounts link socials or tax ID of the business. And we don't want to be reporting income. I am aware we are working on scheme for this, it seems that may take some time.

As it stands, there are a few bitcoin to credit/debit card services available. They do NOT ship to the US, but they do ship to the UK. We can signup for a virtual mailbox out of the U.K., and have our debit card forwarded to a recipient in the US. We can use the cards here.... They legally can't be shipped here.

I'm not sure if that work around will "work". But we all need to get our wheels turning on this. Even if we incorporate in another country, we can get a bank there, and issue ourselves credit cards that can be used around the world.

In order to be successful we must all communicate and work on our goals together. We do not have enough time where we all collaborate. Even if for 15minutes a day.
Let get this company Rolling!

-Kenny



--
Sincerely,
Kenny Rhule
Cannabis Innovator
HerbinArtisans - Sweet Leaf Labs

Armed with substantial cryptocurrency reserves, the Defendant has the means to flee the jurisdiction and live comfortably for a substantial period of time while waiting for the evidence to grow stale.  Although the Defendant is willing to offer his parents' and sibling's homes as collateral, the income earned by HerbinArtisans (over $13.5 million), the Bitcoin converted by the Defendant through BitPay and LocalBitcoins (over $260,000), and the Bitcoin seized from the Defendant's residence (over $300,000), dwarf the collateral pledged by these third parties.  With these financial assets, the Defendant could reimburse his family members for any losses incurred by his failure to appear.

1
2

### d. The Defendant Has the Ability to Hide his Activities Online by Using Encrypted Applications, Tor Browsers, and the Darkweb

3   The Defendant has spent the last six years honing his skills to remain anonymous
4   online, using Tor browsers, encrypted chat communications, and darkweb forums when
5   selling marijuana products.  The Defendant could use these same skills to remain anonymous
6   during flight, evading law enforcement's efforts to track and arrest him.

7   For example, as alleged in the complaint, the Defendant used the darkweb to sell his
8   marijuana products.  When law enforcement searched the Defendant's bedroom on March
9   10, 2020, agents located a laptop open to a darkweb site advertising the sale of marijuana
10  distillates.[51]  This laptop was running the TAILS operating system, a Tor-based, portable
11  operating system designed to protect a user's anonymity online.  On this darkweb site, there
12  were messages sent between the Defendant and his customers, including "Order was dropped
13  yesterday (Mon) at Post office," and "is it same for chips, batter and diamonds, 4 oz per
14  small priority box?  I only like small priority boxes as they don't get much attention."  Also
15  open within the Tor browser was the website Bitcoinpostage.info, which the Defendant used
16  to buy and print USPS shipping labels.

17  During the course of the conspiracy, the Defendant discussed using the darkweb with
18  KENNETH WARREN RHULE via text message.  For example, on April 25, 2015, the
19  Defendant wrote "I wanted to show you the dark sites… I'll make you a bootable
20  anonymous browser."[52]  On May 16, 2015, the Defendant also wrote "Also, online deep web
21  … Setup a couple order takers... The proceeds go into a bitcoin account we control... They
22  send in the orders each day, we ship them, and we pay out the commission when the Bitcoin
23  escrow is released..."[53]

24
25
26

27  [51] RHULE_00340808.
    [52] RHULE_00338056.
28  [53] RHULE_00338056 (ellipses in original).

1    The Defendant and his son also discussed the need to use encrypted chat

2  communications to avoid law enforcement surveillance.  For example on October 30, 2015,

3  the Defendant texted KENNETH WARREN RHULE:[54]

4        We need to standardize on a secure sms and voice platform… Something that
          allows communication between any of us... The government is storing all
5        communications, and working to be able to have 5 years of all
          communications...it's unconstitutional, but a reality... It up to people to encrypt
6        communications in order to have privacy.
7

8  Thereafter, the Defendant started communicating using Signal and Wickr, encrypted

9  messaging services, to communicate with his son and the other employees at HerbinArtisans.

10  For example, on October 25, 2014, the Defendant texted KENNETH WARREN RHULE ". .

11  . I was wick[i]ng you about the extraction gear," referring to marijuana processing

12  equipment.  Additionally on October 28, 2014, when KENNETH WARREN RHULE texted

13  the Defendant "These guys are saying 5-7k for 100 lbs of sugar leaf trim but pickup is

14  Humboldt county," the Defendant responded "Wick…"

15    Consistent with these messages, in order to avoid detection online, the Defendant

16  downloaded Tor browsers and encryption applications onto his personal devices.[55]  For

17  example, according to Apple, the Defendant downloaded multiple applications to access the

18  darkweb, including several Onion browsers.  The Defendant also downloaded numerous

19  applications designed to preserve anonymity, including VPNs, VOIP applications creating

20  burner numbers, PGP applications, and applications designed to alter one's voice on phone

21  calls.  Finally, the Defendant downloaded multiple encrypted chat applications, including

22  Signal, Telegram, WhatsApp, and Wickr.

23

24

25

26

27

28
_____
[54] RHULE_00338056 (ellipses in original).
[55] RHULE_00341471.

