The Honorable John C. Coughenour

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

                Plaintiff,

   v.

KENNETH JOHN RHULE,

               Defendant.

NO. 20-cr-105 JCC

DEFENDANT RHULE'S REPLY IN
SUPPORT OF MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE
DEFENDANT ON CONDITIONS

ORAL ARGUMENT REQUESTED

Noted for: September 4, 2020

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................. 3

II.     ARGUMENT ...................................................................................................... 6

     A.     Whatever the eventual outcome of Olga Rhule's immigration situation, it gives Mr. Rhule no "compelling motive to flee," Opp. at 4, because he and Olga believed (then and now) that she might be able to obtain legal status in the United States. ........................................................................................................ 6

     B.     The government has not demonstrated that Mr. Rhule presently has the "means to flee prosecution," Opp. at 18, and in any event the proposed conditions of release available to the Court will reasonably assure his appearance by placing any such "means" beyond his ability to use. ................................................... 10

     C.     Mr. Rhule is not a private pilot with access to airplanes; he is a student pilot with access to one inoperable plane with no propeller and a bucket of cement where its engine should be. ............................................................................. 14

     D.     The government's claims that Mr. Rhule poses an intolerably great risk to the community are strained and exaggerated. ......................................................... 18

     E.     The government exaggerates the stakes in this case by emphasizing the ten-year mandatory minimum sentence Mr. Rhule technically faces; in any event, Mr. Rhule is presumed innocent and the purported strength of the evidence against him on the single count in which he is charged does not weigh heavily in favor of continued detention. ..................................................................................... 20

     F.     The Court should look skeptically at the government's casual assurances that it has the COVID-19 situation under control at FDC SeaTac, and that Mr. Rhule thus faces no genuine threat to his health even though he may remain confined there for months .............................................................................................. 23

III.    CONCLUSION ................................................................................................. 25

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 2

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1    **I.      INTRODUCTION**

2            On July 24, Magistrate Judge Tsuchida rejected the recommendation of Pretrial Services

3    that Defendant Kenneth John Rhule ("Mr. Rhule"), a near-lifelong resident of the Seattle area

4    who is facing prosecution on a single count of conspiring to manufacture distillates of marijuana,

5    be released on conditions, and instead ordered Mr. Rhule confined at FDC SeaTac to await the

6    disposition of his case.   The Magistrate Judge's comments reflected that he accepted the

7    government's argument that Mr. Rhule posed too great a flight risk to release, because of his

8    purported "significant ties" to Russia and his special skill as a pilot, which might allow him to

9    abscond in an aircraft the government knew of, but had not been able to locate. *See* Motion

10   Exhibit ("Mtn. Exh.") M (Dkt. 48) (Detention Hrg. Transcript) at 32–33.   On August 25, Mr.

11   Rhule moved the Court to revisit the Magistrate Judge's detention decision, offering 53 pages

12   of argument supported by 18 separate exhibits including numerous witness declarations and

13   letters of support. *See generally* Dkt. 48 ("Mtn.").

14           In response, the government urges the Court to leave Mr. Rhule indefinitely confined at

15   FDC SeaTac, where the threat from COVID-19 is steadily worsening. *See generally* Dkt. 52

16   ("Opp.").  The government boldly declares that this outcome is required because in seeking his

17   release on conditions Mr. Rhule "offer[s] essentially the same argument presented" at the

18   detention hearing in July, thus failing to overcome the statutory presumption that he should be

19   detained. Opp. at 2.

20           That claim could not be further from the truth.

21           In almost every conceivable way, the case for releasing Mr. Rhule on conditions—

22   which, again, was the recommendation of Pretrial Services at his initial appearance in this

23   District—has grown much stronger since July 24, and each of those bases was set out in detail

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 3

**skellenger**bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

in Mr. Rhule's motion to this Court.  Specifically, the Magistrate Judge did not have *any* of the following information before him when he made the disputed detention decision:

- Evidence from Olga's attorney showing that at the time of the May 7 conversation between Mr. Rhule and his wife Olga, the two of them believed, based on the advice of counsel, that Olga's best chance of obtaining lawful status in the United States would require her first to return voluntarily to Russia, and that they were contemplating that Mr. Rhule would *temporarily* accompany her there in support of that plan, *see* Mtn. at 19–25; Mtn. Exh. R (Declaration of Nicholas Marchi);

- Evidence that Mr. Rhule's family ties are genuine and strong, and that his family is firmly anchored in this District, *see* Mtn. at 14–18; Mtn. Exh. E (Letter from Johanna and Ken Rhule); Mtn. Exh. G (Letter from Keri Street); Mtn. Exh. H (Letter from Greg Weiner); Mtn. Exh. I (Letter from Leah Barger); Mtn. Exh. Q (Letter from Megan Fletcher);

- Evidence from Mr. Rhule's family and friends, vouching for his reliability and promising the Court to support and assist him in complying with conditions of release, *see* Mtn. at 16–18, 45–47; Mtn. Exh. E (Letter from Johanna and Ken Rhule); Mtn. Exh. G (Letter from Keri Street); Mtn. Exh. I (Letter from Leah Barger);

- Evidence from two different family members of Mr. Rhule, offering to serve as third-party custodians to help ensure his appearance and compliance, *see* Mtn. at 41–44; Mtn. Exh. E (Letter from Johanna and Ken Rhule); Mtn. Exh. G (Letter from Keri Street);

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 4

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

- Evidence that Mr. Rhule has a long history of creating and operating successful legitimate businesses that employed many people and made a positive contribution to the community, *see* Mtn. at 18–19; Mtn. Exh. E (Letter from Johanna and Ken Rhule); Mtn. Exh. I (Letter from Leah Barger);

- Evidence that Mr. Rhule's claimed "ties to Russia," a distant and unfamiliar place where he does not speak the language and has never set foot, are exaggerated if not non-existent, *see* Mtn. at 26–28;

- Evidence that the elusive "second aircraft" in which the government fervently warned that Mr. Rhule might flee to Russia has been located and is inoperable (in fact, as we show herein, it has a bucket of cement where its engine should be); *see* Mtn. at 28–30;

- Evidence that Mr. Rhule's loved ones are willing, via surety bonds, to risk the residences of two different family members on his promise to appear as required and comply with all conditions imposed by the Court, *see* Mtn. at 41–44; Mtn. Exh. E (Letter from Johanna and Ken Rhule); Mtn. Exh. G (Letter from Keri Street);

- Evidence that Mr. Rhule, his wife, and their son/step-son who is charged in this case are all willing to forfeit automatically all interest in the property the government has targeted for forfeiture in the Indictment if Mr. Rhule fails to appear or otherwise violates his conditions of release, *see* Mtn. at 45–46;

- Evidence that Mr. Rhule is willing to comply with home detention with GPS monitoring, *see* Mtn. at 41–44; and

- Evidence that Mr. Rhule is willing to comply with a complete ban on using or accessing the internet while he is released on conditions, *see* Mtn. at 44.

