The Honorable John C. Coughenour

1

2

3

4

5

6

7 UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

UNITED STATES OF AMERICA,

9                                                    NO. 20-cr-105 JCC
        Plaintiff,

10                                                   DEFENDANT RHULE'S MOTION TO
                                                     REVIEW AND REVOKE MAGISTRATE
    v.                                               JUDGE'S DETENTION ORDER AND
11                                                   RELEASE DEFENDANT ON
KENNETH JOHN RHULE,                                  CONDITIONS
12
        Defendant.                                   ORAL ARGUMENT REQUESTED
13
                                                     Noted for:  September 18, 2020
14

15          Defendant Kenneth John Rhule ("Mr. Rhule") is a 45-year-old retired businessman who

16 has lived in or near Seattle since childhood and is married to a Russian-born woman who has

17 resided in the United States for nearly twenty years.  The government has accused Mr. Rhule

18 of conspiring to manufacture distillates of marijuana.[1]  At the July 24 detention hearing, Pretrial

19 Services recommended release, but Magistrate Judge Tsuchida ultimately agreed with the

20 government to detain Mr. Rhule.

21

22          [1] Such activity is a crime under federal law, but legal in Washington if properly licensed. In
    deference to Washington's voters, who passed I-502 specifically to allow such commercial pursuits,
23  federal prosecutors in this District have rarely charged this offense except where state regulatory
    requirements have not been followed.

skellengerbender

The Court should revisit that conclusion, for three overarching reasons.  First, the Magistrate Judge was concerned by a recorded May 7 phone conversation between Mr. Rhule and his Russian-born wife Olga, which the Magistrate Judge regarded as evidence that Mr. Rhule, expecting to be charged in this case, was planning to flee to Russia.  As shown below, that conversation, particularly given Mr. Rhule's solid, extensive, and longstanding family ties to this District, deserves no such significant weight.

Second, this motion presents additional relevant information that was not before the Magistrate Judge on July 24.  For one thing, we propose significant additional conditions of release, some of which enlist Mr. Rhule's family to help guarantee his compliance: home confinement, a ban on internet activity, having close relatives act as third-party custodians, and a substantial promissory note secured by the homes of his parents and sister.  For another, we are submitting what this Court has elsewhere described as "offers of support" from upstanding individuals to help hold Mr. Rhule accountable while on release. *See infra*.

Finally, while each detention assessment is individualized, many of the circumstances relevant here apply equally to Mr. Rhule's son and co-defendant.  Yet Magistrate Judge Peterson found it unnecessary to detain Kenneth Warren Rhule, and indeed he has now been on release for six months without incident.[2]

We respectfully submit that the new information before the Court should lead it to reach the same conclusion as to Mr. Rhule.  That outcome will keep faith with the principle that pretrial detention must be a "carefully limited exception" invoked "only for the strongest of reasons."  *United States v. Salerno*, 481 U.S. 739, 755 (1987); *Sellers v. United States*, 89 S. Ct. 36, 38 (1969) (Black, J., in chambers).

---

[2] *See United States v. Kenneth Warren Rhule*, WAWD No. 20-mj-0097-PLM at Dkt. No. 8. (Both defendants have now been charged by indictment in No. 20-cr-105 JCC.)

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 2

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

## I.   FACTUAL BACKGROUND OF THE CHARGES

### A.   April 2018-February 2020: the government investigates Mr. Rhule's son, and eventually charges him with offenses arising from operating an unlicensed marijuana business.

In April 2018, Homeland Security Investigations (HSI) initiated an investigation into Mr. Rhule's son, Kenneth Warren Rhule.  HSI believed that since at least 2015, Kenneth Warren Rhule had been manufacturing marijuana distillates and extracts, selling them on the dark web, laundering the proceeds through various cryptocurrency exchanges, and running an unlicensed money transmitting business by exchanging cash for cryptocurrency.  *See* Exhibit A (Complaint against Kenneth Warren Rhule).

Agents scrutinized Kenneth Warren Rhule's activity in an online cryptocurrency marketplace where he allegedly offered to exchange cash for bitcoin, conducting over 1,000 transactions since 2016.   From April to December 2018, Kenneth Warren Rhule was periodically provided with $10,000–$15,000 in cash by an HSI undercover agent.   Kenneth Warren Rhule then exchanged that cash for equivalent bitcoin, eventually exchanging a total of $140,000.  *See* Exhibit A. The government also alleges that its undercover agent represented to Kenneth Warren Rhule that some of the cash came from illegal activity (bringing women from Ukraine and Mexico into the U.S.) and that she needed to convert it into an untraceable asset. Based on this investigation, Kenneth Warren Rhule on February 28, 2020, was charged by sealed Complaint with crimes related to operating an illegal marijuana business.[3]

### B.   March 2020: A search of the property alleged to house Kenneth Warren Rule's unlicensed marijuana business nets extensive evidence.

On March 10, the government executed a search warrant at a property in Monroe, Washington, that contained the separate residences of Mr. Rhule and his son Kenneth Warren Rhule and adjacent outbuildings.   Agents found approximately 1,000 kilograms of bulk

---

[3] Specifically, the Complaint charged Kenneth Warrant Rhule with Conducting an Unlicensed Money Transmitting Business, in violation of 18 USC §1960(a), (b)(1)(A), (b)(1)(B), (b)(1)(C) and 2; Laundering of Monetary Instruments, in violation of 18 USC §1956(a)(3)(B), (a)(3)(C) and 2; and Conspiracy to Manufacture and Distribute Marijuana, in violation of 21 USC §841(a)(1), (b)(1)(B) and 846.  *See* Exhibit A.

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 3

skellenger bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

marijuana or marijuana extracts, marijuana distillates, drug paraphernalia, processing equipment, and a Dodge Sprinter van likely used to transport marijuana plants for processing *See* Exhibit B (Complaint against Kenneth John Rhule).

Agents also located a laptop running a TOR browser (used to access the dark-net), various cell phones, and a cryptocurrency hardware-wallet.  Seven guns, including rifles and pistols, were seized, two of which are allegedly stolen.  *See* Exhibit B.  Mr. Rhule's son Kenneth Warren Rhule was arrested on the sealed Complaint against him.

Mr. Rhule was not arrested.

On March 10, the Court—Magistrate Judge Peterson—released Kenneth Warren Rhule without bond, concluding that routine conditions of supervision would reasonably assure public safety and his appearance at trial.[4]  Released on these conditions, Kenneth Warren Rhule has been living in the community without incident for the past six months, at the same separate residence on the Monroe property where he was arrested.

### C.   July 1, 2020: The government charges Mr. Rhule by sealed Complaint with offenses arising from his son's alleged unlicensed marijuana business.

Nearly four more months passed before Mr. Rhule was charged in this District with related offenses via a sealed Complaint (filed under a separate cause number from the charges against his son.[5]  Mr. Rhule first became aware of the charges two weeks after that, when—on his way to visit his other son Connor and his two grandchildren, all of whom reside in Kona, Hawaii—he was arrested at the Honolulu airport and jailed at the local Federal Detention Center.

---

[4] The conditions require Kenneth Warren Rhule to remain within the District, maintain his residence as directed, surrender his passport, and submit to drug testing.  He may not transfer virtual currency or possess or have access to firearms.  Finally, he was initially directed to provide Pretrial Services with specified financial information about assets and liabilities, *see* Exhibit C (Kenneth Warren Rhule's Appearance Bond), but the Court later struck that condition as unnecessary.  *See* Exhibit D (Order Granting Kenneth Warren Rhule's Motion to Modify).

[5] *See* Exhibit B (Complaint charging Mr. Rhule with Conspiracy to Manufacture Marijuana or Marijuana Distillates).

