The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                          Plaintiff,<br><br>          v.<br><br>KENNETH JOHN RHULE,<br><br>                          Defendant. | CASE NO. CR20-105 JCC<br><br>**OPPOSITION TO MOTION FOR REVIEW OF DETENTION ORDER** |

## I.     INTRODUCTION

The Defendant, KENNETH JOHN RHULE, has been charged with an offense carrying a mandatory minimum sentence of ten years' imprisonment.  He is also simultaneously facing the loss of his wife, who has been ordered by immigration authorities to self-deport to Russia, with no lawful path to return to the United States.  Confronted with these dire circumstances, the Defendant has a compelling motivation to flee—to avoid incarceration and marital separation.  Indeed, four days after he was notified that he was a target of law enforcement's investigation, the Defendant told his wife that he would apply for a passport, obtain a Russian visa, and depart with her to Russia.

Not only does the Defendant have a compelling motive to flee but he also has the means to flee.  The Defendant has long been honing his ability to hide from law

enforcement—using shell companies to conceal his assets; opening financial and online accounts using alternative names and addresses; concealing his identity using Tor browsers, encrypted applications, and the darkweb; and amassing substantial cryptocurrency assets. The Defendant could employ these same strategies to effectively evade arrest and access funds while fleeing prosecution.

Given the severity of the charges faced by the Defendant, a presumption of detention applies. As Judge Tsuchida correctly found, the Defendant has failed to rebut this presumption of detention, posing both a flight risk and danger to the community, and should be ordered detained pending trial.

## II.    APPLICABLE LAW

The Bail Reform Act of 1984 permits pretrial detention of a defendant where "no conditions or combination of conditions will reasonably assure the appearance of the person as required . . . ." 18 U.S.C. § 3142(e). A presumption arises that no condition will reasonably assure the person's appearance "if the judicial officer finds that there is probable cause to believe that the person committed an offense for which a maximum term of imprisonment of ten years or more is prescribed in the . . . Controlled Substances Import and Export Act." 18 U.S.C. § 3142(e)(3)(A).

The defendant may proffer contrary evidence to rebut the presumption of detention, but the presumption remains as an "evidentiary finding militating against release, to be weighed along with other evidence relevant to factors in § 3142(g)." *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008). The factors in § 3142(g) include: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the person, including his character, physical and mental condition, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (4) the nature and seriousness of danger posed by release. *See* 18 U.S.C. § 3142(g)(1)-(4); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986); *United States v. Motamedi*, 767 F.2d 1403, 1407 (9th Cir. 1985).

The presumption in favor of detention, as well as the § 3142(g) factors, demonstrate that the Defendant should remain detained.

### III.   BACKGROUND

The Defendant was arrested on July 14, 2020, while disembarking a flight at the Honolulu airport.  The Defendant had flown from Washington to Hawaii, carrying with him a small duffel bag of clothing, a drone, and $10,000 in cash.[1]  For the two weeks prior arriving in Hawaii, law enforcement had been communicating with the Defendant, under the guise of returning various pieces of property, in order to arrest him on an outstanding warrant.  Rather than meeting with law enforcement, the Defendant sent his son's girlfriend to collect his property.  With her in his place, the Defendant traveled to Superior, Montana, where he remained until he traversed through Washington on his way to Hawaii.[2]

After arriving in Hawaii, the Defendant was arrested and held in the Federal Detention Center in Honolulu.  In light of the U.S. Marshals' limited flight schedule due to COVID-19, the United States made alternative arrangements to expeditiously transport the Defendant to Washington.  Specifically, the government arranged to have the Defendant escorted by law enforcement from the Honolulu prison, placed on a commercial flight to Washington, collected by law enforcement from the SeaTac airport, and brought to the courthouse for an initial appearance.  On July 24, 2020, Magistrate Judge Tsuchida ordered the Defendant detained pending trial.  Dkt. 11.

### IV.   ARGUMENT

**A. The Defendant has a Compelling Motive to Flee**

**a.  The Defendant Faces a Mandatory Minimum Prison Sentence of Ten Years**

From 2014 through 2020, the Defendant, along with his son, KENNETH WARREN RHULE, manufactured and distributed marijuana and marijuana distillates, ultimately

---

[1] The Defendant's son, Connor Rhule, was residing in Hawaii at the time.
[2] This information was obtained pursuant to a tracker warrant.

earning more than $13.5 million in income.  For this conduct, the Defendant has been charged by Indictment with Conspiring to Manufacture and Distribute Marijuana and Marijuana Distillates, in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846.  Dkt. 31.  If found guilty of this offense, the Defendant faces a mandatory minimum sentence of ten years' imprisonment.  Facing the daunting prospect of serving a decade in prison, the Defendant has a strong incentive to flee to avoid prosecution.  As described herein, the weight of the evidence favors conviction in this case.

   i.   **Law Enforcement Found Substantial Evidence Implicating the Defendant when they Searched the Monroe Compound and the Defendant's Residence on March 10, 2020**

On March 10, 2020, law enforcement searched several properties owned by the Defendant and KENNETH WARREN RHULE, including a property located in Monroe, Washington, where the Defendant and his co-conspirators manufactured and distributed marijuana products (hereafter described as the "Monroe Property").  As described in the Complaint, the Defendant and his co-conspirators built a laboratory on the Monroe Property, designed to produce marijuana extracts.  In this lab, the Defendant used chemicals and solvents—including combustible butane and propane, carbon dioxide, and dry ice—to extract Tetrahydrocannabinol ("THC") from marijuana plants.  Once extracted, the Defendant created marijuana distillates—sold in the form of gels, liquids, and solid crystalline substances, including those commonly referred to as "clear" and "shatter."

When law enforcement searched the Monroe Property on March 10, 2020, they found a fully-functioning distillation lab, along with an employee who was in the midst of conducting an extraction.[3]  In this lab, law enforcement also found 100 large trash bags filled with over 900 kilograms of bulk marijuana.

---

[3] RHULE_00329701.



At the time of the search, the Defendant was living in a residence located on the property, in close proximity to the laboratory:



Laboratory

Defendant's Residence

The Defendant's residence was used to sell and ship the marijuana products manufactured in the lab.  For example, on a desk in the Defendant's bedroom, agents found marijuana products stored in individual jars, a drug ledger, packing labels, and USPS shipping boxes.[4]  Agents also found packages, sealed and ready to ship, containing marijuana products.  These packages were affixed with shipping labels bearing fake sender names and fake sender addresses.  Additionally, next to the Defendant's bed, law enforcement found a laptop, open to a darkweb vendor page, advertising the sale of marijuana products.[5]  Finally, inside the residence, law enforcement also located multiple firearms, including two stolen weapons, and over $300,000 worth of cryptocurrency.

---

[4] RHULE_00331838.
[5] RHULE_00331836.

In short, the evidence gathered on March 10, 2020, alone would be sufficient to convict the Defendant of the charged offense, which carries with it a ten year mandatory minimum term of imprisonment.  Faced with this substantial evidence, the Defendant has a strong motive to flee rather than face conviction and lengthy incarceration.

