The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

          Plaintiff,

    v.

KENNETH JOHN RHULE,

          Defendant.

NO. 20-cr-105 JCC

DEFENDANT RHULE'S REPLY IN SUPPORT OF MOTION TO REVIEW AND REVOKE MAGISTRATE JUDGE'S DETENTION ORDER AND RELEASE DEFENDANT ON CONDITIONS

ORAL ARGUMENT REQUESTED

Noted for: September 18, 2020

## I.   INTRODUCTION

On July 24, Magistrate Judge Tsuchida rejected the recommendation of Pretrial Services that Defendant Kenneth John Rhule ("Mr. Rhule"), a near-lifelong area resident who faces prosecution on a single count of conspiring to manufacture marijuana distillates, be released on conditions, instead ordering him confined at FDC SeaTac to await the disposition of his case. The Magistrate Judge appears to have concluded that Mr. Rhule posed too great a flight risk to release because of his purported "significant ties" to Russia and his special skill as a pilot, which might allow him to abscond in an aircraft the government had not been able to locate. *See* Motion Exhibit ("Mtn. Exh.") M (Dkt. 61) (7/24/2020 Detention Hearing Transcript) at 32–33.

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 1

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Mr. Rhule has moved the Court to revisit that decision, his arguments supported by 25 exhibits including numerous witness declarations and letters of support. *See generally* Dkt. 61 ("Mtn."). These submissions show in detail how the case for releasing Mr. Rhule—the outcome Pretrial Services still recommends today—has strengthened since July 24. *None* of the following new information was before the Magistrate Judge on that date:

- Evidence from Olga Rhule's attorney, showing that when Mr. Rhule and Olga spoke on May 7 they both believed, based on counsel's advice, that Olga's best chance of obtaining lawful status in the United States would require her first to return voluntarily to Russia, and that their conversation contemplated that Mr. Rhule would *temporarily* accompany her there in support of that plan;[1]

- Evidence that Mr. Rhule has no substantial "ties to Russia," a distant and forbidding place where he does not speak the language and has never set foot;[2]

- Evidence that the elusive "second aircraft" in which the government warned that Mr. Rhule might flee to Russia has been located and is undeniably inoperable;[3]

- Evidence that Mr. Rhule has a long history of creating and operating successful legitimate businesses that employed many people;[4]

- Evidence that Mr. Rhule's family ties are genuine and strong, and that his family is firmly anchored in this District;[5]

- Evidence from Mr. Rhule's family and friends, vouching for his reliability and promising the Court to support him in complying with conditions of release;[6]

---

[1] *See* Mtn. at 11–15; Mtn. Exh. R (Declaration of Nicholas Marchi).

[2] *See* Mtn. at 15–16.

[3] *See* Mtn. at 16–17.

[4] *See* Mtn. at 10; Mtn. Exh. E (Letter from Johanna and Ken Rhule); Mtn. Exh. I (Letter from Leah Barger).

[5] *See* Mtn. at 7–9; Mtn. Exh. E (Letter from Johanna and Ken Rhule); Mtn. Exh. G (Letter from Keri Street); Mtn. Exh. H (Letter from Greg Weiner); Mtn. Exh. I (Letter from Leah Barger); Mtn. Exh. Q (Letter from Megan Fletcher).

[6] *See* Mtn. at 8–9, 25–26; Mtn. Exh.E (Letter from Johanna and Ken Rhule); Mtn. Exh. G (Letter from Keri Street); Mtn. Exh. I (Letter from Leah Barger).

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 2

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

- Evidence from two different family members of Mr. Rhule, offering to serve as third-party custodians to help ensure his appearance and compliance;[7]

- Evidence that two different family members are willing to stake their residences on Mr. Rhule's promise to comply with all conditions of release;[8]

- Evidence that Mr. Rhule, his co-defendant, and his wife are all willing to forfeit automatically all interest in the property the government has targeted for forfeiture in the Indictment if Mr. Rhule violates his conditions of release;[9]

- Evidence that Mr. Rhule is willing to comply with home detention with GPS monitoring;[10] and

- Evidence that Mr. Rhule is willing to comply with a complete ban on using or accessing the internet while he is released on conditions.[11]

The government's response (Dkt. 64, "Opp.") largely ignores these facts.   The government of course is free to insist that Mr. Rhule should remain jailed notwithstanding this mountain of new evidence, but its silence speaks volumes.

