THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                   Plaintiff,<br><br>        v.<br><br>KENNETH JOHN RHULE,<br><br>                   Defendant. | CASE NO. CR20-0105-JCC-2<br><br>ORDER |

This matter comes before the Court on Defendant Kenneth John Rhule's motion to revoke United States Magistrate Judge Brian Tsuchida's order detaining Mr. Rhule before trial (Dkt. No. 61) and the Government's motion to seal certain exhibits (Dkt. No. 65). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby DENIES the motion to revoke the detention order and GRANTS in part and DENIES in part the Government's motion to seal for the reasons explained herein.

I.     **BACKGROUND**

On March 10, 2020, the Government searched the property where Defendant Kenneth Rhule lives with his wife and son. (*See* Dkt. No. 1 at 16–19.) Law enforcement discovered nearly 1,000 kilograms of marijuana, a warehouse that appeared to be equipped for manufacturing large quantities of marijuana distillates and extracts, packing and shipping materials, hundreds of thousands of dollars of cryptocurrency, and a laptop open to a dark web vendor page advertising

marijuana products. (*See id.*)

The Government arrested Mr. Rhule's son, Kenneth Warren Rhule, and charged him with conspiring to manufacture and distribute marijuana. (*See id.* at 19.) The Government also arrested Mr. Rhule's wife, Olga, because she is a Russian citizen who has been living in the United States without legal status for the past two decades. (*See* Dkt. Nos. 61 at 12–13, 64 at 9.) Mr. Rhule was not arrested. (*See id.* at 4.)

Over the next two months, the Government detected an aircraft repeatedly flying low over the Northwest Detention Center, where Olga was held. (*See* Dkt. No. 64-1 at 6.) On May 4, 2020, law enforcement traveled to Harvey Airfield to search Mr. Rhule's plane. (*See id.* at 2–3.) Officers encountered Mr. Rhule, and asked him if he had been flying over the Northwest Detention Center. (*See id.* at 6.) Mr. Rhule admitted that he had and explained that he was flying over the detention center to provide moral support for Olga. (*See id.*) Toward the end of the conversation, law enforcement warned Mr. Rhule that he would likely be receiving a "target letter" from the U.S. Attorney's Office because he had "a connection to the investigation of his son." (*See id.* at 7.)

Three days later, Mr. Rhule had the following conversation with Olga:

Olga Rhule:   First of all let me ask you this. I'm not getting out any time soon right?

Defendant:   I don't think so.

Olga Rhule:   How much time . . . approximately?

Defendant:   I don't know if there is a time limit that you're going to get out. I think we may have to have you go back to Russia, and me meet you there.

Olga Rhule:   Well if that happens how much time?

Defendant:   He couldn't answer that question because of COVID. But it sounds like your hearing is on the 28th.

Olga Rhule:   29th.

Defendant:   29th. Is it the 29th? I thought it was the 28th. So you can basically, um . . . At the hearing you're gonna, you're gonna basically say you're not gonna

|   |   |   |
|---|---|---|
| 1 |   | challenge it anymore, you know and you want to go just proceed with the deportation. |
| 2 | Olga Rhule: | Can it not happen sooner? |
| 3 |   |   |
| 4 | Defendant: | He said from there—He said he didn't think so but I'll push that issue more but . . . I'll see if—He'll have to do another one of these requests to move the hearing up kind of thing and they'll have to grant it or not. |
| 5 |   |   |
| 6 | Olga Rhule: | Can you try? |
| 7 | Defendant: | Yes I can try. Of course. Um . . . But here's the thing, even with that, it's gonna take me about that long to get my passport and visa and stuff like that situated so I'm working on that now to get that expedited. |
| 8 |   |   |
| 9 | Olga Rhule: | OK. |
| 10 | Defendant: | I was gonna go down this afternoon and get my pictures real quick so I can mail off the passport document and I'm gonna do it instead of normal, I'm gonna do it urgent, you know the urgent time frame and pay the extra money. |
| 11 |   |   |
| 12 |   |   |
| 13 | Olga Rhule: | OK. |
| 14 | Defendant: | And then I got to apply for the visa, you know the visa over there . . . There's some other things I'm working on, but I can't talk to you about them. |
| 15 |   |   |
| 16 |   |   |
| 17 | Olga Rhule: | I understand. |
| 18 | Defendant: | You know what I'm talking about right? |
| 19 | Olga Rhule: | I think I maybe— |
| 20 | Defendant: | It's what you think. |
| 21 | Olga Rhule: | OK. |
| 22 | Defendant: | So I'm working on all that stuff right now. OK? |
| 23 | Olga Rhule: | OK. |
| 24 |   |   |
| 25 | Defendant: | And um yeah, I'll be with you no matter what. |
| 26 | Olga Rhule: | Promise? |

