The Hon. John C. Coughenour

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| UNITED STATES OF AMERICA, | NO. CR20-105 JCC |
|---|---|
| Plaintiff, | **MOTION FOR ENTRY OF SECOND PROTECTIVE ORDER RESTRAINING CERTAIN FORFEITABLE PROPERTY** |
| v. | |
| KENNETH WARREN RHULE, and KENNETH JOHN RHULE | NOTE ON MOTION CALENDAR: November 6, 2020 |
| Defendants. | |

## I.    RELIEF REQUESTED

The United States, by and through its undersigned counsel, moves pursuant to 21 U.S.C. § 853(e)(1)(A) for entry of a second protective order restraining the following property pending resolution of this case ("Additional Subject Property"):

1.    The following property, seized on or about March 10, 2020, from
KENNETH JOHN RHULE's residence in Monroe, Washington:

    a) Approximately $2,500 in U.S. Currency;

    b) Approximately $430 in U.S. Currency;

    c) Two Rolex Watches;

    d) 37 Collector Sports Cards;

    e) 59 Various Collector Coins; and

f)   25 Various Collector Stamps and Envelopes.

On September 30, 2020, the United States moved pursuant to 21 U.S.C. § 853(e)(1)(A) for entry of a protective order restraining the following property, which was identified in the Indictment, pending resolution of this case (the "Subject Property"), *see* Dkt. Nos. 31, 72:

1.   The following property, seized on or about March 10, 2020, from KENNETH WARREN RHULE's residence in Bothell, Washington:

a)   One 2016 Dark Gray Tesla Model S, VIN: 5YJSA1E22FF117465, bearing Washington State License Plate BOS0948;

b)   Approximately 89 silver bars and coins;

c)   Approximately 12 Louis Vuitton, Prada, or Gucci handbags;

d)   One Hamilton Luxury Watch, Khaki Aviation X-Wind Auto Chrono; and

e)   Approximately $42,000 in U.S. Currency.

2.   Approximately $593 in U.S. currency, seized on or about March 10, 2020, from KENNETH WARREN RHULE in or around Bothell, Washington.

3.   The following property, seized on or about March 10, 2020, from KENNETH JOHN RHULE's residence in Monroe, Washington:

a)   Approximately 5.12094153 bitcoin; and

b)   Approximately 23.46324478 bitcoin.

4.   One 2015 Black GMC Sierra pick-up truck with topper and lift kit, VIN: 1GT12ZE86FF149097, bearing Washington State License Plate C30354L, seized on or about March 10, 2020.

5.   The following property, seized on or about March 13, 2020, from the aforementioned GMC Sierra pick-up truck:

a)   Approximately $32,339.00 in U.S. Currency;

b)   One Western Union money order in the amount of approximately $499 in U.S. funds;

Motion for Second Protective Order - 2
*United States v. Rhule, et al.,* CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

c) Two American Express gift cards with a combined value of approximately $250.83 in U.S. funds; and

d) One Gray and Black Men's Gucci Shoulder Bag.

6.   One Cessna P210N, with registration number N21LT and serial number P21000216, and associated flight and maintenance logbooks and documents, seized on or about May 4, 2020, in or about Snohomish, Washington.

7.   Approximately $10,000 in U.S. currency, seized on or about July 14, 2020, from KENNETH JOHN RHULE in or around Honolulu, Hawaii.

8.   A Smith and Wesson M&P 9mm handgun, serial number DTV6454.

9.   The real property commonly known as 29428 181st Street SE, Monroe, Washington 98272, Snohomish County, Parcel No. 27081800202100 and all of its buildings, improvements, appurtenances, fixtures, attachments and easements, more particularly described as:

> LOT 12, AS SHOWN ON SURVEY RECORDED IN VOLUME 14 OF SURVEYS, PAGE 107, UNDER SNOHOMISH COUNTY RECORDING NO. 8107085004, RECORDS OF SNOHOMISH COUNTY, WASHINGTON, BEING LOCATED IN SECTION 18, TOWNSHIP. 27 NORTH, RANGE 8 EAST, W.M, IN SNOHOMISH COUNTY, WASHINGTON;

10.   The real property located at 29424 181st Street SE, Monroe, Washington 98272, Snohomish County, Parcel No. 27081800200200, and all of its buildings, improvements, appurtenances, fixtures, attachments and easements, more particularly described as:

> LOT 11, AS SHOWN ON SURVEY RECORDED IN VOLUME 14 OF SURVEYS, PAGE 107, UNDER SNOHOMISH COUNTY RECORDING NO. 8107085004, RECORDS OF SNOHOMISH COUNTY, WASHINGTON, BEING LOCATED IN SECTION 18, TOWNSHIP. 27 NORTH, RANGE 8 EAST, W.M, IN SNOHOMISH COUNTY, WASHINGTON;

Motion for Second Protective Order - 3
*United States v. Rhule, et al.,* CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    As detailed below, and in the supporting declaration of United States Drug

2  Enforcement Administration Special Agent Victor Morales ("Second Morales

3  Declaration") (Exhibit A), the Additional Subject Property is also subject to forfeiture

4  pursuant to 18 U.S.C. § 982; 18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c); and

5  21 U.S.C. § 853(a), as there is probable cause to believe it is property involved in or is

6  traceable to property involved in the Defendants' offenses; constitutes proceeds or is

7  derived from proceeds the Defendants obtained as the result of their offense; and/or was

8  used or intended to be used to commit or to facilitate the Defendants' offenses.  The

9  United States' motion for protective order concerning the Subject Property (Dkt. No. 72)

10  remains pending decision by this Court.  The Additional Subject Property should also

11  remain in the United States' possession and available for forfeiture, until this case is

12  resolved.

13               II.    RELEVANT PROCEDURAL FACTS

14    The Additional Subject Property, like the Subject Property, was seized on or about

15  March 10, 2020, during the execution of search and seizure warrants at/in properties

16  owned, operated, or occupied by the Defendants.  *See* MJ20-099, MJ20-100, MJ20-101,

17  MJ20-102, MJ20-126, filed in the U.S. District Court for the Western District of

18  Washington; *see also* Dkt. No. 72, Ex. A (First Morales Declaration); *see also* Second

19  Morales Declaration, Ex. A, at ¶¶ 4-5, 93.  The warrants were issued on probable cause

20  that the searches would yield evidence of the Defendants' involvement in conducting an

21  unlicensed money transmitting business, laundering of monetary instruments, and

22  conspiracy to manufacture and distribute of marijuana and marijuana distillates, in

23  violation of federal law.  *See id.*

24    On August 5, 2020, after the warrants were executed, the Defendants were

25  charged by Indictment in this case with *Conducting an Unlicensed Money Transmitting*

26  *Business*, in violation of 18 U.S.C. §§ 1960(a), (b)(1)(A), (b)(1)(B) and (b)(1)(C);

27  *Laundering of Monetary Instruments*, in violation of 18 U.S.C. §§ 1956(a)(3)(B),

28  (a)(3)(C) and 2; *Conspiracy to Manufacture and Distribute Marijuana and Marijuana*

Motion for Second Protective Order - 4
*United States v. Rhule, et al.,* CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

*Distillates*, in violation of 21 U.S.C. §§ 841 (a)(1), 841(b)(1)(A), and 846; and
*Possessing a Firearm During and in Relation to a Drug Trafficking Crime*, in violation
of 18 U.S.C. 924(c)(1)(A).  Dkt. No. 31.

In the Indictment, the United States gave notice of its intent to seek forfeiture of
(a) any and all property involved in the offenses identified in Counts 1-7, or any property
traceable to such property, pursuant to 18 U.S.C. § 982(a)(1); (b) any property
constituting, or derived from, any proceeds the defendants obtained, directly or indirectly
as a result of the offense, and also any property used, or intended to be used, in any
manner or part, to commit, or to facilitate the commission of the offense identified in
Count 8, pursuant to 21 U.S.C. § 853(a); and (c) any firearms and ammunition involved
in or used in the offense identified in Count 9, pursuant to 18 U.S.C. § 924(d)(1) and
28 U.S.C. § 2461(c).  *Id.,* at 4-5, 7.

After the Subject Property was seized or otherwise restrained, the United States
Department of Homeland Security ("HSI") and Customs and Border Patrol ("CBP") took
custody of the property (other than the real property) and initiated administrative
forfeiture proceedings against it.  *See* Second Morales Decl., <u>Ex. A</u>, at ¶ 7.  In the
administrative process, four claims were made to the Subject Property: 1) the first claim
for the property identified in Paragraphs 1(a), 4, and 5(a) through (d), above, submitted
by Defendant KENNETH WARREN RHULE; 2) a second claim for the property
identified in Paragraphs 1(b) through (e) and 2, above, submitted by Defendant
KENNETH WARREN RHULE; 3) a third claim for the Cessna Model P210N aircraft,
identified in Paragraph 6 above, submitted by both Defendants and Frontline Aviators,
LLC; and 4) a claim for a small amount of currency submitted by a third party ("L.H.")
which was later determined to be valid and will be returned.  *See* First Morales Decl.,
Dkt. No. 72, at ¶ 7; *see also* Second Morales Decl., <u>Ex. A</u>, at ¶ 7.  These claims were
referred to the U.S. Attorney's Office for judicial resolution.  *See id.*  On July 10, 2020,
Defendant KENNETH WARREN RHULE, by and through his attorney, executed an
agreement extending the governing deadlines for the first and second claims as listed

Motion for Second Protective Order - 5
*United States v. Rhule, et al.,* CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  above, to October 19, 2020 for the United States to take judicial action against some of

2  the Subject Property.  *See* First Morales Decl., Dkt. No. 72, at ¶ 7.  The required date for

3  the government to take judicial action against the property related to the third claim is

4  September 30, 2020.  *See id.*

5        During the administrative forfeiture proceedings initiated by HSI and CBP, and on

6  October 2, 2020, Defendant KENNETH JOHN RHULE submitted a claim to $9,500 in

7  U.S. currency that was seized from him pursuant to Federal warrants, on or about July 14,

8  2020 in Honolulu, Hawaii.  *See* Second Morales Decl., Ex. A, at ¶ 7.  The $9,500 is

9  incorporated in the United States Motion for Protective Order, currently pending before

10  the Court.  *Id.*; *see also* Dkt. No. 72, ¶ 7.  Separately, on August 7, 2020 Defendant

11  KENNETH JOHN RHULE submitted a claim to the Additional Subject Property

12  identified in paragraphs 1(a)–(f), above, which was seized on or about March 10, 2020

13  from the Monroe property.  *See* Second Morales Decl., Ex. A, at ¶ 7.  These additional

14  claims were also referred to the U.S. Attorney's Office for judicial resolution.  *Id.*

15        Now, therefore, the United States is required either to file a civil judicial forfeiture

16  action against the Additional Subject Property or to pursue its forfeiture in this criminal

17  case and take steps to maintain custody of it.  *See* 18 U.S.C. § 983(a)(3)(A)-(C).  In a

18  Motion for Protective Order, filed on September 30, 2020, the United States seeks to

19  forfeit the Subject Property criminally and requests its continued restraint for that

20  purpose.  *See* Dkt. No. 72.  That motion is currently pending and is not replaced by this

21  motion.

