The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES,<br><br>            Plaintiff,<br><br>    v.<br><br>KENNETH JOHN RHULE,<br><br>            Defendant. | NO. CR 20-105 JCC<br><br>DEFENDANT KENNETH JOHN RHULE'S SENTENCING MEMORANDUM |

## TABLE OF CONTENTS

I.     INTRODUCTION AND RECOMMENDATION ......................................................... 3

II.    HISTORY AND CHARACTERISTICS OF THE DEFENDANT ............................... 4

III.   OFFENSE CONDUCT ................................................................................................ 10

       A.    In the space of fifteen years, cannabis in Washington goes from prohibited substance to legally available recreational product. ......................................... 10

       B.    After Kenneth Warren develops an interest in the medical marijuana industry, Ken—newly free of his former duties with Focus Micro—shares and supports his son's ambition to launch a viable marijuana business. ............................... 11

       C.    At first, Ken and Kenneth Warren try in earnest to comply with Washington law by obtaining a license authorizing them to manufacture and distribute marijuana products. ........................................................................................ 13

       D.    Unable to obtain the desired license, and frustrated at the heavy taxes that will fall on legal marijuana, Ken and Kenneth Warren resolve to move ahead

skellenger bender

3580775

without bringing their business into compliance with Washington's regulatory framework.................................................................................................. 15

E.   The evidence developed and disclosed by the government, which forms the factual basis for Ken's guilty plea, also conclusively demonstrates that from mid-2016 through 2020, Ken's involvement in the activities of HerbinArtisans steadily diminished. ................................................................................... 17

1.   Accounting records demonstrate Ken's decreasing involvement and lack of financial gain after 2016. ........................................... 19

2.   Other objective evidence likewise confirms Ken's decreasing involvement. ..................................................................... 20

F.   Particularly in light of the powerful evidence of Ken's minimal participation in HerbinArtisans' activities from mid-2016 to 2020, the Court should find that he does not qualify for a four-level enhancement under the Sentencing Guidelines (USSG) as an "organizer or leader" of the criminal activity in which he took part. ................................................................................. 24

IV.   A STRAIGHTFORWARD APPLICATION OF THE RELEVANT SENTENCING GUIDELINES WOULD PRODUCE AN EXCESSIVELY HARSH PUNISHMENT, A SENTENCE THAT IS "GREATER THAN NECESSARY" TO PROMOTE THE PURPOSES SET OUT IN 18 U.S.C. § 3553(A)(2). ................................................... 29

A.   As the Probation Office's sentencing recommendation rightly reflects, a mechanical application of the Sentencing Guidelines in this case would overstate the seriousness of Mr. Rhule's offense and his personal culpability. 29

B.   Marijuana's status as a Schedule I controlled substance has always been dubious and may well soon be corrected. ....................................... 30

C.   Sentences imposed in a recent tobacco tax case provide a useful lodestar for arriving at an appropriate sentence here. ...................................... 31

D.   Sentences imposed in other recent marijuana conspiracy cases likewise suggest that 60 months in federal prison is "greater than necessary" to accomplish the purposes of sentencing in this case. ............................................ 33

E.   In deciding how much longer Ken Rhule should be imprisoned, the Court may and should consider the extent to which he has already been punished by turning over substantial assets to the government, including personal property that he acquired before his unlicensed marijuana business began, and which had no relationship to that illegal activity. ..................................... 35

V.   CONCLUSION ................................................................................... 38

skellenger bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

3580775

1    I.    **INTRODUCTION AND RECOMMENDATION**

2    Those who love and admire Kenneth John Rhule know him as a kind and generous man

3    who toiled his way to financial success, combining imagination and business savvy with an

4    intense work ethic.  They see someone who not only built two different legitimate companies

5    that employed hundreds of people and contributed to the community but who was also a devoted

6    family man. All those things are true, but they do not tell the entire story.  Mr. Rhule is also

7    someone who experienced the pain of seeing his dreams crumble.  He is someone who, as he

8    tried and failed to manage the intense stress of steering his expanding businesses, lost his first

9    marriage and then his sobriety.  And Mr. Rhule is someone who, burned out and exhausted after

10   that struggle, deluded himself into thinking that he could team up with one of his adult sons to

11   make a comeback in the exploding legal cannabis market.  Ultimately, accelerating errors of

12   judgment and foolish decisions to cut legal corners by both men landed them in the middle of

13   this federal criminal prosecution and resulted in the deportation of Mr. Rhule's second

14   wife.  Having now pleaded guilty to a single count of conspiring with his adult son Kenneth

15   Warren Rhule to manufacture or distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1),

16   841(b)(1)(C), and 846e, Mr. Rhule comes before the Court for sentencing, a chastened middle-

17   aged man who is ashamed of his actions and hoping for a chance to make up for his wrongs and

18   for an opportunity to try to reclaim his reputation.

19   As we will explain in greater detail below, we join the United States Probation Office

20   in respectfully recommending that the unusual circumstances of this case call for a significantly

21   lower sentence for Mr. Rhule than that suggested by the Sentencing Guidelines. The

22   government's own evidence shows that Mr. Rhule's involvement in the charged conspiracy

23   diminished steadily over time, and that his participation netted him exactly zero profit.  He has

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 3

**skellenger**bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

3580775

1   been locked away from his family since his arrest, spending nearly two years confined at the

2   Federal Detention Center under the arduous circumstances imposed by the global coronavirus

3   pandemic.  He has surrendered to the federal government almost all his worldly goods,

4   including his home and adjacent real property, vehicles including a small airplane, and a variety

5   of personal property and long-term investments that have grown to be worth more than

6   $1.5 million. Perhaps most painful, he has been separated involuntarily from his wife of twenty

7   years and does not know when or whether he will ever be with her again. Given this unique

8   constellation of facts, a sentence of confinement of time already served is sufficient, but not

9   greater than necessary, to reflect the seriousness of Mr. Rhule's offense, deter criminal conduct

10  by others, promote respect for the law, and provide just punishment.

11  ## II.        HISTORY AND CHARACTERISTICS OF THE DEFENDANT

12          Kenneth John Rhule, now 47 years old, was born to Johanna and Kenneth Rhule in

13  Salinas, California on May 17, 1975.  He has one sibling, Keri, who is five years his junior.[1]

14  PSR at ¶46.

15          Raising Ken was "a joy" to his parents even as they found themselves challenged by his

16  "intelligent and strong-willed" personality.  Exhibit B (Letter from Kenneth & Johanna Rhule)

17  at 1.  Fortunately, Ken coupled those traits with an "entrepreneurial spirit," leading him even

18  as a youngster to launch his own business.  *Id*.  Living in the Salinas Valley, the "salad bowl of

19  the world," Ken became a gleaner, salvaging and selling vegetables left in the field after harvest.

20  As his mother notes:

---

[1] Because this matter touches three individuals named Kenneth Rhule, we will refer to our client Kenneth John Rhule as Ken, and his son and co-defendant Kenneth Warren Rhule as Kenneth Warren.

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 4



> We lived in California when he was young, he asked some local farmers if after they harvested their crops, if he could pick some of the broccoli and lettuce. They said yes, and he would take his wagon around to the neighbors and sell to them.

Exhibit B (Letter from Kenneth & Johanna Rhule) at 1.

The Rhules moved to Washington when Ken was 11, settling in King County. Here, Ken attended local public schools in Woodinville: Cottage Lake Elementary, Leota Junior High (now Leota Middle School), and Woodinville High School. PSR at ¶47. Longtime family friend Daniel Villarreal, who has known the Rhules for more than 40 years, remembers Ken as "active, happy, and searching for adventure":

> [Ken] enjoyed questioning things and always seemed to be seeking answers to things he did not understand. He was extremely intelligent and found creative ways to earn money, even at an early age. As he got older, he loved to read magazines about successful people and how they accomplished all the great things they had done. I remember one time when Kenneth told me (many years ago) that "one day in the near future you won't have to pay for groceries, you will just use a plastic card for all your transactions." I thought that was pretty far-fetched at the time.

Exhibit C (Letter from Daniel Villarreal) at 1.

During those years, his mother Johanna was employed in the insurance industry at Safeco (later Symmetra). She worked there for a total of 29 years, serving as a claims manager and eventually overseeing the work of three different offices (in Bellevue, WA, Miami, FL, and Norcross, GA). Mr. Rhule's father ran the maintenance program for Starbucks' corporate offices in Seattle, and later contracted with a national commercial real estate firm, working for CBRE as a Service Engineer on the Washington Mutual/Chase Bank accounts for 17 years before retiring.

At age 17, Mr. Rhule learned that his steady girlfriend, sixteen-year-old Leah, was pregnant with twins. The young couple decided to marry. Ken left high school in the middle

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 5

of his junior year, going to work full-time to provide for his wife and children. The couple's twin sons, Connor and Kenneth Warren Rhule, were born in 1993.  PSR ¶49.  While working to support his new family, Ken attended the Running Start Program at Lake Washington Technical School (now Lake Washington Institute of Technology). The program sparked Ken's interest in computers, and he obtained an internship at PC Fix, a computer repair store.  PSR at ¶50.