OPPOSITION TO MOTION FOR REVIEW OF DETENTION ORDER
*United States v. Rhule* – 30

1
2

### e.  The Defendant has a History of Failure to Comply, Obstruction, and Tax Avoidance

3

4

Although the Defendant claims he will abide by the terms of a bond, his history of failing to follow the law and comply with the directives of law enforcement undermine that

5

6

assertion.  The Defendant has a prior conviction for obstruction of justice,[56] another citation for failure to comply, and has an outstanding tax dispute with the IRS.  Additionally, before

7

8

he was charged in the present case, he was sent a cease and desist order by Snohomish County to stop processing marijuana at the Monroe property, which he fully ignored. On

9

10

October 11, 2017, a Snohomish County Planning and Development Services Code Enforcement Officer sent the Defendant a letter stating:

11

12

13

> I am investigating an alleged violation regarding the property [located in Monroe].  The alleged violation involves allowing marijuana processing to take place in an area not zoned for such activity.[57]

14

15

16

17

18

Despite receiving this notice, the Defendant continued to process marijuana on the property until it was searched by law enforcement in March 2020.  In short, the Defendant has repeatedly demonstrated an unwillingness to comply with the law and follow the directives of law enforcement—there is no reason to believe that he will now become compliant and abide by conditions of release.

19

### f.  The Defendant is a Private Pilot with Access to Airplanes

20

21

The Defendant is also a licensed pilot, having obtained his student pilot's license from the FAA in January 2019.[58]  As a student pilot, the Defendant is licensed to fly alone,[59] and

22

23

24

25

26

27

[56] In February 2009, the Defendant was convicted, after trial, of Obstructing a Law Enforcement Officer, in violation of RCW 9A.76.020(1).  In that case, the State alleged that the Defendant and his friend, both intoxicated, were erratically driving a black Ferrari at a high rate of speed across the 520 bridge.  After officers stopped the vehicle, they arrested the driver for driving while intoxicated.  The Defendant, a passenger in the vehicle, also appeared to be intoxicated, and was later determined to have a blood alcohol level of .123 or .124.  After his friend was arrested, the Defendant became belligerent, shouting obscenities at the officers.  When officers informed the Defendant that the Ferrari would be towed, the Defendant became confrontational, jumping in the car and driving it away (despite his intoxication).  Thereafter, officers pursued the vehicle, stopped it, and the Defendant was arrested.  Attached as Exhibit 5 (under seal).
[57] RHULE_00331417.
[58] RHULE_00331644.
[59] https://www.faa.gov/pilots/become/student_cert/

28

1    the Defendant completed his first solo flight on May 7, 2019.[60]  Since that date, the

2    Defendant has completed other solo flights and has logged dozens of flight hours.[61]

3    Although law enforcement seized the Defendant's plane, and the Defendant claims his other

4    aircraft is inoperable, the Defendant still has access to airplanes.  For example, the Defendant

5    could rent an aircraft, as he has done in the past, or purchase a new aircraft.  Even if the

6    Defendant is unable to access the airplanes registered to Frontline Aviators LLC, he still

7    remains capable of chartering planes.  The Defendant's ability to fly private aircraft would

8    certainly be an asset should he decide to flee the jurisdiction.

9        For all of the reasons outlined above—the Defendant's ability to use false identifiers

10    to evade law enforcement detection, his incorporation of shell companies, his access to

11    cryptocurrency reserves, his experience using encrypted and anonymous communication

12    mechanisms, his ability to pilot an aircraft, combined with his historic failure to abide by law

13    enforcement directives—the Defendant has proven that he possesses the resources and skills

14    necessary to evade arrest as a fugitive.

15    **C. The Defendant Also Poses a Danger to the Community**

16        In addition to posing a substantial risk of flight, the Defendant also poses a danger to

17    the community.  On March 10, 2020, when law enforcement searched the Defendant's

18    residence and property, they found not only an arsenal of weapons—including two stolen

19    firearms—they also found that the Defendant was using highly combustible fuels to extract

20    his marijuana products, fuels that have historically caused explosions and injury in other

21    illegal processing facilities.

22

23       **a.  The Defendant Possessed Multiple Firearms, Including Two Stolen Weapons**

24        When law enforcement searched the Defendant's residence on March 10, 2020, they

25    located an arsenal of weapons, including two stolen firearms.[62]  Under the Defendant's bed,

26

27    [60] RHULE_00331628.

28    [61] RHULE_00331632, 00331645.