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 5

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

The extensive *and indisputably new* information contained in Mr. Rhule's motion for release on conditions, which the government's opposition barely mentions, rebuts any claim that Mr. Rhule is rehashing "the same argument" he made on July 24.  The government of course is free to insist that Mr. Rhule should remain jailed notwithstanding this mountain of new evidence.  But the contention that Mr. Rhule has presented nothing new for this Court to consider is flatly false, which should give the Court pause about crediting the rest of the government's arguments.  As we will show, the government's case for continued detention rests on studiously ignoring the new evidence summarized above, while exaggerating the implications of the evidence of the underlying offense it has collected against Mr. Rhule (who is, of course, presumed innocent of the single charge against him), and speculating about matters for which it has no proof.

## II.    ARGUMENT

> **A.    Whatever the eventual outcome of Olga Rhule's immigration situation, it gives Mr. Rhule no "compelling motive to flee," Opp. at 4, because he and Olga believed (then and now) that she might be able to obtain legal status in the United States.**

The government expends considerable energy arguing that Mr. Rhule's wife Olga is barred from ever obtaining legal immigration status in the United States.  *See* Opp. at 1 (Olga "has no lawful path" to return legally to this country), 12 (Mr. Rule "faces certain separation" from Olga), 15–17 ("Olga Rhule will not be permitted to return to the United States").  Thus, the government contends, any conversation between Mr. Rhule and Olga about traveling to Russia—like their recorded telephone conversation on May 7—is necessarily a conversation about *fleeing to* Russia to avoid prosecution, never to return.  *See* Opp. at 12–15.

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 6

skellenger bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1   First, whether Olga Rhule will ever be permitted to return to the United States is

2   undetermined.  According to her experienced immigration lawyer, the best path forward for her

3   to obtain legal status is to voluntarily return to Russia and apply for a consular waiver of her

4   conceded excludability.  *See* Exh. S (Second Declaration of Nicholas Marchi); Mtn. Exh. R

5   (Declaration of Nicholas Marchi).  That is what her experienced immigration lawyer advised

6   her, and why he advised her to request a voluntary departure. *Id.* Indeed, at the August 6, 2020

7   immigration hearing, the experienced Immigration Judge—who was well aware of Olga Rhule's

8   immigration status and the potential pitfalls of her past criminal history—advised her that by

9   taking a voluntary departure **she was preserving for herself a lawful path to eventually return**

10  **to the United States.**  *See* Exh. S; T (Second Declaration of Nicholas Marchi; Second letter of

11  Olga Rhule).

12  Yet, much as the government passionately (and mistakenly) insisted at the detention

13  hearing that Mr. Rhule had access to a "second airplane" to fly to Russia—an airplane that

14  turned out have no propeller and a bucket of cement where its engine should be, see below—

15  the government's lawyer has conducted her own analysis of complex and nuanced immigration

16  law and now boldly declares to this Court without qualification that "Olga Rhule will not be

17  permitted to return to the United States."  Opp. at 15.

18  The government's attempted analysis of several immigration statutes in Title 8 and the

19  *Pazcoguin* case entirely misses the point. *Pazcoguin* only addresses whether the immigration

20  judge had correctly determined that Mr. Pazcoguin was excludable or inadmissible, and

21  therefore properly deported.  The point is not that Olga is excludable or inadmissible; she

22  conceded as much in the proceedings below.  The different question is whether, despite her

23

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 7

excludability or inadmissibility, she is eligible to apply for a *waiver of that excludability or inadmissibility* through the consular process after she voluntarily departs to Russia.

But this Court need not undertake its own examination of that thorny question of immigration law.  The undisputed *evidence* before the Court is that in the view of an experienced immigration judge and an experienced immigration lawyer, Olga Rhule *does* have a legal path to eventually be readmitted to the United States through a consular waiver following her voluntary departure, and that she was so advised by her lawyer and by the judge.  *See* Exh. S; T (Second Declaration of Nicholas Marchi; Second letter of Olga Rhule).  Moreover, it is similarly uncontested that her opportunity for such a waiver and lawful admission will be forever dashed if Ken Rhule fails to appear in this case.  *See* Mtn. Exh. R (Declaration of Nicholas Marchi); Mtn. Exh. L (Letter from Olga Rhule).

Just as important, even if one were to credit the government's ambitious analysis and prediction about immigration law—that once Olga Rhule departs, she will never be allowed to re-enter the United States—its argument completely misses the point.  Namely, the point is not so much whether Olga *in fact* has a path to legalized status in this country, but whether, when she and Mr. Rhule spoke on May 7, they *believed* that she might.  *See* Mtn. at 20–25.  That is, the point is their state of mind, because that is what provides the essential context for understanding their recorded conversation.  If one assumes that on May 7, Mr. Rhule and Olga genuinely believed—*as they had been advised by Olga's immigration counsel*—that by returning to Russia, Olga might pursue a route to legally adjust her status in the U.S., then their conversation reads entirely differently.  Moreover, this advice was not only something Olga had been told by her counsel, but was something she was thereafter told *by the immigration judge himself*, reinforcing the message and adding immeasurably to its weight. *See* Exh. S, T (Second

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 8

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

Declaration of Nicholas Marchi; Second letter from Olga Rhule).  In that light, their exchange is fully consistent with a plan for Olga to return voluntarily return to Russia and remain there temporarily, with Mr. Rhule at her side offering support, while she seeks permission to legally reenter the United States.