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 4

**skellenger**bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

Following proceedings in district court in Honolulu, undersigned counsel and the government agreed that Mr. Rhule should be allowed to return to Seattle on a commercial flight at his own expense.  On July 23, Mr. Rhule was released from the FDC in Honolulu, escorted to the local airport by an HSI agent, and from there took a commercial flight to SeaTac airport unaccompanied.  On July 24, government agents met Mr. Rhule there and drove him directly to the Seattle federal courthouse.  Mr. Rhule's return thus was accomplished voluntarily and without incident.

### D. July 24, 2020: At Mr. Rhule's initial appearance in this District, Magistrate Judge Tsuchida orders him detained.

Mr. Rhule made his initial appearance in this District before Magistrate Judge Tsuchida on July 24.  United States Pretrial Services recommended that he be released on conditions. The government moved for detention.  After hearing argument, Magistrate Judge Tsuchida ordered Mr. Rhule detained.

### E. August 5, 2020: Mr. Rhule is indicted along with his son.

On August 5, Mr. Rhule and his son Kenneth Warren Rhule were charged by Indictment in the above-captioned cause number.  The grand jury charged Kenneth Warren Rhule with multiple serious offenses, including a § 924(c) count relating to the firearms recovered in Monroe, as well as money laundering and unlicensed money transmitting offenses, while charging Mr. (Kenneth John) Rhule only with being a co-conspirator in his son's alleged unlicensed marijuana distillation business.[6]  Dkt. No. 31.  The government is also seeking forfeiture of the Monroe real property (which consists of two lots totaling approximately 21

---

[6] The nine-count indictment charges Kenneth Warren Rhule in each of its counts: Count 1 (Conducting an Unlicensed Money Transmitting Business, in violation of 18 USC §1960(a), (b)(1)(A), (b)(1)(B), and (b)(1)(C)); Counts 2–7 (Laundering of Monetary Instruments, in violation of 18 USC § 1956(a)(3)(B), (a)(3)(B), (a)(3)(C) and 2); Count 8 (Conspiracy to Manufacture and Distribute Marijuana and Marijuana Distillates (1,000 kilograms or more), in violation of 21 USC § 841 (a)(1), 841 (b)(1)(A), and 846); and Count 9 (Possessing a Firearm (a 9mm handgun) During and in Relation to a Drug Trafficking Crime, in violation of 18 USC § 924 (c)(1)(A)).  Mr. Rhule, by contrast, is charged only in Count 8 (the conspiracy to manufacture and distribute marijuana and marijuana distillates).

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 5

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1    acres of land and includes Mr. Rhule's residence), and vehicles, as well as personal property

2    alleged to be the proceeds from, or involved in, manufacturing marijuana and related distillates.

3    **F.      Current status:  Both defendants were arraigned on August 20, and the matter has been set for trial starting October 5.**

4    Both defendants were arraigned on August 20 and pleaded not guilty.  Trial is scheduled

5    to begin on October 5.  Mr. Rhule remains detained at FDC SeaTac.

6    Mr. Rhule now asks the Court to review and revoke the Magistrate Judge's order

7    detaining him and order him released on appropriate conditions under the supervision of Pretrial

     Services.

8    **II.     LEGAL FRAMEWORK**

9    This Court's review is *de novo* and extends to any new evidence the parties may proffer.

10   18 U.S.C. § 3145(b); *United States v. Koenig*, 912 F.2d 1190, 1192–93 (9th Cir. 1990).[7]

11   A defendant must be released pending trial unless *no* condition or combination of

12   conditions will protect the community and reasonably assure that he makes his court

13   appearances. 18 U.S.C. § 3142(e); *see also United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir.

     2008).  The specific charge in this case triggers a rebuttable presumption that Mr. Rhule should

14   be detained. 18 U.S.C. §3142(e).   To rebut it, Mr. Rhule need only present some credible

15   evidence supporting release. *See Chen*, 820 F.Supp at 1207–08; *United States v. Clark*, 791

16   F.Supp 259, 260 (E.D.Wash. 1992).  That shifts the burden of persuasion on the ultimate issue

17   back to the government, which must show by clear and convincing evidence that Mr. Rhule

18   poses a danger to the community, or by a preponderance of the evidence that he poses an

19   unacceptable flight risk. *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991). If this

     Court deems the question close, it must order release.  *United States v. Chen*, 820 F. Supp. 1205,

20   1208 (N.D. Calif. June 18, 1992).

21

22

23   _____

[7] *See also* John L. Weinberg and Evelyn J. Furse, Federal Bail & Detention Handbook 2019, [8:2.3], PLI Press (New York 2019) ("Weinberg & Furse").

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 6

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

III.   **DISCUSSION**

    **A.**   **Mr. Rhule's background and his lifelong connection to the local community suggest a low risk of flight in this case.**

        **1.**   **Mr. Rhule is tightly tied to his family, and his family is firmly rooted in this District.**

Kenneth Rhule is 45 years old. He was born to Johanna and Kenneth Rhule in Salinas, California on May 17, 1975. He has one sister, Keri, who is five years his junior. Mr. Rhule has lived in the Seattle area since age 11. He attended primary and middle schools in Woodinville and graduated from Woodinville High School. Mr. Rhule also attended Lake Washington Vocational College[8] in King County.

During Mr. Rhule's youth in King County, his mother Johanna worked for 29 years in the insurance industry at Safeco (later Symmetra). *See* Exhibit E (Letter from Johanna and Ken Rhule). A high-level claims manager, she eventually oversaw the work of three different offices (in Bellevue, WA, Miami, FL, and Norcross, GA). *Id*. Mr. Rhule's father Kenneth ran the maintenance program for Starbucks' corporate offices, and later contracted with the national commercial real estate firm CBRE, for which he worked as a Service Engineer on the Washington Mutual/Chase Bank accounts for 17 years before retiring. *Id*.[9]

Mr. Rhule married his high-school sweetheart Leah, and in 1993 their twin sons Kenneth and Conner were born at Seattle's Swedish Hospital. He raised his boys in Western Washington, first with Leah and later with his second wife Olga,[10] never living anywhere besides the greater Seattle area.[11]

---

[8] Now Lake Washington Institute of Technology.

[9] In 2012, after living in Woodinville for nearly thirty years, Johanna and Kenneth retired to the warm climate of Mesquite, Nevada. But they return often to Washington State, for "months at a time," to be with their children, grandchildren, and great-grandchildren. *See* Exhibit E.

[10] Mr. Rhule and Olga married in April 2002. *See* Exhibit F (Marriage Certificate).

[11] Although Mr. Rhule and Olga (full prior name Olga Vladimirovna Goncharova) were married in Las Vegas, they dated and fell in love in the Northwest. And while Olga is a Russian citizen, Mr. Rhule and Olga have never traveled to Russia at any time during their 18-year marriage. In March, Olga was detained by immigration authorities. She has since been granted voluntary departure to Russia. Olga has been released on conditions (with a GPS ankle monitor) so that she may arrange her affairs prior to her departure.

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 7

**skellenger**bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

Mr. Rhule's sister Keri Street resides with her husband Jeremy and their two school-age children in Bothell. She is a Senior Technical Project Manager, currently working on a contract assignment with T-Mobile through TEKsystems. She has been in the same professional field for roughly 20 years. Similarly, her husband Jeremy has driven for UPS for more than 20 years.

Beyond merely having relatives in this District, Mr. Rhule has enduring, intimate family ties to the three generations of his family that reside here.[12] He is especially close to his sister's children, including her son D.S. who has special needs.[13] His sister calls Mr. Rhule "extremely … generous," someone who "has always looked out for me and his entire family." *Id*. As Keri sums up Mr. Rhule's role in the family, "It takes a village and Ken is a huge part of ours." *Id*.