> ### ii.   Law Enforcement Found Substantial Additional Evidence Implicating the Defendant During the Course of their Investigation

In addition to the evidence gathered on the Monroe Property, during the course of its investigation, law enforcement has also obtained electronic evidence proving that the Defendant conspired to manufacture and distribute marijuana products.  Specifically, law enforcement determined that the Defendant and his co-conspirators sold their marijuana products under the label HerbinArtisans.  HerbinArtisans held a Google Enterprise account, which the Defendant accessed using the email address ken@herbinartisans.com.  In this account, law enforcement found emails sent by the Defendant describing his marijuana operations.  For example, the Defendant sent the following email to his son, KENNETH WARREN RHULE, on January 10, 2016, creating a protocol for extracting marijuana products.[6]

## worksheet extraction

| | |
|---|---|
| **From:** | Jon Kuhn <ken@herbinartisans.com> |
| **To:** | Kenneth Rhule <kenny@herbinartisans.com> |
| **Date:** | Sun, 10 Jan 2016 19:13:58 -0800 |
| **Attachments:** | extractionworksheetdraft.rtf (3.1 kB) |

Kenny,

I quickly drafted a very basic extraction worksheet.  This is a 1 page document that needs to follow the extraction process from the very beginning to the end.
Its designed to place accountability on each the extract technician, and the purge technician.  Additionally, its a document that will hang by clip on the column, to the stainless table, to the oven and act as a quick visual to each batch (with all the info we need).  Take a look, I am sure it can be more robust, but this is just to get us going.  We need this in place Monday morning.  Feel free to enhance it if....

Print out 50-100 of these at the shop and we need to make sure everyone uses them..

---

[6] RHULE_00256445.

1   Agents also located a self-drafted organizational chart,[7] found on KENNETH
2   WARREN RHULE's laptop and the HerbinArtisans Google account, showing that the
3   Defendant served as the CEO of this operation, overseeing multiple employees.



16   Additionally, on KENNETH WARREN RHULE's laptop, agents located text
17   messages exchanged between the Defendant and KENNETH WARREN RHULE outlining,
18   among other things, the Defendant's ambitions for his marijuana operations, including the
19   following:[8]

20   Defendant:   This op at the warehouse is 95% done.  It's setup to generate 2535lbs per
21              room every 60 days (which is 2535 lbs once per month out of alternating
              rooms) that is $5070k per month, plus the trim that it yields. That, along with
22              supplemental oil to keep the system running is another 2535k per month.
              That can be run smoothly with just [C and M2] (or 2 employees ).  That's
23              roughly 100k per month in revenue with costs of less that 18k per month...
24              That leaves uswith 80k per month for you and I. When the construction is
              finished, that output becomes a walk in the park. As the employees get
25              familiar with the systems, they dial them in further and can do it in their

---

[7] RHULE_00020633. This chart was saved in a Google Photos folder for kenny@herbinartisans.com titled "2016-01-18."  Based on the individuals identified in the chart, it is believed to represent the organizational structure for HerbinArtisans.
[8] RHULE_00338456 (March 30, 2015).

sleep.  It doesn't need to be stessful. It doesn't need [M], end user sales, etc.
Simply moving volume wholesale to a small handful of people.  After the
setup is done, this whole thing can operate with A couple of people, it really
won't be that involved.  It's time consuming because it involved construction
and learning the industry.  Both of those variables are nearly complete now.

Finally, in order to track HerbinArtisans' income and expenses, the Defendant and his
co-conspirators used cloud-based accounting software.  Using this software, the Defendant
tracked HerbinArtisans' sale of marijuana products, purchase of bulk marijuana from
growers, and employee expenses.  In the accounting records, the Defendant is described as
the subscriber on the account, which he routinely logged into, including as recently as
December 2019.[9]  In sum, the electronic evidence gathered in this case, coupled with the
items found during the search of the Defendant's property, weigh in favor of conviction.
Faced with this evidence, and the prospect of serving a lengthy prison sentence, the
Defendant has a compelling reason to flee prosecution.

> ### iii.    On May 4, 2020, Law Enforcement Informed the Defendant that he was a Target of the Investigation

For purposes of evaluating detention, the Defendant's state of mind in May 2020 is
particularly relevant.  In May 2020, less than two months after law enforcement searched the
Defendant's home, officers informed the Defendant that he was a target of their
investigation.  On May 4, 2020, law enforcement met the Defendant at the Harvey Airfield in
Snohomish, Washington.[10]  On that date, agents served a warrant to search the Defendant's
Cessna airplane.  At the time the agents arrived, the Defendant was flying in the aircraft with
his son, Connor Rhule.  When the plane landed, it was searched and, after a drug detection
dog alerted to a locked rear compartment in the tail of the aircraft, the plane was seized.

During the search, the Defendant approached law enforcement and explained that the
aircraft was jointly owned by him and Connor Rhule, a statement that Connor Rhule denied.

---

[9] RHULE_00331038.
[10] Exhibit 1 (RHULE_00331038).

Agents then advised the Defendant to stop flying over the Northwest Detention Center, where Olga Rhule was held, since his low flights were causing the Center to go into lockdown.  Before departing, an agent explained to the Defendant that "it was likely he would be receiving a target letter, as [the Defendant] did have a connection to the investigation of his son KENNETH W. RHULE."[11]  As a result, the Defendant was expressly told that he was under investigation and was a target in the case.

After being advised that he was a target of the investigation, the Defendant didn't appear shocked or express surprise.  And this makes sense.  Based on the substantial amount of evidence taken from the Defendant property, residence, and bedroom on March 10, 2020, and the agent's seizure of his airplane on May 4, 2020, a reasonable person would conclude that he was under investigation for manufacturing and distributing marijuana.  Accordingly, as of May 4, 2020, the Defendant knew that he was under investigation, a target letter was imminent, and, based on the evidence gathered against him, his arrest was nearly inevitable.

### b.  The Defendant Also Faces Certain Separation from His Wife of 19 Years

In addition to avoiding arrest and lengthy incarceration, the Defendant also has a second compelling reason to flee the jurisdiction, his desire to avoid separating from his wife, who has been ordered to return to Russia.  On March 10, 2020, law enforcement arrested the Defendant's wife, Olga Rhule, for immigration-related violations.  In 2002, Ms. Rhule immigrated from Russia on a fiancé visa, which was later withdrawn, remaining in the United States without status.[12]  After overstaying her visa, Ms. Rhule married the Defendant. As a visa overstay, Ms. Rhule was unable to adjust her status and, for the past nineteen years, has had no lawful basis to remain in the United States.

On May 7, 2020—a mere three days after law enforcement informed the Defendant that he was a target of their investigation—Ms. Rhule was detained at the Northwest Detention Center awaiting deportation.  Facing his wife's impending removal from the

---

[11] *Id.* at p. 7.
[12] At the time, Ms. Rhule intended to marry someone other than the Defendant but that engagement ended.