## II.   ARGUMENT

### A.   The government effectively concedes that Mr. Rhule poses no great threat to public safety.

Mr. Rhule may be detained on "threat to public safety" grounds only if clear and convincing evidence shows that he poses an unacceptable danger to the community.   The government's arguments on that score, *see* Opp. at 26–27, are weak.   First, guns were recovered in March from the property in rural Snohomish County where Mr. Rhule then resided, and two appear to have been previously reported as stolen.   *See* Opp. at 26.   Any danger from those

---

[7] *See* Mtn. at 24–25; Mtn. Exh. E (Letter from Johanna and Ken Rhule); Mtn. Exh. G (Letter from Keri Street),

[8] *See* Mtn. at 25–26; Mtn. Exh. E (Letter from Johanna and Ken Rhule); Mtn. Exh. G (Letter from Keri Street).

[9] *See* Mtn. at 26.

[10] *See* Mtn. at 19, 24.

[11] *See* Mtn. at 24.

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 3

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

firearms has been neutralized.[12]   The government's other argument—that if mishandled, the chemicals used to process marijuana can cause fires or explosions, *see* Opp. at 26–27—fares no better.  Any marijuana processing on the property in Monroe has now ended, and any dangerous chemicals identified during the March 10 search have presumably been removed by the government and secured or disposed of.[13]

The government fails to show even by a preponderance, much less by clear and convincing evidence, that Mr. Rhule threatens public safety.[14]   Accordingly, we turn to the real issue: whether, in light of all the evidence now before the Court, the government has shown by a preponderance of the evidence that no possible conditions of release can reasonably assure Mr. Rhule's presence at future proceedings.

**B.** **Contrary to the government's view, Opp. at 27, the flight risk posed by Mr. Rhule does not "compel" detention.**

**1.** **Olga Rhule's immigration situation gives Mr. Rhule no "compelling motive to flee" (Opp. at 1).**

The government emphatically insists that Mr. Rhule's wife Olga can never obtain legal immigration status here in the U.S.[15]   Thus, it contends, any mention by Mr. Rhule and Olga of

---

[12] As Mr. Rhule has noted, in this case the standard pretrial services condition restricting access to firearms led directly to the post-search removal of additional unsecured weapons from the premises, which were then safely stored elsewhere.  *See* Mtn. at 23 n.34.

[13] The government also says a "history" of "obstruction" and "failure to comply" show that court orders cannot restrain Mr. Rhule's behavior.  Opp. at 24. Specifically, it alleges that Mr. Rhule continued operations at the Monroe property even after a Snohomish County employee advised him that it might violate the local zoning code to process marijuana at that location.  *See id*. at 24–25.  The government also cautions that Mr. Rhule drunkenly engaged in dangerous misconduct during a traffic stop a decade ago.  *Id*.  In any case, any marijuana processing at that site has ceased and will not resume. As for the traffic stop, Mr. Rhule regrets his behavior.  But these incidents fall far short of showing dangerousness that only incarceration at FDC SeaTac during a global health crisis can curb.

[14] Indeed, it admits as much.  *See* Opp. at 27 (calling the purported flight risk from Mr. Rhule, "evidenced by his express plan to flee to Russia," the "primary force compelling detention in this case").

[15] *See* Opp. at 1 (once she departs, Olga "has no lawful path" to return here), 9 (Mr. Rule "faces certain separation" from Olga), 12 (same).

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 4

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

his traveling to Russia—like the one in their recorded telephone conversation on May 7—necessarily refers to *fleeing to* Russia to avoid prosecution, never to return.  *See* Opp. at 9–14.