Defendant:     Yes. Of course I promise . . . Of course I promise.

(Dkt. No. 64 at 10–11; Dkt. No. 67.)

On July 1, 2020, the Government charged Mr. Rhule with conspiring with his son to manufacture and distribute marijuana, and Mr. Rhule was arrested two weeks later. (*See* Dkt. Nos. 1, 64 at 3.) Magistrate Judge Tsuchida ordered Mr. Rhule detained. (*See* Dkt. No. 11.) Mr. Rhule now moves for this Court to revoke Judge Tsuchida's detention order and release Mr. Rhule subject to restrictive special conditions, including home confinement and active GPS monitoring. (*See* Dkt. No. 61-1 at 177–79.)

## II.   DISCUSSION

### A.   Standard of Review

The Court reviews a magistrate judge's order detaining a defendant before trial *de novo*. *United States v. Koenig*, 912 F.2d 1190, 1193 (9th Cir. 1990). Thus, the Court makes its own factual findings and reaches an independent conclusion about whether the defendant should be detained, without deference to the magistrate judge's decision. *Id.*

### B.   Legal Standard for Detention

A defendant may be detained before trial only if "no condition or combination of conditions will reasonably assure the [defendant's] appearance . . . and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). The Government bears the burden of proving by a preponderance of the evidence that no conditions will reasonably assure the defendant's appearance and by clear and convincing evidence that no conditions will reasonably assure the safety of the community. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). When analyzing whether conditions can reasonably assure the defendant's appearance and the safety of the community, the Court must consider (1) the nature and circumstances of the offense charged, (2) the weight of the evidence, (3) the history and characteristics of the defendant, and (4) the danger to the community the defendant would pose if released. 18 U.S.C. § 3142(g).

If the Court finds probable cause to believe the defendant committed a drug offense with a maximum term of imprisonment of at least ten years, there is a rebuttable presumption the defendant should be detained. *See* 18 U.S.C. § 3142(e)(3)(A). This presumption "shifts a burden of production to the defendant," *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008), which requires the defendant to produce "some evidence" that there are conditions that would reasonably assure his or her appearance and the community's safety, *United States v. Jessup*, 757 F.2d 378, 384 (1st Cir. 1985). "The burden of production is not a heavy one to meet" and "[a]ny evidence favorable to a defendant that comes within a category listed in § 3142(g) can affect the operation of . . . the presumption[]." *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986). Once the defendant produces some evidence to rebut the presumption, "the presumption 'remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g).'" *Hir*, 517 F.3d at 1086 (quoting *Dominguez*, 783 F.2d at 707). Ultimately, "the burden of persuasion remains with the government." *Hir*, 517 F.3d at 1086.

### C.     Presumption of Detention

A grand jury indicted Mr. Rhule for conspiring with his son to manufacture and distribute marijuana and marijuana distillates in quantities sufficient to trigger a mandatory minimum sentence of at least ten years. (*See* Dkt. No. 31 at 3.) Based on the indictment, the Court finds probable cause to believe the defendant committed the offense, and the presumption of detention applies. *See Dominguez*, 783 F.2d at 706 n.7. As discussed in detail below, Mr. Rhule has presented "some evidence" favorable to him relevant to the § 3142(g) factors. Thus, Mr. Rhule has met his burden of production to rebut the presumption of detention, but the Court will still weigh the presumption along with the Section 3142(g) factors in determining whether Mr. Rhule should be released.