22        In a Bill of Particulars, filed on October 20, 2020, the United States gave notice of

23  its intent to seek forfeiture of the Additional Subject Property, pursuant to the same

24  forfeiture authority articulated in the Indictment.  Dkt. No. 77.  The United States seeks

25  to forfeit the Additional Subject Property criminally and now requests its continued

26  restraint for that purpose.  The Additional Subject Property is currently in the custody of

27  the United States Department of Homeland Security and the Customs & Border

28  Protection.  *See* Second Morales Decl., Ex. A, at ¶ 7.

Motion for Second Protective Order - 6
*United States v. Rhule, et al.,* CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

### III.  GOVERNING LAW AND ARGUMENT

The United States requests the Court issue a protective order pursuant to 21 U.S.C. § 853(e)(1)(A) restraining the Additional Subject Property for the duration of this case. Section 853(e)(1)(A) authorizes the Court to enter orders or to fashion other remedies to preserve the availability of property subject to criminal forfeiture. *See United States v. Monsanto,* 491 U.S. 600, 612 (1989) ("Under § 853(e)(1), the trial court 'may' enter a restraining order if the United States requests it[.]").  Where there is probable cause to believe the relevant property is forfeitable, the United States is generally allowed to restrain it.  *See United States v. Kaley,* 571 U.S. 320, 323 (2014), 134 S. Ct. 1090, 1095 (2014) ("[P]re-trial asset restraint [is] constitutionally permissible whenever there is probable cause to believe that the property is forfeitable"); *see also Monsanto,* 491 U.S. at 615–16 (recognizing Section 853(e)(1) allows for the pretrial restraint of assets where there is probable cause to believe they are forfeitable, stating "[i]ndeed, it would be odd to conclude that the Government may not restrain property . . . based on a finding of probable cause, when we have held that . . . the Government may restrain *persons* where is a finding of probable cause").

Here, the Indictment provided notice of the government's intent to forfeit property, as well as the statutory authority for forfeiture.  Dkt. No. 31.  The Additional Subject Property has been identified for forfeiture in a Bill of Particulars.  *See* Dkt. No. 77.  The facts reflecting the Additional Subject Property's involvement in the Defendants' offenses – i.e., stating probable cause for its forfeitability – are detailed in the Second Declaration of Special Agent ("SA") Victor Morales, Ex. A, ¶¶ 1-119.[1] Those facts include, but are not limited to:

---

[1] SA Morales' Second Declaration provides additional detail in paragraph 93 about the property seized from KENNETH JOHN RHULE's Monroe residence, which includes the Additional Subject Property.  It also contains the factual predicate for probable cause, including a summary of the investigation, to restrain all of the property at issue, substantially identical to that contained in the first declaration.

Motion for Second Protective Order - 7
*United States v. Rhule, et al.,* CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1        DEA and HSI have been investigating whether KENNETH WARREN RHULE

2   sold bitcoins to individuals in exchange for cash without registering with the Financial

3   Crimes Enforcement Network ("FinCen").  *See* Dkt. No. 72, Ex. A; *also see* Second

4   Morales Decl., Ex. A, at ¶ 9.  Between April 2018 and December 2018, law enforcement

5   or confidential sources exchanged more than $140,000 in cash for bitcoin with

6   KENNETH WARREN RHULE or his designee.  Second Morales Decl., Ex. A, at ¶¶ 10,

7   13-54.  When undercover agents told KENNETH WARREN RHULE that some of the

8   cash was proceeds of human trafficking or that the bitcoin would be used for human

9   trafficking purposes, KENNETH WARREN RHULE still conducted the transactions.

10  *Id.*, at ¶¶ 10-11, 33-34, 53.  Neither KENNETH WARREN RHULE nor any of the

11  entities he is associated with – HerbinArtisans, KlearKrew, Heady.Watr, Frontline LLC,

12  or Frontline Aviators – was registered with FinCen or the Department of Financial

13  Institutions ("DFI") as a money services business, as required by law.  *Id.*, at ¶ 57.

14       The investigation also found that KENNETH WARREN RHULE manufactured

15  and distributed marijuana distillates and extracts and that none of his companies are listed

16  as applicants or licensees to produce, process, transport, or sell marijuana or marijuana

17  products in Washington State.  *Id.*, at ¶¶ 12, 58, 78.  The investigation determined that

18  equipment for processing marijuana and products used in the production of marijuana

19  distillates were delivered to the real property identified in paragraphs 9 and 10.  *Id.*, at

20  ¶¶ 90-91.  During execution of the search warrant for this property, law enforcement

21  personnel identified a building dedicated to the processing and storage of marijuana and

22  marijuana distillates.  *Id.*, at ¶¶ 92-95.  A residence on the property, at which KENNETH

23  JOHN RHULE and his wife were located, contained a desk with U.S. Postal Service

24  prepaid postage stickers and lists of names and their associated product orders.  *Id.*, at

25  ¶¶ 92-93.  On the desk were over a dozen glass jars of refined marijuana distillates

26  labelled with product names.  *Id.*  Other items seized from the residence included

27  firearms, firearm accessories, and ammunition; a bundle of U.S. currency totaling $2,500;

28  another approximately $430 of U.S. currency; numerous computers and tablets; media

Motion for Second Protective Order - 8
*United States v. Rhule, et al.*, CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   storage devices (some of which contained Bitcoin wallets, from which approximately

2   28.28 Bitcoin, valued at approximately $226,929, were seized); five cell phones; two

3   Rolex watches; 37 collector sports cards; 59 various collector coins; 25 various collector

4   stamps and envelopes; and a Louis Vuitton purse.  During execution of a search warrant

5   for KENNETH WARREN RHULE's residence, law enforcement personnel seized

6   cryptocurrency hardware, a laptop computer, marijuana products, a Smith & Wesson

7   "MP9" semi-automatic 9mm pistol, $42,000 in U.S. currency, and other high-value

8   items, including a Tesla Model S, 12 luxury brand handbags, 89 silver bars and coins,

9   and a luxury watch.  *Id.,* at ¶¶ 96-97.

10        SA Morales describes the web advertisements under the control of Gimacut93,

11   determined to be KENNETH WARREN RHULE, that offered exchange of bitcoin for

12   U.S. currency and listed exchange rates and payment methods for buying and selling

13   bitcoins (*id.*, at ¶¶ 10-14); several controlled exchanges of bitcoin for U.S. currency,

14   arranged through contact with KENNETH WARREN RHULE via those web

15   advertisements and which were conducted in violation of federal law (*id.*, at ¶¶ 10-54);

16   web advertisements for marijuana and marijuana distillates, using the names of three

17   entities under KENNETH WARREN RHULE's control (*id.*, at ¶¶ 12, 58-77);

18   communications and transactions for the exchange of marijuana and marijuana distillates

19   for bitcoin conducted by KENNETH WARREN RHULE through the three entities under

20   his control, over secured communications websites (*id.*); statements by KENNETH

21   WARREN RHULE indicating that he had an airplane and would use the plane to

22   facilitate the purchase and transport of materials used for manufacturing marijuana

23   distillates (*id.*, at ¶¶ 35-38, 82-83); a canine "alert" to the presence of controlled

24   substances on or near the airplane (*id.*, at ¶¶ 86, 99-101); and the real and personal

25   property owned by or under the control of KENNETH WARREN RHULE and

26   KENNETH JOHN RULE that was used for the purposes of manufacturing marijuana

27   distillates (*id.*, at ¶¶ 90-95).

28

Motion for Second Protective Order - 9
*United States v. Rhule, et al.,* CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    Based on these and other facts detailed in SA Morales's second declaration, the

2 United States submits there is probable cause to believe the Additional Subject Property

3 is subject to forfeiture.  To preserve the Additional Subject Property's availability for

4 forfeiture, the United States respectfully requests that the Court enter a protective order

5 permitting the Additional Subject Property's continued restraint through the conclusion

6 of this case, to include criminal ancillary forfeiture proceedings.  A proposed order is

7 submitted with this motion.

8

9    DATED this 23rd day of October, 2020.

10

11                               Respectfully submitted,

12                               BRIAN T. MORAN
                                United States Attorney
13

14                                /s/ Krista K. Bush
                                _____
15                               KRISTA K. BUSH
                                Assistant United States Attorney
16                               700 Stewart Street, Suite 5220
                                Seattle, WA 98101-1271
17                               Telephone: (206) 553-4169
                                E-mail: Krista.Bush@usdoj.gov
18

19

20

21

22

23

24

25

26

27

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

## <u>CERTIFICATE OF SERVICE</u>

2

3          I hereby certify that on October 23, 2020, I electronically filed the foregoing with

4   the Clerk of the Court using the CM/ECF system, which automatically serves the parties

5   of record.

6                                          */s/ Donna R. Taylor*
                                           DONNA R. TAYLOR
7                                          FSA Paralegal III, Contractor
8                                          United States Attorney's Office
                                           700 Stewart Street, Suite 5220
9                                          Seattle, WA  98101
                                           Telephone:    (206) 553-4132
10                                         Donna.R.Taylor@usdoj.gov

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Motion for Second Protective Order - 11
*United States v. Rhule, et al.*, CR20-105 JCC

# EXHIBIT A

The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

Plaintiff,

v.

KENNETH WARREN RHULE, and
KENNETH JOHN RHULE

Defendants.

NO. CR20-105 JCC

**SECOND DECLARATION OF DRUG
ENFORCEMENT ADMINISTRATION
SPECIAL AGENT VICTOR
MORALES IN SUPPORT OF MOTION
FOR ENTRY OF SECOND
PROTECTIVE ORDER
RESTRAINING CERTAIN
FORFEITABLE PROPERTY**

I, VICTOR MORALES, declare and say:

*My Training and Experience*

1.      I am a Special Agent with the Drug Enforcement Administration ("DEA").
As a Special Agent, I investigate violations of the Controlled Substance Act, Title 21,
United States Code, Section 801, et seq., and other violations of federal law.  I have been
in law enforcement for eleven years.  I have been a Special Agent with the DEA for the
past three years.  I have received narcotics enforcement training over the course of
seventeen weeks at the DEA Basic Agent Training academy in Quantico, Virginia.

Second Declaration of SA Morales in Support of - 1
Motion for Second Protective Order
*United States v. Rhule, et al.*, CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

2.      Throughout my career, I have conducted numerous narcotics investigations, including those leading to arrest and prosecution.  From these experiences, I have become familiar with common slang terms and codes used by drug traffickers and their associates to refer to drugs, money, guns, vehicles, compartments, and other things related to their drug trafficking.  I have learned how they attempt to thwart law enforcement by using code terms, money laundering, multiple cell phones, concealed compartments, "stash houses," and other means.  I have become familiar with the ways in which drugs commonly are transported, stored, and sold, and also how members of a conspiracy communicate with each other.  I am also familiar with common ways in which drug traffickers attempt to profit from their illegal activities, by hiding drug proceeds in various places in order to conceal the illegal source or their ownership, including hiding and transporting bulk cash, sending funds through wire transfers or bank accounts in other persons' names, or investing in assets placed in other persons' names.  I have participated in the debriefing of defendants, witnesses, and informants, during which time I have discussed with them their methods of drug smuggling, distribution, packaging, trafficking, avoiding law enforcement, and laundering proceeds, among other concerns related to drug trafficking.  I have discussed and learned from other law enforcement investigators in regard to these matters, as well.