Ken's passion for computer technology blossomed into what would become CompuCare, the hardware and software retailer he founded while still a teenager.  Working first from home and later from a storefront, Ken developed CompuCare into a thriving business, with locations throughout Washington employing more than 150 people.  *Id.*  His mother Johanna recounts,

> When Ken was 18 we gave him money to start his first business Compucare. He paid us back even though we did not request him to do so… Ken and his first wife [were] married young and had twin boys. Both sides of the family [were] supportive, but not supporting. He worked hard and long hours to support his family.

Exhibit B (Letter from Kenneth & Johanna Rhule) at 1.  Daniel Villarreal remembers that Ken, who was then 19 (but "looked 15") travelled all the way to China to buy computers for his new store.  He further notes

> Unfortunately, the night before his grand opening someone broke into this store and stole his merchandise, and he had not yet secured insurance as the business had not yet opened.  In spite of that, he pulled himself together, worked very hard, and became a very successful businessman.  More impressive is the fact that by this time he was already married with twin babies to support. He quickly became an excellent provider and devoted family man.

Exhibit C (Letter from Daniel Villarreal) at 1.

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 6

skellenger bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

3580775

By the time Ken reached his mid-20s, in 2000, he was in a position to capitalize on his hard work and sold CompuCare.  Unfortunately, the stresses of running and growing the business while trying to raise two young boys had strained his relationship with his wife Leah, and they ultimately separated.  PSR at ¶51.  Even though they formally ended their marriage in 2002, they remained good friends who cooperatively cared for their twin boys.  Both remarried, and Leah moved to Florida with her new husband.  Ken married Olga[2], who was a loving stepmother to the boys.  Ken's sister Keri describes the effort Ken and Leah invested in co-parenting their sons and giving them rich experiences:

> [The boys] split their time between WA and FL and were raised with more than one set of loving, supportive parents. Kenny and Connor were home schooled which allowed them the flexibility to travel. The boys were active in sports, church, went on several mission trips to Honduras to help under privileged communities, and learned a great deal about computers and how to run a successful business from a young age. Both their father and stepfather were ambitious, successful, business owners and entrepreneurs.

Exhibit D (Letter from Keri Street) at 1.

Connor, Ken's son, recalls how his father insisted that his sons take their home-schooling assignments seriously and encouraged them to develop self-discipline:

---

[2] Ken and Olga (full prior name Olga Vladimirovna Goncharova) married in 2002. Olga, a Russian citizen, originally entered the United States legally under a fiancé visa but ultimately did not marry her sponsor. Notwithstanding her subsequent marriage to Ken, a U.S. citizen, that fact precluded her from adjusting her immigration status. Ken and Olga hired attorneys and even petitioned Congress for a change in the law to fix this technical hurdle and allow her to obtain legal status based on her valid marriage to a U.S. citizen.  But these legal efforts failed, leaving the couple a tough choice.  Olga could return to Russia, where she would face a 10-year bar on returning to the U.S. due to having (by then) overstayed her original visa, or she could remain in the U.S. illegally.  Olga chose to stay.  During the execution of the search warrants on Ken's property in March 2020, Olga was detained by immigration authorities. She was eventually allowed to depart voluntarily to Russia in lieu of deportation. At no time between being married in 2002 and being detained by the authorities in 2020 did either Olga or Ken travel to Russia.

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 7

skellenger bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

3580775

> My dad was an excellent model of work ethic, self-discipline, and consistency. Characteristics that I'm forever grateful that he modeled and instilled in me. Even while running a ~70 employee security company, I remember him going above and beyond to help me achieve success in my studies. With homeschooling, it is very easy to let complacency take over and wake up late, work in your pajamas, speed through the day's coursework, or even defer the work altogether to the next day. Despite it being easy to fall into that trap, I can say that letting that happen at my dad's house was never an option. It was imperative that I woke up, showered, became presentable and was at my desk at the appropriate times laid out in the schedule. A typical school day, in the absence of peer distractions, only had about 3 hours of study materials. So my dad would provide additional work of his choosing to fill the other 3 "school hours". This work typically included life skills, reading non-fiction (typically books about business), or housework.

Exhibit E (Letter from Connor Rhule) at 1.

With the proceeds from selling CompuCare, Ken launched Focus Micro, Inc., a security technology company with a nationwide reach.  PSR at ¶50.  Focus Micro counted among its clients large companies like the Albertson's grocery chain, CVS, and Costco, as well as public institutions such as the King County Jail and King County Courthouse; in the latter institution Focus Micro was responsible for installing the judges' courthouse emergency response buttons. Some of the government work required Ken to seek a government security clearance, which he successfully obtained.  Ken was proud of his new venture, which both employed more people than CompuCare (averaging 250 employees at any one time) and was able to pay its employees living wages accompanied by health insurance and paid vacation time.  As CEO and owner, Ken shared in Focus Micro's financial success, earning a gross income of $2.5 million in 2006 and just over $1 million in gross income in 2009. Exhibit F (2006 & 2009 Redacted Partial Tax Returns).   Ken also used his work at Focus Micro as an opportunity to teach his sons about running a business.  Connor writes,

> Just like with school, my Dad treated my time at Focusmicro as a learning opportunity. His desire was for my brother and me to learn all facets of the

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 8

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

3580775

business, and to promote us through it. He impressed upon us the importance of doing the hard work ourselves, and instructed us that the goal was to do the job with more effectiveness than whoever we were "competing" against for that job. He taught us that you can't effectively manage people that don't respect you, and to earn that respect it would take time and hard-work. My dad constantly challenged me, and when there was something else to learn he moved me to another part of the organization. While it started with warehouse work, I eventually got exposure to the software side of the business, cold-call marketing, accounting, and worked as an electrician apprentice. All before the age of 17.

Exhibit E (Letter from Connor Rhule) at 1.

Focus Micro was a whirlwind professional success and very financially profitable for Ken. On a personal level, however, the road Ken traveled became increasingly rocky. Ken worked endless hours and traveled constantly. Burning the candle at both ends led to debilitating stress. Unable to manage that increasing pressure, he drank to excess, which sometimes led to embarrassing and erratic public misbehavior. *See* PSR at ¶37 (describing a 2007 incident where Ken became "confrontational and belligerent" with a state trooper, disobeying instructions and ultimately being arrested, during a traffic stop of a vehicle in which he was a passenger). Sometime around 2011, Ken developed an addiction to prescription opiates (oxycodone). Eventually, when oxycodone became unavailable, he turned to methamphetamine to sustain his energy and heroin to obtain relief. PSR at ¶70.

By 2013, Ken's struggles were becoming apparent to those who cared about him. That year, at his family's urging, Ken attended an in-patient drug treatment program for two weeks in California, with mixed success. PSR at ¶70. The following year, Focus Micro's fortunes began to decline, due in part to Ken's continuing struggle with drug use and his growing apprehension that he was burned out on running a business, a frightening and unfamiliar feeling for someone who had been an entrepreneur his whole life. Ken ultimately had to shut down the company of which he had been so proud. His handsome Woodinville residence went into

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 9

skellenger bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

3580775

foreclosure in November 2014, forcing Ken and Olga into his childhood home, vacated by his parents a couple of years earlier when they retired to Nevada.  Ken felt he had entered a sort of semi-retired limbo, but his entrepreneurial nature would soon draw him toward the potentially lucrative opportunities presented by the marijuana industry, which was then undergoing revolutionary change and growth.

## III.    OFFENSE CONDUCT

### A.    In the space of fifteen years, cannabis in Washington goes from prohibited substance to legally available recreational product.

In 1998, Washington voters approved Initiative 692—the Medical Use of Marijuana Act—which provided authorized patients and their designated caregivers a defense against criminal charges related to possessing or using medical marijuana.[3] The initiative identified the conditions that would permit medical use (including cancer, seizure disorders, and intractable pain) and limited authorized individuals to possessing no more than a 60-day supply.   In 2011, the legislature amended Washington's medical marijuana laws to allow qualifying patients to maintain "collective gardens" to "produce and process cannabis for medical use."[4]  The rules limited each garden to no more than ten qualifying patients, with 15 plants and 24 ounces of usable marijuana per patient, up to a limit of 45 plants and 72 ounces per garden.[5]

---

[3] https://en.wikipedia.org/wiki/Cannabis_in_Washington_(state)#Medical_marijuana.

[4] Engrossed Second Substitute Senate Bill 5073, Chapter 181, Laws of 2011; RCW 69.51A.085 defines collective gardens as "qualifying patients sharing responsibility for acquiring and supplying the resources required to produce and process cannabis for medical use."

[5]   http://www.wsipp.wa.gov/ReportFile/1555/Wsipp_Medical-Marijuana-Access-and-Regulations-in-Washington-State_Full-Report.pdf.