   [62] RHULE_00329890, 00331840-41, 00331880-81, 00331899.

agents located a Colt pistol, which had been reported stolen.  In the Defendant's living room, agents found an assault rifle.  In the Defendant's office, agents located multiple rifles and revolvers, including in a gun safe filled with firearms.  One of these rifles, which was loaded, had also been reported as stolen.  Outside of the residence, near the laboratory, agents found three additional assault rifles.  In short, the Defendant's property was heavily fortified, including with stolen weapons, to protect the marijuana products and cryptocurrency reserves held within.

  



### b. Explosive Nature of Marijuana Extraction

Additionally, the methods used by the Defendant to extract and distill marijuana are heavily regulated for a reason—if done improperly, they can lead to explosions and fires. As reported by one media outlet, as of 2019, at least ten marijuana processing laboratories have exploded, causing severe burns, extensive fires, and occasional deaths.[63] In order to distill marijuana products, processors use highly combustible butane and propane, along with dry ice and carbon dioxide tanks. On March 10, 2020, when law enforcement searched the Defendant's laboratory they found these chemicals, along with an employee who told them that he had just completed a particularly dangerous portion of the extraction run that could have resulted in injury or explosion if performed improperly.[64]

Just last month, a similar marijuana lab exploded in Centralia, Washington, causing one employee to suffer extensive burns and nearly resulting in a brushfire.[65] In 2013, a defendant who caused an explosion at an apartment complex in Bellevue, Washington, resulting in injuries and a death, was sentenced in the Western District of Washington to nine years in prison.[66] As a result, in order to protect the community, licensed marijuana extractors are inspected and are required to operate in buildings built to withstand explosion. The Defendant's laboratory had neither been inspected nor was it specially configured to withstand an explosion. It also lacked necessary safety protocols to prevent employees from suffering life-altering burns.

---

[63] *New problem for legal weed: Exploding pot factories*, Politico (February 18, 2019), *available at* https://www.politico.com/story/2019/02/18/marijuana-factories-explosions-safety-issues-1155850; *Exploding danger: U.S. marijuana oil labs pose deadly, destructive hazard*, Reuters (June 4, 2019), *available at* https://www.reuters.com/article/us-usa-drugs-insight/exploding-danger-u-s-marijuana-oil-labs-pose-deadly-destructive-hazard-idUSKCN1T51F4
[64] RHULE_00329701.
[65] *Fire, explosion at Centralia pot processing plant injures employee*, King 5 (August 12, 2020), *available at* https://www.king5.com/article/news/local/pot-explosion-severe-burn-centralia-cbd/281-12f7d6d4-d190-4569-b356-3ab29e2f7fe0
[66] *Former Bellevue Resident Whose Drug Manufacturing Sparked Explosion and Fire Sentenced to Nine Years in Prison*, Department of Justice (June 8, 2015), *available at* https://www.justice.gov/usao-wdwa/pr/former-bellevue-resident-whose-drug-manufacturing-sparked-explosion-and-fire-sentenced

1    Given the risk of explosion for the workers employed by the Defendant and the

2    Defendant's immediate neighbors, along with the number of stolen and registered firearms

3    located at the Monroe property, the Defendant also appears to pose a safety risk to the

4    community if released.

5    **D. The Cases Cited by the Defendant Do Not Mandate Release**

6    The Defendant cites a myriad of cases, claiming that the offenses charged in those

7    cases are comparatively more dangerous than that committed by the Defendant.  But the

8    United States has never argued that the Defendant must be detained solely because of the

9    threat he poses to the community.  Rather, the flight risk posed by the Defendant, evidenced

10   by his express plan to flee to Russia, remains the primary force compelling detention in this

11   case.  As described herein, the Defendant took concerted efforts to flee—preparing for his

12   imminent trip to Russia, applying for an expedited passport, evaluating obtaining a visa to

13   travel to Russia, conferring with his wife regarding his intentions to meet her in Russia—all

14   days after being informed that he was a target of law enforcement's investigation.  Even the

15   Defendant's co-defendant, KENNETH WARREN RHULE, does not have the same motives

16   to flee—his partner is not from Russia and she is not being removed from the United

17   States.[67]  After evaluating the unique circumstances faced by the Defendant, circumstances

18   that are rare amongst those who appear before this Court, Magistrate Judge Tsuchida

19   correctly determined that the Defendant failed to rebut the presumption of detention.

20   The fact that the Defendant has been charged with manufacturing and distributing

21   marijuana, legal under Washington law if licensed, does not alter this conclusion.  In a

22   comparable case, *United States v. Xiamin Huang*, CR18-124 JCC (October 16, 2018), Dkt.

23   86, this Court upheld Magistrate Judge Donohue's order detaining an individual charged

24   with the same offense as the Defendant—Conspiracy to Manufacture and Distribute

25

26

27   [67] Notably, the Magistrate Judge Peterson's opinion, appended to the Defendant's motion, was issued when KENNETH

28   WARREN RHULE was only charged with violating 21 U.S.C. § 841(b)(1)(B), and as such no presumption of detention applied.