In short, the government's insistence that Olga Rhule in fact has no hope of obtaining legal status in the United States is a red herring.  Its significance in the circumstances of this case depends on a false premise—that Mr. Rhule and Olga *knew* she had no such hope, and thus that when they spoke of possibly traveling to Russia, they were necessarily talking about going on the lam.  Mr. Rhule has rebutted that inference with evidence from Olga's immigration counsel, who confirms that he had advised her to seek an order of voluntary departure to Russia precisely to preserve her best chance of obtaining legal status in the U.S. at some future date. Mtn. at 22–25.  It is further rebutted by the fact that the immigration judge—fully versed in Mrs. Rhule's history and, presumably, in the nuances and complexities of immigration law— also believed that voluntary departure provided a path for potential legal status in the United States, and told Olga so at her hearing. *See* Exh. S; T (Second Declaration of Nicholas Marchi; Second letter of Olga Rhule).

Two final comments on this point are appropriate.  First, the government has no response to Mr. Rhule's point that when he and Olga spoke on May 7, he was aware that their phone conversation was being recorded.  *See* Mtn. at 24.  Especially if, as the government contends, Mr. Rhule knew on May 7 that he was facing a "dire" situation, *see* Opp. at 15, with government agents closing in and his own "inevitable" arrest likely "imminent," *id*. at 12, why on earth would he openly disclose in that conversation that he was arranging to travel to Russia?  Few things would seem better calculated to set into motion the federal criminal justice apparatus that

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 9

skellengerbender

1301 - First Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

finally got around to arresting him almost two months later.  Second, as with much of the government's Opposition, this argument proves too much.  It cannot be the law that every person charged with a federal crime whose spouse has been deported, or is about to be deported, is *ipso facto* an unacceptable flight risk who must be held at the federal detention center, regardless of the circumstances, which circumstances now include an increasingly significant health risk due to the COVID-19 pandemic.  Certainly, the federal judges in this District have previously followed no such rule.

> **B.  The government has not demonstrated that Mr. Rhule presently has the "means to flee prosecution," Opp. at 18, and in any event the proposed conditions of release available to the Court will reasonably assure his appearance by placing any such "means" beyond his ability to use.**

The government offers a great deal of detail about Mr. Rhule's familiarity with computers and online arcana—special browsers, cryptocurrency, the darkweb— and alleges that he has used "alternative names, addresses, and telephone numbers" to "hide from law enforcement." Opp. at 18.  According to the government, this array of risks is too grave for any conditions of release to minimize. This assertion ignores both the evidentiary record, the current posture of the case, and the modern tools employed by federal pretrial services and routinely imposed by the judges in this District.

First, whatever computer skills Mr. Rhule may possess are immaterial.  As noted, this Court can eliminate Mr. Rhule's online access *altogether* if it thinks that step is warranted.  *See* Mtn. at 44 (proposing that the Court, *e.g.*, prohibit Mr. Rhule from having access to "any device that can access the internet with the exception of a telephone to be used for maintaining contact with third-party custodians, family members, the Pretrial Services Officer, approved

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 10

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

employment contacts, and counsel of record").[1]  Keeping Mr. Rhule offline would neutralize the risk from any purported special computer skills.  *The government completely fails to address the impact of this proposed condition.*

The government's expressed concerns about Mr. Rhule's use of "shell corporations" to "hide" his "assets, vehicles, and residence," Opp. at 22–25, are overblown.  As Mr. Rhule has pointed out, Mtn. at 31, there is nothing inherently suspicious about placing the legal ownership of valuable assets in the hands of a corporate entity.  The parties here disagree about exactly how easy it may be to connect Mr. Rhule and his family members to those companies, compare Mtn. at 31 (information is publicly available) with Opp. at 22–24 (only limited information is available via the State of Delaware's internet site).  What is crystal clear, however, is that *the government investigators are able to discover this information*, as it has been provided to undersigned counsel in the discovery.  The government's demonstrated ability to access this information allays any supposed concerns about Mr. Rhule forming secret companies while on pretrial services supervision.  Ultimately, this dispute has no importance for the pretrial release decision.  Placing assets with a corporate entity requires having assets (a car, a van, an aircraft) in the first place.  As we explain below, that kind of activity by Mr. Rhule is unlikely because he no longer has ready access to those kinds of financial resources and the multiple overlapping systems of detection and surveillance we are proposing minimize whatever the perceived risk might be.

---

[1] Indeed, Mr. Rhule has no objection to the Court's tightening this condition yet further by allowing him to possess only a telephone that cannot access the internet at all—a landline, or a mobile phone that is not a smartphone.

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 11

1    The government complains that Mr. Rhule has "vast cryptocurrency reserves," Opp. at

2    26, and that "[a]rmed with [these] substantial cryptocurrency reserves" he can "flee the

3    jurisdiction and live comfortably" while the government's case "grow[s] stale." *Id*. at 28.[2]  But

4    the government already knows about the existence of these supposedly "vast" reserves of

5    cryptocurrency—not only that, it possesses "fastidiously detailed" records documenting their

6    location and contents.  Opp. at 25.  Thus, the government has the information necessary to

7    prevent Mr. Rhule from putting any of those known "reserves" to any such use.  Since the

8    government has enjoyed at least months of unfettered access to all of Mr. Rhule's electronic

9    devices and data, it is unlikely that any "unknown" reserves exist.  And in the very unlikely

10   event that they do, the proposed conditions of release not only restrict Mr. Rhule from using the

11   internet, *see supra*, but separately forbid him from engaging in any transaction involving

12   cryptocurrency without the express consent of Pretrial Services.  *See* Mtn. at 43 ("The defendant

13   cannot directly or indirectly transfer any virtual currency, also known as cryptocurrency, …

14   unless permitted by Pretrial Services").