Mr. Rhule's mother Johanna, too, describes the family as "very close knit," bound by "strong ties." *See* Exhibit E (Letter from Johanna and Ken Rhule). She is proud of her son's generous nature.[14] While dismayed by Mr. Rhule's current situation (the "whole family … is feeling the pain"), the family knows that "together," they "will get through these challenges" and one day "be together again." *Id*.

Mr. Rhule's uncle Greg Weiner, who also recently retired to Nevada, also admires Mr. Rhule's family commitment and generosity. The family spent time together outdoors— "camping trips, boating, skiing, fishing and hiking"—and made a point of reuniting at the holidays, when "Ken and Olga would always host Christmas Eve." Exhibit H (Letter from Greg Weiner). Mr. Weiner notes that "[a]ll of Ken's adult life he has worked very hard to

---

[12] Mr. Rhule's sister Keri, for example, confirms that he "loves his family dearly," calling him "a loving Father and Grandfather," "a wonderful Son," and "the best brother I could ask for." *See* Exhibit G (Letter from Keri Street).

[13] According to Keri, Mr. Rhule is "wonderful" with her children and "has played a huge role in helping to raise" them. *See* Exhibit G (Letter from Keri Street). Mr. Rhule has "a very special bond" with his nephew [D.S.]. *Id*. D.S. "has special needs and is extremely close with his uncle," who seems to understand D.S. like no one else can. *Id*. Particularly given the dislocations of our present moment, D.S. "miss[es] his uncle tremendously and is struggling to grasp why he can't see him." *Id*.

[14] His mother emphasizes that Mr. Rhule "has done so much over the years for our family and the community," and that he has helped defray the costs associated with keeping her brother, who has a mental illness, living with the family. *See* Exhibit E (Letter from Johanna and Ken Rhule). In short, "Ken has always been there when any of us has needed his help." *Id*.

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 8

**skellenger**bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

support and take care of his family. . . and helped all of us in so many ways," including helping Mr. Weiner "many times over the years" with the mentally ill brother who shares his home. *Id.*[15]

Others share the same warm regard for Mr. Rhule. Family friend Megan Fletcher of Woodinville calls Mr. Rhule "one of the most generous and heartfelt people I know," someone who "would literally give you the shirt off his back." *See* Exhibit Q (Letter from Megan Fletcher). She has known the family through good times and bad, and says Mr. Rhule has "always been the first one to share in the excitement, or console others during stress and heartache." *Id.* "He is always there for others without question or hesitation." *Id.*

Leah Barger is Mr. Rhule's ex-wife and mother of his twin sons. Leah describes their early years together—when Mr. Rhule "started a computer business" while still a teenager so he could "financially support [their] family"—as showing how Mr. Rhule can "take responsibility for his actions." *See* Exhibit I (Letter from Leah Barger). Leah reports that their three generations of extended and now blended families have "remain[ed] close" over the past 24 years, gathering to celebrate birthdays and other holidays, and that enjoying their common grandchildren, whom they "adore," has brought the families "even closer." *Id.* Leah "remain[s] close with Ken and Johanna as well as Keri and her two kids." *Id.* Leah is confident that Mr. Rhule would obey any release conditions imposed by the Court:

> I understand that the charges against Ken and Kenny are very serious. We don't agree on everything but one thing Ken does is take responsibility for his actions. He would not violate a court order or abandon his family. At the age of 17 he figured out a way to support his family. He is not one to run but takes on what is necessary to succeed. I do not believe that Ken would flee to Russia or anywhere else in violation of a court order.

*Id.*

---

[15] Mr. Rhule's generosity also extended outside the family. Every year, Mr. Weiner recalls, Ken would lead the family in a trek around Seattle, giving out "all kinds of items" to homeless people— "sleeping bags, socks, toothbrush[es], clothing, McDonald[s'] gift cards, even shoes." Exhibit H (Letter from Greg Weiner). Mr. Rhule has always been "a kind, loving person," to whom "helping those less fortunate" was important, and his generosity was enabled by working hard from a young age to establish his legitimate businesses. *Id.*

skellenger bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

**2.      Mr. Rhule has a long history of operating legitimate businesses that employed many people and contributed positively to the community.**

In 1993, still a teenager, Mr. Rhule co-founded CompuCare, a computer hardware/software retailer.  In just six years, Mr. Rhule grew CompuCare from a two-employee start-up to one of the industry's leading firms, ranked as both a top 100 National Computer Retailer and a Top 100 National System Builder.  CompuCare assembled and distributed several thousand PC systems each month.  CompuCare also built networks and provided maintenance and repair services in its physical locations, as well as through onsite service calls. CompuCare began as one of the first companies in the USA to purchase, refurbish, and sell used desktop computers.

In 1999, Mr. Rhule sold CompuCare to concentrate full-time on developing his next venture, FocusMicro. FocusMicro was a business-to-business enterprise that sold security technology and installed and serviced security cameras for many Fortune 500 companies, including Albertsons, Panera, Starbucks and Walmart, as well as federal government facilities, including airports and prisons, which work required Mr. Rhule to obtain certain government clearances.  On average, FocusMicro employed 250 people at any one time, ranging from engineers to project managers to electricians, and provided living wages with health and vacation benefits.  In just five years, Mr. Rhule and co-founder Bill White grew FocusMicro into a $36 million-dollar-a-year concern.  In 2015, Mr. Rhule wound down the company and went into semi-retirement.

These successful legitimate businesses that Mr. Rhule built at a very young age benefited not only the public but hundreds of employees (and, through their taxes, their communities and the nation at large).  With the proceeds from his work as an entrepreneur, Mr. Rhule has been able to support himself and Olga comfortably.[16]

---

[16]   Ken and Olga Rhule reported more than two and a half million dollars in adjusted gross income in their federal tax filing for 2006, for example, and more than one million dollars in adjusted gross income in 2009.  *See* Exhibit J (Redacted Tax Records).

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 10

**B.** **Mr. Rhule never planned to flee to Russia to avoid prosecution.**

**1.** **When Mr. Rhule mentioned to his wife Olga on May 7 the possibility he might travel to Russia, he was expressing a desire to support and assist her in attempting to acquire legal immigration status in the United States.**

In arguing for detention, the government placed heavy weight on Mr. Rhule's statements to his wife Olga during a recorded telephone call on May 7, while Olga was housed at the Northwest Immigration Detention Center. In that conversation, Mr. Rhule said that if Olga went back to Russia, he might travel there, too, and that he would apply for a passport to facilitate that travel. The government asserted that Mr. Rhule was imminently planning to flee the country to avoid prosecution, arguing that after the search in Monroe, Mr. Rhule surely knew he would face charges.

This contention ignores both the immediate context of the May 7 conversation and Olga's then-existing legal situation with respect to her immigration status. First, on that date— two months after extensive evidence had been seized in a search of the property where he resided—Mr. Rhule had not been charged with any crime.[17]

More important, the background to the conversation provides essential context for understanding it. Namely, Mr. Rhule was then focused on his wife's legal options for resolving both her immediately pending immigration matter and the question of her long-term legal status in the U.S. Nothing said in the exchange hints at any fear that he might be about to face charges in connection with his son's alleged unlicensed marijuana business. The conversation instead reflects what was on Mr. Rhule's mind at that moment: the legal advice they had received regarding Olga's best chance of obtaining lawful status in America, her home for more than half her life. The history of their relationship, and how Olga's immigration status evolved over time, provides additional the essential context for understanding the May 7 conversation.

---

[17] While Mr. Rhule had been confronted by agents at the Snohomish Airport on May 4 who allegedly told him he was a target, they ultimately let him go about his business without arresting him. That experience at least tempted him to believe that he could avoid being drawn into his son's legal situation.