United States, and fearful he would be arrested, the Defendant began making arrangements to flee to Russia.  Specifically, during a recorded conversation on that date, the Defendant explained that he was applying for an expedited passport, was preparing to obtain a Russian visa to travel, and was taking other steps to prepare to live in Russia:[13]

| Olga Rhule: | First of all let me ask you this.  I'm not getting out any time soon right? |
| Defendant: | I don't think so. |
| Olga Rhule: | How much time . . . approximately? |
| Defendant: | I don't know if there is  a time limit that you're going to get out. **I think we may have to have you go back to Russia, and me meet you there.** |
| Olga Rhule: | Well if that happens how much time? |
| Defendant: | He couldn't answer that question because of COVID. But it sounds like your hearing is on the 28th. |
| Olga Rhule: | 29th. |
| Defendant: | 29th. Is it the 29th? I thought it was the 28th. So you can basically, um . . . At the hearing you're gonna, you're gonna basically say you're not gonna challenge it any more, you know and you want to go just proceed with the deportation. |
| Olga Rhule: | Can it not happen sooner? |
| Defendant: | He said from there—He said he didn't think so but I'll push that issue more but . . . I'll see if—He'll have to do another one of these requests to move the hearing up kind of thing and they'll have to grant it or not. |
| Olga Rhule: | Can you try? |
| Defendant: | Yes I can try.  Of course. Um.. But here's the thing, even with that, **it's gonna take me about that long to get my passport and visa and stuff like that situated so I'm working on that now to get that expedited.** |
| Olga Rhule: | OK. |
| Defendant: | I was gonna go down this afternoon and get my pictures real quick so I can mail off the passport document and I'm gonna |

---

[13] Exhibit 2 at 1:25-4:08 (RHULE_00340777) (emphasis added).

|   |   |   |
|---|---|---|
| | | do it instead of normal, **I'm gonna do it urgent, you know the urgent time frame and pay the extra money.** |
| | Olga Rhule: | OK. |
| | Defendant: | And then I got to apply for the visa, you know the visa over there . . . There's some other things I'm working on, but I can't talk to you about them.[14] |
| | Olga Rhule: | I understand. |
| | Defendant: | You know what I'm talking about right? |
| | Olga Rhule: | I think I maybe— |
| | Defendant: | It's what you think. |
| | Olga Rhule: | OK. |
| | Defendant: | So I'm working on all that stuff right now. OK? |
| | Olga Rhule: | OK. |
| | Defendant: | And um yeah, **I'll be with you no matter what**. |
| | Olga Rhule: | Promise? |
| | Defendant: | **Yes. Of course I promise . . . Of course I promise**. |

The United States has confirmed with the State Department that the Defendant did, in fact, apply for a passport, intent on leaving for Russia.  Had the Defendant's passport arrived, and had Ms. Rhule been deported, the United States believes that the Defendant would have fled.

Since this conversation occurred, Ms. Rhule was released from immigration custody on bond and has been ordered to leave the United States by October 5, 2020.  Rather than mitigate the Defendant's risk of flight, his wife's release has made the situation more dire.  Ms. Rhule now has a final order from the immigration judge requiring her to voluntarily leave the United States and return to Russia within the next three weeks.[15]  In light of this order, the Defendant is faced with two choices: (1) remain in the United States, appear at trial, serve a substantial jail sentence, and leave his wife to return to Russia alone; or (2) flee

---

[14] Given the amount of cryptocurrency owned by the Defendant, discussed below, the United States believes that this reference could have described moving funds so that the Defendant and his wife could live comfortably in Russia.

[15] This deadline may be extended due to COVID-19 but statutorily may not be extended more than 120 days (or until February 2, 2021).

OPPOSITION TO MOTION FOR REVIEW OF DETENTION ORDER
*United States v. Rhule* – 11

with his wife and hide in the United States, Russia, or any other country, and avoid separation and a prison term.  Not surprisingly, as the Defendant stated during that recorded phone conversation, he had already chosen to flee.

The Defendant contends that, during this recorded conversation, he was not describing plans to flee prosecution.  Instead, he claims he was describing a strategy to remain with his wife in Russia while she pursued immigration options.  However, regardless of the reason, the outcome remains the same.  In order to be with his wife, the Defendant made plans to move to a country that has no extradition treaty with the United States.  Whether his motives were romantic or nefarious, the fact remains that the Defendant was prepared to leave his home and his family, traveling across the world to live in a foreign land for an undetermined length of time, so his wife could try to obtain immigration relief.  The Defendant's ties to Russia—the country where his wife will reside—coupled with his desire to maintain his nineteen year marriage makes the Defendant a substantial flight risk.

### i.  Olga Rhule Will Not be Permitted to Return to the United States

After Olga Rhule travels to Russia, she will have no lawful path to return to the United States.  Notably, Ms. Rhule faces two barriers to obtaining lawful status.  First, having overstayed her fiancé visa, she is barred from returning to country for a period of ten years.  And, second, as a prior drug user with a conviction for solicitation of heroin, she is permanently barred from reentering the country.  While there is a chance that she might obtain a discretionary waiver for overstaying her visa, prior drug use cannot be waived.

As for the first bar, Ms. Rhule was "unlawfully present in the United States for one year or more."  8 U.S.C. § 1182(a)(9)(B)(i)(II).  As a result, she is ineligible to return to the United States for a period of ten years.  *Id*.  Pursuant to Section 1182(a)(9)(B)(v), she may apply for a waiver, allowing her to reenter the United States on an earlier date, if she can show that refusal of her admission "would result in extreme hardship to [her] citizen . . . spouse."  However, there is no guarantee that a waiver would be granted.  Rather, waivers are purely discretionary, issued by the Attorney General, and "[n]o court . . . ha[s]

1    jurisdiction to review" these decisions.[16]  *Id.*  Furthermore, Ms. Rhule would have to remain

2    in Russia while awaiting this discretionary relief.

3           Even if she were fortunate enough to obtain a discretionary waiver, Ms. Rhule also

4    faces a second bar to returning.  Specifically, Section 1182(a)(2)(A)(II) provides that:

5           any alien convicted of, or who admits having committed, or who admits
6           committing acts which constitute the essential elements of— (II) a violation of
            (or a conspiracy or attempt to violate) any law or regulation of a State, the
7           United States, or a foreign country relating to a controlled substance (as
            defined in section 802 of title 21) . . . is inadmissible.
8

9    Once she returns to Russia, when completing the immigrant visa application, Ms. Rhule will

10   be asked the following question: "Have you ever violated, or engaged in a conspiracy to

11   violate, any law related to controlled substances?"[17]  Based on her prior drug conviction,[18]

12   Ms. Rhule would be required to answer this question in the affirmative.  As set forth in the

13   statute, prior drug possession and use are complete bars to returning.  Under Section 1182(h),

14   the only controlled substance violations that may be waived are those that "relat[e] to a

15   single offense of simple possession of 30 grams or less or marijuana."  Since Ms. Rhule's

16   conviction relates to heroin use, there is no waiver that Ms. Rhule could obtain.