Whether Olga Rhule will be permitted to reenter the United States is undetermined.  Her veteran immigration lawyer says the answer may be yes if she voluntarily returns to Russia and seeks a consular waiver of her conceded excludability.[16]  That was his advice to her, and why he counseled her to request a voluntary departure.  *Id.*  The government's counsel here (a very talented and persuasive federal prosecutor, but not, as far as undersigned counsel is aware, an expert in the parochial intricacies of United States immigration law), on the other hand, declares that the answer is assuredly no.[17]  But if that were self-evidently correct, it would be easy enough to submit a contrary expert legal opinion from a comparably qualified immigration attorney.  Absent any such evidence, the Court may reasonably infer that the question is a more nuanced one.

Moreover, as Mr. Rhule has pointed out, on Aug. 6 Olga Rhule heard an experienced Immigration Judge endorse her attorney's view of the law—that by voluntarily departing she was ***preserving for herself a lawful path to eventually return to this country***.[18]  The government airily dismisses this observation, calling it "dicta" lacking "precedential weight," and asserts that "waiver eligibility was not before the [immigration] court [when] the statement was made."  Opp. at 13 n.16.  The first response is irrelevant, and the second is plainly incorrect, at best.

First, whatever the government means by "precedential weight," the immigration judge's comment confirms that immigration counsel's advice to Ken and Olga Rhule about her prospects for eventually returning to the U.S. was at least reasonable.  That fact, in turn, corroborates immigration counsel's statement that he so advised them.  And *that* means that the

---

[16] *See* Mtn. Exh. S (Second Declaration of Nicholas Marchi); Mtn. Exh. R (Declaration of Nicholas Marchi).

[17] *See* Opp. at 12 ("Olga Rhule will not be permitted to return to the United States").

[18] *See* Mtn. Exh. S (Second Declaration of Nicholas Marchi); Mtn. Exh. T (Second letter of Olga Rhule).

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 5

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

Court should assume that when Ken and Olga spoke on May 7, they shared that understanding of her situation based on counsel's advice, and should interpret their conversation in that light.[19]

The government gamely urges its certain view of Olga's legal status,[20] but this Court need not undertake to resolve that thorny question.  The undisputed *evidence* before the Court is that in the view of an experienced immigration judge and a longtime immigration lawyer, Olga Rhule *does* have a legal path to eventually be readmitted to the United States that begins with voluntary departure, and that her lawyer so advised her.[21]  Just as important, her opportunity for such a lawful admission will be forever dashed if Ken Rhule fails to appear in this case.[22]

Even if one credits the government's prediction that once Olga departs the U.S. she will never be allowed to re-enter, its argument misses the point.  The question is not whether *in fact* Olga has a path, however long, to legal status in this country but whether, when she and Mr. Rhule spoke on May 7, they *believed* that she might—*as they had been advised by Olga's immigration counsel.  See* Mtn. at 11, 15.  If so, then their conversation reads entirely differently. In that light, their exchange at that time is fully consistent with a plan for Olga to return to Russia voluntarily and remain there temporarily, with Mr. Rhule at her side for support, while she seeks permission to legally reenter the United States.[23]

---

[19] As for whether "waiver eligibility" was formally before the immigration judge on Aug. 6, that proceeding was scheduled to be a merits hearing on her removability, so the judge unquestionably familiarized himself with the facts about Olga's background, including those the government cites in arguing that she has no "lawful path" to return.

[20] *See* Opp. at 12–14 (citing cases and attempting to parse several immigration statutes).

[21] *See* Mtn. Exh. S (Second Declaration of Nicholas Marchi); Mtn. Exh. T (Second letter of Olga Rhule).

[22] *See* Mtn. Exh. R (Declaration of Nicholas Marchi); Mtn. Exh. L (Letter from Olga Rhule).

[23] The government insists that if Mr. Rhule were planning to go to Russia, "regardless of [his] reason" for doing so, that fact alone "makes [him] a substantial flight risk." Opp. at 12.  That is nonsense. This circumstance only supports a finding that Mr. Rhule is a "flight risk" if he was contemplating *flight from prosecution*.  If he had been planning an innocent vacation overseas, no reasonable person would say that fact makes him a "substantial flight risk."  Mr. Rhule's motive in considering traveling to Russia last spring is *integral* to the question of whether he poses an unacceptable flight risk now. Now that he is charged with a crime, he will stay to answer to the charges.