### D.     Danger to the Community

The Government argues that Mr. Rhule is a danger to the community because law

1   enforcement found several firearms on Mr. Rhule's property and because Mr. Rhule used

2   dangerous and potentially explosive chemicals to distill marijuana. (*See* Dkt. No. 64 at 25–27.)

3   But Mr. Rhule may not be detained "based on evidence that he has been a danger in the past;" his

4   past conduct is relevant only to the extent it suggests he will endanger the community in the

5   future. *Dominguez*, 783 F.2d at 707.

6          The Government does not even attempt to connect Mr. Rhule's alleged possession of

7   firearms in the past to Mr. Rhule's future dangerousness. The Government seized most of the

8   firearms on Mr. Rhule's property during the March 10 search, and since then the Rhules have

9   voluntarily reported and removed additional firearms that the Government missed. (*See* Dkt. No.

10  61 at 23 n.34). There is no evidence that any firearms remain on the property, nor is there any

11  evidence that Mr. Rhule has a motive to acquire new firearms. The Government concedes that

12  the purpose of the firearms was "to protect the marijuana products and cryptocurrency," (Dkt.

13  No. 64 at 26), which the Government has now seized. Further, there is no evidence that Mr.

14  Rhule ever used the firearms in furtherance of the marijuana business or to threaten or harm any

15  member of the community. Notably, the Government charged Mr. Rhule's son with possession

16  of a firearm in relation to a drug trafficking offense but not Mr. Rhule. (*See* Dkt. No. 31 at 3).

17  Therefore, the Court concludes that Mr. Rhule's past possession of firearms does not show that

18  Mr. Rhule would be a danger to the community if released.

19         Next, the Government argues that Mr. Rhule is dangerous because he could resume

20  operating his marijuana facility and it could explode. (*See* Dkt. No. 64 at 26–27.) The

21  Government overlooks that if Mr. Rhule were to be released, probation officers would regularly

22  visit his property, making it exceedingly unlikely he could resume his alleged industrial-level

23  marijuana operation without detection. The Government describes Mr. Rhule's alleged

24  marijuana-processing facility as relying on, among other supplies, "industrial-grade machinery,"

25  "a large rotary evaporator," "a 50-gallon tank of pressurized butane," "six 50-gallon drums of N-

26  Heptane," and large quantities of marijuana. (Dkt. No. 1 at 16–19.) The Court is quite confident

that the Probation Office could detect any resumption of Mr. Rhule's alleged marijuana
production.

Therefore, even considering the presumption of detention, the Government has failed to
prove by clear and convincing evidence that no set of conditions could reasonably assure the
community's safety if Mr. Rhule were to be released.

### E.    Flight Risk

By contrast, the Court concludes the Government has met its burden of proving by a
preponderance of the evidence that no set of conditions can reasonably assure Mr. Rhule's
appearance.

First, the evidence against Mr. Rhule is strong enough for him to believe there is a
reasonable chance he will be convicted. Among other evidence, the Government discovered
industrial-grade marijuana-processing equipment on his property, nearly 1,000 kilograms of
marijuana, and a laptop open to a dark web vendor page in his bedroom along with packing
materials, shipping labels, and packages containing marijuana prepared for shipment. (*See* Dkt.
No. 1 at 16–19.) The Government also discovered electronic evidence allegedly linking Mr.
Rhule to the marijuana business, including an organizational chart listing Mr. Rhule as the CEO
and electronic communications between him and his son about manufacturing and selling
marijuana. (*See* Dkt. No. 64 at 6–8.)