3.      The information in this declaration is based upon the investigation I have conducted in this case, my conversations with other law enforcement officers who have engaged in various aspects of this investigation, and my review of reports written by other law enforcement officers involved in this investigation.

***Purpose of Affidavit and Property to be Restrained***

4.      This is my second declaration in support of a motion for protective order. My first declaration was in support of a motion for entry of a protective order restraining property listed in the Indictment.  *See* Dkt. 72.  I make this second declaration in support of the motion for entry of a second protective order that would allow the United States to

Second Declaration of SA Morales in Support of - 2
Motion for Second Protective Order
*United States v. Rhule, et al.,* CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

maintain custody of, or otherwise restrain, the following additional property, pending resolution of this criminal case:

    a)    The following property, seized on or about March 10, 2020, from KENNETH JOHN RHULE's residence in Monroe, Washington:

        i   Approximately $2,500 in U.S. Currency;

        ii  Approximately $430 in U.S. Currency;

        iii Two Rolex Watches;

        iv 37 Collector Sports Cards;

        v  59 Various Collector Coins; and

        vi 25 Various Collector Stamps and Envelopes.

5.    Most of the property seized from Defendants KENNETH WARREN RHULE and KENNETH JOHN RHULE, including the property identified in paragraphs 4(a)(i) through (vi) above ("Additional Subject Property"), was seized during the execution of several search warrants at property owned and/or occupied by the Defendants, on or about March 10, 2020, March 13, 2020, May 4, 2020, and July 14, 2020.  Those warrants were issued on probable cause that the target locations would yield evidence of the Defendants' involvement in conducting an unlicensed money transmitting business, laundering of monetary instruments, and conspiracy to manufacture and distribute of marijuana and marijuana distillates, in violation of federal law.

6.    On August 5, 2020, after these search warrants were executed, the United States filed an Indictment charging KENNETH WARREN RHULE and KENNETH JOHN RHULE with *Conducting an Unlicensed Money Transmitting Business*, in violation of 18 U.S.C. §§ 1960(a), (b)(1)(A), (b)(1)(B) and (b)(1)(C); *Laundering of Monetary Instruments*, in violation of 18 U.S.C. §§ 1956(a)(3)(B), (a)(3)(C) and 2; *Conspiracy to Manufacture and Distribute Marijuana and Marijuana Distillates*, in violation of 21 U.S.C. §§ 841 (a)(1), 841(b)(1)(A), and 846; and *Possessing a Firearm During and in Relation to a Drug Trafficking Crime*, in violation of 18 U.S.C. 924(c)(1)(A).  *See* Dkt. No. 31.

Second Declaration of SA Morales in Support of - 3
Motion for Second Protective Order
*United States v. Rhule, et al.,* CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

7.      Currently, the Additional Subject Property, like the Subject Property (other than the real property) is in the custody of the United States Department of Homeland Security ("HSI") and Customs & Border Protection ("CBP").  CBP initiated administrative forfeiture proceedings against the property in custody pursuant to 18 U.S.C. § 983 (governing nonjudicial forfeiture).  In the administrative process, claims were made to the Subject Property and to the Additional Subject Property.  In addition to the claims described in my first declaration, on October 2, 2020 KENNETH JOHN RHULE submitted a claim to $9,500 in U.S. currency that was seized from him in Honolulu, Hawaii, on or about July 14, 2020 pursuant to Federal warrants (included in the Subject Property) and, on August 7, 2020, another claim to the Additional Subject Property.  These claims were referred to the United States Attorney's Office for judicial resolution.  On September 30, 2020, the government filed a motion for protective order for all of the Subject Property, which is pending before the Court.  *See* Dkt. 72.  The required date for the government to take judicial action against the Additional Subject Property is November 5, 2020.

8.      At this time, therefore, pursuant to 18 U.S.C. § 983(a)(3), the United States is required either to file a civil judicial forfeiture action against the Additional Subject Property or to allege its forfeiture in this criminal case and take steps to maintain custody of it.  The United States is pursuing the Subject Property's criminal forfeiture and has given notice of this intent in the Bill of Particulars (Dkt. No. 77).  This second declaration is submitted to provide facts stating the requisite probable cause for the Additional Subject Property's continued restraint for the duration of the criminal case, including the criminal ancillary forfeiture process.

**Summary of Probable Cause**

9.      I have been involved in the investigation that led to the criminal charges in this case, and I am familiar with the relevant evidence.  The charges arise from a joint investigation conducted by the DEA and HSI as to whether KENNETH WARREN RHULE sold bitcoins to individuals in exchange for cash without registering with

Second Declaration of SA Morales in Support of - 4
Motion for Second Protective Order
*United States v. Rhule, et al.,* CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Financial Crimes Enforcement Network ("FinCEN") or the Washington Department of Financial Institutions ("DFI"), in violation of 18 U.S.C. § 1960.

### INVESTIGATION OF KENNETH WARREN RHULE

**A. Bitcoin Transactions**

10. KENNETH WARREN RHULE ("RHULE"), using the moniker Gimacut93, advertised in-person cash-for-bitcoin exchanges on the website localbitcoins.com. From April 2018 until December 2018, law enforcement, or a cooperating source working with law enforcement, exchanged more than $140,000 in cash for bitcoin with RHULE or his designee in nine separate meetings.

11. When completing these transactions, RHULE did not ask any "Know Your Customer" information. In fact, RHULE conducted these transactions even after the undercover agent explained that at least a portion of the cash involved represented proceeds of human trafficking, in violation of 18 U.S.C. § 1956(a)(3).

12. In addition to selling cryptocurrency, RHULE, along with others known and unknown, also manufactured and distributed marijuana distillates and extracts, in violation of 21 U.S.C. §§ 841 and 846. RHULE appeared to operate the companies HerbinArtisans, Heady.Watr, and KlearKrew and sold his product under those monikers, including through Instagram. Neither RHULE, HerbinArtisans, KlearKrew, nor Heady.Watr are listed as applicants or licensees to produce, process, transport, or sell marijuana or marijuana products in the State of Washington.

13. From April 2018 until November 2018, law enforcement, or a cooperating source working with law enforcement, exchanged more than $140,000[1] in cash for bitcoin with RHULE or his designee. A portion of those exchanges are described below.

***First Controlled Exchange of U.S. Currency for Bitcoin***

14. In April 2018, HSI Special Agent ("SA") Judson Scott responded to an advertisement posed by "Gimacut93" on the website localbitcoins.com.

---

[1] Unless otherwise specified, all references to dollars refer to United States Currency.

Second Declaration of SA Morales in Support of - 5
Motion for Second Protective Order
*United States v. Rhule, et al.*, CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Localbitcoins.com is a website that allows users to post advertisements, listing exchange rates and payment methods for buying and selling bitcoins, including allowing users to connect with bitcoin sellers in their vicinities through in-person meetings where cash is exchanged for bitcoins.  The advertisement by Gimacut93 offered to sell bitcoin through an in-person exchange at a "public location only."  The advertisement indicated that Gimacut93 sold bitcoin at fiat[2] exchange rate, and would accept various forms of payment to include unregistered prepaid Visa or MasterCard cards and "various other gift cards."  A review of the website localbitcoins.com showed that Gimacut93 was an established, and apparently well-known, bitcoin trader with history dating back two years and more than one thousand confirmed trades.  Gimacut93 advertised a trade limit of $5,000 to $100,000.

15.     Based upon messages exchanged via text to the telephone number that Gimacut93 listed on localbitcoins.com, SA Scott arranged with Gimacut93 to exchange $12,000 for bitcoin.  The parties agreed to conduct the transaction on April 10, 2018, at a Starbucks in Seattle, Washington.

16.     On April 10, 2018, an HSI SA acting in an undercover capacity ("UCA-1"), met with Gimacut93—determined to be KENNETH WARREN RHULE base upon a review of Washington Department of Licensing records—inside the Starbucks, located in Seattle, Washington.  This meeting was audio and video recorded.

17.     At the meeting, UCA-1 provided $12,000 to RHULE, which RHULE counted.  After RHULE confirmed the amount of U.S. currency tendered by UCA-1, SA Scott texted his bitcoin wallet address to RHULE's cell phone.  Using a wallet application on his phone, RHULE transmitted bitcoin to the wallet designated by a SA Scott.  UCA-1 described SA Scott as his/her "partner."

---

[2] Fiat currency is "sovereign currency" or "real currency, the money of a government." *Interim Regulatory Guidance on Virtual Currency Activities* 2 (December 8, 2014).

Second Declaration of SA Morales in Support of - 6
Motion for Second Protective Order
*United States v. Rhule, et al.,* CR20-105 JCC

18.     While waiting for confirmation that the bitcoin was sent to the wallet address provided by SA Scott, RHULE spoke about his current line of work within the CBD[3] industry, explaining at one point during the meeting that he was doing "5, 10, or 20,000 kilo" CBD orders.

19.     RHULE also spoke at length about bitcoin mining and significant events related to the bitcoin industry.  Specifically, he indicated that he and his fraternal twin had previously mined bitcoin.  RHULE further indicated that his parents had also invested in bitcoin and bitcoin mining.

20.     Notably, in response to UCA-1 indicating that UCA-1's partner was in a cash heavy business, RHULE stated that bitcoin was only pseudo-anonymous and was "extremely easily tracked."  RHULE then explained that if he needed to "wash" bitcoin, he would convert it to Monero, which is "a 100% anonymous cryptocurrency."

21.     RHULE did not charge a fee for the transaction, but indicated that he had charged a 2-3% fee in the past.  He explained that he had a lot of bitcoin that he needed to "dump" right now, and that was the reason why he did not charge a fee.  RHULE then explained that he usually had about $100,000 in bitcoin to work with each month, and sometimes more.

22.     During the cash-for-bitcoin transaction on April 10, 2018, RHULE did not ask UCA-1 for any "Know Your Customer" information.

**Second Controlled Exchange of U.S. Currency for Bitcoin**

23.     On April 22, 2018, SA Scott sent RHULE a text message requesting another exchange of U.S. currency for bitcoin.  RHULE agreed to conduct an exchange

---

[3] Based upon my training and experience, I know that CBD, or cannabidiol, is derived from the stalk and seed of the cannabis plant.  Cannabidiol (CBD) oil or CBD hemp oil is a natural botanical concentrate that is high in the compound CBD.  Of the numerous cannabinoids identified in the cannabis plant, CBD is the second most common after tetrahydrocannabinoil (THC).  As CBD oil is derived from the seeds and stalk of the cannabis plant, it does not contain THC and therefore is non-psychotropic.

Second Declaration of SA Morales in Support of - 7
Motion for Second Protective Order
*United States v. Rhule, et al.,* CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    of $20,000 for bitcoin, and the parties decided to conduct the transaction on April 24,

2    2018, at a Starbucks located in Monroe, Washington.