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 10

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

Despite federal prohibition, public support for legalizing recreational marijuana was also on the rise.  In 2012, Washington voters approved Initiative 502, which legalized the recreational use of cannabis by adults over age 21.  From December 6, 2012, adults over 21 in Washington state could possess up to one ounce of marijuana; cultivating and selling cannabis, however, remained illegal.  After I-502 went into effect, the Washington state Liquor Control Board (now the Liquor and Cannabis Board; hereafter "LCB") drew up regulations for the new recreational marijuana industry. In August 2013, the United States Department of Justice issued a memorandum announcing that it would not interfere with state-level marijuana legalization so long as states strictly regulated distribution and sales.[6]  In November 2013, the LCB began accepting applications for marijuana businesses, including growers, processors, and retail outlets.  The following May, the LCB awarded licenses to qualified applicants by lottery.  The first recreational cannabis stores in Washington opened about two months later.

### B.   After Kenneth Warren develops an interest in the medical marijuana industry, Ken—newly free of his former duties with Focus Micro—shares and supports his son's ambition to launch a viable marijuana business.

Ken's son Kenneth Warren became particularly interested in medical marijuana when his maternal grandfather Steve fell terminally ill with cancer, suffering terribly.  Ken's sister Keri remembers it well:

> My nephew Kenny had originally gotten into the medical marijuana industry around the time his grandfather Steve was diagnosed with terminal cancer.  I believe this was around the time that marijuana became legal in WA state.  The reason that Kenny was so passionate about this industry is because he truly wanted to help people.  He had done extensive research and discovered the amazing healing properties and health benefits found in cannabis and CBD and began developing oils that would help cure people of various ailments, provide pain management, tumor reduction, improved sleep, and prolonged quality of

---

[6] https://www.justice.gov/iso/opa/resources/3052013829132756857467.pdf.

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 11



1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

life. I too had a nodule on my left lobe thyroid that reduced in size from the oils. So, that is how it started, Ken and Kenny worked together initially to setup a legitimate medical marijuana operation, that at one point was audited by the Snohomish County sheriff's department, who said they were compliant with the existing medical marijuana licenses and laws.

Exhibit D (Letter from Keri Street) at 1-2.[7]

As Kenneth Warren's interest in medical marijuana was growing, entrepreneurs in mid to late 2014 were flocking to the newly legitimate Washington cannabis industry. Around the same time, Ken's second company Focus Micro was reaching the end of its run, freeing him from the burdens of overseeing that enterprise and giving him space to focus on a new venture. Thus did Ken and Kenneth Warren, both medical marijuana card holders, decide to try their hand at growing and processing marijuana.[8] To that end, in late 2014, they set up and built out a warehouse in Everett that had formerly been occupied by Focus Micro, by then in decline. Ken invested financially, putting his money into acquiring equipment and trying to help Kenneth Warren figure out the technical side of producing marijuana.

At this time, Ken and Kenneth Warren believed that as medical marijuana card holders they were generally eligible to grow cannabis legally; certainly, given the novel and rapidly changing regulatory environment surrounding cannabis, they did not then believe their activities were clearly illegal. When the Snohomish County Sheriff expressed an intention to stop by in the wake of a burglary at the Everett warehouse, Ken felt no concern, consistent with his belief that their marijuana-related activities were generally tolerated by law enforcement

---

[7] *See also* page 13, describing the Snohomish County Drug Task Force visit to the Woodinville shop, to which Keri Street refers.

[8] Kenneth Warren's medical marijuana license is found in the discovery at Rhule_00217971.

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 12



1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

3580775

authorities.  Ken wrote in a text message: "They may want to pop in to make sure things are on the up and up… Technically we were supposed to notify the city of a coop…It's a city ordinance…. It's not a criminal issue, but they have the ordinance to make police aware." Rhule_00338734.  Following the break-in at the Everett warehouse, Ken and Kenneth Warren looked for a new location.  In the summer of 2015, they relocated their co-op to a rented warehouse on a rural property in Woodinville.  Rhule_00331056.

Around this time, Ken—reflecting the business acumen he had developed in building his previous companies—set up the Xero accounting software system to bring financial structure to their venture by tracking revenue, expenses, and inventory.

**C.    At first, Ken and Kenneth Warren try in earnest to comply with Washington law by obtaining a license authorizing them to manufacture and distribute marijuana products.**

During this early period, however, Ken also realized that Washington state law (Initiative 502) would soon require them to obtain a 502 license to grow and produce marijuana. Although neither Ken nor Kenneth Warren had been awarded a license in the lottery, license holders were free to sell them and a legitimate market in licenses developed. To bring his business fully into compliance with state law, early in the fall of 2014 Ken made efforts to obtain a 502 license.  Ken wrote to Kenneth Warren:  "I'm meeting with Lila tomorrow evening 7-8…Going to try to get their tier 1 502 before she gives it up for basically nothing….I'm going to feel her out, and try hard to get the processor license also…She still has the tier 1 growers 502 and the processors 502 that she got from the lottery…" Rhule_00338993–94.  After no deal materialized with Lila, Ken contacted another individual via Craigslist later that year, expressing interest in purchasing a 502 producer/processor license.  Rhule_00334327 (Ken's email message: "Hi, I'm interested in your 502 producer / processor application.  Where are

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 13

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

3580775

you at in the application process, and what are you asking for it? I look forward to hearing back.").

In November 2014, Ken also asked Kenneth Warren to post an ad on Craigslist offering to buy a Tier 2 502 Producer License, telling him to specify that they were "willing to purchase the llc or corp that the license is registered to."  Rhule_00338159.[9]  Around the same time, Kenneth Warren encouraged Ken to read an article entitled "Radical changes proposed to Washington medical marijuana," calling it "critical to our next step." Rhule_00338213.  Ken responded that because "[u]ltimately" he expected "to end up with a license[d] producer/processor business," they would "want to get co-op licensed ASAP" to take advantage of legislation expected to give medical co-ops priority in converting to recreational production or retail.  Rhule_00338214–15.

Later, Ken pointed out that if the pending legislative initiative was adopted, "we will only have until July of 2016, before medical folds into recreational and changes require us to make adjustments. However, if you are a medical cardholder, that law will allow you to have 60 plants with a 4 person coop as long as it's 15 miles away from a retail shop." Rhule_00338599.  At the time, Ken believed, as he stated in his text message, that "the current law basically says that they are leaving medical facilities alone until 7/2016." Rhule_00338715.

---

[9] The Tiers refer to the maximum amount of space that can be used for marijuana production: Tier 1 (less than four thousand square feet); Tier 2 (between four and ten thousand square feet); and Tier 3 (from ten thousand to thirty thousand square feet).  WAC 314-55-075.

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 14

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

3580775

**D.** **Unable to obtain the desired license, and frustrated at the heavy taxes that will fall on legal marijuana, Ken and Kenneth Warren resolve to move ahead without bringing their business into compliance with Washington's regulatory framework.**

Even as he made efforts to obtain a license, Ken was wrestling with frustration at the tax structure that would accompany the legal sale of marijuana. In a text message to Kenneth Warren in October 2014, he noted the compounding tax liabilities facing their product:

> The Feds are making everyone pay income tax on the 25% at each stop "excise tax". So in essence, you pay 40% on top if each 25% tax... One of the business owners gave a breakdown, if grower sells for $10 it's taxed $2.50, then IRS taxes the tax 40% or $1.20 total $3.70. Then processor sells for $20 and is taxed 25% or, $5.00 plus IRS $2.40 (total $7.40) then retailer sells for $30, tax is $7.50 plus IRS $3.60 total $11.10, so that $30.00 sale has $ $11.1 + $7.40 + $3.70 for a total of $22.20 in taxes on $30 in sales!!!! Then 3 companies need to pay overhead, cover expenses, and hope to make a profit off of the $7.80 that's left! That 7.80 doesn't even take into consideration the cost of the product either!

Rhule_00338057.

In the end, Ken's resistance to this tax framework led him into error. Having convinced himself that obtaining a 502 license was not worth the trouble, expense, and reduced revenue, Ken also urged that view on Kenneth Warren, who in turn ultimately decided to continue operating HerbinArtisans outside the regulatory framework. In his letter to the Court, Ken expresses his profound remorse for this terrible advice to his son:

> The decision not to pursue this license and operate outside of the laws of the State of Washington and the United States was a colossally bad decision costing not only myself and my son tremendously, but also causing significant emotional and financial harm to our entire family. This was my fault and I accept the responsibility for it.

Exhibit A (Letter from Kenneth John Rhule). Kenneth Warren, of course, was an adult himself at the time. But Ken understands that as Kenneth Warren's father and as someone with extensive business experience, his opinion carried significant weight and likely influenced Kenneth Warren's actions. Ken is heartbroken that this advice, rooted in his foolish resistance

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 15



1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

to paying what he perceived as excessive taxes, will inflict pain on his family.  Kenneth Warren will miss time with his young family and newborn child, and Ken himself will forfeit invaluable time with his grandchildren, two of whom he has never met due to his incarceration.  As a father who has always been committed to being involved in his sons' lives, Ken can now see that the real cost of his actions is so much bigger than a concern over tax regulation and money.  Connor writes,

> [Ken] has expressed to me that he is especially regretful for not following the marijuana licensing guidelines laid out by the State of Washington and for the impact the decision has had on his family. He is fearful that he will lose what he now realizes is his most precious commodity, time with his family. Especially his grandchildren.