Marijuana. Xiamen Huang was a U.S. citizen, originally born in China,[68] who purchased residential properties in order to grow marijuana. In this Court's order, it found Huang to be a flight risk based on her access to financial resources, family connections to China, lack of meaningful employment in Washington, and the pending ten year mandatory minimum charge. In comparison, the Defendant has the same, if not worse, risk factors. For one, the Defendant's financial resources far surpass that earned by Huang whose assets were predominately tied up in real estate and amounted to less than $600,000. The Defendant's foreign connections are also comparable to Huang's, now that the Defendant's wife of nearly twenty years is returning to Russia and can help him acclimate and obtain lawful status. In comparison, Huang was a U.S. citizen whose children, siblings, and parents each resided in the United States. At the time she was detained, Huang had lived in Washington for seventeen years. Like Huang, the Defendant has no meaningful employment in Washington, given that he has been employed as a marijuana producer for the past six years with no other source of income. And, like Huang, law enforcement found substantial amounts of marijuana at the Defendant's home, for which he is facing a substantial mandatory minimum sentence. In ordering Huang detained, the Court noted that, upon conviction, she would face a lengthy separation from her children, giving her further incentive to flee. This is comparable to the Defendant's incentive to avoid separating from his wife of nineteen years. If anything, Xiamin Huang posed less of a flight risk, as she did not have the Defendant's technological skills enabling her to remain anonymous, using her own name when opening bank accounts, purchasing her residence, and laundering her drug proceeds.

Additionally, the Defendant's proposed release plan does not compel a different result, as it neither addresses his motive to flee nor the danger the Defendant poses to the community. The Defendant requests to be released from prison, returned to his home where his co-defendant, KENNETH WARREN RHULE, and the Defendant's wife are residing. He requests to be returned to the same property where the Defendant and KENNETH

---

[68] Huang had renounced her Chinese citizenship and no longer possessed a Chinese passport.

WARREN RHULE manufactured and distributed marijuana, in a remote portion of Monroe, Washington.  The risks inherent in allowing co-defendants to reside together, in remote locales, once used to commit the charged offenses, are apparent.  These risks are further heightened by the strain that COVID-19 has placed on our Probation Office, reducing its ability to effectively monitor defendants and conduct regular home visits.  Additionally, as the Court knows, ankle monitors can be tampered with and removed, ultimately providing law enforcement with only moments' notice to apprehend suspects intent on fleeing.  In short, if the Defendant is determined to flee, an ankle monitor is unlikely to stop him.

The only remaining argument the Defendant advances for release concerns the current pandemic.  The government does not take the risk posed to prisoners during the COVID-19 outbreak lightly.  It was because of this risk that the government devised a strategy to escort the Defendant on a commercial flight, rather than having transported through multiple institutions facing COVID-19 outbreaks.  But the risk at FDC SeaTac, while worthy of concern, remains manageable.  Although 31 inmates have now tested positive at the facility, 16 of those inmates were new arrests in segregated detention cells.  The remaining 15 inmates were, unfortunately, located in the general population.  However, given that the FDC SeaTac houses 618 inmates, this represents a 2.5% infection rate, which is lower than King County.  The Bureau of Prisons is taking aggressive steps to quell any further spread, isolating inmates and placing units on lockdown in order to avoid additional infections.  Furthermore, the Defendant is not a high-risk inmate, as he is comparatively young (45) and, according to his PSR, suffers from intermittent asthma that is controlled by albuterol—a non-steroidal inhaler—and Claritin.  In light of the Defendant's substantial flight risk, and danger to the community, the Defendant should be detained despite the current health climate.

1

## V.  CONCLUSION

2          In light of the pending charges, there is a presumption of detention in this case.  The

3   Defendant has failed to rebut that presumption, posing both a risk of flight and a danger to

4   the community.  The Defendant's compelling motivation to flee—to avoid a lengthy prison

5   sentence and separation from his spouse—coupled with his proven ability to evade law

6   enforcement detection require that the Defendant be detained pending trial.

7

8          DATED this 1st day of September, 2020.

9

10                                             Respectfully Submitted,

11                                             BRIAN T. MORAN
                                               United States Attorney
12

13                                             */s/ Marie M. Dalton*
                                               MARIE M. DALTON
14                                             Assistant United States Attorney
                                               United States Attorney's Office
15                                             700 Stewart Street, Suite 5220
                                               Seattle, Washington 98101
16
                                               Phone: (206) 553-1511
17                                             Fax: (206) 553-2502
                                               E-mail: marie.dalton2@usdoj.gov
18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO MOTION FOR REVIEW OF DETENTION ORDER
*United States v. Rhule* – 38