15       This is precisely the same cryptocurrency argument the government forcefully made in

16   the case of the co-defendant Kenneth Warren Rhule—Mr. Rhule's son—in attempting to impose

17   additional financial conditions of release.  And this is precisely the same argument soundly

18   rejected by Magistrate Judge Peterson, who concluded that the additional condition was

19   "unnecessary to assure [Kenneth Warren Rhule's] appearance," because barring him from

20   traveling outside the District, requiring him to maintain his residence, requiring disclosure of

21

22       [2] As laid out before the Court, *see* Opp. at 5–10, the government's evidence appears to consist
     of electronic records and documentary proof, plus a great deal of physical evidence—none of which is
23   at any reasonable risk of growing "stale."

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 12

his monthly cash flow, and surrendering his passport, in combination with his longstanding ties to this District (where he was born and raised) were sufficient to assure his appearance. *See* Mtn. Exh. D (Order Granting Kenneth Warren Rhule's Motion to Modify) at 4.

Its encyclopedic knowledge of the financial resources that formerly belonged to Mr. Rhule, and its ability to block his access to them, makes especially surprising the government's blithe assertion that if released from custody, Mr. Rhule can simply head for the hills, leaving his family members behind to lose their homes, and then just deploy his supposedly "vast" wealth to "reimburse [them] for any losses incurred by his failure to appear." Opp. at 28. First, the financial commitments that Mr. Rhule's parents and his sister's family have made to support his bid for release are, to them, substantial. These are people of ordinary means, not millionaires. Contrary to the government's apparent assumption, they are not idly gambling their residences in the expectation that if things go badly, Mr. Rhule can always reimburse them with some cryptocurrency from a hideout in some faraway land.

These family members are risking the homes in which they make their lives—in Keri Street's case, with her husband and children. The undisputed evidence now before the Court shows that Mr. Rhule's extended family is tightly knit. *See* Mtn. at 16–18. To Mr. Rhule, his loved ones' homes are more than digits in some electronic ledger. He appreciates that the members of his family, despite their dismay at the accusations against him, have publicly staked their most valuable possessions on their belief that he can be trusted when he promises to abide by any conditions of release the Court imposes. The government has given the Court no reason to believe that Mr. Rhule would respond with casual cruelty to their remarkable gesture of love and support. And that is because no such reason exists.

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 13

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

**C.      Mr. Rhule is not a private pilot with access to airplanes; he is a student pilot with access to one inoperable plane with no propeller and a bucket of cement where its engine should be.**

We turn next to the latest iteration of the government's contention that Mr. Rhule is a flight risk because he is a private pilot with what the government now calls "access to airplanes." Opp. at 31–32.  The government, of course, must feel chagrin after warning ominously during the detention hearing that Mr. Rhule should be jailed because he was a pilot and it could not "locate the second plane" in which it feared he would make his escape to Russia, *see* Mtn. Exh. M (Detention Hrg. Transcript) at 14, only to have that elusive aircraft turn up in Chelan with no propeller and its engine cowl concealing a bucket of cement rather than an engine.[3]

 

Photos taken August 28, 2020, by Mr. Richard J. Conte, retired FBI Special Agent most recently assigned to the Joint Terrorism Task Force in Seattle.

The government understandably wants to change the subject from the shadowy second airplane.  And to be sure, the Court should turn the page.  But the government's energetic insistence on pressing the "second plane" argument at the detention hearing, where relaxed

---

[3] According to the airplane mechanic, the actual engine—its various and sundry parts now disassembled and divided among cardboard boxes and garbage bags—is not repairable.

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 14

skellenger bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

"rules of evidence apply,[4] suggests that in its determination to keep Mr. Rhule behind bars, the government risks losing sight of its usually very rigorous commitment to stick to the facts.[5]

In any event, the government's newest take on the purported threat posed by Mr. Rhule's status as a student pilot is that he has "access to airplanes," by which the government apparently means, "he can pay someone money to use *their* plane." *See* Opp. at 32 (speculating that Mr. Rhule could "rent an aircraft" or try "chartering planes"). The problem with this sweeping argument is that it erases any distinction between Mr. Rhule and anyone else, rendering his status as "a pilot" meaningless in terms of increased risk of non-appearance. Anyone who can "rent an aircraft" can just pay someone to fly them (which is why the government falls back weakly on "chartering planes" as the real risk).

Or they can buy a ticket on an airplane—just as Mr. Rhule did a few days after his May 7 phone conversation with Olga, when he traveled as a passenger on a commercial flight to Florida with his son Connor. *See* Exh. U (American Airlines Receipt). The two of them then flew back, again by commercial carrier. This evidence undercuts the government's claim that at every

---

[4] *See* John L. Weinberg and Evelyn J. Furse, Federal Bail & Detention Handbook 2019, [6:8] ("Evidence" and Procedure at Detention Hearing), PLI Press (New York 2019).

[5] Some similar concerns attend other factual assertions by the government. For example, the government repeatedly asserts that Mr. Rhule applied for an expedited passport (Opp. at 2, 12, 14), "prepared" to get a Russian visa (Opp. at 12, 17), and made other plans to travel to Russia (Opp. at 12, 14). It follows those assertions with a broad suggestion that it has "confirmed" this information. Opp. at 14 ("The United States has confirmed that the Defendant did, in fact, apply for an expedited passport, intent on leaving for Russia.") We have checked and rechecked the facts (including consulting the government's counsel), and here is what we believe to be correct: (1) sometime after speaking to his wife Olga on May 7, Mr. Rhule applied to renew his expired passport (*it was the defense* that actually confirmed this fact by submitting a copy of the State Department's written refusal to issue Mr. Rhule a passport as an exhibit to our motion to revise and revoke the detention order, *see* Dkt. 48 at Exh. O); (2) we have discovered no evidence that Mr. Rhule attempted to expedite the processing of his passport renewal request, and have asked the government to disclose to us any evidence to the contrary; (3) Mr. Rhule has never applied for a visa to travel to Russia; (4) we are aware of no evidence that would support the government's bare speculation that Mr. Rhule "began preparing to live in Russia for an extended period of time" or took any other actions "intent on leaving for Russia." Opp. at 12, 14.