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 11

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1
2

      **2.**      **Given Olga's compromised immigration status, she and Ken had to devise a plan to give her the best chance of eventually adjusting her status so she could live legally in the United States.**

3

      Olga, then age 17, came to the United States on a student visa in the late 1990s to attend

4

college.  Olga later met and became engaged to a man (not Mr. Rhule) who then successfully

5

petitioned for her to re-enter the United States on a K-1 (fiancée) visa.  Their marriage never

materialized, and Olga's K-1 visa was withdrawn or expired.

6

      The K-1 visa allows a U.S. citizen's fiancée to enter the United States in order to marry

7

that U.S. citizen.  The newly married non-citizen spouse may then adjust their status to become

8

a Lawful Permanent Resident (LPR). The caveat is that within 90 days of entering the U.S., the

9

non-citizen must marry the person who filed the K-1 visa.  If the non-citizen does not marry the

10

K-1 filer (if she does not marry at all, for example, or marries someone else), she cannot adjust

11

her status to become an LPR. That is what happened to Olga: she never married the U.S. citizen

12

who applied for her K-1 visa and thus lost the opportunity to adjust her status.  Since then, as a

matter of immigration law, Olga has lacked legal status in the United States.

13

      While living in the Seattle area, Olga met Ken.  They fell in love, marrying in April

14

2002.  Despite being married, Ken and Olga ran into barriers trying to have Olga's immigration

15

status in the U.S. lawfully adjusted.  In 2006, they managed to obtain an approved immigrant

16

petition for relative (*see* Exhibit K) but ultimately proved unable to proceed further, despite

17

pursuing the effort all the way to the United States Congress.

18

      When that effort failed, Olga faced the difficult choice of remaining at Ken's side in the

19

United States without properly adjusted legal status or departing for Russia so that she might

20

apply for permission to return to the U.S. based on their marriage.  Because they did not want

21

to be apart and neither wanted to live even temporarily in Russia, Olga made the difficult

decision to risk staying in the United States without legal status.

22
23

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 12

skellenger bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

When the search warrant was executed in Monroe, ICE agents encountered Olga, determined that she did not currently possess legal immigration status, and remanded her to immigration custody to face removal proceedings.

Olga was indeed subject to removal, but ultimately learned of a potential avenue for relief that could give her a possible route to eventually adjusting her status. That path was a voluntary departure to Russia followed by consular processing—essentially, returning to Russia to apply from there for a visa and a waiver of inadmissibility (see below), based on her marriage to a U.S. citizen. *See* Exhibit L (Letter from Olga Rhule) and Exhibit R (Declaration of Nicholas Marchi).[18] Olga and Ken determined that this option represented Olga's best chance to eventually adjust her status so that she could reside legally with her husband and his family in the United States. That goal, however, would have to be pursued by interim steps.

First, rather than fighting removal, Olga would need to depart voluntarily from the U.S. and return to Russia. Once there, as a consequence of having previously overstayed her K-1 fiancée visa, she would be barred from reentering the United States for ten years. *However*, that ten-year inadmissibility bar is waivable at the discretion of a U.S. consular officer in Russia, so long as the applicant has a qualifying United States citizen relative, such as a spouse. Thus, departing voluntarily for Russia would preserve some hope for Olga of adjusting her status from afar, and then returning lawfully to the United States. *See* Exhibit L (Letter from Olga Rhule) and Exhibit R (Declaration of Nicholas Marchi).

### 3. The May 7 conversation reflects Ken and Olga Rhule outlining the contours of her voluntary departure from the U.S. as a first step of a long effort to eventually obtain legal status here.

This then, is the context of the May 7 recorded conversation between Mr. Rhule and Olga, which featured so prominently in the government's arguments for detention. In that conversation, Mr. Rhule explained that Olga would not "challenge it anymore" (*i.e.*, fight to

---

[18] There were two other potentially available avenues: (1) asylum, the withholding of removal due to the prospect of mistreatment in the immigrant's home country, and (2) cancellation of removal for non-permanent residents due to hardship to a United States citizen spouse. *See* Exhibit R (Declaration of Nicholas Marchi).

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 13

**skellenger**bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

remain in the U.S.), acknowledging that this plan might mean Olga would "have to … go back to Russia" and if so, that he would "meet [her] there."  See Exhibit M (July 24, 2020 Detention Hearing Transcript at 9).   He added that he was working on getting his "passport and visa and stuff like that" for such a trip.  *Id*.

The government suggests that Mr. Rhule's true motivation for planning to travel to Russia was to evade an anticipated prosecution, and that he had significant preexisting ties to Russia that would facilitate such flight.  But if those things were true, why would Mr. Rhule have gone two months—after seeing agents swarming over the premises where he lived, seizing evidence left and right, and ultimately taking his son away in handcuffs—without taking any steps whatsoever to put such a plan into motion?  The commonsense inference is that Mr. Rhule's May 7 surmise that he might have to travel to Russia arose in response to Olga's immigration dilemma, and was motivated by his hope that she might thereby—eventually—adjust her status, allowing them to resume their life together in Seattle.

As Olga herself confirms, "Ken discussed getting a passport and meeting me in Russia to help me get acclimated to a country I have not known in 18 years," and to help get underway her consular application to adjust her status.  *See* Exhibit L (Letter from Olga Rhule).  Mr. Rhule knew that his telephone conversations with Olga were being recorded, making it unlikely that he would have talked with her about her going back to Russia, or openly discussed getting his passport and a visa for a spontaneous trip to join her there, if he were genuinely plotting to flee prosecution.  Instead, he was simply laying out the strategy that they believed might well be the only route to successfully adjusting her legal status.

And as her attorney Nicholas Marchi has advised, Olga Rhule has now in fact chosen voluntary departure to Russia—the avenue that she believes will keep alive her chances of one day legally reentering the United States.  She has fastened her hopes on that plan because she "want[s] to live in the United States," where she has "built a life" for herself.  *See* Exhibit L. And crucially, Mr. Rhule is aware that if he gains release and then attempts to abscond, (1) Olga

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 14

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

*will never obtain the consular waiver that is essential for her to acquire legal permission to return to the United States, see* Exhibit R (Declaration of Nicholas Marchi)*;* and (2) if Mr. Rhule were ever allowed to enter Russia—an extremely unlikely prospect—he would face lifetime exile in an unfamiliar and hostile land and likely never see his family again, much less return to the community where he has spent nearly all of his life.

The government will likely insist that no matter what her immigration lawyer may have told her, Olga Rhule can have no legitimate expectation of ever reentering the U.S. legally. But that legal question is beyond what this Court needs to decide, and a red herring in any event. Regardless of whether the government thinks Olga Rhule may ever return legally to the U.S., the record now shows that during the May 7 conversation both Mr. Rhule and Olga believed, based on legal advice, that she had such a hope. *See* Exhibits S; T (Second Declaration of Nicholas Marchi; Second letter of Olga Rhule). Indeed, that is their belief today. And only if they *knew* on May 7 that no such hope existed does their conversation suggest an intent to flee the country. The evidence now before this Court—confirmation from Olga's immigration counsel that in his view, seeking an order of voluntary departure to Russia best preserves her chance of someday obtaining legal status in the U.S.—disproves the inference that is necessary to adopt the government's interpretation of the May 7 conversation.

### 4. Mr. Rhule has no "significant ties to Russia."

Mr. Rhule has never been to Russia. *See* Exhibit E (Letter from Johanna and Ken Rhule). He speaks no Russian.[19] *Id.* Although Mr. Rhule's wife Olga is a Russian citizen, she has lived in the United States for more than half of her life and has not returned to Russia in almost twenty years. *See* Exhibit L (Letter from Olga Rhule). That Mr. Rhule's Russian father-in-law, who lives in the remote city of Khabarovsk near the Chinese frontier, was once listed by Mr. Rhule on a document as a member of an LLC that owns Mr. Rhule's residence does not establish "significant ties to Russia." The government has proffered no evidence——no records of phone

---

[19]  And only 5.48 percent of Russians speak English, making it a distinctly inhospitable place for a non-Russian-speaker to get along. *See* https://bit.ly/2DDOfND (last visited August 10, 2020).