17          Under similar circumstances, the petitioner in *Pazcoguin v. Radcliffe*, 292 F.3d 1209

18   (9th Cir. 2001), was denied admission to the United States.  In *Pazcoguin*, a Philippine

19   national arrived at the Honolulu International Airport and applied to enter the country.  In his

20   immigrant visa application, the petitioner admitted to previously smoking marijuana in

21   violation of law.  Having learned of this drug use, an Immigration Judge found the petitioner

22   excludable from the United States under 8 U.S.C. § 1182(a)(2)(A)(i)(II).  The Ninth Circuit

23   _____

24   [16] In his declaration, Ms. Rhule's immigration attorney stated that, in granting voluntary departure, the Immigration
25   Judge "who was aware of the facts pertaining to Ms. Rhule's case, including her criminal history, told Ms. Rhule that by
     taking a voluntary departure she could attempt to return to the United States through an application for a visa from
26   Russia." Dkt. 61 at 163.  However, any such statement is purely dicta that has no precedential weight.   The Immigration
     Judge has no authority to determine whether Ms. Rhule is eligible for a waiver, and the issue of waiver eligibility was
27   not before the court at the time the statement was made.
     [17] Form DS-260.
28   [18] This conviction is appended as Exhibit 3 (under seal).  It is not discussed in detail in this pleading to protect Ms.
     Rhule's privacy interests.

1   affirmed this finding, determining that the petitioner was excludable despite the fact that he

2   his absence would pose a hardship for the petitioner's mother, who was a United States

3   citizen. *Id*. at 1218-19.

4         Similarly, in *Villa-Valladolid v. Gonzalez*, 146 Fed. Appx. 177, 179 (9th Cir. 2005)

5   (unpublished), the Ninth Circuit evaluated whether a petitioner who "was convicted of

6   possessing marijuana for sale, not simple possession," was entitled to a waiver of

7   inadmissibility under Section 1182(h).[19]   The Court denied the petitioner's request,

8   concluding that he was "ineligible for waiver of inadmissibility . . . because his prior

9   conviction did not involve a minor controlled substance offense for which waiver could be

10   granted." *Id*. Accordingly, as with the petitioner in *Pazcoguin*, Olga Rhule's prior heroin

11   use would render her inadmissible to the United States.  And, as with the petitioner in *Villa-*

12   *Vallodolid*, Olga Rhule would not be entitled to a waiver of that inadmissibility.  Unable to

13   return to the United States, the only way for the Defendant and his wife to maintain their

14   nineteen year relationship would be to flee together.

15         **ii.**    **The Denial of the Defendant's Passport Application Does not**
16                  **Eliminate his Flight Risk**

17         On August 7, 2020, the State Department denied the Defendant's passport application,

18   informing him he was ineligible for a travel document because of an ongoing tax dispute

19   with the Internal Revenue Service ("IRS") and his "seriously delinquent tax debt."  Dkt. 61,

20   Ex. A at 148.  Absent a passport, the Defendant claims he is incapable of fleeing the

21   jurisdiction.  However, as the Court knows, individuals enter and exit the United States on a

22   near daily basis without lawful passports.  The United States land border is extensive, human

23   smugglers are prevalent, and fraudulent passports can be readily purchased.  Additionally,

24   now that the Defendant's wife has been released from immigration custody, the Defendant is

25

26   [19] Section 212(h) of the Immigration and Nationality Act is codified at 8 U.S.C. § 1182(h).  *See also Harvey v.*
27   *Homeland Security*, 207 Fed. Appx. 118, 120 (2d Cir. 2006) (unpublished) (petitioner not entitled to waiver after
conviction for crack cocaine, holding only marijuana could be waived); *Marquez-Perez v. Immigration and*
28   *Naturalization Service*, 2 Fed. Appx. 600, 600 (8th Cir. 2001) (unpublished) (petitioner not entitled to waiver after
conviction for possession with intent to distribute cocaine, noting only simple possession of marijuana could be waived).

no longer required to return to Russia.  Instead, the two could flee virtually anywhere in the world—Mexico, Canada, an alternative city in the United States.  Once reunited out of custody, the two could travel to any preferred location to avoid prosecution and separation.  The Defendant has already shown a willingness to break the law.  Traveling without a passport, or obtaining a fraudulent passport, would be far a less serious charge than the charge the Defendant is already facing.

It is also worth noting that, when asked by the Probation Officer in Hawaii, the Defendant did not report that he had applied to renew his passport.  Instead, he stated that he his passport was expired and did not know its current whereabouts.  Ultimately, the Probation Officer only learned that the Defendant had applied for an new passport when she interviewed the Defendant's son, Connor Rhule, who reported that the Defendant had recently submitted a passport application.  Hawaii PSR at 2.

Facing the prospect of a substantial jail sentence, separation from his wife, and her exclusion from the United States, the Defendant may reasonably conclude that he would be better served fleeing prosecution.  The Defendant has already taken substantial steps towards fleeing—applying for a passport, explaining that he was preparing to obtain a Russian visa, and planning to meet his wife in Russia.  The Defendant took these steps knowing that he was under investigation, knowing that substantial evidence establishing his guilt had been uncovered, and knowing that he could reunite with his wife in Russia where he would not face extradition.  Since the Defendant initially made the decision to flee, his situation has only gotten worse.  The Defendant is now aware that he has been charged with an offense that carries a ten year mandatory minimum prison sentence.  The Defendant has now served over two months in custody and does not want to remain incarcerated.  The Defendant now knows that, by court order, his wife must voluntarily depart the United States.  The Defendant made his intentions clear during that May 7, 2020 phone call, and the events that have occurred since that date have only made his motives to flee more compelling.

**B.  The Defendant has the Means to Flee Prosecution**

The Defendant not only has a compelling motive to flee prosecution—to avoid a lengthy prison sentence and separation from his spouse—he also has the means to evade law enforcement detection.  The Defendant has long been honing his ability to hide from law enforcement—using shell companies to conceal his assets; opening financial and online accounts using alternative names and addresses; concealing his identity using Tor browsers, encrypted applications, and the darkweb; and amassing substantial cryptocurrency assets.

**a.  The Defendant Has Used Aliases, Fake Social Security Numbers, and Alternative Addresses to Hide His Identity**

While committing the charged offense, the Defendant has proven adept at using alternative names, social security numbers, or addresses when purchasing property, applying for cryptocurrency accounts, and communicating online.