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 6

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

In short, the government's insistence that Olga Rhule has no real hope of returning legally to the U.S. is a red herring. Its significance here depends on the false premise that Mr. Rhule and Olga *knew* on May 7 that she had no such hope, and thus that their talk of possibly traveling to Russia was necessarily a conversation about going on the lam. The evidence now before the Court squarely rebuts that inference. *See* Mtn. at 11–15.[24]

> **C.   The government has not demonstrated that Mr. Rhule presently has the "means to flee prosecution," Opp. at 16, and the proposed conditions of release will reasonably assure his appearance in any event.**

The government urges that Mr. Rhule has been "honing" his ability to "hide from law enforcement" via familiarizing himself with computers and online arcana, and that no conditions of release can minimize this array of risks. Opp. at 16. This assertion ignores the evidentiary record, the current posture of the case, and the modern tools employed by federal pretrial services and regularly authorized by the judges in this District.

First, if necessary, the Court can minimize any threat posed by Mr. Rhule's purported computer skills by eliminating his online access *altogether*. *See* Mtn. Exh. Y (proposing that Mr. Rhule be banned from using "any device that can access the internet," other than a telephone to be used solely for maintaining contact with persons approved by Pretrial Services).[25] *The government completely fails to address the impact of this proposed condition.*

The government has already accounted for a substantial portion of Mr. Rhule's financial assets. *See* Opp. at 20–23. Yet it asserts that Mr. Rhule can deploy "vast" cryptocurrency

---

[24] Conspicuously, the government has no response to Mr. Rhule's point that when he and Olga spoke on May 7, he knew their conversation was being recorded. *See* Mtn. at 14. Especially if Mr. Rhule then believed that his "inevitable" arrest was likely "imminent," *id.* at 9, why on earth would he broadcast the fact that he was arranging to travel to Russia, an intention sure to attract the attention of federal law enforcement?

[25] Indeed, Mr. Rhule would assent to a condition that he may possess only a telephone that cannot access the internet at all—a landline, or a mobile phone that is not a smartphone.

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 7

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1

2

reserves that remain "outside … law enforcement's current grasp." *Id.* at 22.  Thus "armed," it warns, he can "flee the jurisdiction and live comfortably." *Id.* at 22–23.[26]  This claim is baseless.

3

4

5

6

7

First, since the government has enjoyed months (at least) of unfettered access to all of Mr. Rhule's electronic data, any outstanding reserves will likely soon be accounted for.  And in the very unlikely event that they are not, the proposed conditions of release not only restrict Mr. Rhule from using the internet, *see supra*, but forbid him from engaging in any transaction involving cryptocurrency without Pretrial Services' express consent.  *See* Mtn. at 24.[27]  That will keep him from accessing funds to acquire assets he might use to flee.

8

9

10

11

12

13

14

More important, the government asserts that if released from custody, Mr. Rhule will simply head for the hills, leaving his family members behind to lose their homes, and then just "reimburse [them] for any losses incurred."  Opp. at 23.  The government is wrong.  To Mr. Rhule, his loved ones' homes are more than digits in some electronic ledger.  Mr. Rhule's extended family is tightly knit, *see* Mtn. at 7–9, and he realizes that his parents and his sister's family have made substantial financial commitments to support his release. He appreciates that his family members, despite their dismay at the accusations against him, have publicly staked their most valuable possessions on their belief that his promises of compliance can be trusted.

15

16

17

18

19

[26] The stated concerns about Mr. Rhule's use of "shell corporations" to "hide" his "assets, vehicles, and residence," Opp. at 18–24, are similarly overblown.  There is nothing inherently suspicious about placing the legal ownership of valuable assets in a corporate entity, *see* Mtn. at 17–18, and in any event the fact that this information has all been provided to undersigned counsel via discovery makes it crystal clear that *government investigators can readily discover it*.  The government's mastery of this information allays any fears that Mr. Rhule might form secret companies to hide assets while on pretrial release. More to the point, no such scheming can create assets (a car, a van, an aircraft) out of thin air, and Mr. Rhule is unlikely to be able to acquire them.