Next, Mr. Rhule has a strong incentive to flee to remain with his wife. Mr. Rhule and
Olga have been married for over eighteen years, and by all accounts the two have a very close
relationship. (*See* Dkt. No. 61 at 12.) Their bond is so strong that "Olga made the difficult
decision to risk staying in the United States without legal status" because "they did not want to
be apart." (*Id.*) In addition, once Olga was detained, Mr. Rhule flew his private plane over the
Northwest Detention Center on at least three occasions to show his continued support. (*See* Dkt.
No. 64-1 at 6.)

As a result of her immigration violations, Olga will be deported to Russia and will be

1   barred from returning to the United States for at least ten years. (*See* Dkt. No. 61 at 13.) The

2   parties spend several pages debating whether that ten-year waiting period is waivable in Olga's

3   case, but the Court need not resolve that dispute. Even assuming Mr. Rhule is correct that the

4   ten-year period is waivable, neither the Court nor the parties can predict whether the United

5   States Consulate in Russia will exercise its discretion to waive the waiting period for Olga.

6   Therefore, Olga faces, at a minimum, a *significant risk* that she will be barred from returning to

7   the United States for the next ten years.

8       In addition to a compelling motive, the Government argues that Mr. Rhule has the means

9   to flee and live comfortably outside the United States and has the skills to evade detection.

10   Before allegedly entering the marijuana business, Mr. Rhule founded two successful technology

11   companies that generated millions of dollars of income for Mr. Rhule and allowed him to "semi-

12   retire[]" at age 40. (*See id.* at 10.) Once he retired, Mr. Rhule's alleged marijuana business

13   generated over $2.5 million dollars in "Net Income" between 2015 and 2020. (*See* Dkt. No. 64-

14   2.) Mr. Rhule held a substantial portion of these proceeds in cryptocurrency, which was spread

15   across multiple accounts at several cryptocurrency wallet providers, including some located

16   abroad. (*See* Dkt. No. 64 at 20–23.) Mr. Rhule also stored cryptocurrency on physical hardware

17   wallets, such as the thumb drive found taped to the bottom of a chair in his living room

18   containing cryptocurrency worth more than $200,000. (*See* W.D. Wash. PSR at 3.) The

19   Government has seized only "a small fraction of the total bitcoins paid by customers" to Mr.

20   Rhule's alleged company and Mr. Rhule has converted at least $180,000 worth of

21   cryptocurrency into cash and gift cards. (*See* Dkt. No. 64 at 21–22.)

22       In addition, Mr. Rhule has taken extensive efforts to conceal his assets and online

23   activities. (*See id.* at 16–24). He has used false names, addresses, and social security numbers to

24   open email accounts, financial accounts, and to incorporate holding companies that anonymize

25   some of his assets. (*See id.*) For example, in 2016 Mr. Rhule incorporated Frontline LLC, which

26   owns his Monroe property, and named Olga's Russian father as the company's managing

member while listing the company's principal place of business as Khabarovsk, Russia. (*See id.* at 19.) Mr. Rhule created another corporation, RKK Associates LLC, using the name "John Kuhn." (*See id.* at 19–20.) Its principal place of business is a post office box in Grandville, Michigan. (*See id.* at 20.) Mr. Rhule regularly used encrypted and anonymous communication services and allegedly sold his products via the dark web. (*See id.* at 16–24.) He has also sent his cryptocurrency through "mixers," which are designed to conceal its source. (*See id.* at 21.)

It is against this backdrop that the Court considers the May 7 conversation between Mr. Rhule and Olga. During that conversation, Mr. Rhule promised Olga that he would be with her "no matter what," and told her that he was applying for a passport and Russian visa on an expedited basis. (*See id.* at 10–11.) He stated expressly, "I think we may have to have you go back to Russia, *and me meet you there*." (*Id.* at 10.) (emphasis added). Then he said the following:

| | |
|---|---|
| Defendant: | And then I got to apply for the visa, you know the visa over there . . . There's some other things I'm working on, but I can't talk to you about them. |
| Olga Rhule: | I understand. |
| Defendant: | You know what I'm talking about right? |
| Olga Rhule: | I think I maybe— |
| Defendant: | It's what you think. |
| Olga Rhule: | OK. |
| Defendant: | So I'm working on all that stuff right now. OK? |

(*Id.* at 11.)