3        24.    On April 24, 2018, RHULE and UCA-1 met at the Starbucks.  This meeting

4    was audio and video recorded.  During the meeting, UCA-1 provided RHULE with

5    $20,000 in cash.  RHULE did not count the cash, as he had during the first transaction.

6    Instead, RHULE indicated that the amount "looked about right" and then placed the

7    $20,000 in an anti-static bag used for packaging electronics.

8        25.    As with the first transaction, UCA-1 advised RHULE that his/her partner—

9    SA Scott—would provide RHULE with the bitcoin wallet address to which the bitcoin

10   would be sent.  RHULE and SA Scott then exchanged text messages, with SA Scott

11   sending the wallet address to RHULE.  RHULE then sent bitcoin to the wallet designated

12   to SA Scott using his cell phone.

13       26.    While UCA-1 and RHULE were waiting for two confirmations of the

14   transaction on the blockchain, UCA-1 asked RHULE if he/she could ask RHULE some

15   questions about Monero, the cryptocurrency that RHULE had indicated was anonymous

16   during the first cash-for-bitcoin exchange on April 10, 2018.  RHULE explained to

17   UCA- 1 that Monero operated under the same concept as any cryptocurrency and was

18   verifiable on the blockchain with one important caveat: wallet addresses could not be

19   tracked.  RHULE explained that converting bitcoin to Monero was time consuming,

20   advised that he could sell Monero to UCA-1, but would need advance notice before

21   making the exchange.  RHULE also provided UCA-1 with advice on using a "Tor"

22   browser and the "TAILS"[4] operating system to ensure complete anonymity.

23

24
_____

25   [4] Based upon my training and experience, I know that TAILS is an acronym for "The Amnesic
     Incognito Live System."  I know that this is an operating system that is designed to be booted
26   from a DVD or USB, and is designed to ensure that no digital forensic information is left on a
     specific machine when TAILS is employed.  Among other security feature of the TAILS
27   operating system, l know that when a machine is booted from TAILS, all outgoing connections
     are forced to go through Tor, and all non-anonymous connections are blocked.
28

Second Declaration of SA Morales in Support of - 8                    UNITED STATES ATTORNEY
Motion for Second Protective Order                                    700 STEWART STREET, SUITE 5220
United States v. Rhule, et al., CR20-105 JCC                          SEATTLE, WASHINGTON 98101
                                                                      (206) 553-7970

27.     During the conversation, UCA-1 advised that one of the reasons he/she wanted to maintain anonymity is because he/she would be sending money to Eastern Europe.  UCA-1 did not elaborate why he/she wanted anonymity with respect to cryptocurrency exchanges in Eastern Europe, and RHULE did not ask for further details. UCA-1 also inquired if his/her girlfriend in Idaho, who was "heavy in cash," could obtain bitcoins from RHULE by sending currency in the mail.  RHULE agreed and provided UCA-1 advice on how best to mail cash so it would not be detected.

28.     As with the first exchange, RHULE did not ask UCA-1 for any "Know Your Customer" information.

***Fourth Controlled Exchange of U.S. Currency for Bitcoin***

29.     On June 20, 2018, SA Scott sent RHULE a text message requesting another exchange of U.S. currency for bitcoin.  RHULE agreed to conduct an exchange of $15,000 for bitcoin.  The parties agreed to conduct the transaction on June 22, 2018, at a Starbucks located in Seattle, Washington.

30.     On June 22, 2018, UCA-1 and RHULE met at the Starbucks.  This meeting was audio and video recorded.  Upon sitting down at the table with UCA-1, RHULE removed an Apple laptop computer from his bag and turned it on.  RHULE explained that he brought the computer because he had to convert some Monero to Bitcoin during their meeting.

31.     RHULE explained to UCA-1 that he had told UCA-1's partner—SA Scott—that he would charge a 4% fee for this transaction, as there was an 8-10% drop in the price of Bitcoin overnight.

32.     UCA-1 handed an envelope to RHULE with $15,000 in cash.  RHULE proceeded to hand-count the $15,000.  As with the first two transactions, SA Scott provided RHULE, via text to RHULE's cell phone, with the bitcoin wallet address to which the bitcoin would be sent.  Using his phone and laptop, RHULE then transferred the bitcoin to the wallet designated by SA Scott.

Second Declaration of SA Morales in Support of - 9
Motion for Second Protective Order
*United States v. Rhule, et al.,* CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

33.     While waiting for the transaction to be complete, UCA-1 explained that he/she was dealing with contacts in Ukraine to assist in bringing women to the United States for the purpose of prostitution.

34.     During this transaction, RHULE offered UCA-1 advice on how to avoid having the mailed cash seized and altered their plan to ensure greater security.  After discussing the above details regarding UCA-1's "new business model" of bringing women from Ukraine, as well as making arrangements regarding UCA-1's girlfriend that was also "running girls" and would be sending RHULE cash through the mail to purchase bitcoin, RHULE proceeded to assist UCA-1 with setting up the TAILS operating system on his/her computer.  As with prior transactions, RHULE did not ask UCA-1 for any "Know Your Customer" information.

*Fifth Controlled Exchange of U.S. Currency for Bitcoin*

35.     On September 18, 2018, SA Scott sent RHULE a text message to arrange an exchange of $20,000 for bitcoin.  Initially, the parties agreed to conduct the exchange at a Starbucks in Seattle, Washington, on September 25, 2018.

36.     On September 25, 2018, RHULE contacted SA Scott via text and informed him that he could not make the meet as scheduled, as he was taking a private flight from the Renton Municipal Airport and would be gone for most of the day.  SA Scott asked RHULE if he could meet when he returned.  RHULE agreed and the meet location was changed to the Top Pot doughnut shop located in Renton, Washington.

37.     Investigators observed RHULE arrive at the Renton Municipal Airport in a private plane.  Also on the plane with RHULE was another male, later identified as R.D.  After arriving in the private plane, RHULE and R.D. carried two white buckets and two boxes off the plane and into a hanger.  Moments later, RHULE was then observed carrying what appeared to be the same two buckets to his vehicle.  RHULE and R.D. exited the airport in their respective vehicles.

38.     After leaving the airport, RHULE met with UCA-1 inside the Top Pot doughnut shop and conducted the exchange of $20,000 for bitcoin.  RHULE explained

Second Declaration of SA Morales in Support of - 10
Motion for Second Protective Order
*United States v. Rhule, et al.,* CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

that he had just arrived from Portland, Oregon, where he stopped at the "terpene store," which he explained were "plant extracts isolated down to their molecules." Based on my training and experience, and information gained during the course of this investigation, I know that terpenes are aromatic oils that give cannabis and CBD distinctive flavors and aromas.

39.    RHULE did not charge UCA-1 a fee for this exchange. As with the previous transactions conducted, RHULE did not ask UCA-1 for any "Know Your Customer" information.

*Sixth Controlled Exchange of U.S. Currency for Bitcoin*

40.    On October 7, 2018, SA Scott sent RHULE a text message to arrange the exchange of $20,000 for bitcoin. The parties agreed to conduct the exchange at a Starbucks located in Redmond, Washington, on October 10, 2018.

41.    On October 10, 2018, RHULE and UCA-1 met at the Starbucks in Redmond, Washington. Once inside, UCA-1 provided RHULE with $20,000 in cash and RHULE sent the equivalent value of bitcoin to a law enforcement controlled wallet.

42.    As with each of the previous bitcoin-for-cash transactions, RHULE did not ask UCA-1 any "Know Your Customer" information. RHULE did not charge UCA-1 a fee for this exchange.

*Seventh Controlled Exchange of U.S. Currency for Bitcoin*

43.    On October 29, 2018, SA Scott sent RHULE a text message, asking RHULE if he would pick up $20,000 in cash that had been shipped to a P.O. Box in Mukilteo, Seattle and exchange it for bitcoin. During a prior meeting with UCA-1, UCA-1 provided RHULE with a key to this P.O. Box. RHULE agreed that, once the cash was received, he would transfer $20,000 worth of bitcoin to a wallet designated by SA Scott.

44.    On October 31, 2018, HSI SA Maher placed $20,000 into three standard letter envelopes that were then placed into two thicker manila envelopes. SA Maher then placed the manila envelopes containing the cash in a U.S. Mail Priority cardboard

Second Declaration of SA Morales in Support of - 11
Motion for Second Protective Order
*United States v. Rhule, et al.,* CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

mailing box, with the return address listed as "Lindsay Richards" in North Dakota. SA
Maher then placed the package into the P.O. Box in Mukilteo, Washington.

45.     On or around October 31, 2018, RHULE agreed to "front" the transfer, *i.e.*,
provide the bitcoin to SA Scott prior to retrieving the cash. RHULE then transferred
$20,000 worth of bitcoin to a law enforcement controlled wallet.

46.     On November 1, 2018, the tracker installed on RHULE's vehicle showed
that the vehicle was located in the area of the U.S. Post Office in Mukilteo, Washington.
Shortly thereafter, RHULE advised SA Scott via text that he had retrieved the cash from
the P.O. Box.

47.     As with previous transactions, RHULE did not require any "Know Your
Customer" information before conducting the above transaction with SA Scott. RHULE
did not charge a fee for this transaction.

***Eighth Controlled Exchange of U.S. Currency for Bitcoin***

48.     On November 1, 2018, HSI SA Scott sent RHULE a text message to
arrange the exchange of $15,000 for bitcoin. RHULE agreed to meet to conduct this
exchange on November 2, 2018.

49.     On November 2, 2018, RHULE met UCA-1 at a Starbucks in Bothell,
Washington. Once inside, UCA-1 provided RHULE with $15,000 in cash, and RHULE
transferred the equivalent amount of bitcoin to a law enforcement controlled wallet.

50.     As with previous transactions, RHULE did not require any "Know Your
Customer" information before conducting this bitcoin-for-cash transaction. RHULE did
not charge a fee for this transaction.

***Ninth Controlled Exchange of U.S. Currency for Bitcoin***

51.     On December 6, 2018, UCA-1 met with RHULE in order to exchange
$20,000 for bitcoin. RHULE agreed to meet UCA-1 at a Starbucks coffee shop in the
Monroe, Washington area.

//

Second Declaration of SA Morales in Support of - 12
Motion for Second Protective Order
*United States v. Rhule, et al.*, CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

52.     Once inside the Starbucks, RHULE accepted $20,000 in cash from UCA-1 and, in exchange, sent the bitcoin equivalent to a law enforcement controlled cryptocurrency wallet.

53.     While waiting for the cryptocurrency to transfer, UCA-1 advised RHULE that he/she would be spending more time in Arizona and would have her associate take over business activities in Seattle, Washington.  UCA-1 explained that he/she would be reducing the amount of Ukrainians that he/she used in his/her business, instead transitioning to women from Mexico.  RHULE told UCA-1 that he was in the middle of a construction project and that he would be picking up his plane the following day, as it had recently been repaired.

54.     RHULE did not charge UCA-1 a fee for this exchange.  As with the previous transactions conducted, RHULE did not ask UCA-1 for any "Know Your Customer" information.

**Subsequent Status on localbitcoins.com**

55.     Law enforcement tried to contact RHULE about purchasing additional cryptocurrency in exchange for cash, but RHULE stopped responding to text messages.