Exhibit E (Letter from Connor Rhule) at 2.

In part, Ken found it easier to convince himself that they could forego seeking a license because he believed that the activities of medical marijuana card holders lay temporarily in a gray area of non-enforcement.  That perception was reinforced by an unannounced February 2016 visit from officers of the Snohomish County Drug Task Force.  The officers inspected the Woodinville facility, interviewed the landlord, spoke with Ken about the co-op's activities, and apparently concluded that nothing illegal was afoot.  They took no action whatsoever to stop the shop from operating, nor even suggested to the Rhules that operations should cease. *See* Exhibit G (Snohomish Co. Drug Task Force Case Report No. 2016-00000091).

At some point thereafter, of course, the regulatory regime assumed its final shape, and it became evident to Ken and Kenneth Warren that because neither of them had ever succeeded in obtaining a Washington state 502 license to legally grow, process, or sell marijuana, their continuing cannabis-related business was illegal.  Ken's culpability for investing money to get

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 16

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

3580775

that business off the ground, and for actively taking part in its nascent stages, is beyond dispute.
As we show below, however, as the business thereafter matured and grew, Ken's involvement
in its activities steadily shrank, diminishing his relative culpability.[10]

> **E.** **The evidence developed and disclosed by the government, which forms the
> factual basis for Ken's guilty plea, also conclusively demonstrates that from
> mid-2016 through 2020, Ken's involvement in the activities of
> HerbinArtisans steadily diminished.**

In July 2016, Ken and his wife Olga purchased and moved to a home in Monroe.  The
house, a double-wide mobile home sitting on about 17 acres of land, needed extensive
renovations, which Ken and Olga planned to undertake as an investment project.[11]

One of Ken's projects on the new property was building a shooting range in the back,
where he could practice his longtime hobby of target and skeet shooting.  Ken had developed
an interest in guns from working in the security industry at Focus Micro, where many of his co-

_____

[10] The Probation Office maintains in its Sentencing Recommendation that "Mr. Rhule
identified himself as the CEO of the company and his son as the COO." USPO Rec. at 4. This
statement is incorrect. We are aware of an organizational chart that lists Ken as CEO and
Kenneth Warren Rhule as COO (RHULE_0020633). But the metadata reflects that this chart
was created by Kenneth Warren Rhule on January 18, 2016 (RHULE_00007179), and that
Kenneth Warren emailed the chart to himself the same day (RHULE_00256689).  It was found
on Kenneth Warren Rhule's MacBook during the execution of the search warrant at his Bothell
residence on March 10, 2020 (RHULE_00423680).  However, we have not been able to locate,
and are not aware of, any evidence Ken ever saw this document or was aware of its existence,
let alone had any input in drafting it.  Indeed, as far as we know there is no evidence that any
person other than Kenneth Warren Rhule ever saw this document before the government located
it on his MacBook.  There is no dispute that in early 2016, when Kenneth Warren Rhule created
this chart, Ken was actively involved in HerbinArtisans' operations. The more important point
is that whatever title Kenneth Warren Rhule may have assigned to Ken in January 2016, all
other evidence shows that from mid-2016 to 2020, Ken's involvement in the enterprise steadily
shrank and he made no profit from its activities.

[11] Contrary to the suggestion in the Final PSR and Recommendation that the marijuana
operation always existed at Ken's Monroe property (_see_ USPO Rec. at 3), HerbinArtisans'
operations were first sited at a warehouse in Everett, then on rented property in Woodinville as
described above, and was not sited on Ken's property in Monroe until 2018.

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 17

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

3580775

workers and clients alike were former military and law enforcement officers.  Over time, Ken grew into a gun enthusiast, acquiring numerous firearms that he used for target practice and small game hunting.  *See* Exhibit E (Letter from Connor Rhule) at 2.  Ken's guns were acquired before he and Kenneth Warren began their foray into the marijuana industry, and none were acquired for the purposes of the marijuana operation.[12]

From around the time he and Olga moved to Monroe, Ken's day to day interest and involvement in HerbinArtisans waned significantly.  By and large, he stopped going to the shop in Woodinville.  Instead, he spent his time at home with his wife.[13]  Indeed, Ken's participation in the marijuana business would shrink steadily from early 2016 onward, to the point of being minimal from mid-2016 through 2020, or for about three-quarters of the lifespan of the conspiracy as described in Ken's plea agreement.[14]

Many a defendant might insist that his personal involvement in a criminal conspiracy dwindled over time.  But in this unusual case, that assertion is solidly supported by objective evidence—here, a painstaking expert analysis of HerbinArtisans' email traffic and accounting records.  And those accounting records are not scribbled in notepads in some arcane code; as

_____

[12] Even though the parties agreed that firearms were present on Ken's property and that the two-level increase for such possession should therefore apply, the defense does not expect the government to argue that the firearms were acquired for any purposes related to the operation.  Certainly, none of the firearms was ever used in any such capacity.

[13] Unfortunately, Ken and Olga both continued to battle substance abuse, despite Ken's having sought treatment years earlier.  In September 2016, a call from Ken, frantic that his wife had overdosed on heroin, brought first responders to the residence.  Fortunately, although Olga's skin was "blue/gray tinged" and she had no pulse, they were able to revive her by administering naloxone hydrochloride.  *See* Exhibit H (Snohomish County Sheriff's Report).

[14] *See* Dkt. No. 127 (Plea Agreement) at 5 (indicating that the charged conspiracy existed from approximately April 2015 to March 10, 2020).

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 18



1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

the government has repeatedly observed in making disclosures to the defense in this case, HerbinArtisans—just like a legitimate business, and *unlike* most drug-distribution conspiracies—kept detailed records of its daily activities in the sophisticated Xero software accounting system. That unique feature of the present case provides critical *objective* insight into the organization's daily operations and financial outcomes, and the extent to which Ken participated in each. Sales and profit figures for HerbinArtisans feature prominently in the parties' agreed statements of facts in both plea agreements;[15] the government's reliance on those very same Xero records in calculating those key figures attests to the records' accuracy and reliability.

As we explain in detail below, those records document that: (1) at least by the spring of 2016, Ken's involvement in the marijuana operation was steadily diminishing; and (2) despite the overall gross sales and profit numbers for the company, Ken himself obtained almost no financial benefit from the operation. Nor, during this period, did Ken involve himself in HerbinArtisans' daily business operations or direct or recruit anyone who was manufacturing or distributing marijuana there.

> ### 1.   Accounting records demonstrate Ken's decreasing involvement and lack of financial gain after 2016.

To objectively appraise the genuine scope of Ken's actual involvement in the conspiracy, the defense engaged Ms. Janet McHard[16] to analyze the HerbinArtisans' Xero

---

[15] *See* Dkt. No. 127 (Plea Agreement) at 6, paragraph 8(c); *United States v. Kenneth Warren Rhule*, No. 2:20-cr-00105-JCC, Dkt. No. 123 (Plea Agreement) at 9, paragraph 8(f).

[16] Ms. McHard is the Founding Partner of McHard Accounting Consulting LLC, which is exclusively dedicated to forensic accounting, investigations, and expert testimony. She is a Certified Public Accountant licensed in New Mexico, Arizona, and California. Ms. McHard is also a Certified Fraud Examiner and has served as a faculty member for the Association of

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 19

**skellenger**bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

3580775

accounting records and determine how much financial gain Ken accrued from its activities. Her

report describing her expert conclusions on the principal question presented states:

> Based on my discussion and analysis above, it is my expert opinion that Mr. Kenneth John Rhule received distributions of no more than $59,100.00 from Herbin Artisans.
>
> Further, Mr. Rhule was owed $5,686.43 as a result of unpaid liabilities owed to him in the category "Unpaid Expense Claims" and $14,378.97 in the category "Shareholder 1 Loan Payable". Lastly, the category "Owner Contribution" shows an equity balance from Mr. Rhule of $56,350.00. Based on this analysis Mr. Rhule is still owed $76,415.40.
>
> Even if the distributions to Mr. Rhule were counted as repayments to him, he would still be owed $17,315.40.
>
> Based on my analysis of Xero records, Mr. Rhule received no financial benefit from being affiliated with Herbin Artisans and is, in fact, owed $17,315.40 by Herbin Artisans.

Exhibit I (McHard Report) at 6.

Ms. McHard's report deserves the Court's serious consideration. It not only documents the actual financial outcomes Ken experienced from the conspiracy, but casts important objective light on his actual role at various times in the life of the conspiracy.

### 2. Other objective evidence likewise confirms Ken's decreasing involvement.

In 2015, Kenneth Warren established a Google Enterprise account for HerbinArtisans and set up dedicated email addresses for himself and for Ken using their actual names.[17] The

---

Certified Fraud Examiners since 2003, training fraud examiners throughout the world. Ms. McHard is a Master Analyst in Financial Forensics. Ms. McHard is also Certified in Financial Forensics and is a Chartered Global Management Accountant as adjudged by the AICPA. She has testified as an expert on a variety of accounting matters in federal and state courts across the Nation. Ms. McHard's full CV is attached to her report.