---

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 15

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

moment after encountering agents at the Snohomish Airport on May 4, Mr. Rhule was on red alert against his "inevitable" arrest. Opp. at 2.  Indeed, the opposite is more likely true—after those agents allowed him to go about his business, and did not arrest him, Mr. Rhule more likely believed his son's case *wasn't* going to ensnare him.  And even if he thought he was a target of the investigation and was going to be charged, he likely thought he would be treated fairly and released on conditions—like his son—pending the resolution of his case.

Certainly, if Mr. Rhule thought he was about to be arrested and charged with a crime, *and was of the mind to flee the criminal justice system*, would he really have flown to Florida, then back again, then flown again by commercial carrier to Honolulu?  If, as the government claims, Mr. Rhule must have believed at the time that his arrest was looming, *and had already decided to flee rather than face any charges, see* Opp. at 1–2, why did he not flee then?  What could possibly have put him *more* on the radar of the federal government than flying commercially across the entire breadth of the United States?

In the end, the government's contention that Mr. Rhule's status as a student pilot makes him likelier to flee because it gives him some amorphous "access to airplanes"—like so many of the arguments in the Opposition, as noted previously—simply proves too much.  There is literally no way of ensuring with absolute certainty that any arrestee released on conditions in this District, pilot or no, will not try to rent a plane or hire a pilot to fly to Canada.  Or for that matter, that such a person will not simply try to cut off his GPS bracelet, head for the border on foot, and attempt to walk into Canada.  But the multiple overlapping systems of surveillance and detection available to the government make such risks vanishingly small.  If Mr. Rhule heads for an airport, the GPS will give his location away.  And cutting off the GPS bracelet will

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 16

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

trigger an alarm that will bring law enforcement swarming.[6]  If Mr. Rhule somehow made it into Canada, he would be arrested, subject to extradition, and heading back to Seattle to face additional charges, increasing any potential prison term, and in the bargain will also have forfeited his parents' home, his sister's home, and his own.

The chances that Mr. Rhule will attempt to abscond in the face of home detention as well as comprehensive real-time monitoring of his behavior and whereabouts are very remote, but not quite zero.  So there remains a tiny risk that one of these highly unlikely scenarios will come to pass.  But if that were enough to rule out release, every arrestee in this District would remain locked up until trial.  In the mine run of cases, the system—eliciting the releasee's promise to abide by reasonable conditions, adding additional leverage where appropriate (*e.g.*, a surety bond secured by real property), and then overseeing the releasee's compliance—works.  If it did not work, then all the mechanisms of Pretrial Services supervision would be for naught.  Nothing the government has offered in its Opposition credibly suggests that it will not work here.

---

[6] While the government blithely dismisses the detection, surveillance, and reporting conditions proposed here, Opp. at 17 ("The United States land border is extensive, human smugglers are prevalent, and fraudulent passports can be readily purchased."), it fails to acknowledge that the proposed conditions are the standard and well-established tools of every federal pretrial services office in the United States that reliably serve to minimize unwarranted pretrial detention.  *See* https://www.uscourts.gov/services-forms/probation-and-pretrial-services/probation-and-pretrial-services-supervision,  last accessed on September 4, 2020.  Resort to these time-tested methods is now even more critically important when a worldwide pandemic threatens the safety of pretrial detainees (and lawyers and court staff), a potentially lethal hazard that will remain until the pandemic is mitigated and abated.  If the government's argument that surrendering passports and restricting travel is meaningless, then courts in this District and elsewhere would not routinely take those steps.  They do so, and in virtually every case, because experience has shown that it works.

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 17

skellenterbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1

2

3   **D.      The government's claims that Mr. Rhule poses an intolerably great risk to
           the community are strained and exaggerated.**

4           The government grasps at straws in contending that Mr. Rhule poses a risk of danger to

5   community so great that no conditions of release can reasonably diminish it.  To begin, the

6   government claims "an arsenal" of guns was recovered in March from the property in rural

7   Snohomish County where Mr. Rhule resided before his arrest, and a couple of them appear to

8   have been previously reported as stolen.  *See* Opp. at 32–33. We note first that although the

9   government does not indicate the precise number of firearms seized, by the government's

10  description the total appears to have been fewer than 10.  *Id.*  More important, whatever danger

11  those firearms might conceivably have posed *before* Mr. Rhule's arrest, they have now been

12  seized by the government and secured, so they pose no threat to anyone.

13          Along the same lines, Mr. Rhule's mother has advised undersigned counsel that agents

14  actually left a couple of guns back on March 10 when they conducted their warranted search of

15  the Monroe premises, and that the residents thereafter duly reported those weapons to the

16  authorities, after which they were likewise removed from the premises in order to maintain

17  Kenneth Warren Rhule's compliance with his conditions of pretrial release.  Far from showing

18  that Mr. Rhule is too dangerous to release to the community, this sequence of events actually

19  provides a perfect illustration of how the pretrial services condition restricting firearms

20  possession is supposed to, and of course does, work.  Such a condition was imposed on Mr.

21  Rhule's son Kenneth Warren Rhule when he was ordered released by Magistrate Judge

22  Peterson, and indeed is routinely imposed on all pretrial releasees in this District.  Under the

23  standard condition, the danger from the weapons is eliminated by having them removed from

    the premises and safely stored elsewhere for the duration of the pretrial release period.

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 18

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

The government's other argument—that the chemicals used in processing marijuana can be dangerous, and sometimes cause injuries, *see* Opp. at 33–34—fares no better.  Certainly, some of those products are volatile and can cause fires or explosions if mishandled.  But any marijuana processing on the property in Monroe has now come to an end.  It will not resume even if the Court releases Mr. Rhule on conditions.  And if dangerous chemicals were present when the property was searched on March 10, the Court can be confident that they have since been removed by the government and secured or properly disposed of.  In other words, whatever risk to the community might have arisen previously from the presence of such dangerous chemicals on the Monroe property no longer exists.  We are skeptical that such a concern has any substance in this case, but if the Court disagrees, an appropriate response might be to impose a condition of release directing Mr. Rhule, for the duration of his pretrial release, to avoid the instrumentalities of marijuana production and to stay out of the building that previously housed the marijuana production equipment.  Such a condition would reasonably assure that the "explosive nature of marijuana extraction," Opp. at 34, poses no risk to community safety on Mr. Rhule's account.