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 15

**skellenger**bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

contact, no letters, no texts, no emails——showing that Mr. Rhule has had any kind of relationship with his father-in-law that would support an inference that the latter would risk assisting Mr. Rhule if he absconded and somehow managed to make his way to Russia. Especially given the language gap (his father-in-law speaks no English), this incidental connection cannot credibly support a finding that Mr. Rhule has "significant ties" to that faraway nation.[20]

Moreover, even that slender thread has been broken.  Official records show that Olga's father is no longer the managing member of the LLC that owns the Monroe residence.  Mr. Rhule is now—and has been for several years—the managing member of that LLC.  *See* Exhibit U (Statement of Authorized Person).  Mr. Rhule, not his father-in-law, is the beneficial owner, managing member, and authorized person who signed all the escrow paperwork and other necessary documents to purchase the Monroe property in 2016.  *See* Exhibit V (Prestige Escrow Document).

**5.  The shadowy 'second airplane' is not airworthy and no longer missing.**

During the detention hearing, the government proffered that although it had seized one airplane associated with Mr. Rhule, a 'second airplane' could not be located by agents.  Because Mr. Rhule is a pilot, the government argued, the existence of this other plane created an unacceptable risk that Mr. Rhule would flee by air to Russia.  *See* Exhibit M (July 24, 2020 Detention Hearing Transcript at 14) (noting that Mr. Rhule "happens to be a pilot," and is the beneficial owner of "two private planes," and that although the government has "seized one of those planes," it has been "unable to locate the second plane"); *see also id.* at 30 (government's counsel: "I think really what's driving here is this connection to Russia, his very strong connection to Russia. His wife is going to be living there. He has in-laws there that have helped him set up companies. He has the ability to leave, *to fly out*.")

---

[20] This is particularly true since an equally good surmise is that identifying Olga's father as a member of the LLC may have simply been an unsophisticated—and temporary—attempt to preserve her community property interest in the Monroe property (acquired during her marriage to Ken), in light of Olga's legal status as an undocumented immigrant.

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 16

skellenger**bender**

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

This concern turns out to have been unfounded.  Attached as Exhibit N is a now-expired FAA request for transfer of registration for "the second airplane," a single-engine 1960 Cessna 210, tail number N149S.[21]  As of August 25, this aircraft was sitting on the tarmac at Lake Chelan Airport, with no propeller and a bucket of cement where its engine should have been.  *See* Exhibit W (Photos of Second Airplane).[22]  Putting aside its evident lack of airworthiness, the plane's whereabouts are no longer a mystery, so the government can no longer maintain that its inability to locate it supports detaining Mr. Rhule as a flight risk.  The government has known the plane's location since August 25, and presumably has seized or secured it. This is another new fact that was not before the Magistrate Judge at the time of the detention hearing.

Further, as the government knows (because this fact appears in the discovery recently provided to undersigned counsel), Mr. Rhule is actually only a *student* pilot, not yet fully qualified, and unauthorized to take up other persons even under visual flight rule conditions.  He is hardly able to fly an aging single-engine airplane to Russia.

For all these reasons, the "missing second plane" has been conclusively eliminated as a basis for detaining Mr. Rhule.

6.   **Mr. Rhule is not a bigger flight risk because he owns some substantial assets via companies.**

Mr. Rhule holds some assets, such as his house and cars, in companies rather than registering them as an individual.  At his detention hearing, the government suggested that this fact makes Mr. Rhule a bigger flight risk.

First, the fact that some of Mr. Rhule's family members have chosen the corporate form of ownership for certain substantial assets is not evidence of anything nefarious.  It is not a

---

[21] Frontline Aviators, LLC, of which Mr. Rhule's son Kenneth Warren Rhule is the managing member, applied in 2019 to change this plane's registration.  That application appears to have expired.

[22] Undersigned counsel has been informed that this plane is not airworthy.  In addition to lacking a propeller, the engine has been removed and disassembled, its various parts distributed among boxes and garbage bags.  The engine's crankcase, cracked and leaking oil, was previously repaired via welding and (per FAA regulations) cannot be welded a second time.

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 17

**skellenger bender**

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

particularly unusual practice and is perfectly legal in Washington and throughout the rest of the country.  More to the point, none of this information is secret from the government any longer, if it ever was.  Indeed, the information undersigned counsel possesses about these arrangements—the fact that the Monroe property is registered to Frontline LLC (managing member: Mr. Rhule), the cars to RKK Associates LLC (managing member: Olga Rhule), and the sole airworthy plane (now seized by the government) to Frontline Aviators LLC (managing member: Mr. Rhule's son Kenny)—was all disclosed by the government in discovery.

If the Court releases Mr. Rhule on conditions, he will be subject to multiple overlapping systems of detection and surveillance that will comprehensively disable him from obtaining new substantial assets while awaiting trial, much less creating new holding companies for them. The key point is that the government has failed to even offer an argument linking Mr. Rhule's apparent practice of holding assets via companies to a higher likelihood that he will attempt to abscond or succeed if he tries.

> **7.  Since the detention hearing, the State Department has officially refused to issue Mr. Rhule a passport—likely ensuring he could never get to, or enter, Russia.**

On August 7, 2020, the U.S. State Department notified Mr. Rhule that he is "ineligible" to receive a passport due to a pending tax dispute with the IRS.  *See* Exhibit O (State Department Passport Denial Letter). This is another new fact that was not before the Magistrate Judge on July 24. Since the State Department will not issue Mr. Rhule a passport, the standard Pretrial Services condition routinely ordered in this District—that he surrender any travel documents in his possession and refrain from seeking new ones—is sufficient, just as it was in the case of his son and co-defendant, to provide reasonable assurance that Mr. Rhule will not flee.

The government might dismiss such a condition as ineffective because it cannot absolutely guarantee that Mr. Rhule will not buy a fake passport or hire a human smuggler. But such conditions are the well-established tools of every federal pretrial services office in the United States, and experience has shown they reliably serve to minimize unwarranted pretrial

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 18

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

detention.[23] Resort to these time-tested methods is now even more critically important when a worldwide pandemic threatens the safety of pretrial detainees (and lawyers and court staff), a potentially lethal hazard of indefinite duration.  Simply put, if surrendering passports and restricting travel were meaningless gestures, then courts in this District and elsewhere would not routinely take those steps. They do so, and in virtually every case, because experience has shown that they work.

### 8. Travel to Russia is extremely dangerous and difficult, and at the present time the living conditions there for an American are grim.

Due to the United States' ongoing inability to control the spread of the COVID-19 pandemic, most governments around the world are refusing entry to U.S. citizens.  *See*, *e.g.*, "E.U. Formalizes Reopening, Barring Travelers from U.S.," The New York Times (June 30, 2020).  Moreover, this month the State Department issued a Level 4 "Do Not Travel" advisory for Russia citing not only COVID-19, but also the persistent threat in that country of "terrorism, harassment, and the arbitrary enforcement of local laws."  *See* https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/russia-travel-advisory.html (last accessed August 23, 2020); *see also* Exhibit X (Do Not Travel Advisory).

But put aside the frightening conditions in Russia and the sheer logistical complexity of traveling there.  If this Court ultimately decides to release Mr. Rhule, he will be under 24/7 GPS monitoring, as recommended by Pretrial Services, from the moment he walks out of jail, his every move tracked.[24]  That circumstance, taken together with those outlined above, and in light of Mr. Rhule's longstanding and deep ties to this community and his powerful desire not to

---

[23] See https://www.uscourts.gov/servicesforms/probation-and-pretrial-services/probation-and-pretrial-services-supervision, last accessed on September 4, 2020.