**i.  The Defendant Uses Aliases to Hide His Identity**

For example, when opening corporations and online accounts, the Defendant has used the aliases "John Kuhn" and "Jon Kuhn."  "John Kuhn" was the subscriber listed on the Defendant's intellivisioninc@gmail.com account, while "Jon Kuhn" was the subscriber listed on the Defendant's ken@herbinartisans.com account.  On January 10, 2016, the Defendant sent the following email to KENNETH WARREN RHULE, noting the alias and indicating that he may have logged into the email address using a "stealth account."[20]

## RE: worksheet extraction

| | |
|---|---|
| **From:** | Jon Kuhn <ken@herbinartisans.com> |
| **To:** | Kenneth Rhule <kenny@herbinartisans.com> |
| **Date:** | Sun, 10 Jan 2016 19:48:39 -0800 |

My name is stuck as john juhn on this... not sure how that happened, I may have been logged into a stealth account when I first logged on.  I cant change my name, are you able to?

---

[20] RHULE_00256449.

In addition to using aliases to open email accounts, the Defendant also used aliases when incorporating companies and opening financial accounts. For example, the Defendant used the alias "John Kuhn" when incorporating his shell company, RKK Associates LLC.[21] The Defendant also opened cryptocurrency accounts at Coinbase using the aliases "John K Rhule," "John Rhule," and "John Ruhl."[22] Finally, the Defendant opened Neteller and PayPal accounts in the name "John Ruhl."[23]

### ii.    The Defendant Avoids Associating Accounts with his Social Security Number

In addition to employing aliases, the Defendant has used a fake social security number to avoid associating his financial accounts with his true identity. For example, the Defendant opened an account at Coinbase, an online cryptocurrency wallet provider, in the name of "Kenneth Rhule," listing a social security number not associated with him.[24] This practice is consistent with the advice the Defendant offered KENNETH WARREN RHULE regarding use of credit cards that are not tied to their names and identifiers. Specifically, on November 4, 2015, the Defendant sent KENNETH WARREN RHULE a photograph of a credit card, stating:

> This one is tied to my name and SSN, so it's more of a short term deal... But we could load a million dollars on to this card and I can justify to the irs that it was from the cash sale of assets acquired on taxes I had already paid and that I had no capital gain in selling the "stuff"... So they can f[*]ck themselves...[25]

Similarly, in May 2015, KENNETH WARREN RHULE advised the Defendant that he had two bank accounts and "didn't think either ha[d] [his] correct social."[26]

---

[21] RHULE_00325257.
[22] RHULE_00328579-81, 00002970.
[23] RHULE_00334253, 00334261, 00334302 (Neteller accounts allow users to send and receive money online).
[24] RHULE_00002975.
[25] RHULE_00338056.   The Hawaii PSR also noted that the social security number the Defendant provided to the Probation Officer was not associated with him.  It's unclear which social security number this report is referencing.
[26] RHULE_00338056.  The United States has confirmed that KENNETH WARREN RHULE uses a fake social security number when opening financial accounts.

1
2

          **iii.**     **The Defendant Uses Mailing Addresses that are Not Tied to his Home**

3         To further conceal his identity, the Defendant has also avoided having his online

4 accounts and assets registered to his home address, instead listing postal boxes, his parents'

5 home, or seemingly random locations as his mailing addresses.[27]  For example, the

6 Defendant used a postal box in Woodinville, Washington, to register his vehicles, receive

7 shipments mailed to his shell company RKK Associates LLC, and register one of his

8 aircrafts.[28]  Additionally, the Defendant used a second postal box in Grandville, Michigan, to

9 incorporate RKK Associates LLC.[29]  The Defendant also used his parents' address in

10 Nevada, to open a Gemini cryptocurrency account, register for a credit card, and pay taxes

11 on the Defendant's property in Monroe, Washington.[30]  The Defendant has also used

12 seemingly random addresses to when mailing marijuana products, using fake return

13 addresses and fake sender names on his shipments.[31]

14         By using these diffuse strategies—false names, false social security numbers, false

15 addresses—the Defendant avoided law enforcement detection, and the closure of his

16 accounts by financial institutions, for a considerable length of time.  The Defendant could

17 employ these same strategies to effectively evade arrest and access funds while fleeing

18 prosecution.

19
20

    **b.  The Defendant Hides His Assets, Vehicles and Residence by Using Shell Corporations**

21         Not only has the Defendant attempted to conceal his identity by providing false

22 information, he has also incorporated shell companies in order to further hide his assets and

23 avoid association with marijuana manufacturing and distribution.  When incorporating these

24

25

26 [27] Notably, the Defendant does have mail and packages delivered to his home address, so the use of alternative mailing address is not due to insufficient mail service.

27 [28] RHULE_00022294, 00006595, 00331926, 00333586, 00333635.
[29] RHULE_00325257.

28 [30] RHULE_00003710, 00000501, 00326509, 00329015.
[31] RHULE_00331627.

companies, the Defendant listed his family members as nominee directors or managers.  He also listed these companies' principal places of business as addresses in Russia or domestic postal box locations.

For example, in March 2016, the Defendant incorporated Frontline LLC in Delaware using a registered agent, Harvard Business Services.[32]  Once incorporated, the Defendant used Frontline LLC to purchase the Monroe Property—used to manufacture marijuana—and to register Olga Rhule's vehicle—used to transport packaged marijuana products.[33]  By incorporating this entity, and using a registered agent, the Defendant avoided being publicly linked to the corporation.  Instead, when searching Delaware's corporations registry, the only information that is available regarding this entity is its incorporation date, and the name and address of its registered agent, Harvard Business Services.[34]  Adding a further layer of anonymity, when incorporating this entity, the Defendant designated his Russian father-in-law as the company's "managing member."[35]  Additionally, on the incorporation paperwork, the Defendant listed Frontline LLC's principal place of business as Khabarovsk, Russia.  The same managing member and business address were submitted to the IRS in order to obtain a taxpayer Employer Identification Number ("EIN").

In addition to Frontline LLC, the Defendant also incorporated RKK Associates LLC in Delaware, again using Harvard Business Services.[36]  Once incorporated, the Defendant used RKK Associates LLC to register a van and a truck—used to transport bulk marijuana and marijuana products.[37]  As with Frontline LLC, this corporation is not publicly linked to

---

[32] RHULE_00325257.

[33] RHULE_00328593.  As described above, on March 10, 2020, law enforcement located a number of USPS mailers containing marijuana products ready to be shipped inside this vehicle.

[34] Obtained by searching the Delaware Division of Corporation's website, *available at* https://icis.corp.delaware.gov/ecorp/entitysearch/namesearch.aspx.

[35] Although the Defendant now states that he is the managing member of Frontline LLC, that document appended to the Defendant's motion is not publicly available and was not produced by Harvard Business Services in response to a subpoena.  As a result, despite the Defendant's protestations to the contrary, that document does not effectively link Frontline LLC to the Defendant.

[36] RHULE_00325257.