20

21

22

23

[27] ***The government advanced precisely the same "cryptocurrency" claim*** in arguing that Mr. Rhule's son Kenneth Warren Rhule should have to disclose additional financial information as a condition of his own release. ***Magistrate Judge Peterson rejected this argument,*** correctly concluding that no such additional condition was necessary to assure Kenneth Warren Rhule's appearance, because given his longstanding ties to this District, the risk of flight could be minimized by barring him from traveling outside the District and requiring him to maintain his residence, disclose his monthly cash flow, and surrender his passport.  *See* Mtn. Exh. D (Order Granting Kenneth Warren Rhule's Motion to Modify) at 4.

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 8

The government has given the Court no reason to believe that Mr. Rhule would respond with casual cruelty to that remarkable gesture of love and support.

### D. Mr. Rhule is not a fully licensed private pilot and has no more "access" to airplanes than any other accused person on pretrial release.

The government now contends that Mr. Rhule is a flight risk because he is a private pilot with what it now calls "access to airplanes." Opp. at 25. On July 24, it urged detention because Mr. Rhule was a pilot and it could not locate the "second plane" in which he might escape to Russia. *See* Mtn. Exh. M (7/24/20 Detention Hearing. Transcript) at 14. The elusive second aircraft has since turned up inoperable in Chelan.[28] The government understandably wants to change the subject from the vigorous argument it made to persuade Magistrate Judge Tsuchida that Mr. Rhule's detention was necessary.

And to be sure, the Court should turn the page. But the government's energetic insistence on pressing the "second plane" argument at the detention hearing, where relaxed "rules of evidence apply,[29] suggests a disconcerting carelessness with the facts.[30]

The government's newest take is that Mr. Rhule's status as a student pilot gives him "access to airplanes," such that he could rent a plane and fly away. *See* Opp. at 25. But this

---

[28] The plane has no propeller and its engine cowl conceals a bucket of cement rather than an engine. According to the airplane mechanic, the actual engine, now disassembled, is not repairable. *See* Mtn. Exh. W (Aug. 2020 Photos of Second Aircraft).

[29] *See* John L. Weinberg and Evelyn J. Furse, Federal Bail & Detention Handbook 2019, [6:8] ("Evidence" and Procedure at Detention Hearing), PLI Press (New York 2019).

[30] Similar concerns attend some of the government's other factual assertions. For example, in its original opposition the government squarely asserted that Mr. Rhule "did, *in fact*, apply for an expedited passport," which allegation it has now dropped in the absence of any supporting evidence. *See* Dkt. 52 at 14 (emphasis added); *cf.* Opp. at 10–11. Similarly, the government originally asserted that at the time of his May 7 conversation with Olga, Mr. Rhule was "preparing to live in Russia *for an extended period of time*;" now the government says only that he was taking "steps to prepare to live in Russia." *See* Dkt. 52 at 12 (emphasis added); *cf.* Opp. at 10. Such shifting descriptions inspire little confidence. Similarly, the government asserts that "*the United States* made alternative arrangements" to get Mr. Rhule back to this District from Hawaii, Opp. at 3, knowing full well that it was *undersigned counsel* who purchased a commercial airplane ticket for Mr. Rhule and hired a former FBI agent to escort him to the plane (acceding to the government's request to substitute an HSI agent only as a courtesy accommodation to get the task accomplished).

---

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 9

argument erases any distinction between Mr. Rhule and anyone else, rendering the increased

flight risk from his status as "a pilot" meaningless.  After all, anyone who can rent an aircraft

can just pay someone to fly them.[31]

In the end, the government's contention that Mr. Rhule's status as a student pilot makes

him likelier to flee by giving him some amorphous "access to airplanes" simply proves too

much.  There is literally no way of ensuring with absolute certainty that any arrestee released

on conditions in this District, pilot or no, will not try to rent a plane or hire a pilot to fly to