Mr. Rhule did, in fact, apply for a passport, (*see id.*), but he failed to inform the Probation

Office about it when he was interviewed after his arrest, (*see* Hawaii PSR at 2).[1] Instead, he told the Probation Office that his passport was expired and he did not know where it was. (*See id.*) Mr. Rhule also provided the Probation Office with a social security number that was issued fifteen years after Mr. Rhule was born. (*See id*.)

The Government argues that the May 7 conversation, which occurred just three days after Mr. Rhule was warned that he should expect a "target letter" from the U.S. Attorney's Office, shows that Mr. Rhule was preparing to flee to Russia. (*See* Dkt. No. 64 at 9–12.) Mr. Rhule characterizes the May 7 conversation as more innocuous: Mr. Rhule, who had not been charged with a crime at that time, was discussing traveling to Russia *temporarily* to help Olga get settled and apply for the waiver of her ten-year ban from the United States. (*See* Dkt. No. 61 at 11–15.) After she was settled, and if he learned that he was charged, he would promptly return to the United States to defend this case. (*See id*.)

The Court finds the Government's explanation more persuasive. First, although Mr. Rhule had not been formally charged with a crime on May 7, he faced plenty of evidence that the Government was closing in: his property had been searched, his son had been arrested, federal agents had questioned him and seized his plane, and, most significantly, the Government warned him three days earlier that he would be receiving a target letter. Next, Mr. Rhule's failure to provide the Probation Office with his true social security number or to inform the Probation Office about his application for a new passport suggests that he was trying to conceal the passport application from the Government even after he was arrested. Finally, Mr. Rhule does not offer any explanation about what "other things" he was working on but could not tell Olga about, knowing he was being recorded. (*See id.* at 14.)

Mr. Rhule makes additional arguments for why he should not be considered a flight risk: (1) he has lived in Seattle for the past 34 years, his sister and her children live here, and he

---

[1] Mr. Rhule's passport application was later denied due to "seriously delinquent tax debt." (Dkt. No. 61-1 at 148.)

started businesses here, (2) he has never been to Russia and Olga has not been back for twenty

years, (3) his passport application was denied, and (4) COVID-19 is not well-controlled in

Russia. (*See id.* at 7–10, 15–20.) Mr. Rhule also offers several conditions that he argues will

reasonably assure his appearance, most notably: (1) active GPS monitoring, (2) home

confinement, (3) a complete ban on Mr. Rhule's internet access, (4) a prohibition on transferring

cryptocurrency, (5) a $600,000 appearance bond secured by his parents' home and his sister's

home, (6) an agreement that Mr. Rhule, his son, and Olga will forfeit their interests in the

Monroe property and certain other property if he flees, and (7) the appointment of his mother and

sister as third-party custodians. (*See* Dkt. No. 61-1 at 177–179.)

These arguments do not alter the Court's conclusion. Although Mr. Rhule has

longstanding ties to this district, most of the ties Mr. Rhule cites are *past* ties; his only family

member remaining in the Seattle area that is not involved in this matter is his sister, and because

he is "semi-retired" his businesses do not give him an ongoing need to stay in the district. The

Court agrees that the Government has not proved that Mr. Rhule has longstanding ties to Russia,

but Mr. Rhule does have longstanding ties to Olga, who will be deported to Russia regardless of

her connection to the country. The lack of a valid passport makes travel more challenging, but

Mr. Rhule is well-versed in using the dark web and has a history of using false names, social

security numbers, and addresses, so he could obtain false travel documents. And while the risk of

contracting COVID-19 in Russia is likely not appealing, Mr. Rhule's conversation with Olga

shows that he is willing to travel there despite the risk.