56.     According to the website localbitcoins.com, the moniker Gimacut93 was active and "last seen" on January 7, 2020.  The most recent feedback listed for Gimacut93 was on July 1, 2019, indicating that he exchanged cryptocurrency on or around this date.  As of February 3, 2020, a notation was listed on the account indicating that, at least as of November 22, 2019, the account was "banned by staff."

57.     According to a search of local and federal databases conducted on February 20, 2020, neither RHULE nor any of the entities he is associated with—HerbinArtisans, KlearKrew, Heady.Watr, Frontline LLC, or Frontline Aviators—was registered with FinCEN or DFI as a money services business, as required by law.

**B.   RHULE's Manufacture and Sale of Marijuana Distillates and Extracts**

58.     In addition to buying and selling cryptocurrency, RHULE, along with others known and unknown, manufactures and sells marijuana distillates and extracts

Second Declaration of SA Morales in Support of - 13
Motion for Second Protective Order
*United States v. Rhule, et al.,* CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    using the business names HerbinArtisans, Heady.Watr, and KlearKrew.  These marijuana

2    distillates and extracts include those referred to as "wax," "shatter," "clear," and

3    marijuana buds, products that contain THC and are marijuana products regulated by the

4    State of Washington.  According to a search conducted on February 19, 2020, neither

5    RHULE nor these businesses were licensed in the State of Washington to produce,

6    process, transport, or sell marijuana or marijuana products in the State of Washington.

7    ***HerbinArtisans***

8            59.     RHULE holds himself out as an operator of HerbinArtisans.  For example,

9    in email correspondence with a supplier of dry ice—a cooling agent used in

10   manufacturing marijuana distillates and extracts—RHULE used the email address

11   kenny@herbinartisans.com and included the signature line "Kenneth Rhule[,] Cannabis

12   Innovator[,] HerbinArtisans – Sweet Leaf Labs."

13           60.     HerbinArtisans has an Instagram page dedicated to marketing and selling

14   the HerbinArtisans product—high-grade THC distillates.  The HerbinArtisans pages

15   includes photos of highly concentrated THC/marijuana extracts, including dabs, shatter,

16   hash oil, hash rosin, sugar wax chips, diamonds, and other forms of extracts and

17   distillates.

18           61.     As of January 29, 2020, the HerbinArtisans account had 324 posts, 1,058

19   followers, and contained the description "PNW Extracts and Distillate[.]  All our own

20   work [.]  Nothing for sale[.]"  Previously, the HerbinArtisans account included the

21   language "DM for inquiries[.]  Bitcoin and Crypto Friendly."  While the account was

22   previously public, it later became a private Instagram account.  According to information

23   obtained from Instagram, the HerbinArtisans account was created on March 26, 2016.

24   The registered email on the account was kenny@herbinartisans.com.  The account is no

25   longer active.

26           62.     The posts for this account include multiple photographs and videos, with

27   the most recent posted at least as late as April 17, 2019, which based on my training and

28   experience, the products shown in the photographs are consistent with various marijuana

Second Declaration of SA Morales in Support of - 14
Motion for Second Protective Order
*United States v. Rhule, et al.,* CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  distillates and extracts, including those referred to as "shatter," "oil", "clear," and
2  marijuana buds.  The account is no longer active.

3       63.    In addition to posting photographs of marijuana distillates and extracts,
4  RHULE uses the HerbinArtisans Instagram page to send and receive direct messages—
5  private communications—with others regarding HerbinArtisans' products.  For example,
6  the following communications were sent to and from the HerbinArtisans Instagram
7  account:

8           a.    On June 18, 2019, coastisclearnj messaged HerbinArtisans "You
9  guys have any d9 liters in the 6-6.5 range?  Crypto ready."

10          b.    On May 13, 2019, solteksolutions messaged HerbinArtisans "Can
11 you contact me in regards to bulk shatter and distillate orders?  I need 6 lb of shatter
12 currently and 1L of clear distillate."

13          c.    On March 12, 2019 erikkve messaged HerbinArtisans "Warm
14 greetings to you and your crew! . . . I'd like to inquire about a small order of raw distillate
15 (for edible or dab use) . . . I've already sent my WA state medical card."  In response,
16 HerbinArtisans directed erikkve to communicate via encrypted messaging service Wickr.

17      64.    Based on my review of the Instagram direct messages, HerbinArtisans
18 would often tell prospective clients to switch over to encrypted messaging services like
19 Wickr and Signal to continue negotiations for product sales.

20      65.    In the Instagram direct messages, HerbinArtisans described selling
21 marijuana extracts and distillates manufactured at a facility in Monroe, Washington.

22 *Heady.Watr*

23      66.    In addition to HerbinArtisans, RHULE also helps operate the entity
24 Heady.Watr, which sells marijuana distillates and extracts.  RHULE is believed to be
25 associated with Heady.Watr because, among other reasons,

26          a.    RHULE received communications addressed to Heady.Watr in his
27 email accounts, including those related to the management of Heady.Watr.

28

Second Declaration of SA Morales in Support of - 15
Motion for Second Protective Order
*United States v. Rhule, et al.,* CR20-105 JCC

1       b.  Heady.Watr held the email address heady.watr@herbinartisan.com.

2    Herbinartisan is a G-Suite client, with email addresses hosted by Google.  According to

3    Google, RHULE is listed as the subscriber for the HerbinArtisans G-Suite account.

4       c.  On HerbinArtisans' Instagram page, used by RHULE, the hashtag

5    #heady.watr was often included in the descriptions posted alongside pictures of marijuana

6    extracts and distillates.

7      67.  Like HerbinArtisans, Heady.Watr also has an Instagram page dedicated to

8    marketing and selling Heady.Watr's product—high-grade THC distillates.  On this

9    Instagram page, there are dozens of photos of various highly concentrated

10   THC/marijuana extracts, including dabs, shatter, hash oil, hash rosin, sugar wax chips,

11   diamonds and other forms of extracts and distillates.

12     68.  As of August 21, 2019, the Heady.Watr account contained the description

13   "Premium Herb & Extracts[.]  Nothing for sale[.]"  At that time, the account had

14   approximately 6,475 followers.  According to information obtained from Instagram, the

15   Heady.Watr account was created on July 15, 2017, and remained active until at least

16   February 2020, albeit it has deleted all but two of its posts.  Despite deleting its posts,

17   other users continued to use the hashtag #headywatr to post pictures of Heady.Watr's

18   products, including as recently as August 2019.  According to Instagram, the registered

19   emails on the account were heady.watr@herbinartisans.com and

20   headywatr@protonmail.com.  The account is no longer active and is no longer being

21   tagged in the posts of other Instagram users.

22     69.  The posts for this account include multiple photographs and videos

23   containing products which, based on my training and experience, are consistent with

24   various marijuana distillates and extracts, including those referred to as "wax," "shatter,"

25   "clear," and marijuana buds.

26     70.  Although "Nothing for sale" is listed in the "About me" section of

27   Heady.Watr's Instagram profile, numerous individuals communicate with Heady.Watr

28   asking to purchase marijuana products using Instagram direct messages.

Second Declaration of SA Morales in Support of - 16
Motion for Second Protective Order
*United States v. Rhule, et al.*, CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1        a.     For example, on March 6, 2018, take_care_111 messaged

2 Heady.Watr "I would still love to stock up on all your products." In response,

3 Heady.Watr stated "We are In The north west. We deal in crypto maily and have a really

4 good team out here" and "Well we can send a sample no problem, we do however only

5 accept crypto atm, are you familiar with it?" Thereafter, Heady.Watr responded "You

6 have signal messanger? Or wickr?" and encouraged take_care_111 to communicate via

7 these encrypted applications.

8        b.     On March 19, 2018, jacksonmcmillen messaged Heady.Watr, stating

9 "I'm tryna get some cartridges." Heady.Watr responded "We can work something out

10 for sure man, are you able to pay in crypto?" Thereafter, Heady.Watr told

11 jacksonmcmillon "Down load signal messenger or wickr," advising that they

12 communicate via these encrypted applications. Heady.Watr also told jacksonmcmillen

13 that they only accept cryptocurrency because, otherwise they "will get banned from any

14 of these money services quickly."

15        c.     Also on March 19, 2018, mikey_kline messaged Heady.Watr asking

16 "So does it have thc?" and "Is it distillate?" Heady.Watr responded that they "make

17 distillate." Mikey_kline asked "do you ship" to Texas, and Heady.Watr replied

18 "Shouldn't be a problem if you can pay in crypto" and advised that "We accept just about

19 any of the top 3" cryptocurrencies.

20    71.    In these direct messages, Heady.Watr advised potential customers that they

21 were based in the Pacific Northwest and discussed licensing requirements to sell

22 marijuana products in the region. For example, on May 29, 2018, highimharry messaged

23 Heady.Watr and asked "Where are you based out of?" and Heady.Watr responded

24 "Seattle area."

25        a.     On May 29, 2018, smokebythepound messaged Heady.Watr and

26 asked "What state do you operate out of?" and Heady.Watr responded "Washington."

27        b.     On May 29, 2018, pharmtechnm messaged Heady.Watr and asked

28 "Hey bro where are you located again" and Heady.Watr responded "NW Seattle area" but

Second Declaration of SA Morales in Support of - 17
Motion for Second Protective Order
*United States v. Rhule, et al.,* CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

said "We will actually have a representative out in California this upcoming week or so."
Pharmatechnm told Heady.Watr "I want to sell your products out here but need you to
have a license first."  Heady.Watr replied that it would be "leasing out [a license] from a
third party."

       c.    On November 28, 2018, le_roi_du_mouille messaged Heady.Watr,
stating "I'm always looking for your stuff in the shops, but I guess you guys don't sell as
north as Whidbey lol."  Heady.Watr replied "We dont do 502 retail in washington."

**KlearKrew**

      72.    In addition to HerbinArtisans and Heady.Watr, RHULE also helps operate
the entity KlearKrew, which sells marijuana distillates and extracts.  RHULE is believed
to be associated with KlearKrew because, among other reasons:

       a.    On November 13, 2017, RHULE received an email to his
kenny@herbinartisans.com account attaching a business card listing the HerbinArtisans
and KlearKrew logos.

       b.    In his email account, RHULE had copies of chemical residue testing
conducted for KlearKrew distillates.

       c.    On November 9, 2018, RHULE received an email, sent to his
kenny@herbinartisans.com account, confirming that he would be attending a conference
in Las Vegas, Nevada as a representative of KlearKrew.   Additionally, on January 30,
2019, RHULE received an email, sent to his kenny@herbinartisans.com account,
confirming that he would be attending a conference in Seattle, Washington as a
representative of KlearKrew.

       d.    On HerbinArtisans' Instagram page, used by RHULE, the hashtag
#klearkrew was often included in the descriptions posted alongside pictures of marijuana
extracts and distillates.

       e.    During a portion of the previously described UC cryptocurrency
exchanges, RHULE arrived wearing a KlearKrew t-shirt and had a KlearKrew sticker on
his laptop.