[17] Kenneth Warren created the domain name herbinartisans.com in February 2015 (Rhule_00328391) and set up Ken's account, ken@herbinartisans.com, in March of that year. Rhule_00334114.

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 20

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

records of activity on that account, as we show below, reflect that Ken's participation in the marijuana business diminished sharply after early 2016 and was minimal from mid-2016 through 2020.  As it happens, this is also the period of time when HerbinArtisans was making its money:



During this interval—when HerbinArtisans was earning the vast majority of its revenue—Ken was not involved in the company's day-to-day operations and did not direct or recruit others who were working to manufacture or distribute marijuana.   This fact is corroborated by his minimal activity on the HerbinArtisans email account after 2016.   An analysis of the email traffic shows that Ken rarely participated in communications about the enterprise after that date, while the email traffic among other participants in the enterprise remained robust and even grew as their activities gathered steam and profits started to flow.

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 21

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

3580775

1
2
3
4
5
6
7
8
9
10



11    Ken's decreasing involvement is also corroborated by Ms. McHard's analysis of the

12    access logs to the Xero accounting system.  That data "show[s] that [Ken] Rhule accessed Xero

13    frequently in 2015," but then "dropp[ed] off significantly after the spring of 2016."  Exhibit I

14    (McHard Report) at 6.  A snapshot of Ken's logins to Xero (those from krhule@icloud.com)

15    shows that, from 2016 onward, he was far less involved in the business than Kenneth Warren

16    Rhule (kenny@herbinartisans.com), Craig Erickson (craig@herbinartisans.com), or Erik Cruz

17    (erik@herbinartisans.com).[18]

18
19
20
21
22

———————————————

[18] As far as undersigned counsel are aware, neither Erickson, Cruz, Coffman, nor anyone
23    else who participated in the distillation operation other than the Rhules was ever prosecuted for
their involvement.

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 22



1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

3580775



Thus, in Ms. McHard's expert view, "[t]hese accounting records indicate that [Ken] Rhule had diminishing involvement in Herbin Artisans over time, and little involvement after approximately May 2016." *Id*.

During the execution of the search warrant in 2020, government agents interviewed Jonathan Coffman, an HerbinArtisans employee they encountered on the property.  Mr. Coffman's account corroborates that in the later years of the company's activity, Ken's involvement was minimal.[19]  Mr. Coffman told law enforcement that he was offered the job by his casual acquaintance Kenneth Warren Rhule, and "never saw the dad, really." (RHULE_342650).   Mr. Coffman "never saw the dad, really" because Ken had little involvement in the HerbinArtisans operation after 2016.

---

[19] The government's interview of this employee indicates it was not Ken but his son Kenneth Warren Rhule—who describes himself as the "Founder" of Herbin Artisans in his email signature block, (see RHULE_00218167); his LinkedIn page, (see RHULE_0033384); and in his job resume see (RHULE_00028981);—who hired the employees and supervised the extraction operation.

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 23

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

3580775

Despite the limited role he played from mid-2016 through 2020, there is no doubt that Ken acquiesced to having his Monroe property used for the operation starting sometime in 2018, when the rented Woodinville location became unavailable because the owner sold it.[20]

> **F.      Particularly in light of the powerful evidence of Ken's minimal participation in HerbinArtisans' activities from mid-2016 to 2020, the Court should find that he does not qualify for a four-level enhancement under the Sentencing Guidelines (USSG) as an "organizer or leader" of the criminal activity in which he took part.**

As noted *supra*, the United States Probation Office in this matter has recommended a significantly lower sentence for Mr. Rhule than that suggested by the Sentencing Guidelines. That being the case, it ultimately may matter little whether the Court endorses every detail of the Probation Office's Guideline calculations concerning Mr. Rhule. Nevertheless, one of those calculations—the USPO's decision to add a four-level upward adjustment under USSG §3B1.1—lacks substantial support in the record, as we explain below, and the Court should reject it.

The draft Presentence Report provided to defense counsel by the Probation Office (dated Apr. 25, 2022) reflected *no adjustment* to Mr. Rhule's Guideline offense level for "role in the offense" under USSG §3B1.1. The draft started from a base offense level of 30 (*see* p. 6, ⁋ 24) and added three adjustments: Mr. Rhule possessed a dangerous weapon (+2, *see id.* at ⁋ 25),

---

[20] At the time of the execution of the search warrant in March 2020, some mailing materials were found in the bedroom Ken shared with Olga, along with some consumer amounts of marijuana products and a computer open to the "dark web," presumably for customer shipping data. Even if Ken were the person about to send out those products (and nothing suggests it could not have been Olga), a single such incident does not establish Ken's regular and active participation in the company's ongoing activities, especially given the undisputed evidence of the Xero access logs and email accounts, which reciprocally corroborate Ken's steadily diminishing involvement in HerbinArtisans after mid-2016.

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 24

**skellenger**bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

distributed a controlled substance through mass-marketing using an interactive computer service (+2, *see id.* at ¶ 26), and maintained a premises for the purpose of manufacturing and distributing a controlled substance (+2, *see id*. at ¶ 27).[21] Thus, the draft reflected an Adjusted Offense Level (Subtotal) of 36 (i.e., 30+2+2+2) (*see* ¶ 31). The entry for "Adjustment for Role in the Offense," ¶ 29, read "0."

The final Presentence Report (*see id.* at 6–7, ¶ 29), by contrast, added on an additional four-level upward adjustment for aggravating role in the offense under USSG §3B1.1, asserting that Mr. Rhule "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." *Id*. at 6 ¶ 29. Its sole attempt to justify this adjustment reads as follows:

> Mr. Rhule made the initial capital investment necessary to start the business, helped organize and promote it, the business was housed at his property in Monroe, Washington, there were employees (an active crew of approximately four to five) who assisted in the facilitation of the offense, he provided guidance and oversight to his son, co-defendant Kenneth Warren Rhule, and he (although disputed by counsel), along with his son enjoyed the lion share of the profits.

*Id*. at 7 ¶ 29. The final Presentence Report does not identify any additional information received after April 25, 2022 that would explain this abrupt decision to recommend the maximum four-level upward adjustment for Mr. Rhule's "role in the offense" after initially concluding that it should be zero. Indeed, the additional information received by the Probation Office on the subject that was arguably relevant—the report of expert forensic accountant Ms. McHard— showed that Mr. Rhule did *not* "enjoy[] the lion share of the profits" from HerbinArtisans, but instead netted exactly zero profit on his investment. *See* Exhibit I (McHard Report) at 6.

---

[21] Mr. Rhule does not dispute any of those three adjustments, and indeed stipulated in the Plea Agreement that they applied in his case. Dkt. No. 127 at 8.

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

3580775

For several additional reasons, the circumstances recited by the Presentence Report do not support an additional four-level adjustment for role in the offense.

First, the Ninth Circuit has emphasized that an organizer enhancement is improper unless evidence in the record supports the conclusion that the defendant "exercised control over" or "was able to influence" the other participant(s) in the offense. *United States v. Holden*, 908 F.3d 395, 402 (9th Cir. 2018). As *Holden* points out, "[m]ere *facilitation* of criminal activity is not sufficient to support the enhancement." *Id.* (citing *United States v. Doe*, 778 F.3d 814, 825 (9th Cir. 2015)) (emphasis original). Organizing "property or activities" is likewise insufficient; "the defendant must have organized *participants*." *Id.* (citing *Doe*, 778 F.3d at 824 n.4). Thus understood, the organizer enhancement cannot stand simply because Ken "made the initial capital investment necessary to start the business" or "housed [the business] at his property in Monroe"—those facts show at best "facilitation," or, put differently, that Ken "organized property" in support of the conspiracy's activities. Under *Holden*, such evidence falls short of establishing that Ken was an "organizer or leader" in the conspiracy.[22] The same

---

[22] Even if it were true that Ken enjoyed a large share of the profits from the illegal activity at HerbinArtisans—and strong expert evidence before the Court, *see* Exhibit I (McHard Report) at 6, indicates that he absolutely *did not*—that fact would not support an adjustment for "role in the offense" absent some other record evidence that Ken directed the activity of other participants in the offense. This enhancement is intended to apply where evidence shows that the defendant "had control over" other participants or organized them "for the purpose of carrying out" the offense. *Holden*, 908 F.3d at 402 (citing *United States v. Whitney*, 673 F.3d 965, 975 (9th Cir. 2012)). There is no necessary logical connection between making a big profit from a criminal enterprise and organizing or directing the activities of others in carrying it out. While experience may teach that "persons who exercise a supervisory or managerial role in the commission of an offense tend to profit more from it," *Holden*, 908 F.3d at 402 (citation omitted), the reverse is not necessarily true.