Finally, the government gestures weakly at what it calls Mr. Rhule's "history of non-compliance" as proving him to be impossible to control via conditions.  Opp. at 31.[7]  To be sure, the conduct the government describes—drunkenly failing to comply with a police officer's lawful directions, and thereafter recklessly trying to evade the police, during a traffic stop when

---

[7] The government groups this incident under its arguments for Mr. Rhule's being a flight risk, *see id.*, but the tenor of its claim—that Mr. Rhule is generally "unwilling[] to comply with the law and follow the directives of law enforcement," giving "no reason to believe that he will now become compliant and abide by conditions of release," Opp. at 31, seems to apply equally to its insistence that if released, Mr. Rhule will endanger public safety.

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 19

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

he was in his early 30s—is nothing to be proud of, and Mr. Rhule wishes he could live that night

over again and behave differently.  But as evidence of dangerousness so uncontrollable that only

incarceration at FDC SeaTac during a worldwide heath crisis can restrain it, the incident is

unpersuasive.

**E.      The government exaggerates the stakes in this case by emphasizing the ten-year mandatory minimum sentence Mr. Rhule technically faces; in any event, Mr. Rhule is presumed innocent and the purported strength of the evidence against him on the single count in which he is charged does not weigh heavily in favor of continued detention.**

Throughout its pleading and in argument to the Magistrate Judge, the government has

attempted to inflate the perceived seriousness of this case by repeatedly emphasizing that it has

charged Mr. Rhule with a crime carrying a ten-year mandatory minimum sentence.  Indeed, that

specter forms the backdrop of the government's stern rhetoric about the purported "flight risk"

presented by Mr. Rhule.  *See* Opp. at 1 (in the opening sentence of its response, as the very first

fact it highlights for the Court, the government solemnly intones that Mr. Rhule "has been

charged with an offense carrying a mandatory minimum sentence of ten years' imprisonment").

The government later describes *United States v. Xiamin Huang*, CR18-124 JCC (October 16,

2018) as "comparable" to Mr. Rhule's case because the unfortunate Ms. Huang also faced a

"ten-year mandatory minimum" sentence.  *See* Opp. at 35–36.  Despite laying out the facts of

*Huang* in some detail, *see* Opp. at 35–36, the government never mentions that when Ms.

Huang's case was ultimately resolved before this Court, she actually received a sentence of *just

24 months' confinement* on her guilty plea.  *See* Exh. V (*Huang* Judgment).  That is because this

Court ultimately agreed that two years in prison, rather than ten, was appropriate punishment in

a case involving marijuana rather than (*e.g.*) methamphetamine, heroin, or fentanyl.  Given the

government's emphasis here on the importance of the "ten-year mandatory minimum" in casting

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

Mr. Rhule as a flight risk, its failure to acknowledge the *real* stakes in *Huang* seems materially significant, given that government counsel is the same in both matters.

Other important facts distinguish the detention decision in *Huang* from the one facing the Court here: (1) Ms. Huang was born and raised in China and lived there until the age of 21, and thus *did*—in contrast to Mr. Rhule—have significant connections to a foreign country, including a hometown, real family connections, familiarity with the culture, and the ability to speak the language; (2) at the time of her detention, Ms. Huang had been living in Seattle for barely 10 years (since 2008) and had been a U.S. citizen for only 4 years, contrasted with Mr. Rhule, a native-born U.S. citizen who has lived in the greater Seattle area since he was 11 years old (the government's suggestion that Ms. Huang "had lived in Washington for 17 years" is puzzling, and apparently incorrect, given the facts set forth in the pleadings in that case); (3) Ms. Huang was also a dual citizen of Canada, and former citizen of China, making any potential extradition request legally quite complicated, while Mr. Rhule is a lifelong citizen of only the United States; (4) after being admitted to the United States in 2010, Ms. Huang continued to travel extensively to China, the country of her birth, and Canada, her other country of citizenship, while in contrast there is no evidence of comparable travel for Mr. Rhule—and *never any travel to Russia*; and (5) while detained at FDC SeaTac, Ms. Huang was not going to be subjected to the risk of a pervasive and deadly viral infection that has resulted in a worldwide pandemic.

The government spends most of its response detailing the evidence of the underlying charged crime it says it has collected against Mr. Rhule.  *See* Opp. at 5–11.  As the Court knows well, Mr. Rhule is presumed innocent of any crime.  *Taylor v. Kentucky*, 436 U.S. 478 (1978). More to the point, the law has long been settled that in making a release determination, the

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 21

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

weight of the evidence against the accused respecting the charged offense is the least important factor in the analysis. *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985) (citing *United States v. Honeyman*, 470 F.2d 473, 474 (9th Cir. 1972).

The government's presentation (complete with color photographs) certainly appears to show that marijuana was being illicitly processed and distributed at the property in Monroe. And it has undertaken months—maybe years—of electronic communications surveillance of Mr. Rhule and his son, as well as executing a search warrant that netted the equivalent of hundreds of thousands of pages of data.  Given all that, it is noteworthy that beyond the suggestion that he allowed his son to use the outbuilding where marijuana "trim" may have been processed, a couple of emails from 2014–16 (*i.e.*, four to six years ago) are still the best evidence the government can produce to show Mr. Rhule's personal involvement in manufacturing marijuana.

The government, of course, would respond that the weight of the evidence is relevant here because of the potential ten-year mandatory minimum sentence that would follow conviction on the charged offense.  But the only real relevance of that mandatory minimum at this juncture (*see* discussion of *Huang*, *supra*) is that it triggers a presumption of detention.  *See* 18 U.S.C. §3142(e). And for present purposes, the most important thing about that presumption is that Congress specifically made it *rebuttable.  See id.*  That qualification is likely required by the Constitution's due process clause, given the traditional assumption in the Anglo-American legal tradition that pretrial detention must be a "carefully limited exception" to the fundamental right of personal liberty. *United States v. Salerno*, 481 U.S. 739, 755 (1987).  And for the same reason, courts have uniformly stressed that the burden an accused person bears in rebutting that presumption is slight.  *See* Mtn. at 12–13 (citing cases).  Thus, even if the Court credits the

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 22

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

government's allegations against Mr. Rhule, it should find that the extensive new evidence he has proffered has rebutted any such presumption.