[24] GPS monitoring—a judicially accepted mechanism to monitor a defendant's whereabouts (*see* Federal Location Monitoring https://www.uscourts.gov/services-forms/probation-and-pretrial-services/supervision/federal-location-monitoring (last accessed August 5, 2020) and Weinberg & Furse, [5.5(iv)] (house arrest and electronic monitoring devices are "statutorily permissible condition[s]")—and often used by mariners for close quarters navigation, is generally considered to be accurate "to within three meters." *See* https://www.brickhousesecurity.com/gps-trackers/gps-accuracy/#:~:text=Ultimately%2C%20most%20GPS%20tracking%20devices,stronger%20signals%20and%20greater%20accuracy. (last accessed on August 25, 2020).

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 19

**skellenger**bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

inflict harm on his family (by causing them to forfeit the property they are willing to risk to secure his release, *see infra*), sufficiently minimizes any risk that Mr. Rhule might abscond.

**C.     This Court's actions in other cases show that appropriately crafted conditions of release can permit the release of defendants even when they present a significant risk of flight or threat to public safety.**

In several recent cases judges in this District have released on conditions defendants who present a significantly greater risk of non-appearance or pose a substantially greater threat to community safety than Mr. Rhule. These cases usefully illustrate how appropriate conditions of release can overcome such concerns in all but truly exceptional circumstances.

In *United States v. Margaret Channon*, WAWD No. MJ 20-336, the defendant was charged with arson after allegedly engaging in vandalism during a protest in downtown Seattle on May 30, 2020.  Despite the seriousness of these allegations and Ms. Channon's arguably limited ties to the community, this Court affirmed her release on conditions.  It reasoned that although Ms. Channon presented a flight risk,[25] the conditions imposed on her release (including a third-party custodian and GPS monitoring) were sufficient to mitigate it.  *Channon*, WAWD No. MJ 20-336, No. 35 at 5.  The Court was "bolstered" in this conclusion by the "help and support" that Channon's family members had offered since her arrest, promising their "best efforts" to help her comply with the conditions of release.  *Id*.  As to dangerousness, the Court noted that the conditions imposed would "help keep the community safe" by making it "incredibly difficult" for her to commit dangerous acts.[26]  *Id*. at 8.[27]

In *United States v. Friedrich*, WAWD No. MJ 20-193, Mr. Friedrich was accused of selling counterfeit Percocet pills laced with fentanyl to a U.S. Navy sailor, who died as a result.

---

[25] Ms. Channon had failed to appear or been arrested for failing to appear six times in 2016-17, and was facing mandatory minimum prison terms.

[26] The conditions required Ms. Channon to reside at a specific location, keep a curfew, and have her whereabouts monitored by Pretrial Services.

[27] And the Court again observed that "the many supportive people in Channon's life" would "help hold her accountable while she is released."  *Channon*, WAWD No. MJ 20-336, No. 35 at 8. These "offers of support" left the Court "reasonably assured" that the community would be safe if Ms. Channon were released. *Id*.

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 20

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

A search of Mr. Friedrich's apartment netted drugs and a pistol.[28]  Even though Mr. Friedrich possessed a dangerous weapon and had distributed a highly lethal controlled substance that actually caused the death of a U.S. serviceman, he was released on conditions.  *United States v. Friedrich*, WAWD No. MJ 20-193, Dkt. No. 9.

In *United States v. Donnie Barnes, Sr.*, WAWD No. MJ 18-5048, the defendant was accused of producing and distributing child pornography.  The charged offense was unusually aggravated, a crime of violence, and involved a minor victim.[29] Despite these grave allegations (which ultimately resulted in a 180-month prison sentence), and testimony at the detention hearing about the terrible impact of the crimes on the victim and the community, the court was convinced that Mr. Barnes' supportive family network would hold him accountable for complying with the conditions of release, which included a third-party custodian.

Federal prosecutors in this District have very recently brought an Indictment in a large scale, 20-defendant methamphetamine and heroin conspiracy (*see United States v. Gomez-Marentes et al.*, WAWD No. 20-cr-00092-JCC).  Despite the indisputable harm that these very drugs have inflicted on the community, the mandatory minimum prison terms very likely to be imposed upon conviction, and the relatively high flight risk inherent in such cases, many of these defendants—with far fewer ties to this community than Mr. Rhule—have been released on conditions.[30]

Every release decision ultimately reflects an "individualized evaluation" of the relevant facts and circumstances surrounding a particular defendant.[31]   But fundamental fairness

---

[28] Agents recovered approximately 100 grams of suspected cocaine, a semiautomatic pistol, and approximately 100 pills suspected to be counterfeit Percocet containing fentanyl.

[29] Mr. Barnes was alleged to have personally produced child pornography victimizing his 11-year old stepdaughter, and then distributed the images online.  He admitted those facts upon arrest.  *See* 18 U.S.C. § 3142(f)(1)(A); (referring to a "crime of violence"); 18 U.S.C. § 3156(a)(4)(C) (defining "crime of violence" as "any felony under chapter . . . 110," which includes 18 U.S.C. § 2252).

[30] *See id.*, Dkt. No. 109 (Appearance Bond for Amanda Meyer); Dkt. No. 122 (Appearance Bond for Blanca Medina); Dkt. No. 134 (Appearance Bond for Ruth Melisa Gomez-Marentes); Dkt. No. 148 (Appearance Bond for Luis Castillo-Barragan); and Dkt. No. 232 (Appearance Bond for Efrain Luna-Rodriguez).

[31] *See United States v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019).

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 21

suggests that where cases are related and share relevant facts, a decision to release one co-defendant and confine another deserves careful scrutiny. Mr. Rhule in fact is at least as good a candidate for release than his son Kenneth Warren Rhule, who has been out of custody for months.

After his release, Mr. Rhule's son Kenneth Warren Rhule asked the Court to lift the requirement that he provide Pretrial Services with a list of all his financial assets and liabilities. The government strenuously opposed the change, arguing that Kenneth Warren Rhule has a history of avoiding financial institutions and hiding his assets to evade law enforcement.  It proffered further that he had possessed sufficient cryptocurrency to provide more than $140,000 worth of bitcoin to an undercover agent, and that a substantial portion of the $13 million in gross sales he generated over several years from selling marijuana products likewise was held in cryptocurrency.  The Complaint itself alleges that Kenneth Warren Rhule was proficient in staying anonymous online.[32]  For all these reasons, the government argued, without a full accounting of his financial assets and liabilities, Pretrial Services would be unable to assess whether he might be liquidating his assets in advance of an attempt to flee the jurisdiction.[33]

Firmly disagreeing that this special condition was warranted, Magistrate Judge Peterson held that even though Kenneth Warren Rhule was familiar with cryptocurrency and the techniques of online anonymity, there were conditions that could reasonably assure his appearance:  requiring him to maintain his residence, surrender his passport, and not travel outside the District. She further found that in combination with these conditions, Kenneth Warren Rhule's longstanding ties to this District (where he was born and raised) were sufficient to assure his appearance.  *See* Exhibit D (Order Granting Kenneth Warren Rhule's Motion to Modify).

---

[32] It points to, *e.g.*, his using a TOR-based browser, avoiding sending funds via the U.S. Postal Service, and coaching the undercover agent in similar techniques during the investigation.  *See* Exhibit A (Complaint against Kenneth Warren Rhule).

[33] *See United States v. Kenneth Warren Rhule*, WAWD No. 20-mj-0097-PLM, Opposition to Motion to Modify Conditions of Release, Dkt. No. 22.

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 22

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

Thus, Mr. Rhule's son and co-defendant, Kenneth Warren Rhule, who faces by far the more serious charges in their joint case (and is, unlike his father, a *fully* licensed pilot), has been at home for six months despite facts that could give a reasonable person pause about his risk of non-appearance and the danger he might pose to the community.  Magistrate Judge Peterson found that the proposed conditions of release—which are significantly less onerous than the ones that Pretrial Services and Mr. Rhule himself have proposed here—were sufficient to reasonably allay those concerns.