[37] On March 10, 2020, law enforcement located bulk marijuana and a cash counter inside the truck, which was, at the time, driven by KENNETH WARREN RHULE.

the Defendant.  In fact, according to the State of Delaware, there is no registered agent currently assigned to this entity.  Instead, when incorporating this entity, the Defendant listed his wife—using her maiden rather than married name—as the corporation's managing member.[38]  Additionally, the Defendant listed a postal box in Grandville, Michigan, as RKK Associates LLC's principal place of business.  This same managing member and business address were submitted to the IRS to obtain an EIN.  Furthermore, as described above, when incorporating this entity, the Defendant used the alias "John Kuhn."

These corporations were created to distance the Defendant from his marijuana operations, designed to avoid taxation and criminal enforcement.  Law enforcement only linked the Defendant to Frontline LLC and RKK Associates LLC by conducting years-long surveillance, identifying the Defendant's vehicles and properties, and obtaining registration and tax records for those assets.

### c.   The Defendant Has Extensive Cryptocurrency Holdings and Financial Reserves

The Defendant also has access to substantial assets, including those held in cryptocurrency, providing him with further means to flee.  As alleged in the complaint, in order to record HerbinArtisans' inventory, expenses, payroll, and sales, the Defendant used cloud-based accounting software.  Complaint at ¶¶ 26-27.  The Defendant fastidiously maintained those accounting records, which law enforcement obtained pursuant to a search warrant.  According to those records, between 2015 and 2020, HerbinArtisans made over $13 million in income.[39]  Furthermore, those records show that HerbinArtisans held a substantial portion of its earnings in cryptocurrency, avoiding financial institutions that could report suspicious activity to law enforcement.[40]

While operating HerbinArtisans, the Defendant held accounts at numerous cryptocurrency exchanges and wallet providers.  For example, the Defendant held accounts

---

[38] RHULE_00325257
[39] Exhibit 4.
[40] *See, e.g.*, Exhibit 5 (under seal).

at multiple cryptocurrency wallet providers, including those located abroad.[41]  Law enforcement has obtained records from a portion of those providers—those that respond to law enforcement requests—and determined that the Defendant has converted a substantial amount of cryptocurrency into cash.  For example, between November 2015 and January 2017, the Defendant used his LocalBitcoins.com account to sell over $180,000 worth of Bitcoin to others in exchange for gift cards and cash.[42]  Additionally, from August 2017 through November 2018, the Defendant transferred over $80,000 to his BitPay card, using that card to make purchases and withdraw cash at ATMs.[43]

Law enforcement has also determined that the Defendant often opened multiple accounts with cryptocurrency wallet providers, using slightly different names, email accounts, and mailing addresses.  In addition to opening multiple accounts, using inaccurate information, the Defendant also appears to have used mixers—which combine cryptocurrency obtained from many users, route them through a complex funding path, and redistribute them so they no longer can be readily traced to a specific source—to conceal his assets.  On April 29, 2015, the Defendant and KENNETH WARREN RHULE exchanged the following text messages, describing the use of such mixers (described as "a wash service"):[44]

Defendant:  There is also a new service that will send you a credit card which is linked to a Bitcoin wallet address and it will convert at market price and transact at any location that accepts credit cards

KWR:  Yeah I can. I'd like to do all of that using tails,[45] or a bit more anonymous than my PC

KWR:  We need to do it ASAP

Defendant:  That's the thing... Bitcoin can be 100% anonymous. If setup correctly ... Once a week we dump all excess profit into an offline wallet, but first run it through a wash service...

---

[41] RHULE_00002963, 00002973, 00003719, 00003638, 00328572, 00328582, 00329253, 00329258, 00334743, 00338048, 00341471.
[42] RHULE_00338022.
[43] RHULE_00325739.
[44] RHULE_00338056.
[45] TAILS is a Tor based, portable operating system that increases a user's anonymity online.

1    Furthermore, the Defendant also uses hardware wallets—external devices, similar to a

2    thumb drive or hard drive, capable of storing cryptocurrency offline.  To seize

3    cryptocurrency stored on hardware wallets, law enforcement must locate and access those

4    devices.  When law enforcement searched the Defendant's residence they located some

5    hardware wallets, along with multiple pieces of paper containing seed phrases—lists of

6    randomly generated words that can be used to access a cryptocurrency wallet.  Using these

7    seed phrases, law enforcement seized more than 28 bitcoins, currently worth over $300,000,

8    from the Defendant.[46]  Notably, this is a small fraction of the total bitcoins paid by customers

9    to HerbinArtisans.[47]  The remainder of this cryptocurrency remains outside of law

10   enforcement's current grasp, capable of being accessed and spent by the Defendant.

11   It's not surprising that the Defendant has such vast cryptocurrency reserves, and

12   employed sophisticated techniques to conceal them from law enforcement.  As the

13   Defendant and KENNETH WARREN RHULE discussed in 2015, in order to profit from

14   their drug ventures they needed to store and spend their proceeds without detection.[48]

From:    Kenneth Rhule <kenny@herbinartisans.com>
To:      Jon Kuhn <ken@herbinartisans.com>, C▮▮▮ E▮▮▮▮▮ ▮▮▮▮▮@herbinartisans.com>
Date:    Thu, 29 Oct 2015 18:55:02 -0700

Secret spending.
We need to have a solution for online transactions, and local ones at that (credit card).... Bitcoin is the
most anonymous currency available. Problem is spending it!

Bank accounts link socials or tax ID of the business. And we don't want to be reporting income. I am aware
we are working on scheme for this, it seems that may take some time.

As it stands, there are a few bitcoin to credit/debit card services available. They do NOT ship to the US,
but they do ship to the UK. We can signup for a virtual mailbox out of the U.K., and have our debit card
forwarded to a recipient in the US. We can use the cards here.... They legally can't be shipped here.

I'm not sure if that work around will "work". But we all need to get our wheels turning on this. Even if we
incorporate in another country, we can get a bank there, and issue ourselves credit cards that can be used
around the world.

In order to be successful we must all communicate and work on our goals together. We do not have
enough time where we all collaborate. Even if for 15minutes a day.
Let get this company Rolling!

-Kenny

---

[46] RHULE_00333402.
[47] Exhibit 5 (under seal).
[48] RHULE_00254668.

Armed with substantial cryptocurrency reserves, the Defendant has the means to flee the jurisdiction and live comfortably while a fugitive.  Although the Defendant is willing to offer his parents' and sibling's homes as collateral, the income earned by HerbinArtisans (over $13.5 million), the bitcoin converted by the Defendant through BitPay and LocalBitcoins (over $260,000), and the bitcoin seized from the Defendant's residence (over $300,000), dwarf the collateral pledged by these third parties.  With these financial assets, the Defendant could reimburse his family for any losses incurred by his failure to appear.

### d. The Defendant Has the Ability to Hide his Activities Online by Using Encrypted Applications, Tor Browsers, and the Darkweb

The Defendant has spent the last six years honing his skills to remain anonymous online, using Tor browsers, encrypted chat communications, and darkweb forums when selling marijuana products.  The Defendant could use these same skills to remain anonymous during flight, evading law enforcement's efforts to track and arrest him.