Canada.  Or for that matter, that such a person will not simply try to cut off his GPS bracelet,

head for the border on foot, and attempt to walk into Canada.  But the multiple overlapping

systems of surveillance and detection available to the government and pretrial services make

such risks vanishingly small.  If Mr. Rhule heads for an airport, the GPS will give his location

away.  Cutting off the GPS bracelet will trigger an alarm that brings law enforcement

swarming.[32]  If Mr. Rhule sneaked into Canada, he would face arrest and extradition, plus

---

[31] Or they can buy a ticket on a commercial flight—just as Mr. Rhule did a few days *after* his May 7 phone conversation with Olga, when he flew roundtrip to Florida with his son Connor.  *See* Exh. Z (American Airlines Receipt).  This evidence undercuts the government's claim that after agents questioned him at the Snohomish Airport on May 4, Mr. Rhule was cognizant of his "inevitable" arrest. Opp. at 9.  Fairly read, the agents' report suggests that Mr. Rhule still thought it was his son Kenneth Warren Rhule who was in trouble, not him.  *See, e.g.*, Opp. Exh. 1 at 4 ("Kenneth J. RHULE stated multiple times that [the plane had] "nothing to do with Kenny (Kenneth W. RHULE)" or "his stuff"). While the government asserts that the agents "expressly told" Mr. Rhule "that he was under investigation and was a target in the case," Opp. at 9, the report actually says the agents "explained" only that "it was "likely he would be *receiving a target letter*," because he "did have *a connection to the investigation of his son* Kenneth W. RHULE." *Id.* at 7 (emphasis added).  Mr. Rhule, as a layperson, cannot be assumed to have understood that the "connection" the agents had in mind was that he would soon be charged alongside his son.  Even if Mr. Rhule believed he was going to be charged, he probably thought he, like his son, would be treated fairly and released on conditions pending the resolution of his case. Certainly, if Mr. Rhule believed his arrest was "imminent," *and was of a mind to flee the criminal justice system,* would he really have flown to Florida, then back again, then flown again by commercial carrier to Honolulu?  If at every moment after May 4 Mr. Rhule believed that his arrest was looming, why did he not flee then?  What could possibly have put him *more* on the federal government's radar than flying commercially across the entire breadth of the United States?

[32] The government breezily dismisses the detection, surveillance, and reporting conditions proposed here.  Opp. at 14 ("The United States land border is extensive, human smugglers are prevalent, and fraudulent passports can be readily purchased.").  But it fails to acknowledge that such conditions are the standard and well-established tools of every federal pretrial services office in the United States and reliably serve to minimize unwarranted pretrial detention.  *See* https://www.uscourts.gov/services-

---

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 10

skellenger bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1  additional charges that increase any potential prison term, and in the bargain would forfeit his

2  parents' home, his sister's home, and his own.

3      The chances that Mr. Rhule will attempt to abscond in the face of home detention as

4  well as comprehensive real-time monitoring of his behavior and whereabouts are very remote,

5  but not zero. If that were enough to rule out release, however, every arrestee in this District

6  would remain locked up until trial.  In the mine run of cases, the system—eliciting the releasee's

7  promise to abide by reasonable conditions, adding additional leverage where appropriate (*e.g.*,

8  a surety bond secured by real property), and then overseeing his compliance—works. Nothing

9  in the government's response credibly suggests that it will not work here.

   **E.      The government exaggerates the stakes in this case and the purported
           strength of its evidence against Mr. Rhule does not weigh heavily in favor of
           continued detention.**

10     From the opening sentence of the government's response, it links the prospect of a ten-

11  year mandatory minimum sentence to the "flight risk" Mr. Rhule purportedly presents.  *See* Opp.

12  at 1.  The government then later describes *United* States *v. Xiamin Huang*, CR18-124 JCC

13  (October 16, 2018) as "comparable" to Mr. Rhule's case because Ms. Huang likewise faced a

14  "ten-year mandatory minimum" sentence.  *See* Opp. at 28.  The government never mentions that

15  when Ms. Huang's case was resolved by a guilty plea, she received a sentence of *just 24 months*.