The Court also finds that the conditions Mr. Rhule proposes—as restrictive as they are—

are not likely to reasonably assure his appearance. A GPS tracker can be removed, and once it is,

Mr. Rhule could flee. The ban on internet access and prohibition on the transfer of

cryptocurrency suffer from the same defect: they both heavily rely on Mr. Rhule's voluntary

compliance. *See Hir*, 517 F.3d at 1092. To be sure, the Probation Office can attempt to enforce

these conditions, but Mr. Rhule's extensive experience in concealing his online activities makes

it difficult to do so. And, although probation officers would visit Mr. Rhule, it is likely difficult to detect pocket-sized internet-enabled devices that could be stashed anywhere on the 21-acre property. (*See* Dkt. No. 61 at 5–6.) Indeed, the last time the Government searched the property, it was unable to uncover several firearms. (*See id.* at 23 n.34.) Mr. Rhule's agreement to forfeit his property does little to deter flight. If Mr. Rhule were intent on fleeing to Russia, he would have already decided to abandon his property in the United States. The appearance bond secured by his family members' residences is perhaps the most compelling condition, but given Mr. Rhule's assets, he could easily reimburse them for any loss. Indeed, the Government found a thumb drive containing over $200,000 worth of cryptocurrency—i.e., the entire value of his sister's home—taped to the bottom of a chair in his living room. Nor will assigning his mother and sister as third-party custodians reasonably assure his appearance. Mr. Rhule's sister would not be living with him, making it difficult for her to detect any alleged violations of his special conditions, (*see* W.D. Wash. Supp. PSR at 2–3), and for the reasons stated above the Court is not persuaded that Mr. Rhule's mother is equipped to monitor Mr. Rhule's compliance with Mr. Rhule's proposed conditions related to the use of the internet and the transfer of cryptocurrency or that she can reasonably ensure his appearance.

Mr. Rhule argues that if the Court finds that this set of conditions is not reasonably likely to assure Mr. Rhule's appearance, then the Court is in effect holding that *every* defendant should be detained before trial. (*See* Dkt. No. 69 at 11.) Not so. As Mr. Rhule acknowledges, the Court must conduct an "individualized evaluation" specific to each defendant. *United States v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019). Mr. Rhule has a particularly compelling motive to flee, the means to live comfortably outside the United States, the skills to avoid detection, *and* the Government has recorded him discussing traveling to Russia just three days after he learned he was a target of the Government's investigation. In light of these facts, the Court concludes that the Government has proved by a preponderance of the evidence that no set of conditions can reasonably assure Mr. Rhule's appearance.

**F.      COVID-19**

In addition to the statutory factors, Mr. Rhule argues that he should not be detained because of the prevalence of COVID-19 at FDC SeaTac. (*See* Dkt. Nos. 61 at 27–28, 69 at 13–14.) The Court is mindful of the impact of COVID-19 on individuals residing at FDC SeaTac and takes it very seriously, but the presence of COVID-19 at FDC SeaTac does not affect the statutory factors Congress instructed courts to consider when making this pretrial detention determination: whether Mr. Rhule is a flight risk and whether he is a danger to the community. *See* 18 U.S.C. § 3142(g). If at some point during Mr. Rhule's pretrial detention there is a compelling reason that Mr. Rhule must be temporarily released, he may seek relief through a separate motion. *See* 18 U.S.C. § 3142(i).

**G.      Motion to Seal**

The Government's motion to seal (Dkt. No. 65) exhibits related to Mr. Rhule and Olga Rhule's criminal history (Dkt. Nos. 66-1, 66-3) is GRANTED. The Government's motion to seal (Dkt. No. 65) an exhibit showing alleged transactions between Mr. Rhule's company and customers (Dkt. No. 66-2) is DENIED. The exhibit does not appear to contain financial account numbers and the Government has not offered any other explanation for why it should remain sealed.

**III.   CONCLUSION**

For the foregoing reasons, Defendant Kenneth John Rhule's motion to revoke the Court's detention order (Dkt. No. 61) is DENIED, and the Government's motion to seal (Dkt. No. 65) is GRANTED in part and DENIED in part.

DATED this 8th day of October 2020.

John C. Coughenour
UNITED STATES DISTRICT JUDGE