Second Declaration of SA Morales in Support of - 18
Motion for Second Protective Order
*United States v. Rhule, et al.,* CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

73.     Like HerbinArtisans and Heady.Watr, KlearKrew also has an Instagram page dedicated to marketing and selling KlearKrew's product—high-grade THC distillates.  On this Instagram page, there are dozens of photos of various highly concentrated THC/marijuana extracts, including dabs, shatter, hash oil, hash rosin, sugar wax chips, diamonds and other forms of extracts and distillates.

74.     As of August 12, 2019, the KlearKrew account contained the description "#thechoiceisklear[.] 21+ only[.]"  While the account was previously public, it later became a private account with approximately 9,184 followers.  According to information obtained from Instagram, the KlearKrew account was created on July 6, 2016 and remained active until at least February 2020, albeit it appears to have deleted all but four of its posts.  In February 2020, the account stated "21+ to enjoy content[.]  Nothing for sale !"  Despite deleting its posts, other users continued to use the hashtag #KlearKrew to post pictures of its products, including as recently as February 21, 2020.  According to Instagram, the registered emails on the account were klearkrew@protonmail.com and terpman710@gmail.com.  The account is no longer active and is no longer being tagged in the posts of other Instagram users.

75.     The posts for this account included multiple photographs and videos, with the most recent posted no later than July 16, 2019; based on my training and experience, the products shown in photographs associated with this account are consistent with various marijuana distillates and extracts, including those referred to as "wax," "shatter," "clear," and marijuana buds.

76.     Although "Nothing for sale!" is listed in the "About me" section of KlearKrew's current Instagram profile, numerous individuals communicated with KlearKrew asking to purchase marijuana products using Instagram direct messages.

       a.     For example, on September 4, 2016, livingfl messaged KlearKrew "U ship?"  In response, KlearKrew said "Hit me up on Wickr."

Second Declaration of SA Morales in Support of - 19
Motion for Second Protective Order
*United States v. Rhule, et al.*, CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1      b. On February 7, 2017, cannabis4two messaged KlearKrew "Product

2   is looking real good!!! You guys ship anywhere or what?"  KlearKrew responded "Hi,

3   Thank you!  We can get you some product for sure.  Do you have a Wickr?"

4      c. On March 12, 2018, amoderatelife messaged KlearKrew "Could I

5   please have your wickr?  If that's what platform you're on."  KlearKrew responded "Hey,

6   how's it going?  We are currently only working with wholesale outside of the events."

7   Amoderatelife replied "I'm into wholesale, if that's between 50-100 pieces."  KlearKrew

8   then stated "download signal private messenger and give me a holler."

9      d. On January 8, 2019, KlearKrew messaged roberthaller "We're

10  currently filling bulk orders.  Oz & over."  Roberthaller responded "Goodman, just

11  finishing up at work, oz dabs?  Or tree?  Usually i get q's of erl at a time but i can cop

12  more if needed. Moneys no issue for me."  KlearKrew responded "700/oz" and "multiple

13  flavors."  Roberthaller replied "Okay, can we meetup friday?"

14    77. In these direct messages, KlearKrew advised potential customers that they

15  were based in the Pacific Northwest and discussed licensing requirements to sell

16  marijuana products in the region.

17     a. For example, on March 26, 2018, KlearKrew messaged sarahjain420

18  "we extract close to Seattle and most of our sales are in Miami."

19     b. On April 5, 2018, KlearKrew messaged kushkweeen.lv "we are

20  blasting in Washington state and Florida is where we handle most of our sales."

21  KlearKrew told kushkweeen.lv "100% able to make a purchase.  We accept bitcoin,

22  Ethereum, and paypal.  Usually have it out the same day that the order is placed."

23     c. On August 23, 2018, KlearKrew messaged miami.mango305, stating

24  "Our shop isn't in Fl."  Miami.mango305 responded "Someone told me otherwise."

25  KlearKrew replied "Distribution is.  Our manufacturing is not" and explained that

26  manufacturing was in "Washington."

27     d. On October 8, 2018, iheartcanna_ messaged KlearKrew "Are you

28  guys fully licensed?!"  KlearKrew responded "Not yet."

Second Declaration of SA Morales in Support of - 20
Motion for Second Protective Order
*United States v. Rhule, et al.,* CR20-105 JCC

**B.    RHULE's Involvement in Manufacturing Marijuana Extracts and Distillates**

78.    While operating under the business names HerbinArtisans, Heady.Watr, and KlearKrew, RHULE manufactures marijuana extracts and distillates.  RHULE has been manufacturing marijuana extracts and distillates since at least 2015.

79.    Initially, RHULE grew marijuana plants in order to manufacture distillates and extracts.  Law enforcement obtained information from Google and Apple, pursuant to search warrants, and found a large number of photographs stored in RHULE's Google and iCloud accounts, depicting him growing and drying marijuana.

80.    In addition to these photographs, RHULE's Google, iCloud, and Instagram accounts also contain photographs of indoor and outdoor marijuana grows.

81.    According to information obtained from Instagram, RHULE stopped growing marijuana after his grow operation was robbed.  On May 29, 2018, HerbinArtisans sent a message to thehealingarmchairchemist stating "my whole growing time was basically R&D best I ever did was 4.2lbs a 1000W light, then they robbed the place and broke everything, and said screw it.  Too much time and energy just to be destroyed." It appears that RHULE sourced marijuana trim[5] from legalized marijuana grows in the States of Washington and Oregon, which is then processed using chemicals such as $CO_2$, dry ice, propane, flavored terpenes, silica gel and bentonite clay to create the products being offered for sale by RHULE.  While trim is regulated under Washington and Oregon law, regulations regarding disposing marijuana trim vary based upon the quantity of THC that the trim contains, and there are lax procedures in place to account for marijuana trim and ensure it's not diverted to unlicensed manufacturers. Based on my training and experience, and information gained during the course of this investigation, I know that marijuana trim is also less expensive to acquire than marijuana

---

[5] Trim is the waste product of the growing cannabis plants. Throughout the growing process the plants leaves are trimmed to focus on the buds produced by the plant. The buds are the most sought-after part of the plant. The trim produced is considered waste but has become a popular product to be used in the production of marijuana distillates.

Second Declaration of SA Morales in Support of - 21
Motion for Second Protective Order
*United States v. Rhule, et al.,* CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  bud, allowing RHULE to maximize profit.  Additionally, the income generated from the

2  sale of the marijuana trim, which would otherwise go unsold, is another revenue stream

3  for the legalized grows.

4      82.    As previously described [paras. 35-39], when RHULE met with UCA-1, he

5  explained that he had flown to Portland, Oregon in order to pick up terpenes, flavorings

6  used in marijuana distilling and extracting.

7      83.    According to information obtained from Instagram, on April 12, 2019,

8  HerbinArtisans was communicating with bhogartog regarding purchasing a freezer

9  condenser and equipment designed for cold extraction – used in distilling and extracting

10  marijuana.  Bhogartog responded that the condenser would cost between $50,000 to

11  $75,000.  HerbinArtisans replied "Perfect . . . New shop just got up, and shopping right

12  now.  Was just going to build our own, but that's a competitive price."  HerbinArtisans

13  told bhogartog, "I'll fly down and pay for it" and "Your guys take bitcoin?  Or use bitpay

14  for bitcoin so you can get a direct wire transfer?  If not I have cash."  Bhogartog replied

15  "Sorry we don't accept bitcoin."  HerbinArtisans responded "I have a plane, I can fly

16  down and pay cash."

17      84.    In December of 2019, investigators received information from the Oregon

18  State Police ("OSP"), Drug Enforcement Section, regarding RHULE.  Detectives from

19  OSP received information from a Source of Information ("SOI")[6] stating RHULE was

20  involved in purchasing large amounts of trim from state-legalized marijuana grows in the

21  state of Oregon.  The SOI stated RHULE would fly a Cessna C-210 bearing tail number

22

23

24

25
_____

26  [6] The SOI began providing information in October of 2019 originally and continued to do so into
    December of 2019.  The SOI provided information to law enforcement for consideration of
27  his/her potential for pending criminal charges.  The SOI's criminal history through the Law
    Enforcement Data Systems (LEDS) and the National Crime Information Center (NCIC) and
28  found the CI does not have any impeachable criminal convictions.

Second Declaration of SA Morales in Support of - 22
Motion for Second Protective Order
*United States v. Rhule, et al.,* CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

N-149S,[7] from Washington State into Oregon in order to facilitate the purchase and transport of the trim to his "lab."

85.     The information provided by the SOI is consistent with other date stored in RHULE's iCloud and Google accounts, which showed travel to and associations with Oregon.  A video saved in RHULE's iCloud account, which was last modied on June 22, 2019, shows RHULE flying in an aircraft over Mt. Hood, which is located outside of Portland, Oregon.  Additionally, according to records obtained from Instagram, RHULE has described having a representative or source of marijuana supply in Oregon.  For example, on August 30, 2016, HerbinArtisans messaged blaze_503 to state "Let me get in contact with our rep in Oregon, and see what he can arrange."  Similarly, on June 30, 2017, HerbinArtisans messaged osorc509, "Summers are a bit tough in wa, now that many of med growers ditched.  We source from Oregon and cali too, but super hit and miss."  Additionally, on January 8, 2018, HerbinArtisans messaged hasin_wit-passion "The medical market is gone here so I have to go to Oregon and Cali for my stuff and it's not always the freshest.  I do have my personals outdoor grow fresh frozen I'm waiting to run once I've dialed in the HCFSE and HTFSE."

86.     On or about March 5, 2020, Frontline Aviators LLC purchased a Cessna model P210N tail number N-21LT, which has an approximate blue book value of $168,000.  On April 17 and April 29, 2020, this airplane was seen stored at Harvey Airfield hanger 22-7 in Snohomish, Washington.  The hanger is open and accessible to the public.  At approximately 11:30 am Customs and Border Protection (CBP) K-9 Officer Adam Chavez and his K-9 narcotics detection dog "Dean" ran a narcotics sniff on the airplane.  Dean did not alert to the plane, but did alert to a "Rubbermaid" storage locker.  The locker is an approximately six-foot-tall plastic storage locker located less than four feet from the airplane, in the area of hanger 22-7.

---

[7] Law enforcement previously obtained a warrant to search this aircraft but have been unable to locate it since the warrant issued in February 2020.

Second Declaration of SA Morales in Support of - 23
Motion for Second Protective Order
*United States v. Rhule, et al.,* CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

87.     Frontline Aviators LLC was incorporated in Delaware on September 19, 2019, and its registered agent is listed as Harvard Business Services, Inc.  For the reasons described herein, RHULE appears to be one of the beneficial owners of Frontline Aviators.

88.     On April 20, 2020, a review of the FAA aircraft registry website showed that the registered owner of the Cessna model P210N is Frontline Aviators LLC at 13110 NE 177th L. PMB 115, in Woodinville, WA 98072-5440.  This is a commercial mail receiving facility known to be used by the RHULE family.[8]  The FAA status of the airplace was "valid" as of April 9, 2020.