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 26

skellenger bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

3580775

is true of the fact that Mr. Rhule "promoted" the business *itself*, which is again nothing more than "facilitation."

While the Presentence Report points to the fact that HerbinArtisans had "employees," an "active crew of approximately four to five" people, it does not even attempt to describe what "control" Ken, as opposed to his son and codefendant Kenneth Warren, is supposed to have exercised over those employees, or how he "coordinate[d] the[ir] behavior" to carry out the crime. *See Holden*, 908 F.3d. at 402 (citing *Doe*, 778 F.3d at 826). To be sure, the Presentence Report does recount —if very vaguely—what the employees themselves did ("assisted in the facilitation of the offense"), but it nowhere identifies any evidence from anywhere in the record showing that Ken in fact organized, led, or managed those employees' activities. And indeed the only real evidence is directly to the contrary: the fact that employee Jonathan Coffman, interviewed by government agents in March 2020 about the illegal activities at HerbinArtisans, said he had been offered his job by Kenneth Warren Rhule and "never saw the dad, really." RHULE_342650.

That means the Presentence Report's entire case for giving Ken a four-level upward adjustment for role in the offense boils down to the threadbare assertion that "he provided guidance and oversight to his son, co-defendant Kenneth Warren Rhule." That claim cannot constitute sufficient evidence that Ken "exercised control over" his adult son. *See Holden*, 908 F.3d at 403. Nothing in the record rebuts the strong inference that the two stood on equal ground when, as adults who both held medical marijuana cards, they embarked together on building HerbinArtisans, and there can be no "organizer" enhancement where a conspiracy consists of two "co-equal conspirators," with neither "in charge of the other." *Holden*, 908 F.3d at 403. And those early days marked Ken's most active participation in HerbinArtisans; the

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 27

**skellenger**bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

3580775

only expert analysis of the evidence before the Court, the report of expert forensic accountant Ms. Janet McHard, shows that from mid-2016 onward, Ken's role in the activities of the conspiracy steadily diminished.  *See* Exhibit I (McHard Report) at 6.  Absent some evidence clearly indicating that Ken "exercise[d] control" or "organizational authority" over Kenneth Warren, *see Holden*, 908 F.3d. at 403, the record does not support the four-level enhancement.

Perhaps the clearest and most commonsensical indication that a four-level enhancement for Ken is unwarranted is this: the Sentencing Recommendation's author admits that she "struggled to determine who was more culpable or if, in the end, [Mr. Rhule and his son] were equally involved."  Sentencing Recommendation at 3. In *Holden*, the Ninth Circuit reversed a sentence where the district court imposed a "role in the offense" enhancement even though it viewed the two co-conspirators as "pretty much comparable in their responsibility" for the offense conduct.  *See Holden*, 908 F.3d at 402.  If the Probation Office, which presumably has had access to all relevant information in this case, is "struggl[ing]" to sort out the Rhules' relative culpability, then it would be similarly mistaken here to impose a four level upward role adjustment on Mr. Rhule.  Doing so—particularly in the face of the Probation Office's candid acknowledgment that it is hard to determine "who was more culpable" in this case—would affront the "main purpose of the 'organizer' enhancement," which is to "apportion relative responsibility" among offense participants, *Holden*, 908 F.3d at 403, an apportionment that must rest on "evidence in the record" and not speculation.  *Id.* at 402.

For all these reasons, the Court should decline to impose the four-level upward adjustment under USSG §3B1.1.

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

3580775

1
2
3

**IV.    A    STRAIGHTFORWARD    APPLICATION    OF    THE    RELEVANT SENTENCING GUIDELINES WOULD PRODUCE AN EXCESSIVELY HARSH PUNISHMENT, A SENTENCE THAT IS "GREATER THAN NECESSARY" TO PROMOTE THE PURPOSES SET OUT IN 18 U.S.C. § 3553(A)(2).**

4
5

    **A.    As the Probation Office's sentencing recommendation rightly reflects, a mechanical application of the Sentencing Guidelines in this case would overstate the seriousness of Mr. Rhule's offense and his personal culpability.**

6
7
8
9
10
11
12
13
14
15
16
17
18
19

    Ken Rhule's crime—conspiring to manufacture and distribute a product which, every day, is legally used by tens of thousands of adults over age 21 in Washington State and elsewhere throughout the country—did not inflict outsized harm on the public, nor bring him enormous personal financial gain.  And his involvement in the conspiracy's start-up activities, while substantial at the outset, diminished steadily thereafter.  Given those unusual circumstances, a literal application of the Sentencing Guidelines would inflate the seriousness of the offense and fail to fairly reflect Ken Rhule's actual personal culpability. And it would result in a sentence of confinement that is harsher than necessary to satisfy the statutory objectives that Congress has made the touchstone of federal sentencing.[23]  Indeed, although the Probation Office has not articulated its view in those terms, that conclusion is consistent with its decision to recommend 60 months' confinement in the Bureau of Prisons as the appropriate sentence for Mr. Rhule, a figure below the applicable Guideline range according to USPO's own calculation. *See* PSR at ¶88.

20
21
22
23

---

    [23] Those familiar purposes are to reflect the seriousness of the offense and provide for its just punishment, to promote respect for the law, to adequately deter criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant in the most effective manner with needed educational or vocational training or other correctional treatment. *See* 18 U.S.C. § 3553(a)(2)(A)-(D).

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 29

**skellenger**bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

3580775

In our view, however, given the unique and compelling features of the present case, that proposed sentence—five years in federal prison—is still "greater than necessary" to accomplish the purposes of federal sentencing.  Below, we explain why.

### B.    Marijuana's status as a Schedule I controlled substance has always been dubious and may well soon be corrected.

Since 1970, the federal Controlled Substances Act has classified cannabis as a Schedule I drug. Most Schedule I substances, such as heroin, fentanyl, cocaine and methamphetamine, have "a high potential for abuse," lack any "currently accepted medical use in treatment in the United States," and cannot safely be dispensed under a prescription. Including marijuana with these other substances has sparked considerable debate, and the United States House of Representatives has recently passed the Marijuana Opportunity, Reinvestment and Expungement ("MORE") Act, which would remove marijuana from the list of scheduled substances under the Controlled Substances Act and eliminate federal criminal penalties for an individual who manufactures, distributes, or possesses marijuana.[24]  While it is unclear whether the MORE Act or some similar proposal will soon become law, no one can doubt that over the last two decades, public sentiment regarding marijuana has shifted drastically against criminalization. *See, e.g.*, *United States v. Trotter*, 321 F. Supp. 3d 337, 340 (E.D.N.Y. 2018) ("[I]t is obvious that marijuana use, through law, policy, and social custom, is becoming increasingly accepted by society. Many people from all walks of life now use marijuana without fear of adverse legal consequences.").  The first state to authorize medical marijuana was California in 1996. Thirty-

---

[24] *See* https://www.congress.gov/bill/117th-congress/house-bill/3617.7.

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 30

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

3580775

eight states now have legal medical marijuana programs, and 18 now permit recreational use of marijuana to some degree.[25]

Yet the 35-year-old marijuana guidelines in the Drug Quantity Table of the Sentencing Guidelines remain unchanged from 1987. With respect, inflexibly applying those marijuana guideline tables often produces unreasonably severe sentences. It defies all logic and fundamental fairness to punish Mr. Rhule as harshly as someone who trafficked more than a pound and a half of heroin, a half-pound of fentanyl, three-quarters of a pound of methamphetamine, or more than *seven and three-quarters pounds* of cocaine.  The Ninth Circuit has made clear that this Court may "reject **any** Sentencing Guideline [based on a policy disagreement], provided that the sentence imposed is reasonable." *United States v. Mitchell*, 624 F.3d 1023, 1030 (2010) (emphasis added). Here, as the Probation Office's recommendation makes plain, there is good reason to impose a sentence below the advisory guideline range.

**C.** **Sentences imposed in a recent tobacco tax case provide a useful lodestar for arriving at an appropriate sentence here.**

What the Rhules did in this case was illegal—and a legitimate target for a federal criminal prosecution—only because, after some initial hesitation, they ultimately decided to ignore state-law regulatory requirements in running HerbinArtisans. In similar fashion, those who conspire to evade tobacco taxes are guilty of frustrating the government's efforts to regulate their business activity, thereby turning an otherwise legitimate enterprise into an unlawful one. Those choices reflect a similar degree of moral culpability, and a comparable degree of public harm, whether the regulated agricultural product is tobacco or marijuana.

---

[25] *See* https://www.ncsl.org/research/health/state-medical-marijuana laws.aspx#:~:text=A%20total%20of%2037%20states,medical%20use%20by%20qualified%2 0individuals.

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

3580775

Those common features make the sentences in tobacco tax cases, which are familiar to the Judges of this district, an instructive comparison for deciding what would constitute an appropriate sentence here.