> **F.      The Court should look skeptically at the government's casual assurances that it has the COVID-19 situation under control at FDC SeaTac, and that Mr. Rhule thus faces no genuine threat to his health even though he may remain confined there for months.**

According to the BOP's official website reporting COVID-19 statistics, the current tally at FDC SeaTac stands at 41 (35 detainees, 6 staff members). The government waves off the significance of those numbers, attempting to explain away half as attributable to "new arrests," Opp. at 37, claiming that the risk to prisoners like Mr. Rhule "remains manageable." *Id*. The government then confidently predicts the epidemiological odds for Mr. Rhule, calculating a 2.5% infection rate inside FDC SeaTac, and even appears to suggest to this Court that being incarcerated there is much safer than living at large in the community. Opp. at 37 ("[T]his represents a 2.5% infection rate, which is lower than King County.")[8]

---

[8]Remarkably, the government nowhere even acknowledges that its confident assertion to Judge Tsuchida at the detention hearing—that "SeaTac['s] COVID procedures are working"—was wildly off-base:

> There is one staff member who has tested presumptively positive for COVID. There's been no inmates that they've identified as linked to that staff member who have received COVID from him. There is one inmate who has tested positive for COVID. That inmate was recently arrested, has been in solitary the entire time, has not been exposed to other inmates. And so there is not an outbreak currently at the FDC SeaTac. It seems, in contrast, that SeaTac COVID procedures are working.

Mtn. Exh. M (Detention Hrg. Transcript) at 28–29.

This argument recalls an equally mistaken prediction about the nation at large from mid-February. *See* https://www.cbsnews.com/news/timeline-president-donald-trump-changing-statements-on-coronavirus/, (last accessed on September 4, 2020) (forecasting that "within a couple of days" COVID-19 infections in the U.S. would "be down close to zero," and assuring Americans that "everything is well under control").

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 23

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

The question is not just whether the risk of illness or death from COVID-19 is theoretically "manageable," but whether the Court has confidence in the BOP's ability to manage it. As of today, the FDC has 35 inmate infections and 6 staff infections, with one staff member recovering from very serious illness that included hospitalization. Mr. Rhule previously pointed the Court to MCC San Diego as an institution presenting an outbreak similar in scale to the one that appears to be underway at FDC SeaTac. On August 23, MCC San Diego had 49 cases. Today, MCC San Diego stands at **128** cases (122 inmates, 6 staff). While of course there is no guarantee that the number of cases at FDC SeaTac will skyrocket as high, there is also little reason for optimism that the SeaTac outbreak will be suppressed quickly, particularly when (according to Chief Judge Martinez) everyone "tried like hell to keep [COVID-19] out" and failed, leaving the facility in "a serious situation."[9]

The government dismisses the significance of Mr. Rhule's medical condition (asthma, presently treated with an inhaler and over-the-counter medication), observing that he is "comparatively young" at age 45. Opp. at 37. The problem is that COVID-19 can fell even "comparatively young" individuals, like the 49-year-old inmate at FCI Oakdale (Louisiana) who died of COVID-19 in March while serving a sentence for distribution of cocaine.[10] And the

---

[9] *See* Jim Brunner, "COVID infections hit 31 inmates and 6 staff at federal detention center in SeaTac," The Seattle Times (Aug. 28, 2020) (available at https://www.seattletimes.com/seattle-news/health/covid-infections-hit-31-inmates-and-6-staff-at-federal-detention-center-in-seatac/) (last visited Sept. 3, 2020).

[10] See "Inmate dies of Covid-19 at federal prison in Oakdale," KPLC-TV news (available at https://www.kplctv.com/2020/03/30/st-federal-inmate-dies-covid-fci-oakdale-i/) (last visited Sept. 3, 2020).

skellenger bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

death rate inside prisons has been estimated as *three times higher* than in the general population.[11]

In short, the issue is not whether, standing alone, the genuine and frankly indisputable threat to Mr. Rhule's long-term health posed by the COVID-19 outbreak at FDC SeaTac would warrant releasing him from confinement that was otherwise legally and factually warranted. Instead, the question is whether, if the Court deems the case for releasing Mr. Rhule on conditions to be a close one, the presently uncontrolled spread of the pandemic inside FDC SeaTac should tip the balance in favor of release. We respectfully suggest to the Court that the answer is yes.

## III.    CONCLUSION

The government has no answer to the extensive and substantial evidence supporting release that Mr. Rhule has presented to this Court—virtually *none* of which was before the Magistrate Judge on July 24 when he decided in favor of detention. Understandably, then, the government clings to the statutory presumption that because Mr. Rhule technically faces a 10-year mandatory minimum sentence, he must remain in jail. *See* Opp. at 2–3 (referencing the statutory presumption six times); *but see supra* (explaining that Ms. Huang, over whom a similar "mandatory minimum" loomed, ended up with a sentence of just 24 months). But that threadbare presumption is rebuttable, and the new evidence now before the Court richly rebuts it.

---

[11] *See* Johns Hopkins School of Public Health, "COVID-19 Cases and Deaths in Federal and State Prisons Significantly Higher Than in U.S. Population" (July 8, 2020) (available at https://www.jhsph.edu/news/news-releases/2020/covid-19-cases-and-deaths-in-federal-and-state-prisons-significantly-higher-than-in-u.s.-population.html) (last visited Sept. 3, 2020).