The same is certainly true for Mr. Rhule.  While no one would deny that Mr. Rhule knows a lot about computers, there is no reason to believe that Mr. Rhule is a more sophisticated user of the dark-web than his son who has been deemed an acceptable risk to release from custody.[34]

**D.      The new information before this Court, which was not before the Magistrate Judge on July 24, strongly supports a finding that available conditions of supervision can reasonably assure Mr. Rhule's appearance and preserve the safety of the community.**

      **1.      The newly proposed conditions, in combination with those already reviewed and approved as sufficient by Pretrial Services, should greatly increase the Court's confidence that Mr. Rhule may safely be released.**

As previously noted, at Mr. Rhule's detention hearing, United States Pretrial Services recommended release, subject to a set of conditions that staff and supervisors in that office had

---

[34] At the detention hearing, the government also voiced a "dangerousness" concern arising from the recovery of firearms from the premises in Monroe.  The ensuing indictment, however, charges only Mr. Rhule's son with any violation related to those weapons.  If Kenneth Warren Rhule's connection to those firearms is insufficient to deny him release, the same has to be true for Mr. Rhule.

In any case, in this District it is a standard condition of release that all firearms a defendant possesses—which possession is not unusual, particularly in a rural Monroe household—be surrendered for the duration of the case.  As far as undersigned counsel is aware, enforcing this condition has not been a problem.

Finally, all the firearms at the premises in Monroe have been seized by law enforcement agents and secured as evidence, eliminating any possible danger from them.  Indeed, undersigned counsel has been advised that after the Monroe property was searched on March 10, the residents notified the authorities that agents had missed a couple of guns in the search.  Those firearms were thereafter likewise removed from the premises in order to maintain Kenneth Warren Rhule's compliance with his conditions of pretrial release. This sequence of events usefully illustrates how the pretrial services condition restricting firearms possession is supposed to, and does, work.

---

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 23

**skellenger**bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

evaluated and approved.  We are now proposing additional conditions of release to those previously proposed and approved by Pretrial Services.  These additional conditions—such as, for example a third-party custodian—were not thought necessary by Pretrial Services and so were not offered to or discussed by the Magistrate Judge at the detention hearing.  The total package of conditions of release now proposed would begin with the following requirements (the full text of these proposed conditions is attached as Exhibit Y): undergo drug/alcohol testing and monitoring; remain within the District; surrender all travel documents and refrain from seeking new ones; maintain residence; surrender firearms; disclose financial information as required by Pretrial Services; contribute toward cost of Pretrial Services; use and possess only your properly assigned Social Security number; avoid contact with any potential co-defendant or witness (excepting your son Kenneth Warren Rhule, with whom you may not discuss the pending case); submit to GPS monitoring and comply with all conditions of that program; follow all applicable COVID-19 directives; and refrain from directly or indirectly transferring any cryptocurrency.

The package of conditions we propose would then **ADD** the following new conditions (as above, the full text of these conditions is attached as Exhibit Y):

- Release to the third-party custody of his mother Johanna Rhule and sister Keri Street, both of whom agree to monitor his compliance and report any violations to Pretrial Services;

- An appearance bond worth $600,000 ($400,000 secured by his parents' residence, and $200,000 secured by his sister's family's residence);

- An agreement that if Mr. Rhule fails to appear, then he, his wife Olga Rhule, and his son and co-defendant Kenneth Warren Rhule forfeit all their interest in all the real and personal property identified in the FORFEITURE ALLEGATIONS section of the Indictment;

- Home confinement;

- Internet access to be restricted or prohibited, to whatever extent Pretrial Services deems appropriate.

These new conditions—again, proposals that were not previously recommended by Pretrial Services nor considered by the Magistrate Judge—represent a significant change

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 24

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

because added conditions A and B bring Mr. Rhule's family members directly into the picture. Mr. Rhule's sister Keri Street and his mother Johanna Rhule would become personally answerable to the Court for his appearance at court and his compliance with other conditions. And their primary residences would rest in this Court's hands, such that Mr. Rhule's failure to appear could result in his mother and father *and* his sister and her family losing their homes.[35] These powerful new constraints will reasonably assure Mr. Rhule's compliance.

### 2. Mr. Rhule's parents are prepared to risk their home on Mr. Rhule's appearance at court and his compliance with conditions of release.

Mr. Rhule's parents' home is unencumbered by any interest.  *See* Exhibit E (Letter from Johanna and Ken Rhule).  His parents are the trustees of the trust that owns it, and have full legal authority to encumber or dispose of it.  *Id.*  *See* Exhibit P (Letter from attorney Brett Harrison).  The residence is near Las Vegas in Mesquite, Nevada, and is worth approximately $400,000.  *See* Exhibit E.  Mr. Rhule's mother and father have volunteered to sign a promissory note, secured by the equity in their home if the Court requires, as a condition of their son's release.  *Id.*

This promise represents a substantial financial risk for this retired couple who, while secure, are not lavishly wealthy.  But Mr. Rhule's parents "have every confidence" that their son "will remain in Washington to answer these charges" and "comply with any and all conditions imposed by the Court," and they reject any suggestion that he might "flee to Russia or anywhere else."  *Id.*   They firmly believe Mr. Rhule can be trusted to "see the process through," because "[h]e loves his family and would never jeopardize [them] by fleeing."  *Id.*

### 3. Mr. Rhule's sister's family are likewise ready to risk their home.

Keri and Jeremy Street, too, are prepared to risk significant financial assets and perhaps their family home to assist the Court in enforcing Mr. Rhule's compliance with the conditions

---

[35] *See* Weinberg & Furse, [5.5(xii)] ("[T]he court may permit another person to act as surety if satisfied that the relationship reasonably assures defendant's appearance." "While the statute suggests that a surety will agree to forfeit a specified 'amount,' not specific real or personal property. . . .the court can require an agreement by the surety to forfeit specific property.").

**skellenger**bender

of release.  They believe that what Mr. Rhule wants is simply to "be home with his family while he awaits next steps."  *See* Exhibit G (Letter from Keri Street).  The Streets are "confident that Ken will comply with all conditions imposed by the Court" and "do not believe that Ken would flee to Russia," because he is committed to "remain in Washington to answer the charges against him."  *Id*.

> **4.     Ken and Olga Rhule, and their son/step-son Kenneth Warren Rhule, are prepared to secure Mr. Rhule's appearance with their entire interest in all the property targeted for forfeiture in the Indictment.**

In the extremely unlikely event that Mr. Rhule defaults on his bond, Ken and Olga Rhule and their son (and step-son) Kenneth Warren Rhule are prepared to forfeit all their interest in the real and personal property identified in the section titled FORFEITURE ALLEGATIONS at pages 3–7 of the Indictment.  This promise represents a significant additional assurance from the involved parties that Mr. Rhule will fully comply with the conditions imposed by the Court.

> **5.     Here, as in *Channon*, the newly available statements of Mr. Rhule's family members shift the balance in favor of release.**

As noted above, in the *Channon* case this Court placed significant weight on the fact that members of Ms. Channon's family had pledged to help hold her accountable for complying with her conditions of release.  *Channon*, WAWD No. MJ 20-336, No. 35 at 8.  It found that such "offers of support" reasonably assured that Ms. Channon would appear for court and refrain from endangering the community.  *Id*.