For example, as alleged in the Complaint, the Defendant used the darkweb to sell his marijuana products. Complaint at ¶ 23.  When law enforcement searched the Defendant's bedroom on March 10, 2020, agents located a laptop open to a darkweb site advertising the sale of marijuana distillates.[49]  This laptop was running the TAILS operating system, a Tor-based, portable operating system designed to protect a user's anonymity online.  On this darkweb site, the Defendant exchanged messages with his customers, including "Order was dropped yesterday (Mon) at Post office," and "is it same for chips, batter and diamonds, 4 oz per small priority box?  I only like small priority boxes as they don't get much attention."  Also open within the Tor browser was the website Bitcoinpostage.info, which the Defendant used to anonymously buy and print USPS shipping labels.

In addition to the darkweb, the Defendant also used encrypted chat communications to avoid law enforcement surveillance.  On his personal devices, the Defendant downloaded numerous applications designed to preserve anonymity, including VPNs, VOIP, and PGP

---

[49] RHULE_00340808.

applications, along with the encrypted chat applications, Signal, Telegram, WhatsApp, and Wickr.[50]  During the course of the conspiracy, the Defendant frequently used Signal and Wickr to communicate with his son and the other employees at HerbinArtisans.  For example, on October 25, 2014, the Defendant texted KENNETH WARREN RHULE ". . . I was wick[i]ng you about the extraction gear," referring to marijuana processing equipment.  Additionally on October 28, 2014, when KENNETH WARREN RHULE texted the Defendant "These guys are saying 5-7k for 100 lbs of sugar leaf trim but pickup is Humboldt county," the Defendant responded "Wick…"  The Defendant could continue to utilize these applications, and his ability to remain anonymous online, to evade law enforcement if he became a fugitive.

### e.  The Defendant has a History of Failure to Comply, Obstruction, and Tax Avoidance

Although the Defendant claims he will abide by the terms of a bond, his history of failing to follow the law and comply with the directives of law enforcement undermine that assertion.  The Defendant has a prior conviction for obstruction of justice,[51] another citation for failure to comply, has failed to appear in a prior matter, and has an outstanding tax dispute with the IRS.  Additionally, before he was charged in the present case, the Defendant was sent a cease and desist order by Snohomish County to stop processing marijuana at the Monroe property, which he fully ignored.  Specifically, on October 11, 2017, a Snohomish County Planning and Development Services Code Enforcement Officer sent the Defendant a letter stating:

---

[50] RHULE_00341471.

[51] In February 2009, the Defendant was convicted, after trial, of Obstructing a Law Enforcement Officer, in violation of RCW 9A.76.020(1).  In that case, the State alleged that the Defendant and his friend, both intoxicated, were erratically driving a black Ferrari at a high rate of speed across the 520 bridge.  After officers stopped the vehicle, they arrested the driver for driving while intoxicated.  The Defendant, a passenger in the vehicle, also appeared to be intoxicated, and was later determined to have a blood alcohol level of .123 or .124.  After his friend was arrested, the Defendant became belligerent, shouting obscenities at the officers.  When officers informed the Defendant that the Ferrari would be towed, the Defendant became confrontational, jumping in the car and driving it away (despite his intoxication).  Thereafter, officers pursued the vehicle, stopped it, and the Defendant was arrested.  Attached as Exhibit 6 (under seal).

> I am investigating an alleged violation regarding the property [located in Monroe].  The alleged violation involves allowing marijuana processing to take place in an area not zoned for such activity.[52]

Despite receiving this notice, the Defendant continued to process marijuana on the property until it was searched by law enforcement in March 2020.  In short, the Defendant has repeatedly demonstrated an unwillingness to comply with the law—there is no reason to believe that he will now become compliant and abide by conditions of release.

### f.   The Defendant is a Private Pilot with Access to Airplanes

The Defendant is also a licensed pilot, having obtained his student pilot's license from the FAA in January 2019.[53]  As a student pilot, the Defendant is licensed to fly alone,[54] and the Defendant completed his first solo flight on May 7, 2019.[55]  Since that date, the Defendant has completed other solo flights and has logged dozens of flight hours.[56]  Although law enforcement seized the Defendant's plane, and the Defendant claims his other aircraft is inoperable, the Defendant still possesses the ability to fly private aircraft.  By renting or purchasing a new airplane, the Defendant could still effectively flee.

For all of the reasons outlined above—the Defendant's ties to Russia, his ability to use false identifiers to evade law enforcement detection, his incorporation of shell companies, his access to cryptocurrency reserves, his experience using encrypted and anonymous communication mechanisms, his ability to pilot an aircraft, combined with his historic failure to abide by the law—the Defendant has proven that he possesses the resources and skills necessary to evade arrest as a fugitive.

### C.  The Defendant Also Poses a Danger to the Community

In addition to posing a substantial risk of flight, the Defendant also poses a danger to the community.  On March 10, 2020, when law enforcement searched the Defendant's

---

[52] RHULE_00331417.
[53] RHULE_00331644.
[54] https://www.faa.gov/pilots/become/student_cert/
[55] RHULE_00331628.
[56] RHULE_00331632, 00331645.

residence and property, they found not only an arsenal of weapons—including two stolen firearms—they also found that the Defendant was using highly combustible fuels to extract his marijuana products, fuels that have historically caused explosions and injury in other illegal processing facilities.

### a. The Defendant Possessed Multiple Firearms, Including Two Stolen Weapons

When law enforcement searched the Defendant's residence on March 10, 2020, they located an arsenal of weapons, including two stolen firearms.[57]  In total, law enforcement located eighteen weapons, including multiple assault rifles, one of which had a hundred round drum-magazine.  Under the Defendant's bed, agents located a Colt pistol, which had been reported stolen.  A second stolen weapon, a loaded rifle, was also found in the Defendant's gun safe.  In short, the Defendant's property was heavily fortified, including with stolen weapons, to protect the marijuana products and cryptocurrency held within.

### b. Explosive Nature of Marijuana Extraction

Additionally, the methods used by the Defendant to extract and distill marijuana are heavily regulated for a reason—if done improperly, they can lead to explosions and fires.  In order to distill marijuana products, processors use highly combustible butane and propane, along with dry ice and carbon dioxide tanks.  On March 10, 2020, when law enforcement searched the Defendant's laboratory they found these chemicals, along with an employee who told them that he had just completed a particularly dangerous portion of the extraction run that could have resulted in injury or explosion if performed improperly.[58]

Just last month, a similar marijuana lab exploded in Centralia, Washington, causing one employee to suffer extensive burns and nearly resulting in a brushfire.[59]  In 2013, a defendant caused an explosion at an apartment complex in Bellevue, Washington, resulting

---

[57] RHULE_00329890, 00331840-41, 00331880-81, 00331899.
[58] RHULE_00329701.
[59] *Fire, explosion at Centralia pot processing plant injures employee*, King 5 (August 12, 2020), *available at* https://www.king5.com/article/news/local/pot-explosion-severe-burn-centralia-cbd/281-12f7d6d4-d190-4569-b356-3ab29e2f7fe0

1    in injuries and a death.[60]  As a result, in order to protect the community, licensed marijuana

2    extractors are inspected and are required to operate in buildings built to withstand explosion.