16  *See* Exh. AA (*Huang* Judgment).  Ultimately, the Court agreed that *two* years in prison, rather

17  than *ten*, was appropriate punishment in a case involving marijuana (rather than, *e.g.*,

18  methamphetamine, heroin, or fentanyl).  Focusing on the real stakes in *Huang* (and here) is

19  essential to assessing how genuine a risk of flight Mr. Rhule poses.[33]

20  forms/probation-and-pretrial-services/probation-and-pretrial-services-supervision, last accessed on
    September 4, 2020.  Resort to these time-tested methods is even more critically important now that a
21  potentially lethal worldwide pandemic threatens the safety of pretrial detainees, lawyers, and court staff.

22  [33] Other important facts explain why detention was appropriate in *Huang* but not here: (1) Ms.
    Huang was born and raised in China and lived there until age 21, and thus—in contrast to Mr. Rhule—
    *did* have significant ties to a foreign country, including a hometown, real family connections, familiarity
23  with the foreign culture, and language ability; (2) at the time of her arrest, Ms. Huang had been a U.S.
    citizen for just four years and had lived in Seattle for barely 10, contrasted with Mr. Rhule, a native-born

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 11

skellenger**bender**

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

The government spends pages detailing the evidence it says it has collected against Mr. Rhule.  *See* Opp. at 3–8.  Mr. Rhule, of course, is presumed innocent.  And respecting release, the weight of the evidence against the accused on the charged offense is the least important factor. *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985) (citation omitted).  It does appear that marijuana was being illicitly processed and distributed at the property in Monroe.  And the government has undertaken extensive electronic communications surveillance of Mr. Rhule and his son, as well as netting (via search warrant) the equivalent of many thousands of pages of data.  Given all that, it is noteworthy that beyond the allegation that he may have let his son use the outbuilding to process marijuana "trim," a couple of emails from 2014–16 are still the best evidence the government can produce to show Mr. Rhule's personal involvement in manufacturing marijuana.

While a mandatory ten-year sentence might follow conviction in this case, the only real relevance of that mandatory term at this early juncture (*see* discussion of *Huang*, *supra*) is that it triggers a presumption of detention.  *See* 18 U.S.C. §3142(e). But Congress specifically made that presumption *rebuttable*.  *See id*.[34]  Even if the Court credits the government's allegations against Mr. Rhule, it should find that the extensive new evidence he has proffered has rebutted the presumption that he should be detained.

U.S. citizen who has lived in the greater Seattle area three times as long; (3) after coming to the United States in 2010, Ms. Huang continued to travel extensively to China and Canada, while in contrast there is no evidence of comparable travel for Mr. Rhule—and *never any travel to Russia*; and (4) while detained at FDC SeaTac, Ms. Huang was not at risk of contracting a pervasive and deadly viral infection.

[34] That qualification is likely required by due process, given our traditional assumption that pretrial detention must be a "carefully limited exception" to personal liberty. *United States v. Salerno*, 481 U.S. 739, 755 (1987).  For the same reason, the accused's burden in rebutting that presumption is slight.  *See*, *e.g.*, *United States v. Chen*, 820 F. Supp. 1205, 1208 (N.D. Cal. 1992).

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 12

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1

2

**F.     The threat to Mr. Rhule's health if he remains at FDC SeaTac is real, and weighs in favor of release.**

3

As of today (Sept. 17), the BOP website counts **57** cases of COVID-19 (50 detainees, 7

4

staff) at FDC SeaTac.[35] The government says that the situation there is "improving," and insists

that being incarcerated at the FDC is safer than living at large in King County.  Opp. at 30.[36]

5

While it is to be hoped that the number of cases at FDC SeaTac soon declines, hope is

6

not a plan.  The outbreak may resist quick suppression, particularly given that Chief Judge

7

Martinez confirms that the virus got in even though everyone "tried like hell" to keep it out.[37]

8

The government downplays the significance of Mr. Rhule's medical condition (asthma,

presently treated with an inhaler and over-the-counter medication), observing that at 45 he is

9

"comparatively young." Opp. at 29.  But the virus can kill at all ages,[38] and the death rate inside

10

prisons has been estimated as *three times higher* than outside.[39]

11

Standing alone, the genuine threat to Mr. Rhule's long-term health posed by the COVID-

12

19 outbreak at FDC SeaTac might not warrant releasing him from otherwise justified

13

14

[35] The government claims 16 active infections among detainees (plus 30 "recovered") and 2 active infections among staff (plus 5 "recovered").  Opp. at 29.  The BOP's official site, however, lists 50 "inmates positive" and 7 "staff positive" at FDC SeaTac, with just 1 "inmate[s] recovered" and 0 "staff recovered."