89.     The FAA "Aircraft Registration Application" for the Cessna model P210N, dated March 5, 2020, is listed as Frontline Aviators LLC.  This document was "DocuSigned" with the name "Kenneth Rhule"[9] with the title "member."  The phone number on the application is listed as 206-681-7434, which is associated with RHULE.[10] This application lists a mailing address of 13110 NE 177th Place, PMB 115, Woodinville, Washington 98072, and a "physical address/location" of 3 Monroe Pkwy STE P #802, Lake Oswego, Oregon 97035.  The Lake Oswego address is, in fact, a "Postal Annex" commercial mail receiving facility and not a physical address for storing an airplane.  On April 21, 2020, the owner of Postal Annex provided information that the box was controlled by "Kenneth Rhule," with an address of 13110 NE 177th Pl, Woodinville, Washington 98072.

---

[8] According to records obtained from FedEx, "Kenneth Rhule" received mail at this address. Additionally, a vehicle that RHULE has been seen driving is registered to this address.  Finally, invoices issued to "Kenneth Rhule" to purchase terpenes – flavors used in marijuana products – listed this address as a billing address.
[9] RHULE's father is named KENNETH JOHN RHULE.
[10] In March 2020, law enforcement executed a search warrant and seized a phone located in a vehicle that RHULE was driving when he was arrested.  In that phone, in the contact information this telephone number is listed as "Kenny's New #."  Inside the phone, law enforcement located photographs of RHULE.

Second Declaration of SA Morales in Support of - 24
Motion for Second Protective Order
*United States v. Rhule, et al.*, CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

90.     RHULE purchased large processing equipment in an effort to maximize effort, time and profit.  The larger processing area and equipment allow RHULE to make "runs" in larger quantities making production more efficient.  Based on the documents received, the equipment, as well as the supplies to run and maintain the processing equipment, were delivered to a property in Monroe, Washington.

91.     According to emails obtained from Google, RHULE also frequently orders products which, based on my training experience, would be used to facilitate the production of THC/marijuana extracts, including dabs, shatter, hash oil, hash rosin, sugar wax chips, diamonds and other forms of extracts and distillates. These products include large amounts of latex gloves, vacuum sealer bags, filter papers, plastic syringes, pre-printed labels and THC/CBD tanks or cartridges.

## C.   Execution of Search Warrants

92.     On February 28, 2020, the Honorable Paula McCandlis authorized a search warrant for 29428 181st Street SE, property on which were located the residence of KENNETH JOHN RHULE and the suspected marijuana distillate processing warehouse.

93.     On March 10, 2020, agents executed this search warrant and arrested KENNETH JOHN RHULE and his wife, who were present.  In KENNETH JOHN RHULE's bedroom, a large desk was set up as a "dark-net vendor" drug distribution operation.  On top of the desk were dozens of unused printed U.S. Postal Service mailing prepaid postage stickers, with printed mailing addresses of various "sender" names and addresses (unassociated with the RHULEs) and nation-side "receiver" names and addresses. In plain view on the desk were additional printed lists of dozens of names (dated March 9, 2020) with associated nation-wide addresses, "user-names," and produce orders for "shatter" and "batter" (in one-ounce units).  These lists were annotated with handwritten notations and highlighting.  Also on the desk were over a dozen glass jars of refined marijuana products professionally labeled with product names, a labeling machine, a digital scale, a heat sealer, sealed mylar bags, multiple packing tape dispensers, glue, rubbing alcohol, a computer, and other items consistent with a dark-net

Second Declaration of SA Morales in Support of - 25
Motion for Second Protective Order
*United States v. Rhule, et al.,* CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

narcotics mailing operation.  One the nightstand next to the bed were multiple phones, laptop computers and thumb drives.  One laptop was an HP computer open and running a TOR browser ("The Onion Router" used to access the "dark-net") open to the TOR page "dark. fail", as well as a U.S. Postal Service package tracking website.  Other documents and phones were scattered around the room.  Other items seized from the residence included firearms, firearm accessories, and ammunition; a bundle of U.S. currency totaling $2,500; another approximately $430 of U.S. currency, numerous computers and tablets; media storage devices (some of which contained Bitcoin wallets, from which approximately 28.28 Bitcoin, valued at approximately $226,929, were seized); five cell phones; two Rolex watches; 37 collector sports cards; 59 various collector coins; 25 various collector stamps and envelopes; and a Louis Vuitton purse.  The $2,000 in U.S. currency, $430 in U.S. currency, Rolex watches, collector sports cards, collector coins, and collector stamps and envelopes are the Additional Subject Property the government seeks to restrain for forfeiture in the Second Motion for Protective Order.

94.     In a warehouse located on the property, agents located approximately 1,000 kilograms of bulk marijuana or marijuana extracts, processing equipment and materials dedicated to the extraction and concentration of marijuana, and bulk cash, among other items.  Some of the equipment in the warehouse was covered in marijuana themed stickers with names known to the investigation, including KlearKrew, Heady Water, Nitro Honey, Advanced Terpene Solutions, Dabs, Oakland Smoke Out, and Black Tie.

95.     Additional firearms and processing equipment and materials were located in a shed, tents, and shipping containers on the property.

96.     On February 28, 2020, the Honorable Paula McCandlis authorized a search warrant for 3614 183rd Street SE, Bothell, Washington, the residence of KENNETH WARREN RHULE.

97.     On March 10, 2020, agents executed this search warrant, seizing a Tesla Model S; marijuana buds, oils, and other products; cell phones; documents (including aircraft documents; a laptop computer: a firearm (Smith & Wesson "MP9" semi-

Second Declaration of SA Morales in Support of - 26
Motion for Second Protective Order
*United States v. Rhule, et al.,* CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

automatic 9mm pistol, serial number DTV6454)[11]: silver coins and bars; U.S. currency totaling $42,000; 12 luxury brand handbags; a Hamilton Luxury Watch Khaki Aviation X-wind auto chrono; and cryptocurrency hardware.  Port of Seattle Detective Cory Stairs and narcotics K-9 Poncho inspected the currency.  Poncho alerted to the residual odor of narcotics on the currency.

98.     RHULE's vehicle, a black 2015 GMC Sierra pick-up truck, was detained for seizure pending a search warrant and the contents inventoried.  A search warrant was executed on the vehicle on March 13, 2020.  The items seized from the vehicle included a currency counter machine, an Apple iPhone, media storage devices, a gray and black Gucci bag, a plastic box containing U.S. currency totaling $32,339, two American Express pre-paid cards, a Western Union Money Order with a value of $499, a laptop computer, an Apple iPad, and 6.62 kilograms of marijuana.  Trace amounts of marijuana were also found in the bed of the vehicle.  Customs and Border Protection (CBP) Officer A. Chavez and his narcotics K-9 "Dean" ran a narcotics sniff on the GMC pickup.  Dean alerted to the residual odor of narcotics.

99.     On May 4, 2020, the Honorable Mary Alice Theiler authorized a search warrant for the Cessna model P210N, tail number N-21LT, as well as Harvey Airfield hanger 22-7.

100.    On May 4, 2020, agents observed a black Sierra pickup truck with Washington license plate B48065W parked along a chain link fence on the southside of the parking lot at Harvey Airfield.  A search of law enforcement databases revealed that the vehicle was registered to "Focus Micro" at the physical address of KENNETH JOHN RHULE in Monroe, Washington.  After receiving permission from the airport manager to drive vehicles onto the airfield, agents observed a Cessna with tail number N-21LT land at Harvey Airfield.  The plane dropped KENNETH JOHN RHULE off near the airport

---

[11] The Seattle Police Department verified the handgun as listed stolen by the Everett, Washington Police Department under their case number 13-007409.

Second Declaration of SA Morales in Support of - 27
Motion for Second Protective Order
*United States v. Rhule, et al.*, CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

office and taxied to Hanger 22.  Agents observed Connor L. Rhule exit the aircraft and push the Cessna into Hanger 22, Storage Bay 7.  Connor L. Rhule is the son of KENNETH JOHN RHULE and the twin brother of KENNETH WARREN RHULE.  Once the plane was inside the storage bag, agents contacted Connor L. Rhule and executed search warrants for the Cessna and for Hanger 22-7.  I searched Connor L. Rhule and retrieved the key to the Cessna.

101.   Customs and Border Protection (CBP) K-9 Officer Adam Chavez and his K-9 narcotics detection dog "Dean" ran a narcotics sniff on the Cessna.  Dean alerted to the plane; specifically, to the locked rear compartment in the tail of the plane.[12] KENNETH JOHN RHULE approached the agents and stated that the plane was not connected to drugs or his son KENNETH WARREN RHULE.  Both Connor J. Rhule and KENNETH JOHN RHULE requested and received permission to video record the search.

102.   When agents entered the hanger, they observed a "Rubbermaid" plastic storage locker with the left door torn off lying next to the storage locker.  KENNETH JOHN RUHLE stated he was aware of the damage to the storage closet, but that nothing important was missing.  The remaining items in the closet consisted of oil, oil filters, and other minor items related to the maintenance of the plane.  Nothing was retained from the search warrant for Hanger 22-7.

103.   Upon execution of the search warrant for the Cessna, agents seized various logbooks and paperwork associated with the aircraft, the aircraft key, a Stratus GPS, an Apple iPad, and a Scout receiver.  KENNETH JOHN RHULE provided law enforcement the password to the Apple iPad.

104.   At approximately 6:15 p.m., CBP Air Interdiction Agent J. Tapparo departed Harvey Airfield flying the Cessna, along with all associated logbooks and

---

[12] On April 17, 2020 Officer Chavez and K-9 Dean ran a narcotics sniff on the same aircraft in the same location.  At that date, Dean did not alert to the plane but did alert to an approximately six-foot-tall "Rubbermaid" storage locker.  The locker is located less than four feet from the airplane.  *See* paragraph 86.

Second Declaration of SA Morales in Support of - 28
Motion for Second Protective Order
*United States v. Rhule, et al.*, CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

airplane paperwork.  The aircraft was flown to the CBP Air facility in Bellingham, WA for secure storage.

105.    On July 1, 2020, the Honorable Brian A. Tsuchida authorized an arrest warrant for KENNETH JOHN RHULE.  On July 14, 2020, law enforcement learned that KENNETH JOHN RHULE traveled to Honolulu, Hawaii and coordinated with HSI Hawaii to execute the arrest warrant and subsequent search warrants of KENNETH JOHN RHULE's possessions.  KENNETH JOHN RHULE was arrested by HSI on July 14, 2020 pursuant to the federal arrest warrant and his luggage was seized.

106.    On July 15, 2020, the Honorable Kenneth J. Mansfield authorized a search warrant for KENNETH JOHN RHULE's possessions, including his luggage.  When this warrant was executed on July 16, 2020, $10,000 in U.S. Currency was seized from KENNETH JOHN RHULE's luggage.  On July 23, 2020, KENNETH JOHN RHULE was released from U.S. Marshal's custody to the custody of HSI Task Force Officer (TFO) C. Ige for transportation back to Seattle.  TFO Ige transported him to the Honolulu airport and watched him board a flight to Seattle.  On July 24, 2020, agents met KENNETH JOHN RHULE at the gate in Seattle and transported him to the U.S. Marshal's Office for his initial appearance in the Western District of Washington.

## BACKGROUND ON UNLICENSED MONEY TRANSMISSION

107.    Pursuant to Title 18, United States Code, Section 1960(a)(1), it is a crime to knowingly conduct, control, manage, supervise, direct, or own all or part of an unlicensed money transmitting business.  The term "money transmitting," as defined by statute, "includes transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier." 18 U.S.C. § 1960(b)(2).