*United States v. Kwon, et al.*, is one such case. *Kwon* involved an extensive multi-year scheme to avoid paying applicable state tobacco taxes and federal income taxes. WAWD No. 19-cr-00083-JLR, Dkt. No. 9 at 7. Altogether, the defendants in the *Kwon* conspiracy cheated the state and federal government of over $10 million in tax revenue. *Id.* at 4. During the past year, Judge Robart sentenced four *Kwon* defendants: Hyung Il Kwon received 26 months' custody; Tae Young Kim received 22 months' custody; Anthony Paul received 14 months' custody; and Theodore Silva received six months of home confinement.

The burdensome licensing requirements and heavy taxes that apply to marijuana and tobacco alike—two heavily regulated agricultural products—can tempt those involved in producing or selling either product to try to deny the government its share of their revenue. At bottom, that is exactly the lure that ensnared both the Rhules. The Court need only look to their emails and text messages to see that Ken and Kenneth Warren began with a shared intention of complying with applicable state regulations, a step that would have foreclosed the current federal prosecution. And it is equally clear that the licensing and tax structure motivated their decision to proceed illegally after a license proved difficult to obtain. We respectfully suggest that the sentences imposed for such conduct should look more like those routinely imposed for criminal regulatory offenses involving tobacco, *see supra*, than like the sentences levied for trafficking in enormous quantities of much more dangerous illegal substances like heroin, methamphetamine, fentanyl, or cocaine.

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 32

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

3580775

**D.**     **Sentences imposed in other recent marijuana conspiracy cases likewise suggest that 60 months in federal prison is "greater than necessary" to accomplish the purposes of sentencing in this case.**

In determining the appropriate sentence, the Court may also wish to consider sentences it has recently imposed in other marijuana conspiracy cases.[26]  In *United States v. Qifeng Li, et al.*, No CR 18-124 JCC, for example, the defendants were charged with conspiring to manufacture and distribute a thousand kilograms or more of marijuana, a charge that would ordinarily carry a 10 year mandatory minimum custodial sentence and USSG guidelines between six and ten years.   Dkt. No. 1.[27]   According to the government's sentencing memorandum, between 2015 and 2018, the *Qifeng Li* defendants and their coconspirators distributed "massive amounts of marijuana" throughout the United States, using a sophisticated multi-faceted distribution network operated from multiple residential premises in Western Washington.  Dkt. No. 44 at 8. As the government argued to this Court:

> Defendant and his fellow co-conspirators took advantage of Washington states relatively permissive regulation – – or nonregulation – – of marijuana offenses to grow and distribute massive amounts of marijuana. Initially the marijuana produced by the defendants was shipped to the East Coast v. FedEx, UPS, USPS, and private freight forwarders. As the organization of all and production increased, defendant established a long-haul shipping company – – Pony Movers, LLC – – to streamline defendant's distribution network… During the course of these Pony Movers, LLC, shipments, defendant's product transited numerous states, with the ultimate destination in New Jersey and/or New York – – both states where the recreational use of marijuana is illegal. There is nothing remotely legal about interstate marijuana trafficking; it is not legal under federal

---

[26] The § 3553(a) factors include "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" and "the need for the sentence imposed . . . to reflect the seriousness of the offense." 18 U.S.C. § 3553(a)(2) and 18 U.S.C. § 3553(a)(6).

[27] In contrast, Ken has plead guilty to a violation of 21 USC § 841(a)(1), 841(b)(1)(C), and 846, which does not allege any quantity or carry any mandatory minimum custodial sentence.

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 33

law, Washington law, New Jersey law, New York law, or any of the various jurisdictions through which the marijuana was shipped by Pony Movers, LLC.

The sheer scope, duration, and utter disregard of federal and multiple State laws shown by defendant warrant the requested . . . custodial term.

*Id.* at 8:13–28, 9:1–2.[28] The *Qifeng* defendants also concealed their crime by structuring "the deposits from their marijuana enterprise into their bank accounts in amounts less than $10,000 to avoid financial reporting requirements."[29]

Considering these facts, this Court sentenced Qifeng Li to 32 months in prison, Qiwei Li to 30 months in prison, and Xiamen Huang to 24 months in prison.

The Court may also wish to consider the sentences imposed in *United States v. Kent Distributor*, No. 07-CR-132-RSL, a major prosecution in this district from the pre-legalization era. *Kent Distributor* involved a "vast" conspiracy that operated a network of grow houses throughout South King County from which more than 32,000 marijuana plants were seized; the conspiracy's activities were concealed via hundreds of illegal and suspicious financial transactions. *See* Dkt. No. 39. (Government's Sentencing Memo as to Le My Nguyen) at 2. Three defendants led this far-reaching conspiracy: Le My Nguyen, Danh Van Nguyen, and Binh Nguyen. *See id.* at 4-5. Pleading guilty to conspiracy to manufacture and distribute marijuana and conspiracy to commit money laundering, Ms. Nguyen admitted engaging in a wide range

---

[28] The government also noted that the Qifeng Li defendants' operations posed a considerable public safety risk to the innocent and unknowing citizens in the residential communities surrounding the marijuana grow houses because of the danger of armed robberies and hazards from unlicensed electrical modifications.  Those factors are not present in this case, where the marijuana distilling operation was housed in a dedicated warehouse in the middle of the woods in rural Monroe.

[29] See https://www.justice.gov/usao-wdwa/pr/members-international-drug-trafficking-conspiracy-plead-guilty.

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 34



1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

of illegal conduct in pursuit of "success in the manufacture, harvest, and distribution of marijuana for profit," and to having laundered between $1M and $2.5M in illegal profits. Dkt. No. 175 (Plea Agreement as to Le My Nguyen) at 4–5, 7–8. Ms. Nguyen also admitted engaging in obstructive conduct in the weeks before her arrest, and the government advised the court that she had not been candid during her proffer session. *See id.* at 4–6, 7.  Bearing all that in mind, the court sentenced Ms. Nguyen to 41 months in custody. The other leaders of this sweeping conspiracy received even shorter sentences: Danh Van Nguyen was sentenced to 36 months in custody, and Binh Nguyen received "time served," amounting to approximately 4 months in custody.

> **E.**   **In deciding how long Ken Rhule should be imprisoned, the Court may and should consider the extent to which he has already been punished by turning over substantial assets to the government, including personal property that he acquired before his unlicensed marijuana business began, and which had no relationship to that illegal activity.**

As part of resolving the government's criminal charges against him, Ken has forfeited to the United States almost all his worldly goods, including his home and adjacent real property, vehicles including a small airplane, and a variety of personal property and long-term cryptocurrency investments collectively worth more than $1.5 million. The defense engaged Ms. Beth Mohr, another expert with the McHard Firm, to analyze Mr. Rhule's bitcoin ownership, based on the records compiled by the investigating agents in this case and provided to the defense in discovery.[30] We asked Ms. Mohr to determine whether and to what extent Ken

---

[30] Ms. Mohr is a Certified Cyber Crimes Investigator (CCCI), a Certified Fraud Examiner (CFE), a Certified Anti-Money Laundering Specialist (CAMS), and a Certified Financial Crimes Investigator. She is a nationally certified law enforcement instructor and has taught courses on Bitcoin and cryptocurrency which have been specifically certified for sworn law enforcement officers. Most recently, Ms. Mohr taught a course on Bitcoin and

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 35

skellenger bender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

owned bitcoin financial assets before becoming involved in the HerbinArtisans marijuana distillation operation; our aim was to demonstrate that Ken's relinquished assets do not reflect profits from sharing in any financial success of HerbinArtisans.[31]

Based on the records provided by the government in discovery and identified in her report, Ms. Mohr concluded:

> **Opinion and Conclusions**:
>
> As demonstrated by the Government's spreadsheets listed above, Kenneth J. Rhule had a substantial amount of Bitcoin holdings prior to the alleged conspiracy, and also prior to any likely or recorded profits from the alleged illegal business activities, which began no later than April 2015, as described in the proposed Plea Agreement.
>
> Mr. Rhule and his business associates began using the Xero accounting software on June 30, 2015, per the Government's disclosure. The first sales of product by the business occurred on August 13, 2015, thus any potential profits would have been derived after August of 2015. The first documented sale of product which was purchased by someone paying with bitcoins, per the Xero accounting records, occurred on January 25, 2016.

cryptocurrency which was awarded law enforcement credit by the California Commission on Police Officer Standards and Training (POST). She has also published numerous articles on Bitcoin and cryptocurrency in bar journals and other professional publications. Ms. Mohr is the Managing Partner of McHard Accounting Consulting, dba The McHard Firm, a licensed CPA and private investigations firm exclusively dedicated to forensic accounting, investigations, and expert testimony. Ms. Mohr's complete qualifications, including her sworn law enforcement experience, courses taught, and complete list of publications are described in her CV, which is Attachment A to her report.  *See* Exhibit J.