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 25

skellenderbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

First and foremost, Mr. Rhule has thoroughly disrupted the theory that explains Magistrate Judge Tsuchida's decision to incarcerate him: that when Mr. Rhule was taken into custody, he was about to abscond to Russia with his Russian-born wife Olga. The statements Mr. Rhule has provided from Olga and her expert immigration attorney paint a completely different, and entirely innocent, picture of the couple's intentions. Far from embarking on a life on the run from the law as outlaws in Russia, Mr. Rhule and Olga were taking steps that they hoped—and reasonably believed—would result in her obtaining legal status in the United States. For Olga, those steps necessarily lead through Russia, and in May it appeared that Mr. Rhule might choose temporarily to join her there, to offer support. But the full evidentiary record now reveals the government's speculative theory for detention—that Mr. Rhule may have been only hours from fleeing to Russia in the missing second plane, placing himself forever beyond the reach of prosecution—as half-baked.

In addition, Mr. Rhule has presented powerful evidence of his longstanding ties to this community and identified numerous and varied evidence-based approaches for minimizing any risk of flight or danger to the community that might conceivably be present in this case:

- This Court has evidence, as the Magistrate Judge did not on the first day of Mr. Rhule's arrival in this District, establishing Mr. Rhule's strong ties to his family and his family's deep roots in this District, *see* Mtn. at 14–18; Mtn. Exh. E (Letter from Johanna and Ken Rhule); Mtn. Exh. G (Letter from Keri Street); Mtn. Exh. H (Letter from Greg Weiner); Mtn. Exh. I (Letter from Leah Barger); Mtn. Exh. Q (Letter from Megan Fletcher);

- This Court has the assurances, as the Magistrate Judge did not, of respectable people in our community—Mr. Rhule's family and friends—that they will work to help him

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

comply with any conditions of release the Court imposes, even to the point of alerting the Court if he should fail to comply, *see* Mtn. at 16–18, 45–47; Mtn. Exh. E (Letter from Johanna and Ken Rhule); Mtn. Exh. G (Letter from Keri Street); Mtn. Exh. I (Letter from Leah Barger);

- This Court has the offers from two different family members, which the Magistrate Judge did not, to serve as third-party custodians for Mr. Rhule, to help ensure his appearance and compliance, *see* Mtn. at 41–44; Mtn. Exh. E (Letter from Johanna and Ken Rhule); Mtn. Exh. G (Letter from Keri Street);

- This Court knows in detail, as the Magistrate Judge did not, about Mr. Rhule's long and successful history as a legitimate businessman, and the individuals and communities that benefited from his entrepreneurial spirit, *see* Mtn. at 18–19; Mtn. Exh. E (Letter from Johanna and Ken Rhule); Mtn. Exh. I (Letter from Leah Barger);

- This Court is aware, as the Magistrate Judge was not, that any claim that Mr. Rhule has "significant ties to Russia" is substantially overstated, *see* Mtn. at 18–19; Mtn. Exh. E (Letter from Johanna and Ken Rhule); Mtn. Exh. I (Letter from Leah Barger);

- This Court knows, as the Magistrate Judge did not, that Mr. Rhule's "second aircraft," which the government could not locate and which the Magistrate Judge worried would prove a getaway vehicle, has now been found and is not even airworthy, *see* 14–15; Mtn. at 28–30;

- This Court has received, as the Magistrate Judge had not, pledges from Mr. Rhule's loved ones confirming their willingness, via surety bonds, to risk the residences of two family members on his promise to comply with all conditions of release, *see*

skellenger bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

Mtn. at 41–44; Mtn. Exh. E (Letter from Johanna and Ken Rhule); Mtn. Exh. G
(Letter from Keri Street);

- This Court has before it, as the Magistrate Judge did not, the promises of Mr. Rhule, his wife, and their son/step-son who is charged in this case, to forfeit automatically all interest in the property targeted for forfeiture in the Indictment, if Mr. Rhule should violate his conditions of release, *see* Mtn. at 45–46;

- This Court has before it, as the Magistrate Judge did not, the option of completely banning Mr. Rhule from using or accessing the internet during his period of pretrial release while he is on home detention and GPS monitoring, *see* Mtn. at 44;

- This Court has before it, as the Magistrate Judge did not, a more fulsome appreciation of the actual nature of the developing COVID-19 crisis at FDC SeaTac (41 infections, as opposed to two, with at least one half of the FDC on lockdown and quarantine), providing the ability to more meaningfully weigh the health risks to Mr. Rhule in the calculus of a release decision.

This is an extraordinary amount of new and different information that completely transforms the picture of the case that was before the Magistrate Judge in July on the first day Mr. Rhule appeared in this District after having flown here voluntarily on his own nickel. The Magistrate did not have before him at the detention hearing information about Mr. Rhule's longstanding and close ties to this community. The Magistrate did not have before him at the detention hearing information about the options available to the Court for encouraging his compliance with potential conditions of supervision. The Magistrate did not have before him at the detention hearing information about the many things that can be counted on to help *keep* Mr. Rhule here in the District, as opposed to the few things that nursed a fear that he might flee. And

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 28

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

finally, while the Magistrate Judge can understandably not have anticipated the explosive COVID-19 outbreak currently unfolding at FDC SeaTac, this Court now knows that the spread of the virus places Mr. Rhule in real peril during his indefinite stay in that facility.

In sum, the Court—in light of all this new evidence—should not hesitate to order Mr. Rhule released on conditions.   All the strongest evidence, none of which was before the Magistrate Judge on July 24, now points clearly in that direction.   Mr. Rhule has strongly rebutted the presumption of detention and should be allowed, in his sister Keri's words, to "be home with his family while he awaits next steps."  *See* Mtn. Exh. G.

Dated this 4th day of September, 2020.

_____
Peter Offenbecher, WSBA No. 11920
SKELLENGER BENDER, P.S.
Attorneys for Kenneth John Rhule

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 29

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1

### CERTIFICATE OF SERVICE

2        I, Jule S. Freeman, certify that on September 4, 2020, I electronically filed Defendant

3  Rhule's Reply in Support of Motion to Review and Revoke Magistrate Judge's Detention Order

4  and Release Defendant on Conditions (with Exhibits S–V) with the Clerk of the Court using

5  the CM/ECF system, which will send notification of such filing to all attorneys of record.

6        DATED this 4th day of September, 2020.

7

8                                              Jule Freeman
                                               SKELLENGER BENDER, P.S.
9                                              Case Analyst

10

11

12

13

14

15

16

17

18

19

20

21

22

23

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 30

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501