Likewise, numerous family members here have stepped forward to express their love for Mr. Rhule, their unwavering confidence that he will walk a straight path if released, and their readiness to help him do so.  Mr. Rhule's parents, who have reviewed the conditions recommended by Pretrial Services and discussed them with undersigned counsel, have stated unequivocally that they are "willing to act as third-party custodians to assist the Court, and,

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 26

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

pretrial services in making sure Ken complies with all of the conditions of release." *See* Exhibit E (Letter from Johanna and Ken Rhule).[36]

His sister Keri Street and her husband Jeremy similarly assure the Court that "Ken will comply with all conditions," with their help if necessary, and that he would never "flee to Russia or anywhere else in violation of a court order to remain here." *See* Exhibit G (Letter from Keri Street).  Like her parents, Ms. Street has volunteered to act as third-party custodian for her brother. She promises to keep a close eye on him and "contact the court or pretrial services to report any violations." *Id.*[37]

> **E.    Another relevant circumstance that has changed since July 24 is the deteriorating COVID-19 situation at FDC SeaTac and the attendant risk to Mr. Rhule's health.**

At the detention hearing, the government argued that Mr. Rhule faced no imminent risk being locked up at FDC SeaTac, because the facility's procedures were effectively preventing or containing any COVID-19 outbreaks. *See* Exhibit M (July 24, 2020 Detention Hearing Transcript at 28–29) (emphasizing that with only two positive tests at the FDC (one staffer and one detainee), "[i]t seems … that SeaTac COVID procedures are working").

This hopeful account is no longer true.  As of today, the BOP reports that there are 42 confirmed COVID-19 infections at FDC SeaTac (36 detainees and 6 staff).  These numbers are among the worst for pretrial facilities in the entire BOP system—only MCC San Diego, with 160 cases (160 detainees, 7 staff) and FDC Miami, with 60 (30 detainees, 30 staff), are

---

[36] *See* Weinberg & Furse, [5.5(i)] (Third-party custody is an appropriate condition of release and "[t]he custodian must agree to supervise the defendant and to report to the court any violation of the release order.")

[37] Even those who will play no formal role in helping Mr. Rhule comply express their full confidence that he will "take responsibility for his actions" and would never "violate a court order or abandon his family" *See* Exhibit I (Letter from Mr. Rhule's ex-wife Leah Barger); *see also* Exhibit L (Letter from Olga Rhule) (stating emphatically that even from afar, she will "always encourage Ken to stay in Washington to face these charges because it is the right thing to do").

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 27

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

comparably high.[38] As we have learned from national and international events, these numbers may not decline any time soon.

The calculus of release in this case must balance the gravity of the allegations (manufacturing products that are legally available in Washington) against the looming risk of serious health impairment or death due to COVID-19 if Mr. Rhule remains indefinitely at the FDC. [39]   And since Mr. Rhule has suffered his entire life with stress-induced asthma treated with a prescription inhaler (*see* Exhibit E (Letter from Johanna and Ken Rhule)), he may be among the more vulnerable of the FDC population.[40]

Moreover, while the FDC remains overwhelmed by the pandemic counsel will face near-insurmountable challenges in communicating with Mr. Rhule to prepare his defense or otherwise work toward a resolution of the charges.  As undersigned counsel and other criminal defense lawyers can attest, the confidential electronic communication available through Bureau of Prisons channels is burdensome to access and too often unreliable in practice.  If Mr. Rhule remains in custody, the significant hurdles to adequate attorney-client communication alone will diminish the chances of bringing a case of this magnitude to prompt resolution.

## IV.    CONCLUSION

On July 24, the government argued forcefully that what should "driv[e the decision about whether to release Mr. Rhule] is this connection to Russia, *his very strong connection to*

---

[38] By contrast, many metropolitan BOP facilities have managed to keep their case totals around or below a dozen infections: MDC Guaynabo (Puerto Rico) (16 total), MCC Chicago (12 total), FDC Houston (8 total), MCC New York City (8 total), MDC Brooklyn (3 total), MDC Los Angeles (3 total) (all as of September 9). Current statistics are available at https://www.bop.gov/coronavirus/ (last visited September 9, 2020).

[39] The pretrial period will likely stretch into a year.  While trial is set for October 5, that seems unrealistic given the volume of discovery and magnitude of the allegations.  The discovery already provided to undersigned counsel includes over 340,000 pages of material.   More is undoubtedly forthcoming. Counsel cannot safely review this volume of discovery in person with an incarcerated client, and the FDC cannot safely provide detainees with adequate computer time in the common areas of the facility; those facts make it unlikely that this case will move swiftly to resolution.

[40]    *See* CDC guidelines for people with certain medial conditions, including asthma. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last accessed August 25, 2020).

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 28

**skellenger**bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

*Russia*. His wife is going to be living there. He has in-laws there that have helped him set up companies. He has the ability to leave, to fly out." *See* Exhibit M (July 24, 2020 Detention Hearing Transcript at 30 (emphasis added)). On the limited record before him, the Magistrate Judge found it difficult to overcome that concern. *See*, *e.g.*, *id*. at 32 (calling Olga Rhule's immigration situation and the possibility that it might lead Mr. Rhule to flee for Russia the "real challenge for me right here"), 33 (Mr. Rhule's "ties to her and to the country [of Russia] are important," and constitute "a distinguishing factor" absent from the case of Mr. Rhule's son and co-defendant); *id*. (Mr. Rhule is "in a peculiar situation" in having "a peculiar motive to leave the country"). Seeing no alternative, the Magistrate Judge consigned Mr. Rhule to indefinite custody at FDC SeaTac (where, the Magistrate Judge had no way of knowing, the COVID-19 pandemic would soon become a much more acute threat).

On a fully developed record, this Court can now place in proper perspective the claim that Mr. Rhule has a "very strong connection" to Russia—a country whose language he does not speak, where he has never set foot, and which he has no prospect of reaching given the U.S. government's refusal to issue him a passport and its now complete control of his access to any financial assets. As the Court can now see, even if that risk were genuine, it can be reasonably minimized by the conditions of release now proposed. Those conditions will hold Mr. Rhule accountable because failing to comply will cost his parents and his sister's family their homes, as well as forfeiting the relationships he values most in life. Equally important, Mr. Rhule recognizes that defaulting on his conditions would rob Olga of what they both believe is her one remaining chance to obtain legal status in this country.

The larger truth is that federal courts routinely see people facing stiff mandatory minimum sentences cooperate with pretrial supervision, make all their court appearances, and, if convicted, surrender as scheduled for their sentences. As a result of these charges Mr. Rhule may someday be sentenced to spend some time in custody, but there is no sufficient reason to

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 29

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

keep him there *now*, while the world—and specifically the BOP—are struggling against a viral adversary that for now threatens us all with serious health problems or even untimely death.

In short, there is no urgent need to force this marijuana case forward towards resolution *now*. Instead, this situation calls for a little reasonable patience, and reliance on the types of conditions of release that have been shown in countless cases, many more aggravated than this, to reasonably assure the defendant's appearance and protect the community.

Mr. Rhule understands that he is in a bad situation but urgently wants to avoid making things worse and appreciates the risk that his family is assuming by committing themselves and their property wholeheartedly to his release. Mr. Rhule is determined to return that confidence and support by complying with whatever conditions this Court sees fit to impose.

Dated this 9th day of September, 2020.

_____
Peter Offenbecher, WSBA No. 11920
SKELLENGER BENDER, P.S.
Attorneys for Kenneth John Rhule

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 30

skellenger bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

**CERTIFICATE OF SERVICE**

I, Jule S. Freeman, certify that on September 9, 2020, I electronically filed Defendant Rhule's Motion to Review and Revoke Magistrate Judge's Detention Order and Release Defendant on Conditions (together with Exhibits A–Y) with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record.

DATED this 9th day of September, 2020.

Jule Freeman
SKELLENGER BENDER, P.S.
Case Analyst

DEFENDANT RHULE'S MOTION TO REVIEW
AND REVOKE MAGISTRATE JUDGE'S
DETENTION ORDER AND RELEASE DEFENDANT
ON CONDITIONS – 31

skellenger**bender**

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501