3    The Defendant's laboratory had neither been inspected nor was it specially configured.  It

4    also lacked safety protocols to prevent employees from suffering life-altering burns.  Given

5    the risk of explosion for the workers employed by the Defendant and the Defendant's

6    immediate neighbors, along with the number of stolen and registered firearms located at the

7    Monroe property, the Defendant also appears to pose a safety risk to the community if he

8    resumes operating his marijuana facility upon release.

9    **D. The Cases and Circumstances Cited by the Defendant Do Not Mandate Release**

10           The Defendant cites myriad cases claiming that the offenses charged in those cases

11   are comparatively more dangerous than that committed by the Defendant.  But the United

12   States has never argued that the Defendant must be detained solely because of the threat he

13   poses to the community.  Rather, the flight risk posed by the Defendant, evidenced by his

14   express plan to flee to Russia, remains the primary force compelling detention in this case.

15   As described herein, the Defendant took concerted efforts to flee—preparing to travel to

16   Russia, applying for a passport, discussing obtaining a visa to travel to Russia, conferring

17   with his wife regarding his intentions to meet her in Russia—all days after being informed

18   that he was a target of law enforcement's investigation.  Even the Defendant's co-defendant,

19   KENNETH WARREN RHULE, does not have the same motives to flee—his partner is not

20   from Russia and she is not being removed from the United States.[61]  After evaluating the

21   unique circumstances faced by the Defendant, circumstances that are rare amongst those who

22   appear before this Court, Magistrate Judge Tsuchida correctly determined that the Defendant

23   failed to rebut the presumption of detention.

24

25

26   [60] *Former Bellevue Resident Whose Drug Manufacturing Sparked Explosion and Fire Sentenced to Nine Years in Prison*,
     Department of Justice (June 8, 2015), *available at* https://www.justice.gov/usao-wdwa/pr/former-bellevue-resident-

27   whose-drug-manufacturing-sparked-explosion-and-fire-sentenced (sentenced to nine years imprisonment).
     [61] Notably, the Magistrate Judge Peterson's opinion, appended to the Defendant's motion, was issued when KENNETH

28   WARREN RHULE was only charged with violating 21 U.S.C. § 841(b)(1)(B), and as such no presumption of detention
     applied.

The fact that the Defendant has been charged with manufacturing and distributing marijuana, legal under Washington law if licensed, does not alter this conclusion.  In a comparable case, *United States v. Xiamin Huang*, CR18-124 JCC (October 16, 2018), Dkt. 86, this Court upheld Magistrate Judge Donohue's order detaining an individual charged with the same offense as the Defendant—Conspiracy to Manufacture and Distribute Marijuana.  Xiamen Huang was a U.S. citizen, originally born in China,[62] who purchased residential properties in order to grow marijuana.  In this Court's order, it found Huang to be a flight risk based on her access to financial resources, family connections to China, lack of meaningful employment in Washington, and the pending ten year mandatory minimum charge.  In comparison, the Defendant has the same, if not worse, risk factors.  For one, the Defendant's financial resources far surpass that earned by Huang whose assets were predominately tied up in real estate and amounted to less than $600,000.  The Defendant's foreign connections are also more significant than Huang's, now that the Defendant's wife of nearly twenty years is returning to Russia.  In comparison, Huang was a U.S. citizen whose children, siblings, and parents each resided in the United States.  Like Huang, the Defendant has no meaningful employment in Washington, given that he has been employed as a marijuana producer for the past six years with no other source of income.  And Like Huang, upon conviction, the Defendant will face a lengthy separation from his family.

Additionally, the Defendant's proposed release plan does not compel a different result, as it neither addresses his motive to flee nor the danger the Defendant poses to the community.  The Defendant requests to be released from prison, returned to his home where his co-defendant, KENNETH WARREN RHULE, and the Defendant's wife are residing. He requests to be returned to the same property where the Defendant and KENNETH WARREN RHULE manufactured and distributed marijuana, in a remote portion of Monroe, Washington.  The risks inherent in allowing co-defendants to reside together, in remote

---

[62] Huang had renounced her Chinese citizenship and no longer possessed a Chinese passport.  Huang was ultimately deemed to be safety valve eligible because, unlike the Defendant she was neither a leader of the conspiracy nor possessed weapons.

locales, once used to commit the charged offenses, are apparent.  These risks are further heightened by the strain that COVID-19 has placed on our Probation Office, reducing its ability to effectively monitor defendants and conduct regular home visits.  Additionally, as the Court knows, ankle monitors can be tampered with and removed, ultimately providing law enforcement with only moments' notice to apprehend suspects intent on fleeing.

The only remaining argument the Defendant advances for release concerns the current pandemic.  The government does not take the risk posed to prisoners during the COVID-19 outbreak lightly.  It was because of this risk that the government devised a strategy to escort the Defendant on a commercial flight, rather than having transported through multiple institutions facing COVID-19 outbreaks.  But the risks at FDC SeaTac, while worthy of concern, are improving and do not compel release.  At present, 16 inmates are infected with COVID-19, 13 of which are male.  Thirty inmates who have previously tested positive have since recovered.  Additionally, two staff members are currently suffering from COVID-19, and five staff members who previously tested positive have since recovered.  Given that the FDC SeaTac houses 648 inmates, this represents a 2% infection rate among inmates, which is lower than that present in King County.  The Bureau of Prisons is taking aggressive steps to quell any further spread, isolating inmates and placing units on lockdown in order to avoid additional infections.  Furthermore, the Defendant is not a high-risk inmate, as he is comparatively young (45) and, according to his PSR, suffers from intermittent asthma that is controlled by albuterol—a non-steroidal inhaler—and Claritin.  In light of the Defendant's substantial flight risk, and danger to the community, the Defendant should be detained despite the current health climate.

1

## V.   CONCLUSION

2      In light of the pending charges, there is a presumption of detention in this case.  The

3  Defendant has failed to rebut that presumption, posing both a risk of flight and a danger to

4  the community.  The Defendant's compelling motivation to flee—to avoid a lengthy prison

5  sentence and separation from his spouse—coupled with his proven ability to evade law

6  enforcement detection require that the Defendant be detained pending trial.

7

8      DATED this 16th day of September, 2020.

9

10                                 Respectfully Submitted,

11                                 BRIAN T. MORAN
                                   United States Attorney
12

13                                 */s/ Marie M. Dalton*
                                   MARIE M. DALTON
14                                 Assistant United States Attorney
                                   United States Attorney's Office
15                                 700 Stewart Street, Suite 5220
                                   Seattle, Washington 98101
16
                                   Phone: (206) 553-1511
17                                 E-mail: marie.dalton2@usdoj.gov

18

19

20

21

22

23

24

25

26

27

28