15

16

[36] Remarkably, the government nowhere even acknowledges that its confident assertion at the detention hearing before Magistrate Judge Tsuchida—that "SeaTac['s] COVID procedures are working"—was wildly off-base.  *See* Mtn. Exh. M. (7/24/20 Detention Hearing Transcript) at 28–29.

17

18

[37] He also called 37 cases, far fewer than now exist at SeaTac, a "serious situation." *See* Jim Brunner, "COVID infections hit 31 inmates and 6 staff at federal detention center in SeaTac," The Seattle Times (Aug. 28, 2020) (available at https://www.seattletimes.com/seattle-news/health/covid-infections-hit-31-inmates-and-6-staff-at-federal-detention-center-in-seatac/) (last visited Sept. 3, 2020).

19

20

[38] A 49-year-old federal prisoner, serving time for selling cocaine, died of COVID-19 in March. *See* "Inmate dies of Covid-19 at federal prison in Oakdale," KPLC-TV news (available at https://www.kplctv.com/2020/03/30/st-federal-inmate-dies-covid-fci-oakdale-i/) (last visited Sept. 3, 2020).

21

22

[39] *See* Johns Hopkins School of Public Health, "COVID-19 Cases and Deaths in Federal and State Prisons Significantly Higher Than in U.S. Population" (July 8, 2020) (available at https://www.jhsph.edu/news/news-releases/2020/covid-19-cases-and-deaths-in-federal-and-state-prisons-significantly-higher-than-in-u.s.-population.html) (last visited Sept. 3, 2020).

23

skellenger bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

confinement.  But in the circumstances of this case, the presently uncontrolled spread of the pandemic inside FDC SeaTac should surely tip the balance in favor of release.

**III.    CONCLUSION**

The government has no answer to the extensive evidence supporting release that Mr. Rhule has now presented—virtually *none* of which was before the Magistrate Judge on July 24. Understandably, then, the government clings to the statutory presumption that Mr. Rhule must remain in jail because he technically faces a 10-year mandatory prison term.[40]   But that threadbare presumption is rebuttable, and Mr. Rhule's new evidence richly rebuts it.  He has thoroughly disrupted the government's speculative theory that led Magistrate Judge Tsuchida to incarcerate him: that when Mr. Rhule was taken into custody, he was poised to flee to Russia with his Russian-born wife.  And he has presented powerful evidence of his enduring ties to this community and identified numerous and varied evidence-based approaches for minimizing any risk of flight or danger to the community that might conceivably be present here.  On this fully-developed record, the Court should not hesitate to order release and permit Mr. Rhule, in his sister Keri's words, to "be home with his family while he awaits next steps."  *See* Mtn. Exh. G.

Dated this 18th day of September, 2020.

Peter Offenbecher, WSBA No. 11920
SKELLENGER BENDER, P.S.
Attorneys for Kenneth John Rhule

---

[40] *See* Opp. at 1, 3, 4, 15.

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 14

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

### CERTIFICATE OF SERVICE

I, Jule Freeman, certify that on September 18, 2020, I electronically filed Defendant Rhule's Reply in Support of Motion to Review and Revoke Magistrate Judge's Detention Order and Release Defendant on Conditions (with Exhibits Z–AA) with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record.

DATED this 18th day of September, 2020.

_____
Jule Freeman
SKELLENGER BENDER, P.S.
Case Analyst

DEFENDANT RHULE'S REPLY IN SUPPORT OF
MOTION TO REVIEW AND REVOKE
MAGISTRATE JUDGE'S DETENTION ORDER AND
RELEASE DEFENDANT ON CONDITIONS – 15

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501