108.    Section 1960 sets forth three prongs defining when a business constitutes an "unlicensed money transmitting businesses."  First, Section 1960(b)(1)(A) makes it a crime to operate a money transmitting business without an appropriate state license where one is required.  Second, Section 1960(b)(1)(B) makes it a crime to operate a money

Second Declaration of SA Morales in Support of - 29
Motion for Second Protective Order
*United States v. Rhule, et al.*, CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 transmitting business without registering with federal authorities if required by federal

2 regulation.  Finally, Section 1960(b)(1)(C) makes it a crime to operate a money

3 transmitting business—whether licensed by, or registered with, any authority or not—that

4 "involves the transportation or transmission of funds that are known to the defendant to

5 have been derived from a criminal offense or are intended to be used to promote or

6 support unlawful activity[.]"

7      109.    Pursuant to the first prong, as set forth above, Section 1960(b)(1)(A) makes

8 it a crime to operate a money transmitting business without an appropriate state license

9 where such operation is punishable as a misdemeanor or felony under state law.  The

10 State of Washington requires such a license when a person engages in the business of

11 accepting cash in exchange for transmitting virtual currencies (which are described

12 further below).  Specifically, Section 19.230.30(1)(a) of the Washington State Code

13 provides that "[a] person may not engage in the business of money transmission, or

14 advertise, solicit, or hold itself out as providing money transmission, unless the person

15 is . . . [l]icensed as a money transmitter."  "Money transmission," in turn, is defined as

16 "receiving money or its equivalent value (equivalent value includes virtual currency) to

17 transmit, deliver, or instruct to be delivered to another location, inside or outside the

18 United States, by any means including but not limited to by wire, facsimile, or electronic

19 transfer."  R.C.W. § 19.230.10(18).

20      110.    The Washington Department of Financial Institutions ("DFI") has issued

21 interim regulatory guidance providing that "[p]ersons engaged in the business of buying

22 or selling virtual currency fall under the definition of money transmission in the Act."

23 *See Interim Regulatory Guidance on Virtual Currency Activities* 2 (December 8, 2014).

24 The DFI specifically addressed the following situation:

25          [T]he buyer of virtual currency provides sovereign currency[13] to a business
26          that either holds value in the form of a desired virtual currency or who upon

27 _____

28 [13] "Sovereign currency" is defined as "fiat or real currency, the money of a government."
*Interim Regulatory Guidance on Virtual Currency Activities* 2 (December 8, 2014)

Second Declaration of SA Morales in Support of - 30
Motion for Second Protective Order
*United States v. Rhule, et al.,* CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

receipt of sovereign currency executes a purchase of the virtual currency from another source. In either case the business ultimately transmits virtual currency value to the buyer. The value is transmitted to a wallet location either designated by the buyer or generated by the business.

*Id.* at 3.  The DFI clarified that this type of transaction constitutes "money transmission and the business must hold a Washington money transmitter license when providing the service to Washington residents." *Id.*

111.    Pursuant to the second prong, as set forth above, Section 1960(b)(1)(B) makes it a crime to operate a money transmitting business without complying with the money transmitting business registration requirements under 31 U.S.C. § 5330 and the regulations prescribed thereunder.  Section 5330 provides that a money transmitting business must be registered not later than 180 days after the establishment of the business.  31 U.S.C. § 5330(a)(1)(B); 31 C.F.R. § 1022.380(b)(4).  The filing of false or materially incomplete information in connection with the registration of a money transmitting business shall be considered a failure to comply with the registration requirements.  31 U.S.C. § 5330(a)(4); 31 C.F.R. § 1022.380(e).

112.    FinCEN has stated that an exchanger of a virtual currency is required to register with FinCEN as a money services business ("MSB").  *See Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies*, FIN-2013-G001, Department of the Treasury, Financial Crimes Enforcement Network (March 18, 2013) ("FinCEN Guidance").  Specifically, FinCEN's regulations provide that an MSB includes persons operating as a "money transmitter"—i.e., "a person that provides money transmission services." 31 C.F.R. § 1010.100(ff)(5).  "Money transmission services," in turn, means "the acceptance of . . . funds or other value that substitutes for currency from one person *and* the transmission of . . . funds, or other value that substitutes for currency to another location or person by any means." *Id.* § 1010.100(ff)(5)(i)(A).  FinCEN has clarified that the "definition of a money transmitter does not differentiate between real currencies and convertible virtual currencies." *See* FinCEN Guidance at 3.

Second Declaration of SA Morales in Support of - 31
Motion for Second Protective Order
*United States v. Rhule, et al.,* CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

113.     Pursuant to the third prong, as set forth above, Section 1960(b)(1)(C) provides that it is unlawful to operate a money transmitting business that "otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity."

## BACKGROUND ON CRYPTOCURRENCY

114.     Cryptocurrency, a type of virtual currency, is a decentralized, peer-to peer, network-based medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies.  Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in cloud-based servers.  Although not usually stored in any physical form, public and private keys (described below) used to transfer cryptocurrency from one person or place to another can be printed or written on a piece of paper or other tangible object.  Cryptocurrency can be exchanged directly person to person, through a cryptocurrency exchange, or through other intermediaries.  Generally, cryptocurrency is not issued by any government, bank, or company; it is instead generated and controlled through computer software operating on a decentralized peer-to-peer network.  Most cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction.[14]  Cryptocurrency is not illegal in the United States.

115.     Bitcoin[15] is a type of cryptocurrency.  Payments or transfers of value made with bitcoins are recorded in the Bitcoin blockchain and thus are not maintained by any single administrator or entity.  As mentioned above, individuals can acquire bitcoins

---

[14] Some cryptocurrencies operate on blockchains that are not public and operate in such a way to obfuscate transactions, making it difficult to trace or attribute transactions.

[15] Since Bitcoin is both a cryptocurrency and a protocol, capitalization differs.  Accepted practice is to use "Bitcoin" (singular with an uppercase letter B) to label the protocol, software, and community, and "bitcoin" (with a lowercase letter b) or "BTC" to label units of the cryptocurrency.  That practice is adopted here.

Second Declaration of SA Morales in Support of - 32
Motion for Second Protective Order
*United States v. Rhule, et al.*, CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

through exchanges (i.e., online companies which allow individuals to purchase or sell cryptocurrencies in exchange for fiat currencies or other cryptocurrencies), Bitcoin ATMs, or directly from other people.  Individuals can also acquire cryptocurrencies by "mining."  An individual can "mine" bitcoins by using his/her computing power to solve a complicated algorithm and verify and record payments on the blockchain.  Individuals are rewarded for this task by receiving newly created units of a cryptocurrency. Individuals can send and receive cryptocurrencies online using many types of electronic devices, including laptop computers and smart phones.

116.    Even though the public addresses of those engaging in cryptocurrency transactions are recorded on a blockchain, the identities of the individuals or entities behind the public addresses are not recorded on these public ledgers.  If, however, an individual or entity is linked to a public address, it may be possible to determine what transactions were conducted by that individual or entity.  Bitcoin transactions are therefore sometimes described as "pseudonymous," meaning that they are partially anonymous.  And while it is not completely anonymous, Bitcoin allows users to transfer funds more anonymously than would be possible through traditional banking and credit systems.

117.    Cryptocurrency is stored in a virtual account called a wallet.  Wallets are software programs that interface with blockchains and generate and/or store public and private keys used to send and receive cryptocurrency.  A public key (or public address) is akin to a bank account number, and a private key (or private address) is akin to a Personal Identification Number ("PIN") number or password that allows a user the ability to access and transfer value associated with the public address or key.  To conduct transactions on a blockchain, an individual must use the public key and the private key. A public address is represented as a case-sensitive string of letters and numbers.  Each public address is controlled and/or accessed through the use of a unique corresponding private key—the cryptographic equivalent of a password or PIN—needed to access the

Second Declaration of SA Morales in Support of - 33
Motion for Second Protective Order
*United States v. Rhule, et al.*, CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  address.  Only the holder of an address's private key can authorize any transfers of

2  cryptocurrency from that address to another cryptocurrency address.

3      118.    Although cryptocurrencies such as Bitcoin have legitimate uses,

4  cryptocurrency is also used by individuals and organizations for criminal purposes such

5  as money laundering, and is an oft-used means of payment for illegal goods and services

6  on hidden services websites operating on the Tor network.  By maintaining multiple

7  wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law

8  enforcement's efforts to track purchases within the dark web marketplaces.

9      119.    Exchangers and users of cryptocurrencies store and transact their

10  cryptocurrency in a number of ways, as wallet software can be housed in a variety of

11  forms, including: on a tangible, external device ("hardware wallet"); downloaded on a

12  Personal Computer ("PC") or laptop ("desktop wallet"); with an Internet-based cloud

13  storage provider ("online wallet"); as a mobile application on a smartphone or tablet

14  ("mobile wallet"); as printed public and private keys ("paper wallet"); and as an online

15  account associated with a cryptocurrency exchange.  Because these desktop, mobile, and

16  online wallets are electronic in nature, they are located on mobile devices (e.g., smart

17  phones or tablets) or at websites that users can access via a computer, smart phone, or any

18  device that can search the Internet.  Moreover, hardware wallets are located on some type

19  of external or removable media device, such as a Universal Serial Bus ("USB") thumb

20  drive or other commercially available device designed to store cryptocurrency (e.g.

21  Trezor, Keepkey, or Nano Ledger).  In addition, paper wallets may contain an address

22  and a QR code[16] with the public and private key embedded in the code.  Paper wallet

23  keys are not stored digitally.  Wallets can also be backed up into, for example, paper

24  printouts, USB drives, or CDs, and accessed through a "recovery seed" (random words

25  strung together in a phrase) or a complex password.  Additional security safeguards for

26

27

28  [16] A QR code is a matrix barcode that is a machine-readable optical label.

Second Declaration of SA Morales in Support of - 34
Motion for Second Protective Order
*United States v. Rhule, et al.,* CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  cryptocurrency wallets can include two-factor authorization (such as a password and a
2  phrase).

3  <u>CONCLUSION</u>

4       Based on the facts described above, there is probable cause to believe that the
5  Additional Subject Property is forfeitable as proceeds of, and/or facilitating property for,
6  the Conducting an Unlicensed Money Transmitting Business, Laundering of Monetary
7  Instruments, and Conspiracy to Manufacture and Distribute Marijuana and Marijuana
8  Distillates, as charged in the Indictment (Dkt. No. 31) and further articulated in the Bill of
9  Particulars (Dkt. No. 77).  The Additional Subject Property should, therefore, remain in
10  the custody of the United States pending resolution of this criminal case, to include
11  criminal ancillary forfeiture proceedings.

12

13       I declare under penalty of perjury that the foregoing is true and correct.
14       DATED this 22nd day of October , 2020

15

16

17                      VICTOR MORALES
18                      DEA Special Agent

19

20

21

22

23

24

25

26

27

28

Second Declaration of SA Morales in Support of - 35
Motion for Second Protective Order
*United States v. Rhule, et al.,* CR20-105 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970