[31] Mr. Rhule's plea agreement with the government distinguishes between property he is forfeiting (see Dkt. No. 127 at 10–12, ¶¶ 12(a)-12(h)) and property he is abandoning (*see id.* at 13, ¶¶ 13 and 14). His bitcoin holdings are included within the latter.  *See id.* at 13, ¶ 14(a) (including "[a]pproximately 5.12094153 bitcoin" and "[a]pproximately 23.46324478 bitcoin" among the property Mr. Rhule is abandoning).  How Mr. Rhule acquired these bitcoin, and when, is the subject to which we addressed Ms. Mohr's attention.  The United States Probation Office's sentencing recommendation counts Mr. Rhule's bitcoin holdings among the property "used to commit or facilitate the offense [or] derived from the offense."  *See* USPO Rec. at 3. As Ms. Mohr's examination and analysis of the detailed financial records compiled by the government in this case makes clear, any such characterization of Mr. Rhule's bitcoin holdings is mistaken.

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 36



1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

Mr. Rhule was clearly investing in Bitcoin as early as February 26, 2014. Between March 14, 2014 and April 13, 2014, Mr. Rhule purchased a total of 24.25 BTC using wallets linked to Coinbase User ID 52f71d2e6849438842000016. The value in US Dollars at the time of purchase was $6,135.49, the current value is $1,124,908.52. These purchases of Bitcoin occurred more than a year prior to any profits being generated from the business, and more than two years prior to any documented sale of product in exchange for Bitcoin.

On April 2, 2015, just two days into the period of the conspiracy per the Plea Agreement, and months prior to any profits from the business activity, Mr. Rhule had a total of 78.543286 BTC in the wallet linked to Coinbase user ID 52f71d2e6849438842000016. The bitcoin had a value at that time of $19,869.60, and has a current value of $3,642,980.74.

Given this evidence, it is my expert opinion that Mr. Rhule was investing in Bitcoin well before the alleged conspiracy and criminal activity, and well before any possible profits were generated by the business.

Exhibit J (Mohr Report) at 3. (As a further note, the 78.543286 bitcoin would have been worth approximately $442,337.28 on March 10, 2020, the day the search warrant was executed.)

Ms. Mohr's analysis makes clear that much of the wealth and assets that Ken enjoyed, and which he has agreed to turn over to the government as part of resolving the criminal case against him, pre-existed the marijuana operation, and were not the result of the operations of HerbinArtisans. Her expert conclusion is supported by the letter to the Court from Ken's son Connor; Connor describes how they became interested in and began to acquire bitcoin long before HerbinArtisans reaped any profit:

Back in 2013 I started to run Bitcoin miners, and despite bitcoin mining being a relatively unknown and unpopular business model at the time, he supported, learned, and helped in that venture. After a proof of concept, he gave my brother and I free reign to take over a room in his warehouse at Focus Micro, that at the time was used for CCTV (camera system) research and development. We took that room, pulled in additional power, and setup racks to host our new bitcoin mining servers. My dad dove into this venture headfirst with us, and even added many of his own built bitcoin miners. Although it was a risky investment at the time, with a relatively high capital investment, it ended up giving us a way to mine and acquire bitcoin at cheap rates.

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 37



1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

3580775

Exhibit E (Letter from Connor Rhule) at 1–2.

At the beginning of 2013, one bitcoin was worth $13. Its value climbed, ending the year 2013 at $1,100.[32] At the time the search warrant was executed, one bitcoin was worth about $8,000. At its peak in November 2021, one bitcoin was worth $69,000. While the value of cryptocurrency has been volatile and in recent decline, the evidence makes clear that Ken and his sons were interested in, and pursuing, investments in cryptocurrency when the concept was still novel. Most important, they were doing so long before HerbinArtisans was created or realized any profits.

## V.      CONCLUSION

This Court's solemn duties in imposing sentence are framed by the purposes of punishment Congress set out in 18 U.S.C. § 3553(a)(2). Essentially, the Court must fashion a sentence that strikes an appropriate balance between the moral imperatives of the criminal law on the one hand ("to reflect the seriousness of the offense," "promote respect for the law," and "provide just punishment") and its practical implications on the other (to deter criminal conduct by other potential offenders, and to protect the public from further crimes by Ken Rhule), while taking compassionate account of the need to reconcile Ken Rhule to the community and restore him to useful citizenship (by assessing his needs in that regard and ensuring that they are met) and to avoid unwarranted disparities with the sentences imposed on comparably situated offenders.

---

[32] https://www.sofi.com/learn/content/bitcoin-price-history/#:~:text=Bitcoin%20Price%20in%202013%3A%20%2413%2D%20%241%2C100&text=Starting%20at%20%2413%20in%20the,price%20peaked%20out%20at%20%241%2C100.

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

3580775

Ken Rhule is not a typical criminal offender.  He enjoyed great personal and financial success at earlier stages in life, building legitimate business enterprises that provided valuable services to thousands of clients and customers, while benefiting the community through creating scores of stable, well-paying jobs.  From his late teens onward, Ken Rhule has been the very model of a self-made businessman: an energetic, highly motivated entrepreneur.  He has also been a devoted family man—close to his parents and his sister, patient and caring with his twin sons.

Middle-aged now, Ken Rhule faces the painful recognition that he has made his share of mistakes, sometimes grave ones.  Stress destroyed his first marriage, his time and attention exhausted by his boundless ambitions for his future as a business owner.  And when his second company's explosive growth sputtered out, he fell victim to recurring alcohol and drug use and deteriorating judgment.  Finally, when he and his son were on the verge of creating a new and potentially profitable enterprise, his pique at what he saw as excessive government taxation led him to the fateful decision to ignore the regulatory compliance that would have kept its operations safely within the letter of the law.

Importantly, Ken has been incarcerated at the FDC since July 2020.  This time has been during the worst circumstances of the COVID-19 pandemic, including a severe outbreak of disease in August 2020.  Ken Rhule himself became sick with COVID-19 in the fall of 2020.  The conditions of confinement at various times in the FDC over the past two years have included 23-24 hour per day unit lockdowns to curb the spread of the disease, no family visitation, and legal visitation limited to video-conferencing.  A term of confinement served during these extremely difficult circumstances has been much more punitive than a comparable term of imprisonment under normal circumstances. As Judge Settle noted in a recent decision

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 39

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

granting compassionate release, "the lockdown measures prisons across the country [ ] have undergone to mitigate the spread of the pandemic have made confinement much more punitive . . ." *United States v. Indarte*, No. CR17-5554 BHS, 2020 WL 6060299 (W.D. Wash. Oct. 14, 2020).

Ken Rhule acknowledges his guilt of the charged offense and accepts fully his responsibility for his actions. A longer prison term is not necessary to serve the purposes of punishment here. When accounting just for good time credit, a sentence of time already served is roughly the equivalent of imposing a nominal sentence of at least 25 months in prison.

An additional consideration is the lack of programming and rehabilitative resources available at the FDC SeaTac during the past two years, which has directly impacted Ken Rhule's ability to obtain the benefits of reduced time under BOP's RDAP and First Step programs during his first two years of confinement. An inmate's ineligibility for BOP programming and early release from confinement have also been cited as harsher conditions of confinement justifying a downward variance in custodial time. *See, e.g.*, *United States v. Lopez-Salas*, 266 F.3d 842, 846–51 (8th Cir. 2001) (ineligibility caused by immigration status); *United States v. Smith*, 27 F.3d 649, 651–55 (D.C. Cir. 1994) (caused by immigration status). Considering the arduous circumstances of the pandemic incarceration and unavailability of programming for early release, a sentence of time served in Ken Rhule's case is at least equivalent to a nominal sentence of 36 to 48 months under normal circumstances, particularly compared to a person on bond permitted to self-report to an institution after classification.

In light of these considerations, a sentence of time already served is sufficient but not more than necessary to reflect the seriousness of Mr. Rhule's actions and promote respect for the law he flouted. Others who might be similarly tempted to ignore the regulatory

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 40

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

3580775

requirements for producing and distributing marijuana—who, indeed, might reasonably imagine that in a world of legalized marijuana such violations would only incur a fine—will surely be deterred by the imposition of this prison sentence on Mr. Rhule, along with the loss of most of his worldly goods.

As for protecting the public, the Court has not only Mr. Rhule's own promise that he will stay on the straight and narrow path from now on, but also the assurances of the many people who love Mr. Rhule that they can be counted on to support him and give him strength as he works to build not a business, but a new, healthy, and law-abiding life.

For all the foregoing reasons, we request that the Court sentence Ken Rhule to the time that he has already served in confinement. That sentence—along with his relinquishment of substantial real and personal property—will constitute full and just punishment in the unusual circumstances of this case.

Dated this 24th day of May 2022.

Peter Offenbecher
SKELLENGER BENDER, P.S.

Barry Flegenheimer
BELL FLEGENHEIMER

Attorneys for Kenneth John Rhule

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 41

3580775

skellengerbender

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

## CERTIFICATE OF SERVICE

I, Jule S. Freeman, certify that on May 24, 2022, I electronically filed Defendant Kenneth John Rhule's Sentencing Memorandum (together with Exhibits A-N) with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record.

DATED this 24th day of May 2022.

Jule S. Freeman
SKELLENGER BENDER, P.S.
Case Manager

DEFENDANT KENNETH JOHN RHULE'S
SENTENCING MEMORANDUM – 42

skellenger**bender**

1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

3580775